UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES *ex rel.* ANDREW SHEA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | |
| v. | ) | FILED UNDER SEAL PURSUANT |
| | ) | TO 31 U.S.C. § 3730(b)(2) |
| eHEALTH, INC., eHEALTHINSURANCE | ) | |
| SERVICES, INC., AETNA LIFE INSURANCE | ) | |
| COMPANY, HUMANA INC., WELLCARE | ) | |
| HEALTH PLANS, INC., ANTHEM, INC., | ) | |
| DEVOTED HEALTH, INC., GOHEALTH, INC., | ) | |
| SELECTQUOTE, INC., and ALLSCRIPTS | ) | |
| HEALTHCARE, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

FILED
IN CLERKS OFFICE
2021 NOV -2 AM 9: 33

## FALSE CLAIMS ACT COMPLAINT

Andrew Shea ("Relator") brings this action as a *qui tam* relator on behalf of the United

States against eHealth, Inc., eHealthInsurance Services, Inc., Aetna Life Insurance Company,

Humana Inc., WellCare Health Plans, Inc., Anthem, Inc., Devoted Health, Inc., GoHealth, Inc.,

SelectQuote, Inc., and AllScripts Healthcare, LLC (collectively, "Defendants"), pursuant to the

*qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729-33, to recover damages, penalties,

attorneys' fees and costs, and other relief.

## I.    PRELIMINARY STATEMENT

1.    Defendants have engaged in three types of kickbacks that caused false claims to

the Medicare program.

2.    *First*, the insurance carrier defendants collectively paid eHealthInsurance

Services, Inc., and its parent, eHealth, Inc. (collectively, "eHealth"), tens of millions of dollars in

kickbacks each year with the intent to induce eHealth, a tele-sales insurance broker, to refer

1

Medicare-eligible individuals to the carriers' Medicare Advantage ("MA") plans, notwithstanding the express Congressional intent that "agents and brokers . . . enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w–21(j)(2).

3.      The insurance carrier defendants made these payments – which eHealth commonly referred to as "sponsorship" money – to eHealth on top of commissions and administrative payments that the Medicare statute and regulations allowed. *Cf.* 42 C.F.R. §§ 422.2274(a), 422.2274(d), and 422.2274(e).

4.      Although the insurance carrier defendants and eHealth purported in their written contracts to describe the sponsorship money as payment for general advertising or marketing expenses, rather than as additional compensation for sales of MA policies, the parties' extra-contractual communications made clear that the parties entered into *quid pro quo* arrangements whereby the insurance carriers paid eHealth sponsorship money in exchange for eHealth's commitments to refer MA applications to them.

5.      In some instances, the insurance carrier defendants further conditioned the sponsorship payments on eHealth reducing the proportion of referrals for disabled Medicare beneficiaries, even though the Medicare statute and regulations explicitly prohibited such discrimination among eligible Medicare beneficiaries. *See* 42 U.S.C. § 1395w–21(g)(1); 42 C.F.R. § 422.110.

6.      Over the years, Relator expressed compliance concerns about eHealth's relationships with the defendant carriers, but other eHealth executives largely ignored those concerns.

7.    *Second*, defendants GoHealth, Inc. ("GoHealth"), and SelectQuote, Inc. ("SelectQuote"), two other tele-sales insurance brokers, also took kickbacks in the form of sponsorship money from insurance carriers in exchange for referring Medicare-eligible clients to the carriers' MA plans.

8.    GoHealth and SelectQuote, and later eHealth, too, used other terms, such as "marketing development funds," "co-op marketing funds," or "Enterprise revenue" to reference sponsorship money, but there was no substantive difference: the money was in exchange for referral of MA applications and was on top of permissible commissions and administrative payments.

9.    *Third*, eHealth paid defendant AllScripts Healthcare, LLC ("AllScripts"), a supplier of electronic health records ("EHR") software to physicians and other healthcare providers, a kickback in the form of a $175 (now $191) referral fee for each MA application that resulted from a referral AllScripts made to eHealth.

10.    AllScripts generated these referrals by identifying Medicare beneficiaries through its EHR software platform and then contacting the beneficiaries through the platform or via e-mail or direct mail.

11.    While the Medicare marketing regulations permit certain referral fees, thereby effectively creating a limited safe harbor from the anti-kickback statute, the regulations do not permit fees that exceed $100 per referral. *See* 42 C.F.R. § 422.2274(f); *see also* Centers for Medicare and Medicaid Services ("CMS"), Medicare Communications and Marketing Guidelines, §110.6.3 (Sept. 5, 2018).

12.     Because the purpose of Defendants' kickback arrangements was to induce the referral of MA business that is reimbursed by the Medicare program, the kickbacks violated the anti-kickback statute. *See* 42 U.S.C. § 1320a-7b(b).

13.     The MA plans' claims to Medicare that resulted from these kickbacks were false claims under the False Claims Act. *See* 42 U.S.C. § 1320a-7b(g).

14.     Moreover, the carrier defendants' kickbacks to eHealth, GoHealth, and SelectQuote undermined Congressional intent that brokers and agents act only in the best interests of Medicare beneficiaries. Because of the large sums of money that eHealth, GoHealth, and SelectQuote received from carriers, the broker defendants had an incentive to cause their agents to steer Medicare beneficiaries to MA plans that would generate the most remuneration for the brokers, even if another MA plan, or original Medicare with a Medicare Supplement plan, might have better served the beneficiaries.

15.     In some instances, the kickbacks also induced eHealth to minimize the number of disabled Medicare beneficiaries it referred to certain carriers, thus undermining the anti-discrimination provisions in the Medicare statute and regulations.

16.     Meanwhile, eHealth's kickbacks to AllScripts generated increased referrals to eHealth agents, who were incentivized to switch vulnerable Medicare beneficiaries from their current plans so that the agents could earn commissions on selling new plans, even if the new plans were not better for the beneficiaries.

17.     Overall, as described further below, Defendants' kickback schemes have contributed to high levels of consumer complaints – commonly involving misleading sales presentations or enrollment without beneficiaries' consent – and high rates of "churning" of Medicare beneficiaries from one plan to another.

18.     Prior to the filing of this Complaint, Relator made substantive disclosures to the government of facts and evidence underlying the allegations in this Complaint, in accordance with the requirements of the False Claims Act, 31 U.S.C. § 3730(b)(2).

19.     This action is filed *in camera* and under seal pursuant to the requirements of the False Claims Act, 31 U.S.C. § 3730(b)(2).

## II.    JURISDICTION AND VENUE

20.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3732, which confers jurisdiction over actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

21.     · This Court may exercise personal jurisdiction over each of the Defendants, and venue is appropriate in this Court, under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b), because each of the Defendants can be found and transacts business in this District.

## III.    THE PARTIES

### A.    Relator

22.     Since 2001, Relator has held various positions involving marketing of health products for adults aged 50 or older. In January 2017, he joined eHealth, and he currently serves as its Senior Vice President of Marketing. (Technically, he is an employee of defendant eHealthInsurance Services, Inc.) Until December 31, 2020, his responsibilities at eHealth included marketing of MA, Medicare Part D, Medicare Supplement, and other insurance plans through direct mail and direct response television ("DRTV") advertising. On January 1, 2021, Relator moved into a new role in which he is responsible for creating a new business incubator within eHealth's Medicare division, initially focused on diversifying the products eHealth sells

5

to Medicare beneficiaries, including hospital indemnity and standalone dental-vision insurance. Relator lives in Missouri.

**B.    eHealth, Inc., and eHealthInsurance Services, Inc.**

23.    eHealth, Inc., a Delaware corporation, is a publicly-traded company based in Santa Clara, California. eHealthInsurance Services, Inc., a Delaware corporation, is a wholly-owned subsidiary of eHealth, Inc., and is also based in Santa Clara, California. eHealth, Inc., and eHealthInsurance Services, Inc., share senior management, including the same Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, and General Counsel.

24.    eHealth is an insurance broker and sells MA and other health insurance plans online and through tele-sales. eHealth's websites include www.Medicare.com, www.eHealthMedicare.com, www.PlanPrescriber.com, and www.GoMedigap.com. Hundreds of insurance agents work for eHealth in call centers and remotely; they speak by telephone with people who have been contacted by a lead source working on eHealth's behalf, or who have seen a telephone number in an eHealth advertisement for Medicare Advantage, either on television, in a direct mail piece, or online. The agents take information from these individuals, recommend Medicare or other health insurance plans to them, and then prepare applications that eHealth submits to insurance carriers. Medicare beneficiaries also can apply for a Medicare insurance plan directly through one of eHealth's websites.

25.    Consistent with the Medicare statute and regulations requiring Medicare insurance agents to enroll Medicare beneficiaries in a plan that "is intended to best meet their health care needs," eHealth holds itself out as a carrier-agnostic customer advocate that seeks to match beneficiaries with plans that are best for them. Thus, for example, in a July 2017 meeting with CMS Administrator Seema Verma, eHealth represented that its goal was "Fulfilling Every

Senior's Medicare Need through Constant, Unbiased Service." Similarly, in the company's most recent Annual Report, eHealth stated that "Our mission is to connect every person with the highest quality, most affordable health insurance and Medicare plans for their life circumstance." eHealth made these claims even though, in many areas, it offered far fewer than all available MA plans and directed Medicare beneficiaries primarily to MA plans of carriers that were paying it large amounts of sponsorship money.

26.     For the years 2018, 2019, and 2020, eHealth's total annual Medicare segment revenues were $210,570,000, $446,961,000, and $516,762,000, respectively. During the same period, an increasingly large amount of eHealth's Medicare segment revenue came from insurance carriers' sponsorship payments, which were on top of commissions and administrative payments. eHealth's annual revenues from Medicare carrier sponsorship in 2018, 2019, and 2020 were $14,367,761, $33,909,235, and $67,046,004, respectively. Put another way, sponsorship money from insurance carriers represented approximately 6.8%, 7.6%, and 13.0% of eHealth's total annual Medicare segment revenues during 2018, 2019, and 2020, respectively. During those years, sponsorship payments accounted for a much larger share of eHealth's profits from its Medicare business: 23.6% in 2018, 21.8% in 2019, and 65.8% in 2020. In May 2021, an eHealth executive asserted in an internal company meeting that eHealth's "sponsorship program has huge goals, and makes up half of the EBITDA."

27.     Below is a table of eHealth's sponsorship revenue, by carrier, during the years 2018, 2019, 2020:

| Carrier | Sum of 2018 Total | Sum of 2019 Total | Sum of 2020 Total | SUM THREE YEARS | CARRIER |
|---|---|---|---|---|---|
| Aetna | $ 2,269,670 | $ 5,733,195 | $ 10,990,400 | $ 18,993,265 | Aetna |
| Anthem | $ 4,418,644 | $ 3,181,356 | $ 0 | $ 7,600,000 | Anthem |
| Anthem Blue Cross | $ 378,261 | $ 7,600,005 | $ 21,890,000 | $ 29,868,266 | Anthem Blue Cross |
| BCBS MI | $ | $ 5,500 | $ 1,500 | $ 7,000 | BCBS MI |
| Blue Shield of CA | $ 3,000 | $ 1,500 | $ | $ 4,500 | Blue Shield of CA |
| CareFirst BlueCross BlueShield | $ 2,400 | $ | $ | $ 2,400 | CareFirst BlueCross BlueShield |
| CareFirst MedPlus | $ 7,200 | $ | $ | $ 7,200 | CareFirst MedPlus |
| Centene | $ 225,000 | $ 200,000 | $ 336,744 | $ 561,744 | Centene |
| Cigna-HealthSpring | $ 150,000 | $ | $ 1,190,000 | $ 1,340,000 | Cigna-HealthSpring |
| Florida blue Medicare, Inc. | $ | $ | $ 3,024,000 | $ 3,024,000 | Florida Blue Medicare, Inc. |
| Health Alliance Medical Plans | $ | $ | $ 100,000 | $ 100,000 | Health Alliance Medical Plans |
| Health Care Service Corporation | $ 12,500 | $ | $ 255,000 | $ 267,500 | Health Care Service Corporation |
| HealthSpring | $ 40,000 | $ | $ | $ 40,000 | HealthSpring |
| HighMark | $ | $ | $ 190,000 | $ 190,000 | HighMark |
| Horizon Blue Cross Blue Shield of New Jersey | $ | $ 3,790 | $ 5,345 | $ 9,135 | Horizon Blue Cross Blue Shield of New Jersey |
| Humana | $ 5,000,000 | $ 13,500,000 | $ 18,500,000 | $ 37,000,000 | Humana |
| Kaiser Foundation Health Plan, Inc | $ | $ | $ 325,000 | $ 325,000 | Kaiser Foundation Health Plan, Inc |
| Molina Healthcare, Inc | $ 86,086 | $ 298,888 | $ 190,832 | $ 575,807 | Molina Healthcare, Inc |
| Mutual of Omaha Insurance Company | $ | $ | $ 28,100 | $ 28,100 | Mutual of Omaha Insurance Company |
| Oscar Insurance Corporation | $ | $ 50,000 | $ 150,000 | $ 200,000 | Oscar Insurance Corporation |
| Primary Care Holdings II, LLC | $ | $ | $ 14,083 | $ 14,083 | Primary Care Holdings II, LLC |
| WellCare | $ 1,795,000 | $ 3,275,000 | $ 10,095,001 | $ 15,165,001 | WellCare |
| Grand Total | $ 14,367,761 | $ 33,909,235 | $ 67,046,004 | $ 115,323,000 | Grand Total |

## C.    Aetna Life Insurance Company

28.    Aetna Life Insurance Company ("Aetna") is a Connecticut corporation with a principal place of business in Hartford, Connecticut. Aetna is a subsidiary of CVS Health. Aetna offers and markets MA plans.

## D.    Humana Inc.

29.    Humana Inc. ("Humana") is a Delaware corporation with a principal place of business in Louisville, Kentucky. Together with its wholly-owned subsidiaries, including Humana Insurance Company and Humana MarketPoint, Inc., Humana offers and markets MA plans.

## E.    WellCare Health Plans, Inc.

30.    WellCare Health Plans, Inc. ("WellCare"), is a Delaware corporation with a principal place of business in Tampa, Florida. In January 2020, WellCare became a wholly-owned subsidiary of Centene Corporation ("Centene"). WellCare offers and markets MA plans.

### F.    Anthem, Inc.

31.    Anthem, Inc. ("Anthem"), is an Indiana corporation with a principal place of business in Indianapolis, Indiana. Anthem is an independent licensee of the Blue Cross and Blue Shield Association. Together with its subsidiaries, Anthem offers and markets MA plans.

### G.    Devoted Health, Inc.

32.    Devoted Health, Inc. ("Devoted Health"), is a Delaware corporation with a principal place of business in Waltham, Massachusetts. Together with its wholly-owned subsidiary, Devoted Health Services, Inc., Devoted Health offers and markets MA plans.

### H.    GoHealth, Inc.

33.    GoHealth is a Delaware corporation with a principal place of business in Chicago, Illinois. GoHealth is an insurance broker and sells MA and other health insurance plans online and through tele-sales. Like eHealth, GoHealth represents that it "help[s] individuals find the best health insurance plan for their specific needs." Go-Health, 2020 Annual Report at 5 (Mar. 16, 2021).

### I.    SelectQuote, Inc.

34.    SelectQuote is a Delaware corporation with a principal place of business in Overland Park, Kansas. SelectQuote is an insurance broker and sells MA and other health insurance plans online and through tele-sales. Like eHealth and GoHealth, SelectQuote represents that it "help[s] consumers select the [insurance] option that best suits their needs and circumstances." SelectQuote, 2020-2021 Annual Report at 7 (Aug. 26, 2021).

### J.    AllScripts Healthcare, LLC

35.    AllScripts is a North Carolina limited liability company with a principal place of business in Chicago, Illinois. AllScripts markets and sells EHR software to medical providers.

9

## IV.    BACKGROUND ON ORIGINAL MEDICARE, MEDICARE PART D, AND MEDICARE ADVANTAGE

36.     In order to be eligible for Medicare, a person must be age 65 or older, be disabled, or have end-stage renal disease.

37.     The "Original Medicare" program (which still exists) has two parts: A and B.

38.     Part A covers inpatient stays at hospitals and skilled nursing facilities. For people who paid sufficient Medicare taxes, Medicare Part A does not have a premium, but it does have a deductible (currently $1,484) per benefit period (which runs from the date of admission to 60 days from the date of discharge).

39.     Part B covers medical services and supplies (including physician-administered drugs, but not other drugs). Part B coverage requires payment of a monthly premium (currently $148.50). Part B also has an annual deductible (currently $203), and it requires the patient to pay a 20% coinsurance amount for all covered services.

40.     Many people with Part B coverage purchase a separate Medicare Supplement (sometimes referred to as "MS" or "Medigap") plan from a private insurer. Medicare Supplement plans typically cover all or most of Part B coinsurance amounts.

41.     Almost all medical providers in the United States accept Medicare Part B.

42.     Since 2006, people eligible for Medicare also may purchase prescription drug coverage (for non-physician-administered drugs) through a Part D plan ("PDP") offered by a private insurer that receives reimbursement from the Medicare program. PDPs have premiums, deductibles, and a complex coinsurance/co-pay structure.

43.     As an alternative to Original Medicare, a person eligible for Medicare may subscribe to an MA plan offered by a private insurer through Medicare Part C. *See* 42 U.S.C. §§ 1395w-21-1395w-28. MA plans include the benefits of Parts A and B, and usually Part D.

They sometimes offer other benefits, too, such as dental or vision insurance. An MA plan, however, typically only covers services from a health care provider in the plan's network. Also, MA plans with drug coverage have formularies that may limit access to certain drugs.

44.     CMS pays each MA plan a monthly capitation rate for each beneficiary enrolled as a member of the plan. *See* 42 U.S.C. § 1395w-23. If a beneficiary is also covered by Medicaid, then a state Medicaid program also may contribute to the cost of the MA plan.

45.     A particular MA plan's provider network, drug coverage, other benefits, and premiums may change from year to year. Most Medicare beneficiaries may switch MA plans once each year, during the Annual Enrollment Period ("AEP"), which runs from October 15 to December 7. *See* 42 U.S.C. § 1395w–21(e)(3)(B)(v); 42 C.F.R. § 423.38(b)(3). Medicare beneficiaries who are also eligible for Medicaid (aka "dual-eligibles") may switch MA plans up to four times each year: during the first, second, and third quarters of the year, and again during the AEP. *See* 42 C.F.R. § 423.38(c)(4).

## V.     LEGAL BACKGROUND

### A.     The False Claims Act

46.     The False Claims Act provides, in pertinent part, that any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

. . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

47.     For purposes of the False Claims Act, "the terms 'knowing' and 'knowingly'

mean that a person, with respect to information[,] (i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless

disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). No proof of

specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

48.     The False Claims Act defines the term "claim," in pertinent part, as

> any request or demand, whether under a contract or otherwise, for money or
> property and whether or not the United States has title to the money or property,
> that (i) is presented to an officer, employee, or agent of the United States; or (ii) is
> made to a contractor, grantee, or other recipient, if the money or property is to be
> spent or used on the Government's behalf or to advance a Government program
> or interest, and if the United States Government--(I) provides or has provided any
> portion of the money or property requested or demanded; or (II) will reimburse
> such contractor, grantee, or other recipient for any portion of the money or
> property which is requested or demanded[.]

31 U.S.C. § 3729(b)(2).

## B.     The Anti-Kickback Statute

49.     The AKS makes it illegal either to:

> (1)... knowingly and willfully solicit[] or receive[] any remuneration (including
> any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash
> or in kind—
>> (A) in return for referring an individual to a person for the furnishing or
>> arranging for the furnishing of any item or service for which payment may
>> be made in whole or in part under a Federal health care program, or
>> (B) in return for purchasing, leasing, ordering, or arranging for or
>> recommending purchasing, leasing, or ordering any good, facility, service,
>> or item for which payment may be made in whole or in part under a
>> Federal health care program... [or]

> (2)... knowingly and willfully offer[] or pay[] any remuneration (including any
> kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in
> kind to any person to induce such person—
>> (A) to refer an individual to a person for the furnishing or arranging for the
>> furnishing of any item or service for which payment may be made in
>> whole or in part under a Federal health care program, or

> (B) to purchase, lease, order, or arrange for or recommend purchasing,
> leasing, or ordering any good, facility, service, or item for which payment
> may be made in whole or in part under a Federal health care program. . . .

42 U.S.C. § 1320a-7b(b). Thus, the AKS prohibits, among other things, monetary inducements to

"refer an individual to a person for the furnishing . . . of any item or service" (such as an MA

plan) reimbursed by a Federal health care program.

50.     "[A] claim that includes items or services resulting from a violation of [the AKS]

constitutes a false or fraudulent claim for purposes of [the False Claims Act]." 42 U.S.C.

§ 1320a-7b(g).

51.     "[A] person need not have actual knowledge of [the AKS] or specific intent to

commit a violation of [the AKS]." 42 U.S.C. § 1320a-7b(h).

**C.    Rules Concerning the Marketing of MA Plans**

52.     There are rules concerning the marketing of MA plans in the Medicare statute and

CMS regulations, and there is guidance interpreting those rules in CMS's Medicare

Communications and Marketing Guidelines ("MCMG") and the Federal Register notices

accompanying the regulations and proposed regulations.

53.     The Medicare statute contains certain broad prohibitions and requirements,

including:

- Anti-Discrimination. "A Medicare Advantage organization may not deny, limit, or
  condition the coverage or provision of benefits under this part, for individuals
  permitted to be enrolled with the organization under this part, based on any health
  status-related factor. . . ." 42 U.S.C. § 1395w–22(b)(1). Likewise, an MA plan must
  "accept without restrictions individuals who are [Medicare] eligible." 42 U.S.C.
  § 1395w–21(g)(1).

- Compensation Limitations. "The Secretary [*i.e.*, CMS] shall establish limitations with
  respect to . . . [t]he use of compensation other than as provided under guidelines
  established by the Secretary. Such guidelines shall ensure that the use of
  compensation creates incentives for agents and brokers to enroll individuals in the

13

Medicare Advantage plan that is intended to best meet their health care needs." 42
U.S.C. § 1395w–21(j)(2)(D).

54.     CMS first set compensation limits for MA plan brokers and agents in 2008. *See*
*generally* 42 C.F.R. § 422.2274. In initially proposing these limits, CMS noted that, consistent
with the statute, their purpose was "to prevent agents from unnecessarily moving beneficiaries
from plan to plan and to ensure that beneficiaries are receiving the information and counseling
necessary to select the best plan based on their health care needs." CMS, *Medicare Program;*
*Revisions to the Medicare Advantage and Prescription Drug Benefit Programs*, 73 Fed. Reg.
28556, 28583 (May 16, 2008).

55.     Under the finalized version of the regulations, "[f]or each enrollment in an initial
enrollment year, MA organizations may pay compensation at or below FMV [fair market
value]," 42 C.F.R. § 422.2274(d)(2), and "[f]or each enrollment in a renewal year, MA plans
may pay compensation at an amount up to 50 percent of FMV." 42 C.F.R. § 422.2274(d)(3).

56.     The current regulations further prescribe that, for 2021, "the national FMV is
$539, the FMV for Connecticut, Pennsylvania, and the District of Columbia is $607, the FMV
for California and New Jersey is $672, and the FMV for Puerto Rico and the U.S. Virgin Islands
is $370." 42 C.F.R. § 422.2274(a) (2021).

57.     If a beneficiary disenrolls from an MA plan less than three months after enrolling,
the plan generally must recover any commission paid. *See* 42 C.F.R. § 422.2274(d)(5)(ii)(A)
(2021); MCMG § 110.7.

58.     The CMS regulations also permit an MA plan to pay an agent or broker
"administrative payments" (which are commonly called "overrides"). *See* 42 C.F.R.
§ 422.2274(e) (2021). Specifically, the regulations provide that:

(1) Payments made for services other than enrollment of beneficiaries (for example, training, customer service, agent recruitment, operational overhead, or assistance with completion of health risk assessments) must not exceed the value of those services in the marketplace.

(2) Administrative payments can be based on enrollment provided payments are at or below the value of those services in the marketplace.

*Id.*

59.     The version of this regulation in effect prior to January 19, 2021, also stated clearly that the administrative payments could only be for "services other than selling insurance products." 42 C.F.R. § 422.2274(b)(1)(iv)(B) (2020) ("The amount paid to the third party for services other than selling insurance products, if any, must be fair-market value and must not exceed an amount that is commensurate with the amounts paid by the MA organization to a third party for similar services during each of the previous 2 years.").

60.     CMS has cautioned that MA plans should "not use these administrative payments as a means to circumvent the limits on compensation to agents and brokers." CMS, *Medicare and Medicaid Programs; Contract Year 2022 Policy and Technical Changes to the Medicare Advantage Program, Medicare Prescription Drug Benefit Program, Medicaid Program, Medicare Cost Plan Program, and Programs of All- Inclusive Care for the Elderly*, 86 Fed. Reg. 5864, 5994 (Jan. 19, 2021).

61.     In 2008, when CMS first published its regulations on agent and broker compensation, the agency warned that excessive payments from MA plans to agents and brokers could violate the anti-kickback statute:

The compensation structure is designed to help prevent inappropriate moves of beneficiaries from plan-to-plan. Parties remain responsible, however, for compliance with fraud and abuse laws, including the anti-kickback statute. Depending on the circumstances, agent and broker relationships can be problematic under the anti-kickback statute if they involve, by way of example only, compensation in excess of fair market value, compensation structures tied to

15

the health status of the beneficiary (for example, cherry-picking), or compensation that varies based on the attainment of certain enrollment targets.

CMS, *Medicare Program; Revisions to the Medicare Advantage and Prescription Drug Benefit Programs*, 73 Fed. Reg. 54226, 54239 (Sept. 18, 2008).

62.     The current regulations separately permit MA plan agents and brokers, such as eHealth, to pay referral fees to third parties, but the regulations specify that "[t]he payment may not exceed $100 for a referral into an MA or MA-PD plan." 42 C.F.R. § 422.2274(f) (2021). (The prior version of this provision referenced the CMS-determined referral fee rate, which was also $100. *See* 42 C.F.R. § 422.2274(h)(1) (2020)).

63.     Thus, the regulations effectively allow MA agents and brokers to pay up to $100 for a successful lead.

64.     CMS has cautioned, however, that "referral fees that exceed a nominal amount (e.g., $25-$100) may result in inappropriate steerage of beneficiaries to particular plans or sponsors without regard to beneficiaries' health care needs." CMS Medicare Drug & Health Plan Contract Administration Group, *Memorandum re Excessive Referral Fees for Enrollments* (Oct. 19, 2011).

65.     Consistent with the Medicare statute, the regulations also prohibit MA plans from engaging in discrimination, including discrimination based on disability. Thus, the regulations provide that:

> an MA organization may not deny, limit, or condition the coverage or furnishing of benefits to individuals eligible to enroll in an MA plan offered by the organization on the basis of any factor that is related to health status, including, but not limited to the following:
>
> (1) Medical condition, including mental as well as physical illness.
> (2) Claims experience.
> (3) Receipt of health care.
> (4) Medical history.

16

(5) Genetic information.
(6) Evidence of insurability, including conditions arising out of acts of domestic violence.
(7) Disability.

42 C.F.R. § 422.110.

66.     The regulations also provide that, "[i]n marketing, MA organizations may not . . . [e]ngage in any discriminatory activity." 42 C.F.R, § 422.2268(b)(12); *see also* MCMG § 30.1.

## VI.    FACTUAL ALLEGATIONS

### A.     Carrier Kickbacks to eHealth

#### 1.     General Allegations

67.     Each of the insurance carrier defendants paid eHealth commissions and administrative fees. As described further below, each of the insurance carrier defendants also made substantial payments to eHealth in exchange for eHealth's commitment to refer specific numbers of MA applications to those carriers. In some instances, the carrier defendants also made clear that their payments, or future payments, were contingent on eHealth minimizing the proportion of MA applications from disabled, or "U65," Medicare beneficiaries that eHealth referred to the carriers, because disabled Medicare beneficiaries often suffered from mental illness, physical disability, or chronic pain, and tended to have health care needs that were more costly and more difficult to manage than the health care needs of people who were Medicare-eligible solely because of age.

68.     Until recently, the carrier defendants generally "pre-funded" eHealth with sponsorship money in exchange for commitments by eHealth to refer them specific numbers of MA applications. eHealth kept close track of these commitments. In a June 2019 internal presentation, for example, the company noted that its commitments for the fourth quarter of 2018 (which included the AEP) included the following:

17

| Carrier | Q4 2018 Commitment |
|---------|--------------------|
| Humana | 25,000 |
| Aetna | 9,900 |
| Anthem | 9,100 |
| WellCare | 6,900 |

69.    Further, eHealth (and the carriers) internally calculated the amount of sponsorship

money on a per application basis. Thus, in an e-mail on July 24, 2018, Chris Hakim, the former

General Manager of eHealth's Medicare business, provided his team with per-application data on

the value of sponsorship money eHealth then was receiving:

> [H]ere are the incremental $$'s per MA enrollment for the carriers we are
> receiving sponsorship for . . .
>
> Carrier        Incremental $$ per MA enrollment
> Humana       $200
> Wellcare      $138
> Anthem       $219
> Aetna         $161 (No dedicated Agents but we are receiving $1.244M of
> funding to drive 7,700 MA's)

70.    Notably, however, the written contracts between the carrier defendants and

eHealth did not mention eHealth's application submission commitments or cost per enrollment

(beyond commissions and administrative expenses). As William Kinkead, an eHealth Director of

Carrier Development, noted in an instant message chat with Relator on August 25, 2021, "[t]he

commitments on production are verbal over the phone and on spreadsheets - but nowhere on the

contracts." In an instant message chat with Relator on September 20, 2021, Mr. Kinkead further

explained that the carriers did this intentionally because, "as long as they [the sponsorship

contracts] don[']t explicitly call out app count or funding against production….they should be

able to skirt around the regs."

18

71.     So, the parties generally attempted to disguise the true purpose of the payments by writing in their contracts that the carrier defendants were paying eHealth to cover various marketing expenses, such as the costs of maintaining carrier-specific "mini-sites" on eHealth's websites.

72.     eHealth understood that, for any given carrier, future sponsorship money was at risk if eHealth did not meet the commitments the parties had discussed. For example, in a September 2018 slide presentation to eHealth's board of directors, company management wrote that "[a]chieving carrier specific enrollment targets [is] critical for 2019 sponsorship revenue."

73.     Several months later, in a January 2019 invitation to a conference call with senior company leaders, Gregg Ratkovic, who was then eHealth's Senior Vice President of Carrier and Business Development, wrote: "We're looking to leverage carrier dollars in excess of 2018 pressing towards a significant stretch goal. It's critical that we're aligned and planned in order to meet the enrollment targets we've committed to."

74.     Similarly, in an e-mail on July 28, 2021, Jake Roberts, an eHealth Director of Strategic Carrier Programs, explained that, "if we ask carriers for additional investment dollars[,] we have to be able to tie that back to apps and deliver those apps. Generally carriers are willing to pay about $200/app."

75.     Likewise, in the instant message chat with Relator on August 25, 2021, Mr. Kinkead observed that, "in the old days - the straight marketing pre-fund days you're right…. Carriers would hold us accountable on our sent app commitments."

76.     In a March 2017 e-mail, Mr. Hakim elaborated on eHealth's concerns about the effect of not meeting the commitments it made to carriers in exchange for sponsorship money:

> [T]his year since we are not growing for MA we are missing the numbers from the carriers we have received money from. Humana has given us $250K for Q1

and we are more than 50% off of what they want us to do so the $250K for Q2 is
in jeopardy. Wellcare called me today and said we are off in the markets that their
GM's gave us incremental $$'s. We also have a national deal for Wellcare which
they have commitment [of] $700K through AEP broken out by quarter and they
can cancel the spend with 30 days notice if we are not delivering. Aetna is giving
us $500K for Q2 and Q3, (Andy you have the numbers we need to hit for them).

Bottom line is we need to spend incrementally this year in their markets or the $$
will be taken back or not continue giving to us.

77.      In 2020, when eHealth did not meet its commitments to certain carriers, those

carriers reacted by reducing their sponsorship spending on eHealth during the first half of 2021.

As a result, during the course of an August 12, 2021, off-site management meeting in Texas,

Mr. Roberts warned that "[w]e don't want to be in a spot like we were last year with Anthem and

Humana and others where we underperformed and the carrier was unhappy and then we didn't

get money for the first half of the year."

78.      Earlier, during an off-site meeting in Texas on May 12, 2021, Brian Shasha,

eHealth's Vice President of Carrier Business Development, remarked that: "We want longevity

in the sponsorship model, right. And so, if we accept the money from the carrier and we don't

perform, then we become that agency that takes money and doesn't do what they say they're

going to do. And that gets around, and then no one invests with us. . . . Those are the

conversations. That's the fear. We don't want that to happen."

79.      More recently, on October 28, 2021, during an internal eHealth meeting that

addressed carrier sponsorship money, Mr. Shasha explained that "we need to hit our

commitments, right, from a sponsorship perspective. . . .[T]here's still a sales goal and one that

they've paid for." Mr. Shasha subsequently elaborated:

I'm worried about Anthem. We monetized to the max to forecast with them on a
pre-fund. It was split this year. Half goes into the override, half goes into pre-fund
but they're still funding that pre-fund at a max so there's an expectation that we
get to that max production level. I think it's 24,000 apps.

80.     The carriers also made it clear to eHealth that, notwithstanding the language of the contracts, they generally cared little about how eHealth actually spent their sponsorship money, and cared much more about whether eHealth sent them the MA applications eHealth had committed to sending in exchange for the sponsorship money. Thus, for example, in an e-mail exchange on June 4, 2018, Sukie Dean, who was then an eHealth Senior Director for Medicare Carrier Relations, commented that "[t]he carriers are looking at the total sent application number and not the sent apps by mini-site or one marketing effort."

81.     For its part, eHealth generally regarded sponsorship money as unencumbered cash, and not as reimbursement for administrative expenses. When, in a May 2017 e-mail exchange, Relator asked if eHealth "contemplate[d] actually spending that [sponsorship] money [it budgeted for receipt in the fourth quarter of 2017] or did we assume all of it would fall to the bottom line," an eHealth financial analyst responded that "in the Plan we assumed that sponsorship revenue would be 100% profit." Similarly, in a text exchange on September 29, 2021, Robert Follansbee, a former eHealth Director of Marketing, confirmed to Relator that, "[y]es, we would book that [sponsorship money] as revenue not money for expense offset."

82.     To ensure that the flow of sponsorship money continued, eHealth took specific steps, when necessary, to direct business to particular carriers. For example, eHealth prevented some of its agents from selling for particular carriers, such as United Healthcare, that did not pay substantial sponsorship money to eHealth. Then, eHealth used an algorithm to identify callers most likely to purchase a plan that those carrier-limited agents could sell and, unbeknownst to the callers, eHealth routed the callers to those agents.

21

83.     In a September 2018, e-mail, Tim Hannan, who was then eHealth's Chief Marketing Officer, explained this methodology for shifting applications to specific carriers in order to meet the commitments eHealth had made in exchange for sponsorship money:

> [First], we can use the propensity models from the data science team to more aggressively answer/route the calls that are likely to yield those carriers. The models will need to train for the first few days of the AEP, but thereafter we can make sure we're answering these calls at a higher rate and routing them to the most appropriate skill set.
>
> [Second], we can use the output of the propensity model to source users who are more likely to convert with those carriers.

84.     Similarly, in an e-mail exchange on July 18, 2018, David Nicklaus, eHealth's Senior Vice President of Sales and Operations, explained a plan to limit certain eHealth agents to selling the plans of three carriers – Humana, Anthem, and WellCare – that were paying eHealth large amounts of sponsorship money.

85.     As Nate Purpura, a former eHealth Vice President of Marketing, commented in an August 2021 text exchange with Relator, Mr. Hakim "used to [engage in such steering tactics] ALL the time to make sure you hit the sponsorship numbers."

86.     In an August 2021 instant message chat between Relator and Alan Jones, eHealth's Vice President of Innovation and Market Insights, Mr. Jones observed that "the problem is we're hooked on 'sponsorship' from the big guys. Which . . . distorts our business decisions. [B]ut 68M out of a total revenue target of 750M is too big to ignore."

87.     As a result of eHealth's favoritism toward the plans of carriers that paid it more in sponsorship, eHealth sometimes actively resisted marketing the plans of carriers that did not pay it sponsorship money. On May 30, 2018, for example, Mr. Hakim sent several of his eHealth colleagues a spreadsheet showing the amounts of money certain carriers had committed to pay eHealth in sponsorship and the "[e]nrollment [c]ommitments" eHealth had made to those carriers

in exchange, and then he noted on the spreadsheet that "[w]e will be shifting Market Share from other carriers to hit these numbers."

88.     Over three years later, in August 2021, Derek Streich, an eHealth Director of Business Development, announced in an e-mail to several of his colleagues that his team would add ConnectiCare, a relatively small, Connecticut-based MA carrier, to eHealth's marketing platform. Shortly thereafter, however, Mr. Shasha expressed concern that adding ConnectiCare would "have a sponsorship impact on Anthem, WellCare, and Aetna," which each paid eHealth millions of dollars per year in sponsorship money. Mr. Shasha then directed that ConnectiCare be added only to eHealth's online sales platform, and not to its much larger tele-sales platform. When Mr. Streich subsequently asked Mr. Roberts if "the only rationale" for limiting ConnectiCare to online sales was "that we don't want them to interfere with other (higher sponsoring) carriers," Mr. Roberts confirmed that, "Yes, that was Brian [Shasha's] view/rationale."

89.     After this decision, Mr. Streich expressed to Relator his frustration with having to tell ConnectiCare that eHealth would not market its plans via tele-sales: "I HATE this part of the job. . . . '[W]e' decide to use them for online only . . . solely because we don't want to disrupt more lucrative carrier partnerships in CT. I obviously can't tell them this. . . ."

90.     Similarly, during the summer of 2021, when a relatively small carrier, SCAN Health Plan ("SCAN"), expanded its service area to Arizona and Nevada and asked eHealth to add those states to the territory where eHealth would sell SCAN plans during the 2021 AEP, Mr. Shasha demurred. Ultimately, Mr. Shasha said that eHealth would consider selling for SCAN in Arizona and Nevada only in 2022 "depending on the support of expansion." As

Mr. Streich noted in a subsequent chat with Relator, "'support of expansions' means they give us more money."

91.     In 2020, some carriers began to condition their payments to eHealth explicitly on eHealth's success in sending them MA applications. As Mr. Streich observed in a chat with Relator on August 25, 2021, "[w]e did that last year (over promised and under delivered), so none of the carriers really fund us in advance based on our promise, it's almost all incremental 'sponsorship' based on volumes."

92.     Mr. Kinkead made a similar observation in his instant message chat with Relator on August 25, 2021: "Many of the big carriers though have moved away from straight prefund and tied marketing dollars more to performance, paying retroactively on accreted policies."

93.     Thus, several carriers (including defendants Humana and WellCare) began explicitly paying eHealth a specific amount of money – in addition to commissions and administrative payments – for each MA application that eHealth submitted to them. In remarking on this transition to retroactive, performance-based payments, Mr. Shasha commented in a November 2020 e-mail exchange that "[t]he carrier's [*sic*] don't see a ton of value of that [pre-fund sponsorship] model and we are in the middle of changing it up, partly because [the carriers] just want the production, [and] creating an exchange of services the carrier can pay for makes it less appealing for them." Mr. Roberts explained this transition further in an internal eHealth conference call on September 16, 2021:

> From the funding standpoint, last year, 2020 and previous, almost all of the money was pre-funded. So we would tell carriers, "we're going to sell x number of apps," and they would give us x number of dollars. And whether we sold half of that, or twice as many of that, we got the same amount of money. That wasn't, isn't, the best scenario for us, or for the carriers, and this year we're moving a lot more into performance-based. So, we're getting paid almost a per-app rate regardless of how many we write.

94.     The characterization of the carriers' sponsorship payments to eHealth evolved further in 2021, as some carriers shifted the money from separate sponsorship payments into larger "administrative payments" that were conditioned on sales. As Mr. Roberts explained in the conference call on September 16, 2021, "some carriers are now putting these marketing fees into our administrative fees, our overrides. That drives up the amount of money we get per app. You don't have to re-negotiate these every [year], at all. They're evergreen deals, right."

95.     Mr. Roberts did not explain how eHealth and the carriers could justify the fair market value of these increased administrative payments when (1) eHealth previously had accepted much smaller administrative payments from those carriers for the same purported administrative expenses, and (2) eHealth still accepted much smaller administrative payments from other carriers for the same purported administrative expenses.

96.     On September 23, 2021, Mr. Shasha presented a slide showing, by carrier, the sponsorship amounts that eHealth had received so far in 2021 and expected during the remainder of the year. The "Grand Total" was $68,649,433.

97.     Meanwhile, multiple eHealth employees have acknowledged that the legality of the company's receipt of carrier sponsorship money was, at best, a "gray area." For example, on August 25, 2021, Mr. Streich and Mr. Roberts of eHealth had the following instant message exchange:

| | |
|---|---|
| Mr. Streich: | For some reason I had it my brain that "per app" sponsorship was illegal. I think that was the stance at HealthMarkets [another insurance broker]. |
| Mr. Roberts: | Your brain is right<br>Lots of gray area |
| Mr. Streich: | Some day when things calm down I'd love to understand how [to] do this to make sure we[']re safely in the gray area. |

25

Mr. Roberts:    It isn't our risk, it's the carriers

98.    Similarly, when, that same day, Relator asked Mr. Kinkead whether carriers could pay eHealth extra money "based on per policy production," Mr. Kinkead responded that "It's a gray area[.] Always has been. Carriers are assuming that risk."

99.    In a subsequent instant message exchange, on October 21, 2021, Relator expressed to Mr. Shasha his concerns about eHealth's volume commitments in exchange for carrier sponsorship money:

Relator:    We need to be careful not to give the impression [to eHealth employees] that we have made any volume promises to carriers or, if that has happened, that we not use the language that suggests there is a volume expectation.

Mr. Shasha:    They have to know that, Andy. It comes up in most of the calls they are in during AEP and [it's] important as part of the team that they understand how we work.

Relator:    I do not think we want to give the impression that marketing money is conditioned on the delivery of any specific number of applications.

**B.    Aetna's Cherry-Picking Directives and Kickbacks to eHealth**

**1.    Aetna's Cherry-Picking Directives to eHealth in 2017 and 2018**

100.    In early 2017, soon after Relator started working at eHealth, he learned that Aetna had pledged to pay eHealth $1.4 million in sponsorship money that year in exchange for a commitment by eHealth to generate 17,164 new MA policies for Aetna, but that Aetna was concerned about the "U65 mix" (*i.e.*, the proportion of disabled Medicare beneficiaries) in the MA applications eHealth was submitting to Aetna.

101.    Relator also learned that Aetna managers in two large markets, New Jersey and Texas, were so unhappy about the U65 mix in the business eHealth was generating for Aetna in their states that they did not want eHealth to market Aetna plans in those states at all. Thus, on

February 24, 2017, Relator received the following e-mail from Ms. Dean, the e-Health Senior

Director for Medicare Carrier Relations:

> I spoke with Amy [Ike, an Aetna National Sales Director] my contact at Aetna
> this morning and wanted to get over some agenda items for our March 7th
> meeting in Orlando. She stressed that our mix is a daily topic of discussion within
> Aetna and anything we can do to talk through how we are managing/monitoring
> the mix would be helpful. . . . The other items they would like to discuss are -
> ...
> •     How can we meet and exceed 2017 goals, is there anything Aetna can do
>     to help us get beyond our goals
> •     Mix and how we are addressing the spike in under 65 sales
> •     Marketing analysis by channel, which channels are driving the most under
>     65 leads/sales

102.     On March 3, 2017, Ms. Ike sent an e-mail to Mr. Hakim, the then-General

Manager of eHealth's Medicare business, attaching a spreadsheet showing that Aetna's 2017

"goal" for eHealth was 17,164 issued MA plans, and that, as of the date of the e-mail, eHealth

had generated 6,808 new MA plans for Aetna in 2017.

103.     Relator and his colleagues knew that one way to lower the U65 percentage would

be to reduce eHealth's use of DRTV advertising (which could be seen by anyone and tended to

generate a relatively high percentage of calls from U65 beneficiaries) and to rely more on direct

mail advertising (which could be targeted to people who were 65 or about to turn 65).

104.     As Melissa Wong, an eHealth Senior Carrier Account Manager, observed in an

instant message chat with Relator on September 13, 2021, "[I] think when we were doing that

old DRTV it was capturing the <65 sick people, so costing the carriers more money. When we

pushed more on DM [direct mail], it evened out. . . ."

105.     On March 7, 2017, Relator and Mr. Hakim met with several Aetna executives,

including Ms. Ike and John Sowell, Aetna's Head of Individual Medicare Strategic Distribution.

During the meeting, Mr. Sowell reiterated Aetna's concerns about the U65 mix in the MA

applications coming from eHealth and said that Aetna's managers in the Texas and New Jersey markets were particularly upset about that mix.

106. Relator presented slides during the meeting with Aetna on March 7, 2017. In the slides, Relator recognized Aetna's desire to "[a]ddress concerns with U/O 65 mix," and he outlined plans for an eHealth direct mail campaign that would have a "100% focus on age 64+." At the conclusion of the meeting, as Relator reported in an e-mail to Robert Hurley, then the President of eHealth's Medicare division, eHealth "secured at least $500,000 in new co-marketing dollars (to support a few specific direct mail initiatives)."

107. On April 18, 2017, Aetna's Ms. Ike sent an e-mail to e-Health's Ms. Dean: "I am checking in to see if the marketing plan is available for you to share? (For the $500K)." Ms. Dean forwarded this e-mail to Relator, who, knowing that Aetna did not want eHealth to market to disabled Medicare beneficiaries or to anyone in Texas or New Jersey, responded that "We're going to drop approximately 425[],000 packages to people age 67+. . . . We're also sending roughly 41,000 packages to people approaching their Medicare [Initial Enrollment Period]. . . . We are only mailing in the counties Aetna shared and excluding TX + NJ."

108. In May 2017, eHealth undertook an effort to market to previously "unconverted" leads who had consented to a follow-up call, but eHealth tailored the effort in an attempt to satisfy Aetna's (and Humana's) aversion to disabled Medicare beneficiaries. Thus, before sending the lead list to a telemarketing vendor who would refer interested Medicare beneficiaries back to eHealth, an eHealth employee removed from the list all Medicare beneficiaries who were under 64 years old.

109. Notwithstanding eHealth's incipient efforts to reduce the proportion of disabled Medicare beneficiaries it was referring to Aetna for MA plans, Aetna continued to express

concern about the U65 mix and even threatened to stop using eHealth as a broker if the U65 mix did not go down.

110.    On May 3, 2017, Ms. Dean sent an e-mail to Relator reporting that she had just spoken with Ms. Ike at Aetna and that "there are a few things we need to address," including "[o]ur under 65 mix for 2/1-5/1 is at 46% which is significantly higher than our 1/1 mix which was 32% for under 65. Can you take a look at what is driving this mix to increase and is there anything we can do without impacting sales to help improve this before the Direct mail hits?"

111.    On May 16, 2017, Ms. Dean sent an e-mail to Relator and Mr. Hakim reporting that "we are behind 2900 MA's for Aetna. . . . John [Sowell] is holding the payment for $250K until we discuss the mix and the mail drop."

112.    On May 17, 2017, Relator and Mr. Hakim had a call with Aetna, and Mr. Hakim then sent an e-mail to several senior eHealth executives reporting that "we had a call with Aetna today and they were extremely clear that if we do not start making a significant dent in the mix of our business with them by June 30th we will most likely not be able to sell their MA products in most of the country for AEP." After discussing potential tactics to "drive >65 leads," Mr. Hakim concluded his e-mail by stating that eHealth "now need[s] to do something pretty significant or we will lose one of the top carriers in the MA business. In addition there is $1M of sponsorship revenue in our plan for Q4 which is at risk as well."

113.    On May 18, 2017, Relator reported to two of his colleagues that "we're no longer allowed to sell Aetna products in TX or NJ."

114.    The same day, eHealth's Chief Financial Officer and Chief Operating Officer, Dave Francis, sent an e-mail to Relator and other senior eHealth executives affirming that eHealth "intended . . . to address the mix issues raised by Aetna" and that "[o]ur strategy in

moving toward more partnership driven business [*i.e.*, getting more sponsorship money from carriers] has among its goals capturing an improved mix of business."

115.    The next day, May 19, 2017, Relator sent an e-mail to his eHealth marketing colleagues outlining some of the tactics eHealth was employing to address Aetna's "dissatisfaction with our application mix."

116.    Aetna continued close monitoring the success of eHealth's efforts to reduce the proportion of MA applications from U65 beneficiaries that eHealth was sending to Aetna. On June 12, 2017, Aetna's Ms. Ike sent eHealth's Ms. Dean an e-mail showing "your [U65] MA mix week to week for 2017 submissions." At that point, the average for the year was 46.04%.

117.    On June 16, 2017, Ms. Dean forwarded Ms. Ike's e-mail to Relator, and she added that she had spoken with Ms. Ike, who conveyed that Aetna's Mr. Sowell "was interested in touching base and wanted to review where we are with the direct mail and overall mix strategy."

118.    Ten days later, on June 26, 2017, Ms. Ike reported to Ms. Dean that: "You are averaging about 45-46% for the year. The last full 4 weeks are averaging at 41%."

119.    Two days later, on June 28, 2017, Ms. Ike sent Ms. Dean an e-mail breaking down "your 2017 submission" by age group:

- I see 124 submissions that are age 64
- 2283 submissions are ages 22-63
- 3378 submissions are ages 65-100
- There are 206 'submission only' (never made it to an active status) that did ... not have a DOB.

120.    Ms. Dean promptly forwarded Ms. Ike's e-mail to Relator and Mr. Hakim, and she commented that "[w]e aren't seeing movement on the mix and it looks like removing Aetna from DRTV may be the only way to bring down the percentage."

121.    "[R]emoving Aetna from DRTV" meant that, when an eHealth agent received a call on a telephone number that eHealth had advertised via DRTV, eHealth ensured that the agent would not see any Aetna plans available.

122.    Ms. Dean's suggestion concerned Relator, and he responded to Ms. Dean and Mr. Hakim as follows:

> I have a very specific and passionate point of view. I recognize that there are other business considerations in place but here's my POV anyway.
>
> 1.    We should do whatever is reasonable to help with mix.
>
> 2.    We should not exclude them from DRTV (it's not reasonable).
>
> 3.    The Medicare guidelines state very clearly that a carrier cannot force a broker to cherry pick beneficiaries. They can ask us to get better at serving the 65+ crowd and we should work on that but my understanding is that they may not shut us off in any region due to undesirable mix. In my experience, CMS would take this seriously.
>
> 4.    I believe it would be improper for us to make major changes to our marketing efforts (for Aetna) because of the compliance risks to our company. Plus, limiting these people to other carriers just sends more difficult members their way, which seems unfair to me.

123.    On July 14, 2017, notwithstanding Relator's previously-expressed compliance and policy concerns about Aetna's demands on eHealth, Mr. Hakim sent Relator an e-mail discussing the possibility of "turning some things [*i.e.*, DRTV] off" to satisfy Aetna because "[w]e really need their $750K."

124.    Relator responded to Mr. Hakim as follows:

> You may consider the following:
>
> ...
>
> 2.    We've found two solid direct mail pieces and will introduce a new series of packages ahead of the next AEP. The mix is exactly as we anticipated ... virtually 100% age 64+. We will invest more than $2 million in direct mail.
>
> 3.    Threatening to shut us off isn't just bad business for Aetna. It's also improper and very likely illegal. I would be surprised if a more widespread shut

31

down didn't force our compliance folks to self-report the matter to CMS, which wouldn't be good for anyone and certainly not for Aetna. So it's in our mutual best interest to figure out a proper compromise that doesn't run afoul of the law.

a. A reasonable compromise cannot be to shut off a bunch of markets or to abstain from major marketing campaigns. The last thing we want is to be dragged into a bunch of compliance drama thanks to Aetna making us do questionable things.

125.    Mr. Hakim ignored Relator's cautionary statements and responded by instead suggesting that eHealth also would have to reduce the U65 percentage for Humana: "Thanks for sending. Humana just called me about this same topic and we need to assure them we will be in the mid 30% range to get marketing $$'s so these items will be good for them as well."

126.    For much of the rest of 2017, Aetna continued to condition its payment of sponsorship money to eHealth on eHealth not marketing for Aetna in New Jersey or Texas, as well as on eHealth reducing the U65 mix in all markets. Thus, in an e-mail about Aetna to Relator and Ms. Dean on November 6, 2017, Mr. Hakim reiterated that "we do not sell them in NJ and TX."

127.    In late February 2018, Aetna temporarily allowed eHealth to market Aetna plans in Texas, but not through DRTV.

128.    As of June 21, 2018, however, eHealth understood that it could not market Aetna plans in either Texas or New Jersey.

129.    In an e-mail to Relator on August 12, 2018, Paul Rooney, eHealth's Vice President of Medicare, Individual and Small Group Carrier Relations, noted that "we have $1.2m from Aetna for AEP marketing and need to deliver 7,600+ apps."

130.    Late in 2018, Aetna permitted eHealth to engage in limited marketing on behalf of Aetna in New Jersey, but only so long as eHealth targeted the marketing to Medicare

32

beneficiaries who were 65 or over. Thus, on November 1, 2018, Mr. Rooney reported that,

"[d]espite my best efforts, Aetna wants us to turn off TV in NJ."

131.    In an instant message chat that same day, Mr. Rooney and Relator further

discussed Aetna's directive, and eHealth's understanding that it needed to comply with the

directive in order to continue receiving sponsorship money from Aetna:

| | |
|---|---|
| Rooney: | hey. if needed, can we remove Aetna from TV channel in NJ? is that easily done at the alliance id level? |
| Relator: | It can be done but not great for our business. . . . |
| Rooney: | I hear you. they are freakout about <65 business. we were actually not supposed to turn tv on for them to begin with. ok. I am pushing back but may have to do it. |
| Relator: | isn't direct mail helping? |
| Rooney: | absolutely |
| Relator: | The DRTV enrollments should pale in comparison |
| Rooney: | only 2 of the apps from tv are <65. They are being unreasonable. but they are giving us lots of $! |
| Relator: | That region is nuts in my opinion and they should be reminded that asking us to do these things is not legal[.] The money is great but they can't cherry pick their members and it's not even a gray area. They know this. |
| Rooney: | got it |

132.    The next day, Ms. Wong, the eHealth Senior Carrier Account Manager, sent an e-

mail to a group of eHealth employees stating: "We need to turn off all TV marketing for *ONLY*

*Aetna New Jersey*. This is due to the mix of business we send to that state, so they want to turn

off the TV marketing. We need to do this ASAP. . . ." (Emphasis and coloration in original.)

133. Aetna's cherry-picking activities not only violated federal law and CMS regulations, they also violated Aetna's own Medicare Marketing Code of Conduct, which directed Aetna employees not to "engage in discriminatory marketing practices" such as "focusing only on aged Medicare-eligible population and not disabled beneficiaries."

### 2. Aetna's Kickbacks to eHealth

134. As noted above, Aetna agreed to pay eHealth $1.4 million in sponsorship money in 2017, but paid that sum out in increments and conditioned the payments on eHealth hitting certain enrollment goals and reducing the U65 mix.

135. While the U65 mix eventually went down and Aetna relented on its cherry-picking directives, Aetna continued to pay eHealth sponsorship money that was conditioned on eHealth referring MA business to Aetna.

136. Going back to at least 2014, Aetna and eHealth were parties to an "Aetna Marketing Agreement for Upline Agents and Agencies." Under this agreement, Aetna agreed to pay eHealth commissions (at the maximum allowable amount) and administrative payments.

137. Separately, the parties agreed on amounts of sponsorship money Aetna would pay to eHealth each year in exchange for each MA policy eHealth generated for Aetna. Thus, for example, in 2017, Aetna agreed to pay eHealth $1.4 million in exchange for 17,164 new MA policies.

138. Aetna and eHealth papered the sponsorship payment agreements in a series of amendments to a master agreement called the "July 1, 2014 eHealth-Aetna Advertising Agreement" ("Advertising Agreement"). Each amendment covered only a part of a year (in some cases, the periods overlapped), and each amendment ostensibly called for Aetna to pay eHealth

in exchange for eHealth agreeing "to conduct a website marketing program related to [Aetna's] Medicare Products (the 'Custom Site')," or words to that effect.

139.     Examples of such amendments to the Advertising Agreement include the following:

- Amendment Eleven, for $250,000, "[i]n consideration for extending the period for the operation and maintenance of the Custom Site from April 1, 2017 through April 30, 2017, and for other marketing services as described in the [Advertising Agreement]."

- Amendment Twelve, for $250,000, "[i]n consideration for extending the period for the operation and maintenance of the Custom Site from May 1, 2017 through May 31, 2017, and for other marketing services as described in the [Advertising Agreement]."

- Amendment Thirteen, for $500,000, "[i]n consideration for extending the period for the operation and maintenance of the Custom Site from [August 28, 2017] through December 31, 2017, and for other marketing services as described in the [Advertising Agreement]."

- Amendment Fifteen, for $153,700, "[i]n consideration for additional marketing services during the period and for the operation and maintenance of the Custom Site from November 1, 2017 through December 31, 2017, and for other marketing services as described in the [Advertising Agreement]."

- Amendment Seventeen, for $65,250, "[i]n consideration for additional marketing services during the period and for the operation and maintenance of the Custom Site from December 8, 2017 through December 31, 2017, and for other marketing services as described in the [Advertising Agreement]."

- Amendment Twenty-One, for $255,000, "[i]n consideration for extending the period for the operation and maintenance of the Custom Site from [November 1, 2018] through December 31, 2018, and for other marketing services as described in the [Advertising Agreement]."

- Amendment Twenty-Two, for $250,000, "[i]n consideration for extending the period for the operation and maintenance of the Custom Site from [November 8, 2018] through December 31, 2018, and for other marketing services as described in the [Advertising Agreement]."

140.     As the foregoing list shows, the amounts of sponsorship money Aetna agreed to pay eHealth varied considerably, especially when viewed on a per-month basis. In fact, the

amounts bore no relation to costs eHealth actually incurred "to conduct a website marketing program" or other marketing for Aetna. Nor did the amounts bear any relation to costs eHealth incurred for administrative expenses such as "training, customer service, agent recruitment, operational overhead, or assistance with completion of health risk assessments." *Cf.* 42 C.F.R. § 422.2274(e) (2021).

141.    In a conversation with Relator on September 14, 2021, Mr. Kinkead, the eHealth Director of Carrier Development, explained the true rationale behind Aetna's payments:

> So, it's a combination of a couple of things. One, there is a pre-fund component to it. And the pre-fund component is driven off of a new-issued apps expectation, right. So, unlike Humana that pays us our pre-fund based on sent apps, Humana [*sic* Aetna] always pays, typically always pays based on new-issued apps, and historically has always set sort of a base, a benchmark CPS [cost per sale], and then they'll pay us sort of retrospectively, or retroactively, based on the total number of issued apps that we sell within a given qualifying period.

142.    Mr. Kinkead further explained that, for 2021, Aetna agreed to pay eHealth "a $300 CPS, and then at the quarter's end, we will look at how many of the apps that we sent actually were new-issued apps, and then we'll reconcile with Aetna, and then we'll send an invoice to them based on the total number of new-issued apps against that $300 CPS."

143.    In or about December 2020, eHealth agreed to participate in a separate arrangement with Aetna's "Heartland/Midlands" territory. Under this arrangement, called the "Heartland/Midlands Close-the-Gap Incentive Program," Aetna agreed to pay eHealth "increased marketing fees amounting to $150 for additional services provided with respect to each new issued sale."

144.    In an instant message chat with Relator on September 20, 2021, Mr. Kinkead described the "Heartland/Midlands Close-the-Gap Incentive Program" as "a kicker campaign":



Mr. Kinkead further explained that, "between you and I – [the kicker money from Aetna is] just more money in the general pot" for eHeath.

145.    eHealth did not incur any additional administrative expenses to justify the extra $150 per policy. That amount was just an additional kickback for each MA policy eHealth generated for Aetna's "Heartland/Midlands" territory. Indeed, in the instant message chat with Relator on September 20, 2021, Mr. Kinkead commented that, "between you and I - its just more money in the general pot."

146.    Similarly, in an instant message chat with Relator about the Aetna Heartlands program on September 16, 2021, Mr. Shasha acknowledged that it would cause "no immediate rise in admin costs [for eHealth], it's just an additional incentive to 'drive more sales.'" Mr. Shasha elaborated: "That is the Heartlands and Midlands kicker you are referencing. We are

actually locking that in again this afternoon for 2022, meeting with the region. We are going to go after the other regions as well, doing this for Humana, Aetna and CIGNA."

147.    Separately, Aetna offered to pay eHealth and other brokers a "Retention Incentive" of $100 per policy for brokers "that retain at least 90 percent of [their] total book of business throughout 2021." Aetna described the $100 payments as "administrative fees," but did not list any administrative expenses brokers would have to incur to qualify for the per-policy payments.

148.    In the period from January 1, 2018, through December 31. 2020, Aetna paid eHealth a total of at least $18,993,265 in sponsorship money, and eHealth referred to Aetna approximately 188,487 MA applications that Aetna approved. eHealth forecasts receiving an additional $19,928,930 from Aetna in calendar year 2021, in exchange for delivering 52,500 additional MA enrollments to Aetna.

**C.    Humana's Kickbacks to eHealth**

149.    Like other carriers, Humana paid eHealth per-policy commissions and administrative payments. In addition, Humana paid eHealth millions of dollars each year in sponsorship money, although the contracts between eHealth and Humana obscured the true purpose of this remuneration by describing it as payment for development and implementation of a Humana "Minisite" on the eHealth websites.

150.    Effective March 15, 2010, Humana and eHealth entered into a "Marketing & Distribution Agreement" pursuant to which Humana paid eHealth commissions at the maximum allowable amount plus administrative fees of $200 per MA enrollment and $9 per member per month after the first year.

38

151.    Separately, like Aetna, Humana agreed to pay eHealth additional amounts of sponsorship money in exchange for each MA policy eHealth generated for Humana. Humana and eHealth initially papered the sponsorship payment agreements in a series of amendments to their 2010 Marketing & Distribution Agreement. These amendments included the following:

- Seventh Amendment, "In consideration for the development, maintenance and implementation of the Mini-Site for the period running from July 1, 2012 through September 30, 2012, Humana shall pay to [eHealth] . . . Three Million Dollars ($3,000,000)."

- Twenty-Sixth Amendment, "In consideration for the development, maintenance and implementation of the Mini-Site for the period running from August 15, 2015 through December 31, 2015, Humana shall pay to [eHealth] . . . Three Million Dollars ($3,000,000)."

- Twenty-Ninth Amendment, "In consideration for the development, maintenance and implementation of the Mini-Site for the period running from February 15, 2016 through March 31, 2016, Humana shall pay to [eHealth] . . . Two Hundred Fifty Thousand Dollars ($250,000)."

- Thirty-Ninth Amendment, "In consideration for the development, maintenance and implementation of the Mini-Site for the period running from September 1, 2017 through September 30, 2017, Humana shall pay to [eHealth] . . . a fee of $1,000,000 (the 'September 2017 fee'). In consideration for the development, maintenance and implementation of the Mini-Site for the period running from October 1, 2017, through December 31, 2017, Humana shall pay to [eHealth] . . . a fee of $1,500,000 (the 'Q4 2017 fee')."

- Forty-Third Amendment, "In consideration for the development, maintenance and implementation of the Mini-Site for the period running from August 1, 2018 through December 31, 2018, Humana shall pay to [eHealth] . . . a fee of $5,000,000 (the 'Q3 2018 Fee')."

- Forty-Sixth Amendment, "In consideration for the development, maintenance and implementation of the Mini-Site for the period running from January 1, 2019 through March 31, 2019, Humana shall pay to [eHealth] . . . a fee of $1,000,000 (the 'Q1 2019 Fee'). In consideration for the development, maintenance and implementation of the Mini-Site for the period running from April 1, 2019 through June 30, 2019, Humana shall pay to [eHealth] . . . a fee of $2,000,000 (the 'Q2 2019 Fee')."

152.    In July 2019, Humana and eHealth entered into a new Marketing & Distribution Agreement. The updated agreement called for Humana to pay eHealth commissions at the maximum allowable amount and an administrative fee of $175 per MA policy in the first year and $10 per member per month thereafter.

153.    The new agreement also contained an addendum with a "Schedule Number 001" providing that, during the third quarter of 2019, eHealth would continue "hosting a Minisite [and] . . . undertaking efforts to drive customer traffic to that Minisite," and that, in exchange, Humana would pay eHealth $2.5 million.

154.    The parties subsequently entered into a series of updated schedules and amendments to those schedules, including the following:

- Amendment 01 to Schedule Number 001, changing the fee for the third quarter of 2019 to $3,000,000.

- Schedule Number 002, in consideration for "(a) eHealth hosting a Minisite; and (b) eHealth undertaking marketing efforts to drive customer traffic to that Minisite . . . from October 1, 2019 through and including December 31, 2019 . . . Humana shall pay to eHealth . . . four million dollars ($4,000,000) (the '2020 AEP Fee')."

- Amendment 01 to Schedule Number 002, changing the "2020 AEP Fee" to $8,500,000.

- Schedule Number 003, in consideration for "(a) eHealth hosting a Minisite; and (b) eHealth undertaking marketing efforts to drive customer traffic to that Minisite . . . from June 1, 2020 through and including December 31, 2020 . . . Humana shall pay to eHealth . . . eighteen million dollars ($18,000,000) (the '2020 Additional Marketing Fee')."

- Amendment 01 to Schedule Number 003, providing for an "Amended 2020 Additional Marketing Fee" of $18,500,000.

- Schedule Number 004, in consideration for "(a) eHealth hosting a Minisite; and (b) eHealth undertaking marketing efforts to drive customer traffic to that Minisite . . . from January 1, 2021 through June 30, 2021 . . . Humana shall pay to eHealth . . . one hundred twenty five thousand dollars ($125,000) (the 'TN Digital Marketing Fee')."

40

- Schedule Number 005, in consideration for "(a) eHealth hosting a Minisite; and (b) eHealth undertaking marketing efforts to drive customer traffic to that Minisite . . . from July 1, 2021 through September 30, 2021 . . . Humana shall pay to eHealth . . . one million one hundred thousand dollars ($1,100,000) (the '2021 Q3 Fee')."

- Schedule Number 006, in consideration for "(a) eHealth hosting a Minisite; and (b) eHealth undertaking marketing efforts to drive customer traffic to that Minisite . . . from October 1, 2021 through December 31, 2021 . . . Humana shall pay to eHealth . . . nine million dollars ($9,000,000) (the '2022 AEP Fee')."

- Schedule Number 007, in consideration for "(a) eHealth hosting a Minisite; and (b) eHealth undertaking special marketing efforts to drive customer traffic to that Minisite . . . from October 1, 2021 through December 31, 2021 . . . Humana shall pay to eHealth . . . one hundred ninety thousand dollars ($190,000) (the '2022 North and Central FL AEP Fee') and one hundred thousand dollars ($100,000) (the '2022 South FL AEP Fee')."

155.    None of these schedules and amendments explained how eHealth's costs of hosting a mini-site for Humana could have varied so dramatically from period to period.

156.    In reality, the fees in the amendments had little, if anything, to do with eHealth maintaining a mini-site for Humana or driving traffic to it, and everything to with eHealth sending MA business to Humana.

157.    In an instant message chat on October 26, 2021, Yung Le, an eHealth Vice President of Digital, confirmed that eHealth was "no longer doing specific advertising for the carrier-specific sites or sending traffic specifically to them."

158.    Various eHealth executives made clear that the true purpose of Humana's sponsorship payments to eHealth was to induce eHealth to send MA business to Humana.

159.    For example, on March 20, 2017, as noted above, Relator received an e-mail from Mr. Hakim reporting that "Humana has given us $250K for Q1 and we are more than 50% off of what they want us to do so the $250K for Q2 is in jeopardy."

160.    Then, on May 15, 2017, Mr. Hakim noted in an e-mail that, for "Humana we are about 4300 MA's behind last year and they were wanting us to be at least flat [year over year]."

161.    In a similar vein, on October 11, 2017, Scott Flanders, eHealth's then-CEO, reported to several senior eHealth managers that he and two other eHealth executives "had dinner last night with the President of Retail at Humana, Alan Wheatley, who leads their Medicare business" and that "[Mr. Wheatley] stated further that their evaluation of marketing and other support for 2018 will be significantly impacted by how we perform during this AEP."

162.    The next summer, as eHealth and Humana were discussing how much sponsorship money Humana would pay eHealth in the second half of 2018, Mr. Hakim commented in an e-mail to his colleagues that, with "Humana if we do not hit MA numbers regardless of how much MS [Medicare Supplement] we do it will be viewed as a miss. . . . Bottom line is that these $$'s are for selling MA plans and if we miss their targets for MA the $$'s will not flow next year."

163.    On July 20, 2018, Mr. Hurley, the then-President of eHealth's Medicare division, sent an e-mail to his colleagues explaining the details of these negotiations:

> The negotiations for AEP Humana Marketing money continue. They have proposed the high end of the range ($5m), however they are pushing for a 20% increase in our production goal from the original commitment of 25,000 enrollments to 30,000 enrollments during the Q4 period.
>
> I countered them that we'd deliver between 25k and 30k for the $5m, given they pay most of it in Q3. This morning they responded and are insisting on the $5m for a commitment of 30,000 enrollments.
>
> Dave F[rancis, former CFO and COO], Dave N[icklaus, former SVP of Sales and Operations, Chris [Hakim, former General Manager of Medicare] and I just discussed this proposal and are concerned with the uplift in the enrollment commitment. There will not be any clawback provision in our contract, but we could potentially jeopardize some portion of our marketing commitment for next year and may harm some of our business operations trying to get to the commitment this AEP.

42

164.    During the eHealth off-site meeting on August 12, 2021, Mr. Roberts, the eHealth

Director of Strategic Carrier Programs, elaborated on the purpose of Humana's sponsorship

payments to eHealth:

> The volume commitments are most important on pre-funded dollars because we
> give them a commitment and they give us dollars to meet that commitment. . . .
> So, when we negotiated with Humana previously, they typically paid about $150
> an application. This year, we said, alright, we want you to pay $200 an application
> and we can drive 80,000 apps for you, or something along those lines. And they
> said, OK, well we'll pay you $200 an app, but only for 40,000 applications. So,
> that's the biggest pre-fund portion, and we're obviously very confident that we
> can hit that mark.

165.    These "volume commitments" never appeared in the written contracts between

Humana and eHealth. As Mr. Shasha acknowledged in an instant message chat with Relator on

August 23, 2021, "these agreements with Humana are not so specific. They are all verbal and the

written is general."

166.    Similarly, in Relator's instant message chat with Mr. Kinkead on August 25,

2021, Mr. Kinkead said: "Humana for example they are paying for the mini site[.] Nothing more

nothing less[.] The commitments on production are verbal over the phone and on spreadsheets –

but nowhere on the contract."

167.    Humana closely monitored eHealth's compliance with the volume commitments

it made to Humana in exchange for Humana's marketing dollars. On October 21, 2021, for

example, Jason Breunig, a Humana National Sales Manager, sent his eHealth counterpart,

Mr. Kinkead, an e-mail with a table showing, for the month of October 2021, eHealth's daily

application "Target" and the number of applications eHealth actually submitted to Humana each

of those days. Above this table, Mr. Breunig wrote:

> Wanted to share where you are vs our daily goal. I'll share these periodically but
> if you ever don't have one and want to know just send me a quick note as it is a

43

quick pull. These are ALL Q4 sales and not just 1/1 which is what the Marketing $ goal is set for. As a whole our marketing $ partners are at 106% of goal.

168.    That same day, October 21, 2021, eHealth's Mr. Shasha told his colleagues that, "[i]f we want additional marketing dollars [from Humana] during AEP, we'd be challenged to gather those if we're telling Humana that they're not number one in our environment."

169.    Separately, like Aetna, Humana also ostensibly prohibited discrimination based on health status. Under the 2010 Marketing & Distribution Agreement, for example, eHealth was required to "make all reasonable efforts to ensure that [eHealth] agents . . . [u]understand that it is a violation of CMS regulations and they are strictly prohibited from discriminating against any Medicare eligible prospect . . . based upon their health status, except as permitted by CMS." In 2018, the parties amended their agreement to say that eHealth was required to "make all reasonable efforts to ensure that [eHealth] agents . . . [u]understand that it is a violation of CMS regulations and they are strictly prohibited from discriminating against any Medicare eligible prospect . . . based upon their . . . age, mental or physical disability, health status, receipt of health care, claims experience, [or] medical history."

170.    Nonetheless, like Aetna, Humana repeatedly expressed concern to eHealth about the percentage of U65 beneficiaries in the business eHealth was sending to Humana.

171.    Humana made it clear that eHealth risked losing Humana's sponsorship money if eHealth did not reduce that percentage. For example, as noted above, Mr. Hakim reported to Relator on July 14, 2017, that "Humana just called me about this same topic [the U65 mix] and we need to assure them we will be in the mid 30% range to get marketing $$'s."

172.    Mr. Hakim subsequently monitored the U65 mix eHealth was delivering to Humana. On December 14, 2017, for example, Mr. Hakim sent Relator a table showing that 33.4% of the MA business eHealth sent to Humana during the 2017 AEP was U65, and that the

44

U65 percentage for business that came through eHealth's direct mail channel was 32.5%. In his

cover e-mail, Mr. Hakim asked "why isn't our DM <65% way lower then [sic] this? I would

expect that to be in the 20% range."

173.    On February 27, 2018, Relator and several other eHealth executives met with a

large group of Humana executives at Humana's offices in Louisville, Kentucky. During the

meeting, Humana executives presented a PowerPoint slide deck concerning eHealth's

performance during the 2017 AEP. The slide deck included a slide showing the "eHealth

Percentage of Sales Under Age 65" for each month from January 2011 through February 2018.

The slide showed that the U65% in the business from eHealth averaged 47% in 2017. The slide

thus reaffirmed that the U65 mix in the eHealth referrals remained a significant concern for

Humana.

174.    On May 1, 2018, Mr. Breunig, the Humana National Sales Manager, sent his

eHealth counterpart an e-mail with an update that the "U65 [was] 37.6% [and] going in very

positive directions in comparison to the past and expect to continue to get better." Mr. Breunig's

e-mail attached a "Scorecard" that Humana maintained on the business it received from eHealth.

One of the metrics on the Scorecard was "Under 65%."

175.    In January 2019, Mr. Breunig provided eHealth with updated data showing that

the U65 percentages in the business from eHealth had declined in recent months. Mr. Breunig

commented that this was a "great change from last July," and concluded by saying "Appreciate

the efforts!"

176.    Mr. Rooney, the eHealth Vice President of Carrier Relations, forwarded

Mr. Breunig's e-mail to Relator with a comment that "This is a huge help as we look to grow the

business / relationship."

177.    In the 2020 AEP, as Mr. Kinkead told relator in a September 2021 instant message chat, eHealth had brought the Humana U65 mix down to 13.5%, a "huge improvement."

178.    On or about September 8, 2021, Humana provided eHealth with a current "Scorecard." Among other things, the Scorecard showed that, for the 2020 AEP period, Humana paid eHealth $4,000,000 in sponsorship money and that, in exchange, eHealth delivered 45,396 MA enrollments to Humana during that period, for an average cost per sale of $88. During the rest of 2020, according to the Scorecard, Humana paid eHealth $6,500,000 in sponsorship money and, in exchange, eHealth delivered 48,510 MA enrollments to Humana during that period, for an average cost per sale of $134. The Scorecard also continued to track the U65 mix in the MA business eHealth sent to Humana; in 2019, the U65% was 25.8%, and, in 2020, it was 20.1%. An image of that Scorecard is below:

**Humana**

**EHEALTHINSURANCE SERVICES INC**

Humana MarketPoint Partner Scorecard

## Sales

### TOTAL SALES

| Product | 2019 | 2020 | 2021 | Total Sales |
|---|---|---|---|---|
| MA AEP | 29,251 | 45,396 | 56,403 | |
| MA ROY | 40,418 | 48,510 | 48,681 | |
| PDP AEP | 3,042 | 20,406 | 5,180 | |
| PDP ROY | 1,823 | 6,316 | 1,978 | |
| SUPP AEP | 883 | 1,227 | 720 | |
| SUPP ROY | 3,219 | 2,710 | 861 | |
| OSB AEP | 1 | 2 | 575 | |
| OSB ROY | 811 | 515 | 672 | |
| IDV | 7,043 | 5,748 | 4,576 | |

### MA AEP

| | 2019 | 2020 | 2021 | |
|---|---|---|---|---|
| Issued | 78.7% | 73.1% | 73.0% | |
| New Mbr | 66.7% | 88.3% | 87.4% | |
| Retention | 89.0% | 86.2% | 84.6% | |
| Under65 | 25.8% | 20.1% | 13.5% | |

### MA ROY

| | 2019 | 2020 | 2021 | |
|---|---|---|---|---|
| Issued | 80.3% | 80.2% | 79.1% | |
| New Mbr | 90.7% | 87.9% | 83.3% | |
| Under65 | 32.3% | 28.4% | 20.9% | |

### TOP 10 SELLING STATES

| | CallCenter/eVendor | | | PARTNER | |
|---|---|---|---|---|---|
| State | %MA Sales | | State | %MA Sales | |
| FL | 9.94% | | TX | 7.70% | |
| TX | 8.18% | | FL | 7.18% | |
| GA | 8.14% | | GA | 6.14% | |
| NC | 5.33% | | NC | 5.02% | |
| LA | 4.56% | | CA | 4.75% | |
| SC | 3.85% | | NY | 4.46% | |
| MI | 3.75% | | IL | 4.25% | |
| NY | 3.70% | | OH | 3.52% | |
| OH | 3.67% | | LA | 3.36% | |
| PA | 3.44% | | VA | 3.10% | |

### MA Distribution

| Product Category | Partner % | Count | CallCenter/eVendor % |
|---|---|---|---|
| CP HMO | 1.9% | 1,957 | 3.2% |
| CP HMO SNP | 0.2% | 282 | 0.9% |
| HMO | 40.9% | 42,970 | 36.5% |
| HMO SNP | 9.9% | 10,401 | 15.1% |
| PFFS | 0.3% | 288 | 0.2% |
| PPO | 46.8% | 49,208 | 44.1% |

### Veterans

| Veteran Response | Count | Partner Distribution | CallCenter/eVendor Distribution |
|---|---|---|---|
| Not Answered | 102,849 | 97.9% | 84.8% |
| Not a Veteran | 1,992 | 1.9% | 12.3% |
| Is Veteran | 243 | 0.2% | 2.9% |
| Veteran Honor Plan | Count | % of submitted | CallCenter/eVendor % |
| HMO | 642 | 5.2% | 7.1% |
| PPO | 11,698 | 94.8% | 92.9% |

### Partner Profile

| 2021 Book Of Business | | Avg Mbr | MER | BoB U-65 |
|---|---|---|---|---|
| MA | | 188,278 | 174.7% | 15.8% |
| PDP | | 44,782 | 164.2% | 7.4% |

| 2021 Current Agent Depth | | | |
|---|---|---|---|
| Certified | | 1,547 | |
| Selling Agents | | 1,050 | |
| %Selling to Certified | | 67.9% | |

| Market spend | 2020 | 2021 |
|---|---|---|
| AEP MAPD Spend | $4,000,000 | $10,000,000 |
| AEP CPS | $88 | $177 |
| ROY MAPD Spend | $6,500,000 | $8,000,000 |
| ROY CPS | $134 | $164 |

### Provider Relationship

| Sales | Total Apps | % of submitted MA | CallCenter/eVendor |
|---|---|---|---|
| In Radius of JOA | 24,482 | 23.3% | 26.8% |
| Submitted In Radius | 1,533 | 6.3% | 10.2% |
| Submitted with JOA | 1,610 | 1.5% | 2.9% |

| Top JOA Providers | | Submitted MA Applications | |
|---|---|---|---|
| MCCI | | 424 | |
| JENCARE | | 219 | |
| OSH | | 214 | |
| Conviva | | 163 | |
| RPC | | 134 | |
| ISLAND DOCTORS | | 66 | |
| IORA | | 62 | |
| HCPDSA | | 57 | |
| AMICUS MED SRVS ORG | | 51 | |
| MTC | | 38 | |

### Member Enrichment

| Humana Pharmacy | 2019 | 2020 | 2021 | |
|---|---|---|---|---|
| MAPD Electronic Consent | 0.0% | 0.2% | 0.0% | ↓ |
| PDP Electronic Consent | 0.0% | 0.0% | 0.0% | ↓ |

| Humana @ Home | 2019 | 2020 | 2021 | |
|---|---|---|---|---|
| Engagement | 0.0% | 0.0% | 3,700.0% | ↑ |

### Compliance

| DNC(Prev.Mo.) | Disenroll | Rtng | Cancelled | Rtng |
|---|---|---|---|---|
| MAPD | 0.8% | 5☆ | 11.7% | 3☆ |
| PDP | 0.4% | 5☆ | 5.3% | 5☆ |

| Cycle Time(% within 3 days)-Submitted | Volume | Rate |
|---|---|---|
| Non-electronic | 2 | 100.0% |

| B | Quality: A/ly | Volume: A |
|---|---|---|

### Agencies, Downlines, Subs

| Sales Executive | Account Executive | Agency |
|---|---|---|
| Jason Breung | Holly Kropp | EHEALTHINSURANCE SERVICES INC |
| | | View additional downlines |

Last Updated 9/8/2021 11:48:09 AM   **MARKETPOINT**

179. In the period from January 1, 2018, through December 31, 2020, Humana paid eHealth a total of at least $37,000,000 in sponsorship money, and eHealth referred to Humana approximately 273,483 MA applications that Humana approved. eHealth forecasts receiving an

additional $10,825,000 from Humana in calendar year 2021, in exchange for delivering 45,500 additional MA enrollments to Humana.

### D.    WellCare's Kickbacks to eHealth

180.    In 2010, WellCare and eHealth entered into an agreement pursuant to which WellCare paid eHealth commissions and annual renewal commissions at the maximum allowable amounts, as well as administrative payments, for each MA and PDP enrollment eHealth delivered to WellCare.

181.    In June 2020, eHealth's Mr. Rooney reported to Relator that WellCare was paying commissions and renewal commissions at the maximum allowable amount, plus administrative overrides of $150 or $200 per policy, depending on the state.

182.    Like Aetna and Humana, WellCare also paid eHealth substantial amounts of sponsorship money to induce referrals of MA business to WellCare. Thus, on March 20, 2017, Mr. Hakim told Relator in an e-mail that "Wellcare called today as their market leaders who gave us marketing $$'s are not seeing the growth they [were] expecting for their investment. . . . Can we look at ways to juice those markets in the near term[?]" A few hours later, as noted above, Mr. Hakim reported to Relator and others that "[w]e also have a national deal for Wellcare which they have commitment $700K through AEP broken out by quarter and they can cancel the spend with 30 days notice if we are not delivering."

183.    WellCare and eHealth papered the sponsorship payment arrangements in a series of agreements, each called either an "Advertising Agreement" or a "Producer Marketing Agreement." Each agreement covered only a part of a year (in some cases, the periods overlapped). These agreements included the following:

- Advertising Agreement for $450,000 for eHealth to "conduct a search marketing program related to [WellCare's] Medicare products in all regions in the United

48

States where [WellCare] offers Medicare Advantage products through eHealth with a goal of attracting [customers who are Medicare eligible] to the eHealth Call Center" during the period from June 20, 2016, through December 31, 2016.

- Amendment to Advertising Agreement for $25,000 for eHealth to "(a)increase its level of effort in performing the Search Marketing Services in Mississippi, Tennessee and Arkansas; and (b) perform certain marketing services related to [WellCare's] Medicare products in Mississippi, Tennessee and Arkansas, also with a goal of attracting users to the eHealth Call Center" during the period from December 8, 2016, through December 31, 2016.

- Advertising Agreement for $700,000 for eHealth to "conduct a search marketing program related to WellCare's Medicare products in all regions in the United States where WellCare offers Medicare Advantage products through eHealth with a goal of attracting [customers who are Medicare eligible] to the eHealth Call Center" during the period from February 1, 2017, through December 31, 2017.

- Advertising Agreement for $120,000 for eHealth to "conduct a search marketing program related to WellCare's Medicare products in Texas with a goal of attracting [customers who are Medicare eligible] to the eHealth Call Center" during the period from February 15, 2017, through June 15, 2017.

- Producer Marketing Agreement for $300,000 "for overhead and administrative services" during the period from January 20, 2018, through April 30, 2018.

- Producer Marketing Agreement for $25,000 "for overhead and administrative services" during the period from February 1, 2018, through March 1, 2018.

- Producer Marketing Agreement for $845,000 "for overhead and administrative services" during the period from May 1, 2018, through December 30, 2018.

- Producer Marketing Agreement for $500,000 "for overhead and administrative services" during the period from June 1, 2018, through December 31, 2018.

- Producer Marketing Agreement, for $775,000 "for overhead and administrative services" during the period from January 1, 2019, through June 30, 2019.

- Producer Marketing Agreement, for $2,500,000 "for overhead and administrative services" during the period from July 1, 2019, through December 31, 2019.

- Producer Marketing Agreement, for $600,000 "for overhead and administrative services" during the period from January 1, 2020, through March 31, 2020.

- Producer Marketing Agreement, for $600,000 "for overhead and administrative services" during the period from April 1, 2020, through June 30, 2020.

- • Producer Marketing Agreement, for $1,200,000 "for overhead and administrative services" during the period from April 1, 2020, through June 30, 2020.

184. The payments WellCare made pursuant to these agreements were on top of the administrative payments WellCare already was paying eHealth for each MA policy eHealth sold for WellCare. In other words, although the agreements purported to call for WellCare to pay fair market value for administrative costs eHealth incurred, WellCare already was separately paying eHealth purported fair market value to cover those costs.

185. The real consideration for WellCare's additional payments was new MA policies that eHealth sold for WellCare. For example, in the fourth quarter of 2018, eHealth committed to delivering 6,900 new MA policies to WellCare. In the fourth quarter of 2019, that figure had jumped to 10,000 new MA policies.

186. For 2021, WellCare moved its sponsorship of eHealth into explicit per-policy payments, on top of the administrative payments. Thus, in January 2021, Mr. Shasha explained to Relator that WellCare was paying an administrative fee of $250 per policy, plus approximately $200 per policy in "MDF." MDF is an acronym for market development funds. and is just another name for sponsorship money.

187. During an eHealth meeting on April 22, 2021, Tom Loach, an eHealth Director of Carrier Relations, provided a further explanation of the latest WellCare contract:

> [J]ust a quick note on WellCare. Just to give you an idea of what, how the contracts are working. WellCare, when they basically moved all their sponsorship into the override, that came with, on paper at least, a lot of additional tasks and items that we're expected to cover in the pre-enrollment and the first 90 days of the application receipt date. So, that's their way of kind of getting around this FMV and not tying it straight through a sponsorship or marketing per app piece. So there are some additional items there. I would say it was pretty creative in the way it was written. But at least there's something, they've got some place to defend.

.

50

188.    In other words, categorizing the additional $200 per policy as MDF money was
just an attempt to make the sponsorship payments seem compliant with the law, even though
both WellCare and eHealth knew that the payments were illegal remuneration to induce eHealth
to generate MA business for WellCare.

189.    The new payment rubric also enabled the parties to ensure that WellCare paid
eHealth for exactly what eHealth delivered. No longer would WellCare overpay if eHealth
underperformed relative to the target WellCare had set, nor would eHealth leave money on the
table if it overperformed.

190.    In or about the summer of 2021, WellCare also agreed to pay eHealth "renewal
bonuses" on top of the annual renewal commissions that the Medicare regulations permit. *Cf.* 42
C.F.R. § 422.2274(d)(3). As Mr. Shasha explained in a chat with Relator on August 10, 2021,
"WellCare provided us a huge renewal bonus at $125 for month 15 and another $125 at month
26. We also got an additional $200 at issued app."

191.    These renewal bonuses incentivize eHealth not to recommend competing plans to
existing eHealth clients who have a WellCare MA plan that is up for renewal, even when plans
have changed over time and plans offered by other carriers might be better-suited for those
Medicare beneficiaries. In other words, the payments are merely a reward for eHealth achieving
a financially-desirable outcome for WellCare, regardless of the interests of Medicare
beneficiaries.

192.    In the period from January 1, 2018, through December 31, 2020, WellCare paid
eHealth a total of at least $15,165,001 in sponsorship money, and eHealth referred to WellCare
approximately 117,192 MA applications that WellCare approved. eHealth forecasts receiving an

51

additional $10,964,546 from WellCare's parent, Centene, in calendar year 2021, in exchange for delivering 37,000 additional MA enrollments to WellCare and Centene.

### E.    Anthem's Kickbacks to eHealth

193.    In July 2010, Anthem and eHealth entered into a Field Marketing Organization Agreement pursuant to which Anthem agreed to pay eHealth commissions and annual renewal commissions at the maximum allowable amount, as well as administrative payments of $200 per policy plus $100 more per policy each year a policy was renewed.

194.    Beginning at least as early as 2017, Anthem also paid eHealth substantial additional amounts in exchange for eHealth's commitment to generate new MA policies for Anthem and Amerigroup, a carrier that Anthem acquired in 2012. Apart from the Field Marketing Organization Agreement, Anthem and eHealth entered into a series of additional agreements, each called an "Advertising Agreement." Each of these agreements called for eHealth to "conduct a marketing program related to Anthem's [or Amerigroup's] Medicare products . . . with a goal of attracting [Medicare eligible people] to the eHealth Call Center" during a particular period of time, and sometimes in particular regions, in exchange for a specified sum of money. These agreements include the following:

- For the period October 15, 2017, through December 7, 2017, $250,000 for a "marketing program . . . in Georgia, Indiana, Kentucky, Missouri, Ohio, Tennessee, and Wisconsin."

- For the period October 15, 2017, through December 7, 2017, $100,000 for a "marketing program . . . in Connecticut, Maine, New Hampshire, New Jersey and Virginia."

- For the period September 1, 2017, through December 7, 2017, $150,000 for a "marketing program . . . in Texas."

- For the period November 14, 2017, through March 31, 2018, $350,000 for a "marketing program" without any geographic limitation.

- For the period February 1, 2018, through March 31, 2018, $250,000 for a "marketing program . . . in Georgia, Indiana, Kentucky, Missouri, Ohio, Tennessee, and Wisconsin."

- For the period February 1, 2018, through March 31, 2018, $150,000 for a "marketing program . . . in California, Nevada, Colorado, New Mexico, Texas and Washington."

- For the period April 1, 2018, through June 30, 2018, $250,000 for a "marketing program . . . in Georgia, Indiana, Kentucky, Missouri, Ohio, Tennessee, and Wisconsin."

- For the period June 1, 2018, through September 30, 2018, $650,000 for a "marketing program" without any geographic limitation.

- For the period September 1, 2018, through September 30, 2018, $750,000 for a "marketing program" without any geographic limitation.

- For the period October 1, 2018, through December 31, 2018, $2,000,000 for a "marketing program" without any geographic limitation.

- For the period January 1, 2019, through June 30, 2019, $2,800,000 for a "marketing program" without any geographic limitation.

195.    Anthem's purpose in making these various sponsorship payments was, as eHealth's Ms. Dean reported in an e-mail on August 21, 2017, "to drive additional sales."

196.    For example, when Anthem agreed to pay $150,000 for a marketing program in Texas from September 1, 2017, through December 7, 2017, Ms. Dean explained that "[t]he expectation Anthem [h]as is 500-600 submits in Q4."

197.    Similarly, Mr. Hakim reported that, in negotiating the contract that ultimately covered Georgia, Indiana, Kentucky, Missouri, Ohio, Tennessee, and Wisconsin during the period February 1, 2018, through March 31, 2018, "[w]e told them we could do between 1,750 and 2,000 MA's in the Central Region for 1-1 effective dates with their $250K investment which they have agreed to pay us."

198.    In early 2018, eHealth presented Anthem with a proposal for Anthem to make a "$2.4M investment" with eHealth so that eHealth could "grow sales to over 13,000 total sent

applications" for Anthem. The proposal further noted that the "[c]lose rate is obtained based upon Anthem branded advertising, dedicated 800# into call center, whisper into agent identifying caller as Anthem lead, [and] agent screen pop with only Anthem plans displayed."

199.    About a year later, in the summer of 2019, Mr. Rooney sent an e-mail to Relator about "Anthem Medicare Investments" and said: "As a reminder, Q4 volume commitment is 19K sent MA apps."

200.    In an e-mail chain in November 2019, when it appeared eHealth might miss this 19,000 MA application commitment, Mr. Ratkovic sent an e-mail to several eHealth executives saying that "I believe Anthem is the highest or near the highest in comp, so we would see meaningful impact in revenue and EBITDA in leaning into Anthem as well as the largest opportunity for eH in 2020 for sponsorship revenue."

201.    On June 11, 2021, Anthem and eHealth entered into an "Anthem Agency Call Development Program Agreement." Ostensibly, this agreement required Anthem to pay eHealth $1,774,490 to cover expenses eHealth incurred during the second and third quarters of 2021 in generating a minimum number of calls to eHealth call centers "from markets where Anthem or its applicable affiliates are actively marketing Medicare Advantage plans."

202.    On October 13, 2021, Anthem and eHealth agreed that Anthem would pay eHealth an additional $6,761,300 to cover expenses for generating additional calls in the fourth quarter of 2021.

203.    In fact, Anthem's payments to eHealth under the Anthem Agency Call Development Program Agreement were not contingent merely on eHealth generating calls to eHealth call centers, but also on eHealth generating MA applications specifically for Anthem. Mr. Loach confirmed as much in an instant message chat with Relator on September 30, 2021:

| Relator: | I disconnected from the team meeting right as you were giving an update about Anthem marketing money. . . . |
|---|---|
| Mr. Loach: | we lost $400K due to Q3 mniss [*sic*] but I was able to clawback $154k for Q4. |
| Relator: | What was Q3 miss? Applications you mean? |
| Mr. Loach: | yes. We fell short of our commitments based on their investment. |

204.   Similarly, during a telephonic meeting on October 28, 2021, Mr. Shasha

confirmed that, "with Anthem there is a performance piece – it's just achieving the goal and then

how they deal with it next year. Right. Are we coming into next year with another deficit and we

owe them production? Are we gonna be able to negotiate some of that away? Are they just gonna

say they're not gonna do it anymore?"

205.   Mr. Shasha subsequently elaborated:

I'm worried about Anthem. We monetized to the max to forecast with them on a
pre-fund. And it was split this year. Half goes into the override, half goes in the
pre-fund. But they're still funding that pre-fund at a max so there's an expectation
that we get to that max production level. I think it's 24,000 apps. . . .

206.   In the period from January 1, 2018, through December 31, 2020, Anthem paid

eHealth a total of at least $37,468,266 in sponsorship money, and eHealth referred to Anthem

approximately 82,629 MA applications that Anthem approved. eHealth forecasts receiving an

additional $10,159,211 from Anthem in calendar year 2021, in exchange for delivering 22,000

additional MA enrollments to Anthem.

**F.    Devoted Health's Kickbacks to eHealth**

207.   In April 2021, Devoted Health agreed to pay eHealth $200,000 in exchange for

eHealth's commitment to deliver 400 Medicare insurance applications from Medicare

beneficiaries who were over 65 years old (*i.e.*, not disabled Medicare beneficiaries). This

payment, as described further below, was on top of commissions and administrative payments Devoted Health was already paying eHealth.

208.    On November 24, 2020, Devoted Health and eHealth entered into a "Field Marketing Organization Agreement" pursuant to which Devoted Health engaged eHealth to market Devoted Health MA plans. Under the agreement, Devoted Health authorized eHealth to perform various "marketing services," including supporting Devoted Health educational and marketing events, meeting with Medicare beneficiaries, and enrolling those beneficiaries into Devoted Health's MA plans. For each enrollment into a Devoted Health plan from an application that eHealth submitted, Devoted Health agreed to pay eHealth both (1) commissions at the maximum allowable amount and (2) an "Administrative Fee" of between $200 and $250 (depending on the state) for the initial enrollment year and between $12.50 and $14 per month (depending on the state) thereafter.

209.    Then, on April 2, 2021, Devoted Health and eHealth entered into a separate agreement called a "Producer Marketing Agreement." Under the terms of this agreement, Devoted Health agreed to pay eHealth a flat fee of $200,000, purportedly in exchange for the following "marketing, overhead and administrative services":

- Administrative support of agents (i.e., general office overhead expenses, copiers, computers)
- Payment for agent's appointment fees
- Coordinate contracting, licensing and appointing efforts between agents and [Devoted Health]
- Payment for direct mail
- Costs associated with internet marketing
- Payment for agent licenses, including non-resident licenses
- Direct response television

56

210.     Schedule A to the Producer Marketing Agreement stated that the $200,000 fee for these services "must be based on Fair Market Value."

211.     In fact, eHealth was already performing all of these services and incurring these costs as part of its efforts to obtain enrollments in Devoted Health's MA plans pursuant to the earlier Field Marketing Organization Agreement, which remained in effect.

212.     The subsequent Producer Marketing Agreement's description of services was window dressing to cover up the parties' actual intent, which was for Devoted Health to pay eHealth $200,000 in exchange for a commitment by eHealth to obtain 400 Medicare insurance plan enrollments for Devoted Health.

213.     eHealth made the real purpose of Devoted Health's $200,000 payment clear in its internal communications about the agreement. On March 8, 2021, Mr. Kinkead, the eHealth Director of Carrier Development, explained to his superiors that "we are entering into a marketing services agreement with Devoted Health for Over 65 MA/MS/PDP products. The construct of the deal is that they will pre-fund us $200,000 for 400 issued Apps."

214.     The parties omitted this *quid pro quo* language from their written agreement. Similarly, the written agreement made no mention of the requirement that eHealth refer only Medicare beneficiaries aged 65 and older to Devoted Health in exchange for the extra $200,000.

215.     On October 31, 2021, Devoted Health and eHealth entered into an amendment to their Producer Marketing Agreement providing for new additional fees beyond the commissions and administrative payments set forth in the Field Marketing Organization Agreement:

> Fees for the CMS Annual Election Period (AEP) for calendar 2022 (October 15, 2021 to December 7, 2021) shall be as follows: [Devoted Health] shall pay [eHealth] a one time payment of $800,000 after [eHealth] exceeds 2,000 Issued Enrollments with a January 1, 2022 effective date. In addition, [Devoted Health]

shall pay [eHealth] $400 per Issued Enrollment above 2,000 Issued Enrollments with a January 1, 2022 effective date.

The amendment does not explain why, if the payments are for administrative expenses, Devoted Health will not pay anything to eHealth if eHealth does not refer at least 2,000 enrollments to Devoted Health during the 2021 AEP.

## G.    GoHealth's Receipt of Kickbacks from Carriers

216.    Like eHealth, GoHealth takes kickbacks from MA carriers in exchange for referring MA business to them.

217.    In 2020, according to its Annual Report, GoHealth's "Enterprise" revenue increased to over $206 million, an increase of 71.4 percent from 2019. This "Enterprise" revenue, according to the Annual Report, derives from "non-commission revenue sources, . . . [including] providing partner marketing and enrollment services, dedicated insurance agent resources for carrier-specific programs, sales of insurance leads to other marketing agencies and carriers, and the implementation and use of the Company's platform." The Annual Report further explains that: "The Company . . . has arrangements with certain carriers that allow the Company to increase marketing efforts, including through direct mail, television advertisements, and online advertising for various insurance products that are being offered by these carriers. The Company is reimbursed by carriers for the incremental marketing efforts and records the amounts received as a reduction of the marketing costs incurred."

218.    In fact, the payments GoHealth obtained from carriers were not merely to cover the cost of its "incremental marketing efforts," but also for referral of specific amounts of MA business.

219.    As eHealth's Mr. Ratkovic reported in an e-mail on October 19, 2019, "I have heard from multiple sources that they [GoHealth] have received between $75-90M from Anthem to deliver between 150-180K enrollments for 2020 effective dates."

220.    eHealth's Brian Shasha, who previously worked at Molina Healthcare, an MA carrier, subsequently confirmed that GoHealth takes sponsorship (or "Enterprise") money from carriers in exchange for commitments to deliver Medicare policies to them, and that GoHealth steers Medicare business away from carriers that don't pay it sponsorship money.

221.    In an e-mail on November 12, 2020, Mr. Shasha noted that "[t]hey [GoHealth] are willing to turn off their carriers when they hit their targets." In other words, when GoHealth fulfilled its MA policy commitment to a particular carrier during a particular period of time, GoHealth would stop sending MA business to the carrier for the rest of the period unless that carrier made an additional payment to GoHealth.

222.    In a call on September 16, 2021, Mr. Shasha elaborated on this practice, based on his prior experience working at Molina:

> I can tell you directly, within the last four years, the business presentation that was put in front of me by GoHealth when I was at Molina was, "here's the amount of money we want, this is the amount of apps we'll drive for that." My questions back were, "Well, what if you get over that number?" "We turn you off." "What if we decide not to fund you next year?" "We turn you off."

**H.    SelectQuote's Receipt of Kickbacks from MA Carriers**

223.    SelectQuote, too, has taken kickbacks from MA carriers in exchange for referring MA business to them.

224.    Select Quote's latest annual report, filed August 26, 2021, explicitly acknowledges that carriers provide it "with marketing development funds as additional compensation to deliver policies. Marketing development funds are similar to production

bonuses in that they are based on attaining various predetermined target sales levels or other agreed-upon objectives for individual insurance carrier partners."

225.    In other words, SelectQuote takes money from carriers that is separate from commissions and, in exchange, refers MA business to them.

226.    For the year ended June 30, 2021, SelectQuote reported that it received $19.5 million in such "marketing development funds."

227.    On August 27, 2021, Relator and his eHealth colleague, Mr. Streich, spoke by telephone with Josh Matthews, SelectQuote's Executive Vice President of Medicare Sales and Operations, about the sponsorship money, or "marketing development funds," that brokers receive from MA carriers. Mr. Matthews explained that, "five years ago you did these deals, small handshake deals in dark back rooms," but he predicted that, "because the money is so big now . . . [t]here's more scrutiny, gonna be more scrutiny . . . [and] I don't think it'll last, no." Mr. Matthews further described these payment arrangements as a "loophole," *i.e.* a way to collect otherwise prohibited remuneration under the cover of administrative payments.

**I.    eHealth's Kickbacks to AllScripts**

228.    While the Medicare marketing regulations permit payment to "individuals" of referral fees up to $100 per referral, *see* 42 C.F.R. § 422.2274(f), eHealth has paid defendant AllScripts fees of $175 or more per referral that resulted in an MA application.

229.    In September 2019, eHealth and AllScripts entered into a "Non-Licensed Partner Referral Agreement." The agreement used the term "non-licensed" because AllScripts is not licensed to sell health insurance. As a result, eHealth cannot share commissions with AllScripts.

230.    Under the agreement, eHealth agreed to pay AllScripts $175 for each MA application, $150 for each Medicare Supplement application, and $18.50 for each PDP application that eHealth submitted to a carrier as a result of a referral from AllScripts.

231.    Effective September 30, 2020, the parties amended their agreement to provide that eHealth also would reimburse AllScripts for any costs AllScripts incurred in undertaking direct mail campaigns on behalf of eHealth.

232.    Further, pursuant to an amendment that eHealth and AllScripts signed on October 5, 2021, eHealth now pays AllScripts $191 for each MA application, $164 for each Medicare Supplement application, and $20 for each PDP application that eHealth submits to a carrier as a result of a referral from AllScripts.

233.    Under the referral arrangement, AllScripts uses HIPAA-protected patient health information on its EHR platform, which is called FollowMyHealth, to identify Medicare eligible people or people who are about to turn 65. AllScripts then uses direct mail, e-mail, and secure messages on FollowMyHealth (which patients typically use only to communicate with their health care providers) to contact those people about using eHealth to obtain a new Medicare insurance policy.

234.    In 2020, pursuant to this arrangement, AllScripts sent eHealth referrals that led to over 6,700 MA applications, as well as over 1,000 additional Medicare Supplement and PDP applications, and eHealth paid AllScripts over $1 million in referral fees. The referrals from eHealth generated over $6 million in booked revenue for eHealth.

61

**J.      Defendants' Kickbacks Caused Harm to Medicare Consumers and to Competition among Medicare Insurance Agents**

235.    The carrier defendants' kickbacks to the broker defendants incentivized those brokers and their agents to sell the carrier defendants' plans even when those plans were not necessarily in the best interests of the brokers' Medicare beneficiary clients.

236.    The kickbacks worked for the defendant carriers. At eHealth, for example, the defendant carriers' market shares were uniformly higher than the carriers' national market shares, as reflected in the following table:

| Carrier | | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| Aetna | eHealth Market Share | 17.9% | 19.2% | 21.1% |
| | National Market Share | 6.4% | 7.4% | 7.9% |
| Humana | eHealth Market Share | 20.9% | 24.3% | 26.8% |
| | National Market Share | 18.5% | 19.1% | 19.7% |
| WellCare | eHealth Market Share | 4.4% | 5.6% | 6.6% |
| | National Market Share | 4.1% | 4.2% | 4.8% |
| Anthem | eHealth Market Share | 6.2% | 6.5% | 8.2% |
| | National Market Share | ~5.0% | ~5.2% | 6.0% |

237.    But the policies that eHealth, GoHealth, and SelectQuote sold as a result of the carriers' kickbacks often did not work out well for the Medicare beneficiaries who purchased them.

238.    eHealth, for example, has had a consistently high, and increasing, rate of complaints involving Medicare plans that it sold. In 2019, eHealth's rate of Medicare customer complaints vs. submitted applications was 1%; in 2020, that rate was 1.1%, and in 2021, as of August 13, that rate was 1.8%. Many of the complaints involved allegations of enrollment without consent, beneficiaries whose providers were not in plans' networks, and abusive/high pressure sales tactics. eHealth compliance personnel substantiated many of the complaints, including the following:

- In May 2019, an independent insurance agent in Kansas complained that, after an eHealth agent convinced a Medicare beneficiary, who was undergoing expensive cancer treatment, to switch from original Medicare and TRICARE (which covered the beneficiary's Medicare co-pays) to a Humana MA plan, the beneficiary suddenly faced $17,000 in out of pocket costs because the beneficiary's providers were out of network.

- In August 2019, a beneficiary's son complained that the beneficiary felt misled because the eHealth agent told him his coverage wouldn't change with an MA plan, and "[n]ow he has found out that has to use doctors and hospitals that are in network. This was never explained."

- In September 2019, a beneficiary complained that she felt misled because she sought a plan with prescription drug coverage, and the agent enrolled her into an MA plan without drug coverage.

- In March 2019, a beneficiary complained that "she never completed an application or gave anyone permission to enroll her into the Aetna plan."

- In October 2019, a Medicare beneficiary complained that an eHealth agent had convinced him to switch from a Humana MA plan to a WellCare MA plan only to find out that the WellCare plan's provider network did not include his providers.

- In September 2019, a Medicare beneficiary complained that an eHealth agent falsely told her that she would not lose her employer-sponsored health care coverage if she switched to an Aetna Advantra plan.

- In January 2020, a beneficiary complained that an agent told her that enrolling in a Humana MA plan would not affect her Medicare, but then she found out that she could not have a surgery she had scheduled for January 28, 2020, because the providers did not accept the new plan.

239.    Another consequence of eHealth's aggressive, carrier-fueled sales tactics has been a particularly high churn rate, *i.e.*, the annual rate at which eHealth loses customers. From the fourth quarter of 2018 through the first quarter of 2021, eHealth's churn rate ranged from 31% to 38%. By the second quarter of 2021, according to an eHealth earnings call transcript, eHealth's churn rate had increased to 42%. eHealth's churn rate was far higher than the national average for MA brokers.

240.    eHealth used sponsorship money to make up for its substantial and ongoing loss of revenue from policy commissions.

241.    The sponsorship payments from the defendant carriers to tele-sales brokers like eHealth, GoHealth, and SelectQuote also distorted the market and hindered competition from independent insurance agents. With tens of millions of dollars in extra revenue from the defendant carriers, eHealth, GoHealth, and SelectQuote have been able to flood cable television channels with commercials, pay lead brokers to make millions of outbound telemarketing calls, and send out millions of direct mail pieces to encourage Medicare beneficiaries to call agents in their call centers. Meanwhile, independent insurance agents – who often meet with their customers in person, devote significant effort to finding plans that will best serve their clients, and generally have far lower churn and complaint rates – have no ability to engage in such marketing activities.

242.    Separately, eHealth's payments to AllScripts caused AllScripts to use patients' personal health information to refer those patients to eHealth, which then attempted to switch the patients' Medicare coverage, even when such switches may not have been in the patients' best interest.

## VII.   CAUSE OF ACTION

### COUNT I
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

243.    Relator re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

244.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented materially false or fraudulent claims for payment or approval to the United States in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A); that is, Defendants knowingly

64

made or presented, or caused to be made or presented, to the United States claims for payment for MA policies that were tainted by illegal kickbacks.

245.    Payment of the false and fraudulent claims was a reasonable and foreseeable consequence of Defendants' conduct.

246.    By reason of the foregoing, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false or fraudulent claim.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Relator demands and prays for the following relief:

1.    That judgment be entered in favor of the United States for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper;

2.    An award to the Relator of a percentage of the proceeds of the action in accordance with 31 U.S.C. § 3730(d);

3.    An award to the Relator of his costs and reasonable attorney's fees for prosecuting this action; and

4.    All other relief as may be required or authorized by law and in the interests of justice.

## IX.    DEMAND FOR JURY TRIAL

Relator hereby demands a trial by jury.

Dated: November 2, 2021

Respectfully submitted,

ANDREW SHEA

By his attorney

/s/ Gregg Shapiro
Gregg Shapiro (BBO No. 642069)
Newman and Shapiro
1 Story Terrace
Marblehead, MA 01945
Tel: 617-582-3875
gshapiro@newmanshapiro.com