**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

UNITED STATES _ex rel._ ANDREW SHEA,     )
                                  )

      Plaintiff,               )       Civil Action No. 1:21-cv-11777-DJC

                                    )

v.                                )       FILED UNDER SEAL PURSUANT

                                  )       TO 31 U.S.C. § 3730(b)(2)

eHEALTH, INC., eHEALTHINSURANCE   )

SERVICES, INC., AETNA LIFE INSURANCE )

COMPANY, HUMANA INC., WELLCARE   )

HEALTH PLANS, INC., ELEVANCE HEALTH, )

INC. (f/k/a ANTHEM, INC.), GOHEALTH, INC., )

and SELECTQUOTE, INC.,                )

                                  )

      Defendants.               )

_____)

**<u>AMENDED FALSE CLAIMS ACT COMPLAINT</u>**

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................................ 1

II.   JURISDICTION AND VENUE .............................................................................. 4

III.  THE PARTIES ......................................................................................................... 4

    A.    Relator ................................................................................................................. 4

    B.    eHealth, Inc., And eHealthInsurance Services, Inc. ........................................... 4

    C.    Aetna Life Insurance Company ............................................................................ 7

    D.    Humana Inc. ......................................................................................................... 7

    E.    WellCare Health Plans, Inc. ................................................................................ 7

    F.    Elevance Health, Inc. (f/k/a Anthem, Inc.) .......................................................... 8

    G.    GoHealth, Inc. ...................................................................................................... 8

    H.    SelectQuote, Inc. .................................................................................................. 8

IV.   LEGAL BACKGROUND ....................................................................................... 8

    A.    The False Claims Act ........................................................................................... 8

    B.    The Anti-Kickback Statute ................................................................................... 9

    C.    General Background On Original Medicare And Medicare Advantage .......................... 10

    D.    Medicare Advantage Rules Concerning Carrier Compensation Of Brokers .................... 13

    E.    Medicare Advantage Prohibitions On Discrimination Against Disabled Medicare Beneficiaries, And The Carriers' Representations Of Compliance With Those Prohibitions ......................................................................................................... 16

    F.    The Carriers' Representations Of Compliance With The False Claims Act And The Anti-Kickback Statute. .............................................................................................. 19

    G.    Responsibility Of The Brokers To Comply With The Carriers' Contracts With CMS .... 20

    H.    The Process For Medicare Advantage Carriers To Submit Claims To CMS ................. 20

V.    FACTUAL ALLEGATIONS ................................................................................. 22

    A.    The Carriers' Kickbacks To The Brokers ........................................................... 22

        1. The Carriers' Kickbacks To eHealth ................................................................ 22

            a. General Allegations Of The Carriers' Kickbacks To eHealth ............................... 22

            b. Aetna's Kickbacks To eHealth ............................................................................ 31

            c. Humana's Kickbacks To eHealth ........................................................................ 35

            d. Wellcare's Kickbacks To eHealth ...................................................................... 43

            e. Anthem's Kickbacks To eHealth ........................................................................ 47

        2. The Carriers' Kickbacks To GoHealth ............................................................ 53

        3. The Carriers' Kickbacks To SelectQuote ........................................................ 55

    4. Defendants' Kickback Arrangements Harmed Medicare Beneficiaries, Harmed Competition In The Medicare Advantage Market, And Wasted Scarce Taxpayer Dollars. ................................................................................................ 57

B.   Aetna And Humana Pressured eHealth To Discriminate Against Disabled Medicare Beneficiaries. ............................................................................................... 61

    1. Aetna's Pressure On eHealth To Discriminate Against Disabled Medicare Beneficiaries ............................................................................................. 62

    2. Humana's Pressure On eHealth To Discriminate Against Disabled Medicare Beneficiaries ............................................................................................. 71

C.   SelectQuote Discriminated Against Disabled Beneficiaries On Behalf Of The Carriers. 76

VI.   THE CARRIERS' FALSE REPRESENTATIONS TO CMS THAT THEY HAD COMPLIED WITH MATERIAL CONDITIONS OF PAYMENT ................................... 76

VII.  EXAMPLES OF THE CARRIERS' FALSE CLAIMS ....................................... 78

VIII. CAUSES OF ACTION ................................................................................. 80

IX.   PRAYER FOR RELIEF ................................................................................ 84

X.    DEMAND FOR JURY TRIAL ........................................................................ 85

Andrew Shea ("Relator") brings this action as a *qui tam* relator on behalf of the United States against eHealth, Inc., eHealthInsurance Services, Inc. (collectively, "eHealth"), Aetna Life Insurance Company ("Aetna"), Humana Inc. ("Humana"), WellCare Health Plans, Inc. ("Wellcare"), Elevance Health, Inc. ("Anthem"), GoHealth, Inc. ("GoHealth"), and SelectQuote, Inc. ("SelectQuote") (collectively, "Defendants"), pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729-33, to recover damages, penalties, attorneys' fees and costs, and other relief.

## I.    PRELIMINARY STATEMENT

1.    Each of the carrier defendants – Aetna, Humana, Wellcare, and Anthem (collectively, the "Carriers") – paid at least tens of millions of dollars in kickbacks to the insurance broker defendants – eHealth, GoHealth, and SelectQuote (collectively, the "Brokers") – to induce the Brokers to steer Medicare beneficiaries to the Carriers' Medicare Advantage plans ("Advantage plans"), rather than to Original Medicare or to the Advantage plans of other carriers that were not paying any kickbacks, or not paying as much in kickbacks, to the Brokers.

2.    Further, even though Congress mandated that Medicare Advantage be a guaranteed issue program equally accessible to all Medicare beneficiaries, two of the Carriers – Aetna and Humana – paid kickbacks to eHealth, and also threatened to withhold kickbacks from eHealth, to induce eHealth to discriminate against disabled Medicare beneficiaries by steering those beneficiaries away from Aetna and Humana Advantage plans. On information and belief, SelectQuote, too, discriminated against disabled Medicare beneficiaries so that it would continue receiving kickbacks from the Carriers.

3.    The Carriers paid the kickbacks, which the Defendants at various times called "sponsorship," "co-op money," or "marketing developments funds" (collectively, "MDF"), on

top of commissions and administrative payments that the Medicare statute and regulations allowed. *Cf.* 42 C.F.R. §§ 422.2274(a), 422.2274(d), and 422.2274(e) (2021).

4.      Although the Defendants undertook in their formal written contracts to describe the MDF as reimbursement or payment for general advertising or for marketing expenses or services, rather than as additional remuneration for enrollment of Medicare beneficiaries in the Carriers' Advantage plans, the Defendants' extra-contractual communications made clear that the Defendants entered into *quid pro quo* arrangements whereby the Carriers paid the Brokers in exchange for the Brokers' commitments to refer specific numbers of Medicare beneficiaries to the Carriers' Advantage plans.

5.      The Defendants engaged in these kickback-fueled steering arrangements notwithstanding the express Congressional intent that "agents and brokers . . . enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w–21(j)(2). The kickbacks also violated the Carriers' undertakings in their Advantage plan contracts with the Centers for Medicare and Medicaid Services ("CMS"). In those contracts, the Carriers agreed to comply with the False Claims Act, 31 U.S.C. § 3729-33, and the anti-kickback statute, 42 U.S.C. § 1320a-7b(b). *See* 42 C.F.R. § 422.504(h).

6.      Separately, Aetna and Humana, in pressuring eHealth and SelectQuote to discriminate against disabled Medicare beneficiaries by not enrolling them in Aetna or Humana Advantage plans, violated the Medicare statute's prohibitions against such discrimination, as well as the requirements in Aetna's and Humana's Advantage plan contracts with CMS that they not discriminate in beneficiary enrollment. *See* 42 U.S.C. § 1395w–21(g)(1); 42 C.F.R. §§ 422.110, 422.504(a).

7.     Meanwhile, each of the Brokers agreed in their own contracts with the Carriers that the Brokers would adhere to the terms of the Carriers' contracts with CMS. By soliciting and receiving kickbacks from the Carriers, the Brokers knowingly caused the Carriers to misrepresent their compliance with the anti-kickback statute in their contracts with CMS. And eHealth and SelectQuote, by discriminating against disabled Medicare beneficiaries at the behest of Carriers, knowingly caused those Carriers to misrepresent their adherence to the discrimination prohibitions in their contracts with CMS.

8.     The Carriers' kickbacks to the Brokers diverted limited government health care dollars that, absent the kickbacks, would have been returned to Medicare beneficiaries in the form of lower cost sharing, lower premiums, or more supplemental benefits, and to the federal fisc in the form of lower monthly reimbursement payments from CMS.

9.     Defendants' kickback schemes also contributed to high levels of Medicare beneficiary complaints – commonly involving misleading sales presentations or enrollment without the beneficiaries' consent – and high rates of "churning" of Medicare beneficiaries from one plan to another. And the kickback schemes harmed competition in the Medicare Advantage marketplace by (1) making it harder for carriers that did not pay kickbacks to compete against carriers that did pay kickbacks, and (2) making it harder for brokers that did not solicit and receive kickbacks to compete against brokers that did solicit and receive kickbacks.

10.    Over the years, Relator expressed compliance concerns about eHealth's relationships with the Carriers, but other eHealth executives largely ignored those concerns.

11.    Prior to the filing of his Complaint, and again before the filing of this Amended Complaint, Relator voluntarily made substantive disclosures to the government of facts and evidence underlying his allegations.

12.     This action is filed *in camera* and under seal pursuant to the requirements of the False Claims Act, 31 U.S.C. § 3730(b)(2).

## II.    JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3732, which confers jurisdiction over actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

14.     This Court may exercise personal jurisdiction over each of the Defendants, and venue is appropriate in this Court, under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b), because each of the Defendants can be found and transacts business in this District.

## III.    THE PARTIES

### A.    Relator

15.     Since 2001, Relator has held various positions that involve the marketing of health products for adults aged 50 or older. In January 2017, he joined eHealth. As of 2021, he served as eHealth's Senior Vice President of Marketing. (Technically, he was an employee of defendant eHealthInsurance Services, Inc.) Until December 31, 2020, his responsibilities at eHealth included marketing of Medicare Advantage, Medicare Part D, Medicare Supplement, and other insurance plans through direct mail and direct response television ("DRTV") advertising. On January 1, 2021, Relator moved into a new role in which he was responsible for creating a new business incubator within eHealth's Medicare division, initially focused on diversifying the products eHealth sells to Medicare beneficiaries. Relator's last day as an eHealth employee was December 29, 2021. He lives in Missouri.

### B.    eHealth, Inc., And eHealthInsurance Services, Inc.

16.     eHealth, Inc., a Delaware corporation, is a publicly-traded company that is now based in Austin, Texas. eHealthInsurance Services, Inc., a Delaware corporation, is a wholly-

owned subsidiary of eHealth, Inc. As of 2021, the two companies shared senior management, including the same Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, and General Counsel.

17.    eHealth is an insurance broker and sells Advantage and other health insurance plans online and through tele-sales. eHealth's websites include www.Medicare.com, www.eHealthMedicare.com, www.PlanPrescriber.com, and www.GoMedigap.com. Hundreds of insurance agents work for eHealth in call centers and remotely; they speak by telephone with people who have been contacted by a lead vendor working on eHealth's behalf, or who have seen a telephone number in an eHealth advertisement, either on television, in a direct mail piece, in a pharmacy, in a doctor's office, or online. The agents take information from these individuals, recommend Medicare or other health insurance plans to them, and then prepare applications that eHealth submits to insurance carriers. Medicare beneficiaries also can apply for a Medicare insurance plan directly through one of eHealth's websites.

18.    From at least as early as 2016 until on or about May 1, 2018, eHealth had a place of business at 2 Technology Park Drive, Westford, Massachusetts. As of March 1, 2018, eHealth had 50 insurance agents and 29 other employes in Westford. eHealth agents in Westford sold Advantage plans offered by each of the Carriers.

19.    Consistent with the express statutory intent that Medicare insurance agents enroll Medicare beneficiaries in a plan that "is intended to best meet their health care needs," eHealth has held itself out as a carrier-agnostic customer advocate that seeks to match beneficiaries with plans that are best for them. Thus, for example, in a July 2017 meeting with CMS Administrator Seema Verma, eHealth represented that its goal was "Fulfilling Every Senior's Medicare Need through Constant, Unbiased Service." Similarly, in 2018, eHealth's website represented to

potential customers that "[w]e're unbiased." In a 2020 press release, eHealth's then-CEO, Scott Flanders, said: "We've helped to drive an industry toward greater transparency and choice as an advocate and unbiased resource for health insurance consumers." In the company's Annual Report for the year 2020, eHealth stated that "[o]ur mission is to connect every person with the highest quality, most affordable health insurance and Medicare plans for their life circumstance." In answering a question about carrier MDF payments during eHealth's quarterly earnings call on July 23, 2020, Mr. Flanders said that "we have a consumer centric model . . . that does not direct seniors to specific carriers the way that some of our competitors constrain their carrier choice." eHealth made these claims even though, in many parts of the country, it offered far fewer than all available health insurance plans for Medicare beneficiaries and directed beneficiaries primarily to Advantage plans of carriers that were paying it large amounts of MDF.

20. For the years 2018, 2019, and 2020, eHealth's total annual Medicare segment revenues were $210,570,000, $446,961,000, and $516,762,000, respectively. During the same period, an increasingly large amount of eHealth's Medicare segment revenue came from insurance carriers' MDF payments, which were on top of commissions and administrative payments. eHealth's annual revenues from Medicare carrier MDF in 2018, 2019, and 2020 were $14,367,761, $33,909,235, and $67,046,004, respectively. Put another way, MDF from insurance carriers represented approximately 6.8%, 7.6%, and 13.0% of eHealth's total annual Medicare segment revenues during 2018, 2019, and 2020, respectively. During those years, MDF accounted for a much larger share of eHealth's profits from its Medicare business: 23.6% in 2018, 21.8% in 2019, and 65.8% in 2020. In May 2021, an eHealth executive asserted in an internal company meeting that eHealth's "sponsorship program has huge goals, and makes up half of the EBITDA."

21.    Below is a table of eHealth's MDF revenue, by carrier, during the years 2018, 2019, 2020:

| Carrier | Sum of 2018 Total | Sum of 2019 Total | Sum of 2020 Total | SUM THREE YEARS | CARRIER |
|---|---|---|---|---|---|
| Aetna | $ 2,249,670 | $ 5,793,195 | $ 10,950,400 | $ 18,993,265 | Aetna |
| Anthem | $ 4,418,644 | $ 3,181,356 | $ 0 | $ 7,600,000 | Anthem |
| Anthem Blue Cross | $ 378,261 | $ 7,600,005 | $ 21,890,000 | $ 29,868,266 | Anthem Blue Cross |
| BCBS MI | $ | $ 5,500 | $ 1,500 | $ 7,000 | BCBS MI |
| Blue Shield of CA | $ 3,000 | $ 1,500 | $ | $ 4,500 | Blue Shield of CA |
| CareFirst BlueCross BlueShield | $ 2,400 | $ | $ | $ 2,400 | CareFirst BlueCross BlueShield |
| CareFirst MedPlus | $ 7,200 | $ | $ | $ 7,200 | CareFirst MedPlus |
| Centene | $ 225,000 | $ 200,000 | $ 136,744 | $ 561,744 | Centene |
| Cigna-HealthSpring | $ 150,000 | $ | $ 1,190,000 | $ 1,340,000 | Cigna-HealthSpring |
| Florida blue Medicare, Inc. | $ - | $ - | $ 3,024,000 | $ 3,024,000 | Florida Blue Medicare, Inc. |
| Health Alliance Medical Plans | $ | $ - | $ 100,000 | $ 100,000 | Health Alliance Medical Plans |
| Health Care Service Corporation | $ 12,500 | $ - | $ 255,000 | $ 267,500 | Health Care Service Corporation |
| HealthSpring | $ 40,000 | $ | $ | $ 40,000 | HealthSpring |
| HighMark | $ | $ - | $ 190,000 | $ 190,000 | HighMark |
| Horizon Blue Cross Blue Shield of New Jersey | $ | $ 3,790 | $ 5,345 | $ 9,135 | Horizon Blue Cross Blue Shield of New Jersey |
| Humana | $ 5,000,000 | $ 13,500,000 | $ 18,500,000 | $ 37,000,000 | Humana |
| Kaiser Foundation Health Plan, Inc | $ | $ | $ 325,000 | $ 325,000 | Kaiser Foundation Health Plan, Inc |
| Molina Healthcare, Inc | $ 86,086 | $ 298,888 | $ 190,832 | $ 575,807 | Molina Healthcare, Inc |
| Mutual of Omaha Insurance Company | $ | $ | $ 28,100 | $ 28,100 | Mutual of Omaha Insurance Company |
| Oscar Insurance Corporation | $ - | $ 50,000 | $ 150,000 | $ 200,000 | Oscar Insurance Corporation |
| Primary Care Holdings II, LLC | $ | $ | $ 14,083 | $ 14,083 | Primary Care Holdings II, LLC |
| WellCare | $ 1,795,000 | $ 3,275,000 | $ 10,095,001 | $ 15,165,001 | WellCare |
| Grand Total | $ 14,367,761 | $ 33,909,235 | $ 67,046,004 | $ 115,323,000 | Grand Total |

### C.    Aetna Life Insurance Company

22.    Aetna is a Connecticut corporation with a principal place of business in Hartford, Connecticut. Aetna is a subsidiary of CVS Health Corporation. Aetna offers and markets Advantage plans. Aetna does business in Massachusetts.

### D.    Humana Inc.

23.     Humana is a Delaware corporation with a principal place of business in Louisville, Kentucky. Together with its wholly-owned subsidiaries, including Humana Insurance Company and Humana MarketPoint, Inc., Humana offers and markets Advantage plans. Humana does business in Massachusetts.

### E.    WellCare Health Plans, Inc.

24.    Wellcare is a Delaware corporation with a principal place of business in Tampa, Florida. In January 2020, Wellcare became a wholly-owned subsidiary of Centene Corporation ("Centene"). Together with its subsidiaries, Wellcare offers and markets Advantage plans. Wellcare does business in Massachusetts.

**F.    Elevance Health, Inc. (f/k/a Anthem, Inc.)**

25.    Anthem, which in May 2022 changed its corporate name from Anthem, Inc., to Elevance Health, Inc., is an Indiana corporation with a principal place of business in Indianapolis, Indiana. Anthem is an independent licensee of the Blue Cross and Blue Shield Association. Together with its subsidiaries, Anthem offers and markets Advantage plans. Anthem does business in Massachusetts.

**G.    GoHealth, Inc.**

26.    GoHealth is a Delaware corporation with a principal place of business in Chicago, Illinois. GoHealth is an insurance broker and sells Advantage and other health insurance plans online and through tele-sales. Like eHealth, GoHealth has represented that it "help[s] individuals find the best health insurance plan for their specific needs." GoHealth, 2020 Annual Report at 5 (Mar. 16, 2021). GoHealth does business in Massachusetts.

**H.    SelectQuote, Inc.**

27.    SelectQuote is a Delaware corporation with a principal place of business in Overland Park, Kansas. SelectQuote is an insurance broker and sells Advantage and other health insurance plans online and through tele-sales. Like eHealth and GoHealth, SelectQuote has represented that it "help[s] consumers select the [insurance] option that best suits their needs and circumstances." SelectQuote, 2020-2021 Annual Report at 7 (Aug. 26, 2021). SelectQuote does business in Massachusetts.

**IV.    LEGAL BACKGROUND**

**A.    The False Claims Act**

28.    The False Claims Act provides, in pertinent part, that any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

8

> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

> . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

29.     For purposes of the False Claims Act, "the terms 'knowing' and 'knowingly' mean that a person, with respect to information[,] (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

30.     The False Claims Act defines the term "claim," in pertinent part, as

> any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded[.]

31 U.S.C. § 3729(b)(2).

## B.     The Anti-Kickback Statute

31.     The anti-kickback statute makes it illegal either to:

> (1). . . knowingly and willfully solicit[] or receive[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service,

or item for which payment may be made in whole or in part under a
Federal health care program. . . [or]

(2). . . knowingly and willfully offer[] or pay[] any remuneration (including any
kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in
kind to any person to induce such person—
  (A) to refer an individual to a person for the furnishing or arranging for the
  furnishing of any item or service for which payment may be made in
  whole or in part under a Federal health care program, or
  (B) to purchase, lease, order, or arrange for or recommend purchasing,
  leasing, or ordering any good, facility, service, or item for which payment
  may be made in whole or in part under a Federal health care program. . . .

42 U.S.C. § 1320a-7b(b). Thus, the anti-kickback statute prohibits, among other things, monetary

inducements to "refer an individual to a person for the furnishing . . . of any item or service"

(such as an Advantage plan) reimbursed by a Federal health care program. As Wellcare's Code

of Conduct and Business Ethics explained, "[a] kickback arrangement involves giving a reward

to someone for sending business your way."

32.    "[A] claim that includes items or services resulting from a violation of [the anti-

kickback statute] constitutes a false or fraudulent claim for purposes of [the False Claims Act]."

42 U.S.C. § 1320a-7b(g).

33.    In order for a person to violate the anti-kickback statute, the "person need not

have actual knowledge of [the anti-kickback statute] or specific intent to commit a violation of

[the anti-kickback statute]." 42 U.S.C. § 1320a-7b(h).

**C.    General Background On Original Medicare And Medicare Advantage**

34.    In order to be eligible for Medicare, a person must be age 65 or older, be disabled,

or have end-stage renal disease. Disabilities that may qualify an under-65 individual for

Medicare include multiple sclerosis, metastatic cancer, total blindness, seizure disorders, Down

syndrome, severe mental illness, and spinal cord injury. *See* 45 C.F.R. § 92.4; 20 C.F.R. Pt. 404,

Subpt. P, App. 1.

35.     The "Original Medicare" program (which still exists) has two parts: A and B.

36.     Part A covers inpatient stays at hospitals and skilled nursing facilities. For people who paid sufficient Medicare taxes, Medicare Part A does not have a premium, but it does have a deductible ($1,484 in 2021) per benefit period (which runs from the date of admission to 60 days from the date of discharge), as well as other patient cost sharing obligations for longer hospital stays and for skilled nursing facility stays.

37.     Part B covers medical services and supplies (including physician-administered drugs, but not other drugs). Part B coverage requires payment of a monthly premium ($148.50 in 2021). Part B also has an annual deductible ($203 in 2021), and it requires the patient to pay a 20% coinsurance amount for all covered services.

38.     Many people with Part B coverage purchase a separate Medicare Supplement (sometimes referred to as "MS" or "Medigap") plan from a private insurer. Medicare Supplement plans typically cover all or most of Part B coinsurance amounts.

39.     Almost all medical providers in the United States accept Medicare Part B.

40.     Since 2006, people eligible for Medicare also have been able to purchase prescription drug coverage (for non-physician-administered drugs) through a Part D plan offered by a private insurer that receives reimbursement from the Medicare program. Part D Plans have premiums, deductibles, and a complex coinsurance/co-pay structure.

41.     As an alternative to Original Medicare, a person eligible for Medicare may enroll in an Advantage plan offered by a private insurer through Medicare Part C. *See* 42 U.S.C. §§ 1395w-21-1395w-28. Advantage plans include the benefits of Parts A and B, and usually Part D. They sometimes offer other benefits, too, such as dental or vision insurance. An Advantage plan, however, frequently only covers services from a health care provider in the plan's network,

11

and Advantage plans often require a referral or prior authorization as a condition of coverage. Also, Advantage plans with drug coverage have formularies that may limit access to certain drugs. Recent years have seen a trend toward vertical integration by Medicare Advantage carriers, many of which now own or control physician groups, pharmacies, and even pharmacy benefit managers. Consequently, a beneficiary's choice of an Advantage plan also has a significant impact on which clinicians will provide care to the beneficiary, which pharmacy will dispense drugs to the beneficiary, and which pharmacy benefit manager will determine the formulary for the beneficiary's drug benefit.

42.     For each of a carrier's Advantage plans, CMS pays the carrier a monthly capitated rate for each beneficiary enrolled as a member of the plan. *See* 42 U.S.C. § 1395w-23. The capitated per-beneficiary rate for each plan is determined based in part on how the carrier's annual plan bid compares to an administratively set benchmark established under the Part C statute. *See* 42 U.S.C. § 1395w-23(a)(1)(B); 42 C.F.R. § 422.254. "Each bid submission must contain all estimated revenue required by the plan, including administrative costs and return on investment." 42 C.F.R. § 422.254(b)(3). Consequently, carriers with lower MDF expenditures are able to submit lower plan bids. If a carrier's plan bid is below the benchmark, the plan must pay enrollees in the plan a "rebate" – in the form of supplemental benefits or lower premiums or cost sharing – of a percentage of the difference between the bid and the benchmark. *See* 42 C.F.R. § 422.266. The remainder of the difference is cost savings that CMS retains on behalf of taxpayers. If a carrier's plan bid is above the benchmark, there are no rebates, and each enrollee in the plan must pay a premium to make up the difference. *See* 42 C.F.R. § 422.262(a)(2).

43.     A particular Advantage plan's provider network, drug coverage, other benefits, and premiums may change from year to year. Most Medicare beneficiaries may switch

Advantage plans once each year, during the Annual Enrollment Period ("AEP"), which runs from October 15 to December 7. *See* 42 U.S.C. § 1395w–21(e)(3)(B)(v); 42 C.F.R. § 423.38(b)(3). Medicare beneficiaries who are also eligible for Medicaid may switch Advantage plans up to four times each year: during the first, second, and third quarters of the year, and again during the AEP. *See* 42 C.F.R. § 423.38(c)(4).

### D.    Medicare Advantage Rules Concerning Carrier Compensation Of Brokers

44.    The Medicare Advantage statute directs CMS to "establish limitations with respect to . . . [t]he use of compensation other than as provided under guidelines established by the Secretary. Such guidelines shall ensure that the use of compensation creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w–21(j)(2)(D).

45.    CMS first set compensation limits for Medicare Advantage brokers and agents in 2008. *See generally* 42 C.F.R. § 422.2274. In initially proposing these limits, CMS recognized that "[a]gents selling MA and PDP products play a significant role in providing guidance and advice to beneficiaries when selecting health plan options. This unique position allows them to influence beneficiary choices." CMS, *Medicare Program; Revisions to the Medicare Advantage and Prescription Drug Benefit Programs*, 73 Fed. Reg. 28556, 28583 (May 16, 2008). CMS thus explained that, consistent with the statute, the purpose of the compensation regulations was "to prevent agents from unnecessarily moving beneficiaries from plan to plan and to ensure that beneficiaries are receiving the information and counseling necessary to select the best plan based on their health care needs." *Id.*

46.    As of 2021, the Medicare Advantage regulations provided that, "[f]or each enrollment in an initial enrollment year, [Medicare Advantage] organizations [*i.e.*, Medicare Advantage insurance carriers] may pay compensation at or below FMV [fair market value]," 42

C.F.R. § 422.2274(d)(2) (2021), and "[f]or each enrollment in a renewal year, [Advantage] plans

may pay compensation at an amount up to 50 percent of FMV." 42 C.F.R. § 422.2274(d)(3)

(2021).

47.     The regulations further prescribed that, for 2021, "the national FMV is $539, the

FMV for Connecticut, Pennsylvania, and the District of Columbia is $607, the FMV for

California and New Jersey is $672, and the FMV for Puerto Rico and the U.S. Virgin Islands is

$370." 42 C.F.R. § 422.2274(a) (2021).

48.     If a beneficiary disenrolled from an Advantage plan less than three months after

the start of coverage, the regulations generally required the plan to recover any commission paid.

*See* 42 C.F.R. § 422.2274(d)(5)(ii)(A) (2021).

49.     The regulations also permitted a Medicare Advantage carrier to pay an agent or

broker "administrative payments" (which are also commonly called "overrides"). *See* 42 C.F.R.

§ 422.2274(e) (2021). Specifically, the regulations provided that:

> (1) Payments made for services other than enrollment of beneficiaries (for
> example, training, customer service, agent recruitment, operational overhead,
> or assistance with completion of health risk assessments) must not exceed the
> value of those services in the marketplace.

> (2) Administrative payments can be based on enrollment provided payments are
> at or below the value of those services in the marketplace.

*Id.*

50.     The version of this regulation in effect prior to January 19, 2021, similarly stated

that the administrative payments could only be for "services other than selling insurance

products." 42 C.F.R. § 422.2274(b)(1)(iv)(B) (2020) ("The amount paid to the third party for

services other than selling insurance products, if any, must be fair-market value and must not

exceed an amount that is commensurate with the amounts paid by the [Medicare Advantage] organization to a third party for similar services during each of the previous 2 years.").

51.    CMS has cautioned that Advantage plans should "not use these administrative payments as a means to circumvent the limits on compensation to agents and brokers." CMS, *Medicare and Medicaid Programs; Contract Year 2022 Policy and Technical Changes to the Medicare Advantage Program, Medicare Prescription Drug Benefit Program, Medicaid Program, Medicare Cost Plan Program, and Programs of All- Inclusive Care for the Elderly*, 86 Fed. Reg. 5864, 5994 (Jan. 19, 2021).

52.    In 2008, when CMS first published its regulations on agent and broker compensation, the agency warned that excessive payments from Advantage plans to agents and brokers could violate the anti-kickback statute:

> The compensation structure is designed to help prevent inappropriate moves of beneficiaries from plan-to-plan. Parties remain responsible, however, for compliance with fraud and abuse laws, including the anti-kickback statute. Depending on the circumstances, agent and broker relationships can be problematic under the anti-kickback statute if they involve, by way of example only, compensation in excess of fair market value, compensation structures tied to the health status of the beneficiary (for example, cherry-picking), or compensation that varies based on the attainment of certain enrollment targets.

CMS, *Medicare Program; Revisions to the Medicare Advantage and Prescription Drug Benefit Programs*, 73 Fed. Reg. 54226, 54239 (Sept. 18, 2008). Shortly thereafter, CMS reiterated that Medicare Advantage carriers "should be mindful that their compensation arrangements including arrangements with [brokers] and other similar type entities must comply with the fraud and abuse laws, including the anti-kickback statute." CMS, *Medicare Program; Revisions to the Medicare Advantage and Prescription Drug Benefit Programs: Clarification of Compensation Plans*, 73 Fed. Reg. 67406, 67410 (Nov. 14, 2008).

E.     **Medicare Advantage Prohibitions On Discrimination Against Disabled Medicare Beneficiaries, And The Carriers' Representations Of Compliance With Those Prohibitions**

53.     Congress designed Medicare Advantage to be a guaranteed issue program that does not permit carriers to cherry-pick enrollees less likely to generate claims. Thus, the Medicare Advantage statute provides that a "Medicare Advantage organization may not deny, limit, or condition the coverage or provision of benefits under this part, for individuals permitted to be enrolled with the organization under this part, based on any health status-related factor." 42 U.S.C. § 1395w–22(b)(1). Likewise, an Advantage plan must "accept without restrictions individuals who are [Medicare] eligible." 42 U.S.C. § 1395w–21(g)(1).

54.     The Medicare Advantage statute further provides that:

If the Secretary determines that an eligible organization with a contract under this section . . .

> (iv) engages in *any practice that would reasonably be expected to have the effect of denying or discouraging enrollment* (except as permitted by this section) by eligible individuals with the organization whose medical condition or history indicates a need for substantial future medical services . . .
> the Secretary may provide, in addition to any other remedies authorized by law, for any of the remedies described in subparagraph (B).

> (B) The remedies described in this subparagraph are—

> (i) civil money penalties of not more than $25,000 for each determination under subparagraph (A) or, with respect to a determination under clause (iv) or (v)(I) of such subparagraph, of not more than $100,000 for each such determination, plus, with respect to a determination under subparagraph (A)(ii), double the excess amount charged in violation of such subparagraph (and the excess amount charged shall be deducted from the penalty and returned to the individual concerned), and plus, with respect to a determination under subparagraph (A)(iv), $15,000 for each individual not enrolled as a result of the practice involved,

> (ii) suspension of enrollment of individuals under this section after the date the Secretary notifies the organization of a determination under subparagraph (A) and until the Secretary is satisfied that the basis for such determination has been corrected and is not likely to recur, or

16

(iii) suspension of payment to the organization under this section for individuals enrolled after the date the Secretary notifies the organization of a determination under subparagraph (A) and until the Secretary is satisfied that the basis for such determination has been corrected and is not likely to recur.

42 U.S.C. § 1395mm(i)(6)(a) (emphasis added).

55.     Similarly, Section 1557 of the Affordable Care Act provides that:

Except as otherwise provided for in this title 1 (or an amendment made by this title), an individual shall not, on the ground prohibited under . . . section 794 of title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance. . . .

42 U.S.C. § 18116(a). Section 794 of title 29 in turn provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

56.     On information and belief, each of the Carriers (each of which is a Medicare Advantage organization) has entered into annual contracts with CMS for each of its Advantage plans.

57.     The Medicare Advantage regulations provide that:

The contract between the [Medicare Advantage] organization and CMS must contain the following provisions:

(a) *Agreement to comply with regulations and instructions.* The [Medicare Advantage] organization agrees to comply with all the applicable requirements and conditions set forth in this part and in general instructions. Compliance with the terms of this paragraph (a) is material to the performance of the [Medicare Advantage] contract. The [Medicare Advantage] organization agrees—
…
(2) That it will comply with the prohibition in § 422.110 on discrimination in beneficiary enrollment.

17

42 C.F.R. § 422.504(a). The referenced regulatory prohibition on discrimination in beneficiary enrollment provides that a "[Medicare Advantage] organization may not deny, limit, or condition the coverage or furnishing of benefits to individuals eligible to enroll in [a Medicare Advantage] plan offered by the organization on the basis of any factor that is related to health status, including, but not limited to the following: … (7) Disability." 42 C.F.R. § 422.110.

58.    The Medicare Advantage regulations further provide that:

CMS may at any time terminate a contract if . . .

> (4) . . . the [Medicare Advantage] organization has had one or more of the following occur:
> …
> (ix) Failed to comply with the regulatory requirements contained in this part. . . .
> …
> (xiv) The [Medicare Advantage] organization has committed any of the acts in § 422.752(a) that support the imposition of intermediate sanctions or civil money penalties under subpart O of this part.

42 C.F.R. § 422.510. The listed acts in 42 C.F.R. § 422.752(a) include "[e]ngag[ing] in any practice that would reasonably be expected to have the effect of denying or discouraging enrollment (except as permitted by this part) by eligible individuals with the organization whose medical condition or history indicates a need for substantial future medical services."

59.    On information and belief, each of the Carriers' contracts with CMS has provided that "[t]he [Medicare Advantage] Organization shall comply with the provisions of 42 CFR §422.110 concerning prohibitions against discrimination in beneficiary enrollment, other than in enrolling eligible beneficiaries in a CMS-approved special needs plan that exclusively enrolls special needs individuals as consistent with 42 CFR §§422.2, 422.4(a)(1)(iv) and 422.52."

60.    On information and belief, each of the Carriers' contracts with CMS also has provided that "CMS may elect not to authorize renewal of a contract for any of the following

18

reasons: . . . [t]he [Medicare Advantage] Organization has committed any of the acts in

§422.752(a) that would support the imposition of intermediate sanctions or civil money penalties

under 42 CFR Part 422 Subpart O."

61.    On information and belief, since at least 2017, each of the defendant carriers'

contracts with CMS also has required that each carrier submit to CMS "assurances that the

[Medicare Advantage] Organization's health programs and activities will be operated in

compliance with the nondiscrimination requirements . . . in 45 CFR §92.5." The referenced

assurance, as set forth in Form HHS 690, provides that the carrier "agrees that it will comply

with . . . Section 1557 of the Affordable Care Act (Pub. L. 111-148), as amended, and all

requirements imposed by or pursuant to the Regulation of the Department of Health and Human

Services (45 CFR Part 92), to the end that, in accordance with Section 1557 and the Regulation,

no person in the United States shall, on the ground of . . . disability be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any health

program or activity for which the Applicant receives Federal financial assistance from the

Department [of Health and Human Services]." The assurance further provides that "[t]he

Applicant agrees that compliance with this assurance constitutes a condition of continued receipt

of Federal financial assistance."

### F.    The Carriers' Representations Of Compliance With The False Claims Act And The Anti-Kickback Statute.

62.    The Medicare Advantage regulations provide that:

The contract between the [Medicare Advantage] organization and CMS must
contain the following provisions:
…
(h) ***Requirements of other laws and regulations.*** The [Medicare Advantage]
organization agrees to comply with-

(1) Federal laws and regulations designed to prevent or ameliorate fraud,
waste, and abuse, including, but not limited to, applicable provisions of

> Federal criminal law, the False Claims Act (31 U.S.C. 3729 et. seq.), and the anti-kickback statute (section 1128B(b)) of the [Social Security] Act)[.]

42 C.F.R. § 504(h).

63.   On information and belief, each of the Carriers' contracts with CMS has provided that "[t]he [Medicare Advantage] Organization agrees to comply with . . . Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law, the False Claims Act (31 USC 3729 et seq.), and the anti-kickback statute (section 1128B(b) of the Act)."

### G.   Responsibility Of The Brokers To Comply With The Carriers' Contracts With CMS

64.   The Medicare Advantage regulations provide that:

> All contracts or written arrangements between [Medicare Advantage] organizations and first tier, downstream, and related entities must contain the following:
> …
> (iii) A provision requiring that any services or other activity performed by a first tier, downstream, and related entity in accordance with a contract are consistent and comply with the [Medicare Advantage] organization's contractual obligations.

42 C.F.R. § 422.504(i)(3).

65.   On information and belief, each of the Carriers entered into contracts with each of the Brokers that contained provisions consistent with the requirements of 42 C.F.R. § 422.504(i)(3).

### H.   The Process For Medicare Advantage Carriers To Submit Claims To CMS

66.   For each of a carrier's Advantage plans, CMS pays the carrier a monthly capitation rate for each beneficiary enrolled as a member of the plan. *See* 42 U.S.C. § 1395w-23. If a beneficiary is also covered by Medicaid, then a state Medicaid program also may contribute to the cost of the Advantage plan.

20

67.    The Medicare Advantage regulations provide that:

The contract between the [Medicare Advantage] organization and CMS must contain the following provisions:
…
(l)    As a condition for receiving a monthly payment under subpart G of this part, the [Medicare Advantage] organization agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to such officer, must request payment under the contract on a document that certifies (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of relevant data that CMS requests. Such data include specified enrollment information, encounter data, and other information that CMS may specify.

> (1)    The CEO, CFO, or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to such officer, must certify that each enrollee for whom the organization is requesting payment is validly enrolled in [an Advantage] plan offered by the organization and the information relied upon by CMS in determining payment (based on best knowledge, information, and belief) is accurate, complete, and truthful.

42 C.F.R. § 422.504(*l*).

68.    On information and belief, each of the Carriers' contracts with CMS has provided that:

As a condition for receiving a monthly payment under paragraph B of this article, and 42 CFR Part 422 Subpart G, the [Medicare Advantage] Organization agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to such officer, must request payment under the contract on the forms attached hereto as Attachment A (enrollment attestation) and Attachment B (risk adjustment data) which attest to *(based on best knowledge, information and belief, as of the date specified on the attestation form)* the accuracy, completeness, and truthfulness of the data identified on these attachments. . . .

> 1. Attachment A requires that the CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to such officer, must attest based on best knowledge, information, and belief that each enrollee for whom the [Medicare Advantage] Organization is requesting payment is validly enrolled, or was validly enrolled during the period for which payment is requested, in [an Advantage] plan offered by the [Medicare Advantage] Organization. The

> [Medicare Advantage] Organization shall submit completed enrollment attestation forms to CMS, or its contractor, on a monthly basis.

(Emphasis in original.)

69.     On information and belief, each of the Carriers requested payment from CMS by submitting monthly attestations of the number Medicare beneficiaries enrolled in each of their Advantage plans, and CMS reimbursed each of the Carriers based on those attestations. Consequently, each such attestation constituted a "claim" for purposes of the False Claims Act.

## V.    FACTUAL ALLEGATIONS

### A.    The Carriers' Kickbacks To The Brokers

#### 1.    The Carriers' Kickbacks To eHealth

##### a.    General Allegations Of The Carriers' Kickbacks To eHealth

70.     Each of the Carriers paid eHealth commissions and administrative fees. As described further below, each of the Carriers also made substantial payments (in the guise of MDF) to eHealth in exchange for eHealth's commitments to refer specific numbers of Advantage plan applications to those Carriers.

71.     Through 2020, the Carriers generally "pre-funded" eHealth with MDF in exchange for commitments by eHealth to refer specific numbers of Medicare beneficiaries to those Carriers' plans. eHealth kept close track of these commitments. In a June 2019 internal presentation, for example, the company noted that its commitments for the fourth quarter of 2018 (which included the AEP) included the following:

| Carrier | Q4 2018 Commitment |
|---|---|
| Humana | 25,000 |
| Aetna | 9,900 |
| Anthem | 9,100 |
| WellCare | 6,900 |

72.     Notably, however, the written contracts between the Carriers and eHealth did not mention eHealth's enrollment commitments. As William Kinkead, an eHealth Director of Carrier Development, noted in an instant message chat with Relator on August 25, 2021, "[t]he commitments on production are verbal over the phone and on spreadsheets - but nowhere on the contracts." In an instant message chat with Relator on September 20, 2021, Mr. Kinkead further explained that the carriers did this intentionally because, "as long as they [the MDF contracts] don[']t explicitly call out app count or funding against production….they should be able to skirt around the regs."

73.     So, the parties generally attempted to disguise the true purpose of the MDF payments by writing in their contracts that the Carriers were paying eHealth to cover various marketing expenses, such as the costs of maintaining carrier-specific "mini-sites" (essentially landing pages) on eHealth's websites. At the same time, eHealth did not charge other Medicare Advantage carriers, *e.g.*, UnitedHealthcare, anything at all to create and maintain mini-sites for those carriers on eHealth's website.

74.     eHealth understood that, for any given Carrier, future MDF was at risk if eHealth did not meet the enrollment commitments it had made to that Carrier in exchange for MDF. For example, in a September 2018 slide presentation to eHealth's board of directors, company management wrote that "[a]chieving carrier specific enrollment targets [is] critical for 2019 sponsorship revenue."

75.     Several months later, in a January 2019 invitation to a conference call among senior eHealth leaders, Gregg Ratkovic, who was then eHealth's Senior Vice President of Carrier and Business Development, wrote: "We're looking to leverage carrier dollars in excess of 2018

pressing towards a significant stretch goal. It's critical that we're aligned and planned in order to meet the enrollment targets we've committed to."

76.    Similarly, in an email on July 28, 2021, Jake Roberts, an eHealth Director of Strategic Carrier Programs, explained that, "if we ask carriers for additional investment dollars[,] we have to be able to tie that back to apps and deliver those apps. Generally carriers are willing to pay about $200/app."

77.    Likewise, in the instant message chat with Relator on August 25, 2021, Mr. Kinkead observed that, "in the old days - the straight marketing pre-fund days you're right…. Carriers would hold us accountable on our sent app commitments."

78.    In 2020, when eHealth did not meet its commitments to certain Carriers, those Carriers reacted by reducing their MDF spending on eHealth during the first half of 2021. As a result, during the course of a company meeting on August 12, 2021, Mr. Roberts warned that "[w]e don't want to be in a spot like we were last year with Anthem and Humana and others where we underperformed and the carrier was unhappy and then we didn't get money for the first half of the year."

79.    Earlier, during a company meeting on May 12, 2021, Brian Shasha, eHealth's Vice President of Carrier Business Development, remarked that: "We want longevity in the sponsorship model, right. And so, if we accept the money from the carrier and we don't perform, then we become that agency that takes money and doesn't do what they say they're going to do. And that gets around, and then no one invests with us. . . . Those are the conversations. That's the fear. We don't want that to happen."

80.    On October 28, 2021, during an internal eHealth meeting that addressed MDF from the Carriers, Mr. Shasha explained that "we need to hit our commitments, right, from a

sponsorship perspective. . . .[T]here's still a sales goal and one that they've paid for." Mr. Shasha subsequently elaborated:

> I'm worried about Anthem. We monetized to the max to forecast with them on a pre-fund. It was split this year. Half goes into the override, half goes into pre-fund but they're still funding that pre-fund at a max so there's an expectation that we get to that max production level. I think it's 24,000 apps.

81.     The Carriers also made it clear to eHealth that, notwithstanding the language of the contracts, they generally cared little about how eHealth actually spent their MDF, and cared much more about whether eHealth sent them the Advantage plan enrollment applications that eHealth had promised in exchange for the MDF. Thus, for example, in an email exchange on June 4, 2018, Sukie Dean, who was then an eHealth Senior Director for Medicare Carrier Relations, commented that "[t]he carriers are looking at the total sent application number and not the sent apps by mini-site or one marketing effort." Similarly, at the company meeting on May 12, 2021, Mr. Roberts explained that, when Medicare Advantage carriers were paying MDF to eHealth, "they're not paying for advertising. They're paying for business. . . . It's not easy to get the money, and there are expectations tied to it."

82.     For its part, eHealth generally regarded the MDF it received as unencumbered cash, and not as reimbursement for administrative expenses. When, in a May 2017 email exchange, Relator asked if eHealth "contemplate[d] actually spending that [MDF] money [it budgeted for receipt in the fourth quarter of 2017] or did we assume all of it would fall to the bottom line," an eHealth financial analyst responded that "in the Plan we assumed that sponsorship revenue would be 100% profit." Similarly, in a text exchange on September 29, 2021, Robert Follansbee, a former eHealth Director of Marketing, confirmed to Relator that, "[y]es, we would book that [MDF] as revenue not money for expense offset."

83.    To ensure that the flow of MDF continued, eHealth took specific steps, when necessary, to direct business to carriers that paid MDF. On May 30, 2018, for example, Mr. Hakim sent several of his eHealth colleagues a spreadsheet showing the amounts of money certain carriers (including Aetna, Anthem, Humana, and Wellcare) had committed to pay eHealth in MDF and the "[e]nrollment [c]ommitments" eHealth had made to those carriers in exchange, and then he noted on the spreadsheet that "[w]e will be shifting Market Share from other carriers to hit these numbers." Below is an image of that spreadsheet (highlighting in original):



84.    Shortly thereafter, eHealth began preventing some of its agents from selling for particular carriers, such as UnitedHealthcare, that did not pay substantial amounts of MDF to eHealth. eHealth referred to these agents as "carrier designated agents" or "carrier limited agents." eHealth then used an algorithm that purportedly identified callers most likely to purchase a plan that those carrier-limited agents could sell and, unbeknownst to the callers, eHealth routed the callers to those agents.

85.    Thus, in an email exchange on July 18, 2018, David Nicklaus, eHealth's Senior Vice President of Sales and Operations, explained a plan to limit certain eHealth agents to selling the Advantage plans of three carriers – Humana, Anthem, and WellCare – that were paying

eHealth large amounts of MDF. Shortly thereafter, on July 23, 2018, Tim Hannan, who was then eHealth's Chief Marketing Officer, outlined the plan in more detail. According to Mr. Hannan, eHealth would "evaluate each incoming call for its propensity to create revenue" and assign it a "propensity score" based on the call's estimated revenue. Mr. Hannan explained that, in generating this score, "[f]or the carrier specific measures, we should incorporate the incremental value per conversion associated with hitting their [*i.e.*, Humana's, Anthem's, or Wellcare's] sales target." Then, according to Mr. Hannan, "[w]here the predicted value of any one carrier conversion is sufficiently high, . . . the first routing should be to the limited agents."

86.    On November 11, 2019, Jing Zhou, eHealth's chief data scientist, confirmed to several eHealth executives that "[w]e had carrier propensity model last year and routed higher propensity calls to a group of dedicated agents."

87.    As Nate Purpura, a former eHealth Vice President of Marketing, commented in an August 2021 text exchange with Relator, Mr. Hakim "used to [engage in such steering tactics] ALL the time to make sure you hit the sponsorship numbers."

88.    In an August 2021 instant message chat between Relator and Alan Jones, eHealth's Vice President of Innovation and Market Insights, Mr. Jones observed that "the problem is we're hooked on 'sponsorship' from the big guys. Which . . . distorts our business decisions. [B]ut 68M out of a total revenue target of 750M is too big to ignore."

89.    As a result of eHealth's favoritism toward the plans of carriers that paid it MDF, eHealth sometimes actively resisted allowing any of its tele-sales agents to sell the plans of other carriers that did not pay eHealth MDF. In August 2021, Derek Streich, an eHealth Director of Business Development, announced in an email to several of his colleagues that his team would add plans offered by ConnectiCare, a relatively small, Connecticut-based Medicare Advantage

carrier, to eHealth's sales platform. Shortly thereafter, however, Mr. Shasha expressed concern that adding ConnectiCare plans would "have a sponsorship impact on Anthem, WellCare, and Aetna," which each paid eHealth millions of dollars per year in MDF. Mr. Shasha then directed that ConnectiCare plans be added only to eHealth's online sales platform, and not to eHealth's much larger tele-sales platform. When Mr. Streich subsequently asked Mr. Roberts if "the only rationale" for limiting ConnectiCare plans to online sales was "that we don't want them to interfere with other (higher sponsoring) carriers," Mr. Roberts confirmed that, "Yes, that was Brian [Shasha's] view/rationale."

90.    After this decision, Mr. Streich expressed to Relator his frustration with having to tell ConnectiCare that eHealth would not market its plans via tele-sales: "I HATE this part of the job. . . . '[W]e' decide to use them for online only . . . solely because we don't want to disrupt more lucrative carrier partnerships in CT. I obviously can't tell them this. . . ."

91.    Similarly, during the summer of 2021, when another Medicare Advantage carrier, SCAN Health Plan ("SCAN"), expanded its service area to Arizona and Nevada and asked eHealth to offer its plans in those states during the upcoming AEP, Mr. Shasha demurred. Ultimately, Mr. Shasha said that eHealth would consider selling SCAN plans in Arizona and Nevada only the following year, in 2022, "depending on the support of expansion." As Mr. Streich noted in a subsequent chat with Relator, "'support of expansions' means they give us more money."

92.    In 2020, some carriers began to condition their payments to eHealth explicitly on eHealth's success in sending them Advantage plan applications. As Mr. Streich observed in a chat with Relator on August 25, 2021, "[w]e did that last year (over promised and under

delivered), so none of the carriers really fund us in advance based on our promise, it's almost all incremental 'sponsorship' based on volumes."

93.    Mr. Kinkead made a similar observation in his instant message chat with Relator on August 25, 2021: "Many of the big carriers though have moved away from straight prefund and tied marketing dollars more to performance, paying retroactively on accreted policies."

94.    Thus, several carriers (including defendants Humana and WellCare) began explicitly paying eHealth a specific amount of money – in addition to commissions and administrative payments – for each Advantage plan application that eHealth submitted to them. In remarking on this transition to retroactive, performance-based payments, Mr. Shasha commented in a November 2020 email that, in exchange for their MDF, carriers "just want the production." Mr. Roberts explained this transition further in an internal eHealth conference call on September 16, 2021:

> From the funding standpoint, last year, 2020 and previous, almost all of the money was pre-funded. So we would tell carriers, "we're going to sell x number of apps," and they would give us x number of dollars. And whether we sold half of that, or twice as many of that, we got the same amount of money. That wasn't, isn't, the best scenario for us, or for the carriers, and this year we're moving a lot more into performance-based. So, we're getting paid almost a per-app rate regardless of how many we write.

95.    The characterization of the Carriers' MDF payments to eHealth evolved further in 2021, as some Carriers shifted the money from separate MDF payments into larger "administrative payments" that were conditioned on sales. As Mr. Roberts explained in the conference call on September 16, 2021, "some carriers are now putting these marketing fees into our administrative fees, our overrides. That drives up the amount of money we get per app. You don't have to re-negotiate these every [year], at all. They're evergreen deals, right."

96.     Mr. Roberts did not explain how eHealth and the Carriers could justify the fair market value of these increased administrative payments when (1) eHealth previously accepted much smaller administrative payments from those Carriers for the same purported administrative services, and (2) eHealth still accepted much smaller administrative payments from other carriers for the same purported administrative services.

97.     Meanwhile, multiple eHealth employees acknowledged that the legality of the company's receipt of carrier MDF was, at best, a "gray area." For example, on August 25, 2021, Mr. Streich and Mr. Roberts of eHealth had the following instant message exchange:

| | |
|---|---|
| Mr. Streich: | For some reason I had it my brain that "per app" sponsorship was illegal. I think that was the stance at HealthMarkets [an insurance broker where Mr. Streich previously worked]. |
| Mr. Roberts: | Your brain is right<br>Lots of gray area |
| Mr. Streich: | Some day when things calm down I'd love to understand how [to] do this to make sure we[']re safely in the gray area. |
| Mr. Roberts: | It isn't our risk, it's the carriers |

98.     Similarly, when, that same day, Relator asked Mr. Kinkead whether carriers could pay eHealth extra money "based on per policy production," Mr. Kinkead responded that "It's a gray area[.] Always has been. Carriers are assuming that risk."

99.     In a subsequent instant message exchange, on October 21, 2021, Relator expressed to Mr. Shasha his concerns about eHealth's volume commitments in exchange for carrier MDF:

| | |
|---|---|
| Relator: | We need to be careful not to give the impression [to eHealth employees] that we have made any volume promises to carriers or, if that has happened, that we not use the language that suggests there is a volume expectation. |

Mr. Shasha:     They have to know that, Andy. It comes up in most of the calls they are in during AEP and [it's] important as part of the team that they understand how we work.

Relator:        I do not think we want to give the impression that marketing money is conditioned on the delivery of any specific number of applications.

### b.    Aetna's Kickbacks To eHealth

100.    Going back to at least 2014, Aetna and eHealth were parties to an "Aetna Marketing Agreement for Upline Agents and Agencies." Under this agreement, Aetna agreed to pay eHealth commissions (at the maximum allowable amount) and administrative overrides.

101.    Separately, the parties agreed on amounts of MDF Aetna would pay to eHealth each year in exchange for each Advantage plan enrollment eHealth generated for Aetna. For example, in early 2017, soon after Relator started working at eHealth, he learned that Aetna had pledged to pay eHealth $1.4 million in MDF that year in exchange for a commitment by eHealth to generate 17,164 new Advantage plan enrollments for Aetna. Thus, on March 3, 2017, Amy Ike, an Aetna National Sales Director, sent an email to Mr. Hakim, the then-General Manager of eHealth's Medicare business, attaching a spreadsheet showing that Aetna's 2017 "goal" for eHealth was 17,164 Advantage plan enrollments, and that, as of the date of the email, eHealth had generated 6,808 new Advantage plan enrollments for Aetna in 2017.

102.    Similarly, in an email to Relator on August 12, 2018, Paul Rooney, eHealth's Vice President of Medicare, Individual and Small Group Carrier Relations, noted that "we have $1.2m from Aetna for AEP marketing and need to deliver 7,600+ apps."

103.    Aetna and eHealth papered the MDF payment agreements in a series of amendments to a master agreement called the "July 1, 2014 eHealth-Aetna Advertising Agreement" ("Advertising Agreement"). Each amendment covered only a part of a year (in some

31

cases, the periods overlapped), and each amendment ostensibly called for Aetna to pay eHealth

in exchange for eHealth agreeing "to conduct a website marketing program related to [Aetna's]

Medicare Products (the 'Custom Site')," or words to that effect. None of the Advertising

Agreement amendments referenced the number of Advantage plan applications that Aetna

expected to receive from eHealth in exchange for Aetna's MDF.

104.    Examples of such amendments to the Advertising Agreement include the

following:

- Amendment Eleven, for $250,000, "[i]n consideration for extending the period for the operation and maintenance of the Custom Site from April 1, 2017 through April 30, 2017, and for other marketing services as described in the [Advertising Agreement]."

- Amendment Twelve, for $250,000, "[i]n consideration for extending the period for the operation and maintenance of the Custom Site from May 1, 2017 through May 31, 2017, and for other marketing services as described in the [Advertising Agreement]."

- Amendment Thirteen, for $500,000, "[i]n consideration for extending the period for the operation and maintenance of the Custom Site from [August 28, 2017] through December 31, 2017, and for other marketing services as described in the [Advertising Agreement]."

- Amendment Fifteen, for $153,700, "[i]n consideration for additional marketing services during the period and for the operation and maintenance of the Custom Site from November 1, 2017 through December 31, 2017, and for other marketing services as described in the [Advertising Agreement]."

- Amendment Seventeen, for $65,250, "[i]n consideration for additional marketing services during the period and for the operation and maintenance of the Custom Site from December 8, 2017 through December 31, 2017, and for other marketing services as described in the [Advertising Agreement]."

- Amendment Twenty-One, for $255,000, "[i]n consideration for extending the period for the operation and maintenance of the Custom Site from [November 1, 2018] through December 31, 2018, and for other marketing services as described in the [Advertising Agreement]."

- Amendment Twenty-Two, for $250,000, "[i]n consideration for extending the period for the operation and maintenance of the Custom Site from [November 8,

2018] through December 31, 2018, and for other marketing services as described in the [Advertising Agreement]."

105.    As the foregoing list shows, the amounts of MDF Aetna agreed to pay eHealth varied considerably, especially when viewed on a per-month basis. In fact, the amounts bore no relation to the fair market value of work that eHealth actually performed "to conduct a website marketing program" or to perform other marketing services. Nor did the amounts bear any relation to the fair market value of eHealth's administrative services such as "training, customer service, agent recruitment, operational overhead, or assistance with completion of health risk assessments." *Cf.* 42 C.F.R. § 422.2274(e) (2021).

106.    In a conversation with Relator on September 14, 2021, Mr. Kinkead, the eHealth Director of Carrier Development, explained the true rationale behind Aetna's payments:

> So, it's a combination of a couple of things. One, there is a pre-fund component to it. And the pre-fund component is driven off of a new-issued apps expectation, right. So, unlike Humana that pays us our pre-fund based on sent apps, Humana [*sic* Aetna] always pays, typically always pays based on new-issued apps, and historically has always set sort of a base, a benchmark CPS [cost per sale], and then they'll pay us sort of retrospectively, or retroactively, based on the total number of issued apps that we sell within a given qualifying period.

107.    Mr. Kinkead further explained that, for 2021, Aetna agreed to pay eHealth "a $300 CPS, and then at the quarter's end, we will look at how many of the apps that we sent actually were new-issued apps, and then we'll reconcile with Aetna, and then we'll send an invoice to them based on the total number of new-issued apps against that $300 CPS."

108.    In or about December 2020, eHealth agreed to participate in a separate arrangement with Aetna's "Heartland/Midlands" territory. Under this arrangement, called the "Heartland/Midlands Close-the-Gap Incentive Program," Aetna agreed to pay eHealth "increased marketing fees amounting to $150 [subject to a $350 maximum for all MDF] for additional services provided with respect to each new issued sale."

33

109.    In an instant message chat with Relator on September 20, 2021, Mr. Kinkead described the "Heartland/Midlands Close-the-Gap Incentive Program" as "a kicker campaign":



110.    eHealth did not incur any additional administrative expenses to justify Aetna's extra remuneration per enrollment. That remuneration from Aetna was just an additional kickback for each enrollment that eHealth generated for an Aetna Advantage plan in Aetna's "Heartland/Midlands" territory. Indeed, in the instant message chat with Relator on September 20, 2021, Mr. Kinkead commented that, "between you and I - [the kicker money from Aetna is] just more money in the general pot." Mr. Kinkead later added that "really it was an additional $100 on top of our national CPS of $250. But it was to drive additional volume on top of baseline."

111.    Similarly, in an instant message chat with Relator about the Aetna Heartland/Midlands program on September 16, 2021, Mr. Shasha acknowledged that it would

cause "no immediate rise in admin costs [for eHealth], it's just an additional incentive to 'drive

more sales.'" Mr. Shasha elaborated: "That is the Heartlands and Midlands kicker you are

referencing. We are actually locking that in again this afternoon for 2022, meeting with the

region. We are going to go after the other regions as well, doing this for Humana, Aetna and

CIGNA."

112.    Separately, Aetna offered to pay eHealth and other brokers a "Retention

Incentive" of $100 per policy for brokers "that retain at least 90 percent of [their] total book of

business throughout 2021." Aetna described the $100 payments as "administrative fees," but did

not list any administrative expenses brokers would have to incur, or any additional services the

brokers would have to provide, to qualify for the enrollment maintenance payments.

113.    All of the additional remuneration from Aetna to eHealth achieved its intended

purpose. During the years 2018 through 2020, Aetna's share of all Advantage plan sales at

eHealth was more than double Aetna's share of all Advantage plan enrollments nationwide.

114.    In the period from January 1, 2018, through December 31, 2020, Aetna paid

eHealth a total of at least $18,993,265 in MDF, and eHealth referred to Aetna approximately

188,487 Advantage plan applications that Aetna approved. eHealth forecasted receiving an

additional $19,928,930 from Aetna in calendar year 2021, in exchange for delivering 52,500

additional Advantage plan enrollments to Aetna.

### c.    Humana's Kickbacks To eHealth

115.    Like other carriers, Humana paid eHealth per-policy commissions and

administrative payments. In addition, Humana paid eHealth millions of dollars each year in

MDF, although the contracts between eHealth and Humana obscured the true purpose of that

remuneration by describing it as payment for development and implementation of a Humana "Minisite" on the eHealth websites.

116.    Effective March 15, 2010, Humana and eHealth entered into a "Marketing & Distribution Agreement" pursuant to which Humana paid eHealth commissions at the maximum allowable amount, plus administrative overrides of $200 per Advantage plan enrollment and $9 per member per month after the first year.

117.    Like Aetna, Humana agreed to pay eHealth separate amounts of MDF money in exchange for each Advantage plan enrollment that eHealth generated for Humana. Humana and eHealth initially papered the MDF agreements in a series of amendments to their 2010 Marketing & Distribution Agreement. These amendments included the following:

- Seventh Amendment – "In consideration for the development, maintenance and implementation of the Mini-Site for the period running from July 1, 2012 through September 30, 2012, Humana shall pay to [eHealth] . . . Three Million Dollars ($3,000,000)."

- Twenty-Sixth Amendment – "In consideration for the development, maintenance and implementation of the Mini-Site for the period running from August 15, 2015 through December 31, 2015, Humana shall pay to [eHealth] . . . Three Million Dollars ($3,000,000)."

- Twenty-Ninth Amendment – "In consideration for the development, maintenance and implementation of the Mini-Site for the period running from February 15, 2016 through March 31, 2016, Humana shall pay to [eHealth] . . . Two Hundred Fifty Thousand Dollars ($250,000)."

- Thirty-Ninth Amendment – "In consideration for the development, maintenance and implementation of the Mini-Site for the period running from September 1, 2017 through September 30, 2017, Humana shall pay to [eHealth] . . . a fee of $1,000,000 (the 'September 2017 fee'). In consideration for the development, maintenance and implementation of the Mini-Site for the period running from October 1, 2017 through December 31, 2017, Humana shall pay to [eHealth] . . . a fee of $1,500,000 (the 'Q4 2017 fee')."

- Forty-Third Amendment – "In consideration for the development, maintenance and implementation of the Mini-Site for the period running from August 1, 2018

36

through December 31, 2018, Humana shall pay to [eHealth] . . . a fee of $5,000,000 (the 'Q3 2018 Fee')."

• Forty-Sixth Amendment – "In consideration for the development, maintenance and implementation of the Mini-Site for the period running from January 1, 2019 through March 31, 2019, Humana shall pay to [eHealth] . . . a fee of $1,000,000 (the 'Q1 2019 Fee'). In consideration for the development, maintenance and implementation of the Mini-Site for the period running from April 1, 2019 through June 30, 2019, Humana shall pay to [eHealth] . . . a fee of $2,000,000 (the 'Q2 2019 Fee')."

118.    In July 2019, Humana and eHealth entered into a new Marketing & Distribution Agreement. The updated agreement called for Humana to pay eHealth commissions at the maximum allowable amount, plus an administrative override of $175 per Advantage plan enrollment and $10 per member per month after the first year.

119.    The new agreement also contained an addendum with a "Schedule Number 001" providing that, during the third quarter of 2019, eHealth would continue "hosting a Minisite [and] . . . undertaking efforts to drive customer traffic to that Minisite," and that, in exchange, Humana would pay eHealth $2,500,000.

120.    The parties subsequently entered into a series of updated schedules and amendments to those schedules, including the following:

• Amendment 01 to Schedule Number 001, changing the fee for the third quarter of 2019 to $3,000,000.

• Schedule Number 002, in consideration for "(a) eHealth hosting a Minisite; and (b) eHealth undertaking marketing efforts to drive customer traffic to that Minisite . . . from October 1, 2019 through and including December 31, 2019 . . . Humana shall pay to eHealth . . . four million dollars ($4,000,000) (the '2020 AEP Fee')."

• Amendment 01 to Schedule Number 002, changing the "2020 AEP Fee" to $8,500,000.

• Schedule Number 003, in consideration for "(a) eHealth hosting a Minisite; and (b) eHealth undertaking marketing efforts to drive customer traffic to that Minisite . . . from June 1, 2020 through and including December 31, 2020 . . .

37

Humana shall pay to eHealth . . . eighteen million dollars ($18,000,000) (the '2020 Additional Marketing Fee')."

- Amendment 01 to Schedule Number 003, providing for an "Amended 2020 Additional Marketing Fee" of $18,500,000.

- Schedule Number 004, in consideration for "(a) eHealth hosting a Minisite; and (b) eHealth undertaking marketing efforts to drive customer traffic to that Minisite . . . from January 1, 2021 through June 30, 2021 . . . Humana shall pay to eHealth . . . one hundred twenty five thousand dollars ($125,000) (the 'TN Digital Marketing Fee')."

- Schedule Number 005, in consideration for "(a) eHealth hosting a Minisite; and (b) eHealth undertaking marketing efforts to drive customer traffic to that Minisite . . . from July 1, 2021 through September 30, 2021 . . . Humana shall pay to eHealth . . . one million one hundred thousand dollars ($1,100,000) (the '2021 Q3 Fee')."

- Schedule Number 006, in consideration for "(a) eHealth hosting a Minisite; and (b) eHealth undertaking marketing efforts to drive customer traffic to that Minisite . . . from October 1, 2021 through December 31, 2021 . . . Humana shall pay to eHealth . . . nine million dollars ($9,000,000) (the '2022 AEP Fee')."

- Schedule Number 007, in consideration for "(a) eHealth hosting a Minisite; and (b) eHealth undertaking special marketing efforts to drive customer traffic to that Minisite . . . from October 1, 2021 through December 31, 2021 . . . Humana shall pay to eHealth . . . one hundred ninety thousand dollars ($190,000) (the '2022 North and Central FL AEP Fee') and one hundred thousand dollars ($100,000) (the '2022 South FL AEP Fee')."

121.    None of these schedules and amendments explained how eHealth's costs of hosting a mini-site for Humana could have varied so dramatically from period to period.

122.    In reality, the fees in the amendments had little, if anything, to do with eHealth maintaining a mini-site for Humana or driving traffic to it, and everything to do with eHealth referring Medicare beneficiaries for enrollment in Humana Advantage plans.

123.    In an email to Relator on June 4, 2018, Jeet Mansharamani, eHealth's Vice President of Digital and Affiliate and Retention Marketing, indicated that he knew little about the mini sites. "What is the deal with these mini sites," Mr. Mansharamani asked Relator. "Can you

38

share it with Sara [Haddox, a direct report] and myself in regards to expectation on driving traffic (if any) to these?" Years later, in an instant message chat on October 26, 2021, Yung Le, an eHealth Vice President of Digital, confirmed that eHealth was "no longer doing specific advertising for the carrier-specific sites or sending traffic specifically to them."

124.    Various eHealth executives made clear that the true purpose of Humana's MDF payments to eHealth was to induce eHealth to steer Medicare beneficiaries to Humana Advantage plans.

125.    For example, on March 20, 2017, Relator received an email from Mr. Hakim reporting that "Humana has given us $250K for Q1 and we are more than 50% off of what they want us to do so the $250K for Q2 is in jeopardy."

126.    Then, on May 15, 2017, Mr. Hakim noted in an email that, for "Humana we are about 4300 MA's [Medicare Advantage sales] behind last year and they were wanting us to be at least flat [year over year]."

127.    In a similar vein, on October 11, 2017, Mr. Flanders, eHealth's then-CEO, reported to several senior eHealth managers that he and two other eHealth executives "had dinner last night with the President of Retail at Humana, Alan Wheatley, who leads their Medicare business" and that "[Mr. Wheatley] stated further that their evaluation of marketing and other support for 2018 will be significantly impacted by how we perform during this AEP."

128.    The next summer, as eHealth and Humana were discussing how much MDF Humana would pay eHealth in the second half of 2018, Mr. Hakim commented in an email to his colleagues that, with "Humana if we do not hit MA numbers regardless of how much MS [Medicare Supplement] we do it will be viewed as a miss. . . . Bottom line is that these $$'s are for selling MA plans and if we miss their targets for MA the $$'s will not flow next year."

129.    On July 20, 2018, Robert Hurley, the then-President of eHealth's Medicare

division, sent an email to his colleagues explaining the details of these negotiations:

> The negotiations for AEP Humana Marketing money continue. They have
> proposed the high end of the range ($5m), however they are pushing for a 20%
> increase in our production goal from the original commitment of 25,000
> enrollments to 30,000 enrollments during the Q4 period.
>
> I countered them that we'd deliver between 25k and 30k for the $5m, given they
> pay most of it in Q3. This morning they responded and are insisting on the $5m
> for a commitment of 30,000 enrollments.
>
> Dave F[rancis, then CFO and COO], Dave N[icklaus, then SVP of Sales and
> Operations], Chris [Hakim, then General Manager of Medicare] and I just
> discussed this proposal and are concerned with the uplift in the enrollment
> commitment. There will not be any clawback provision in our contract, but we
> could potentially jeopardize some portion of our marketing commitment for next
> year and may harm some of our business operations trying to get to the
> commitment this AEP.

Mr. Hurley's email notably did not make any mention of Humana paying eHealth to maintain a

Humana mini-site, even though the parties' subsequent contract amendment provided that

Humana would pay eHealth $5,000,000 "[i]n consideration for the development, maintenance

and implementation of the Mini-Site for the period running from August 1, 2018 through

December 31, 2018."

130.    On July 24, 2018, Mr. Hurley reported to Mr. Francis that, "[r]egarding Humana,

we are in agreement for $5m for 25K apps."

131.    During the eHealth company meeting on August 12, 2021, Mr. Roberts, the

eHealth Director of Strategic Carrier Programs, elaborated on the purpose of Humana's MDF

payments to eHealth:

> The volume commitments are most important on pre-funded dollars because we
> give them a commitment and they give us dollars to meet that commitment. . . .
> So, when we negotiated with Humana previously, they typically paid about $150
> an application. This year, we said, alright, we want you to pay $200 an application
> and we can drive 80,000 apps for you, or something along those lines. And they

said, OK, well we'll pay you $200 an app, but only for 40,000 applications. So, that's the biggest pre-fund portion, and we're obviously very confident that we can hit that mark.

132.    These "volume commitments" never appeared in the written contracts between Humana and eHealth. As Mr. Shasha acknowledged in an instant message chat with Relator on August 23, 2021, "these agreements with Humana are not so specific. They are all verbal and the written is general."

133.    Similarly, in Relator's instant message chat with Mr. Kinkead on August 25, 2021, Mr. Kinkead said: "Humana for example they are paying for the mini site[.] Nothing more nothing less[.] The commitments on production are verbal over the phone and on spreadsheets – but nowhere on the contract."

134.    Humana closely monitored eHealth's compliance with its volume commitments to Humana in exchange for Humana's MDF payments. On or about September 8, 2021, for example, Humana provided eHealth with a "Scorecard" that Humana maintained on the business it received from eHealth. Among other things, the Scorecard showed that, for the fall 2020 AEP period, Humana paid eHealth $4,000,000 in MDF and that, in exchange, eHealth generated 45,396 Advantage plan enrollments for Humana during that period, for an average cost per sale of $88. During the rest of 2020, according to the Scorecard, Humana paid eHealth $6,500,000 in MDF and, in exchange, eHealth generated 48,510 Advantage plan enrollments for Humana during that period, for an average cost per sale of $134.

135.    On October 21, 2021, Jason Breunig, a Humana National Sales Manager, sent his eHealth counterpart, Mr. Kinkead, an email with a table showing, for the month of October 2021, eHealth's daily application "Target" and the number of applications eHealth actually submitted to Humana each of those days. Above this table, Mr. Breunig wrote:

Wanted to share where you are vs our daily goal. I'll share these periodically but if you ever don't have one and want to know just send me a quick note as it is a quick pull. These are ALL Q4 sales and not just 1/1 which is what the Marketing $ goal is set for. As a whole our marketing $ partners are at 106% of goal.

136.    That same day, October 21, 2021, eHealth's Mr. Shasha told his colleagues that, "[i]f we want additional marketing dollars [from Humana] during AEP, we'd be challenged to gather those if we're telling Humana that they're not number one in our environment."

137.    Humana knew that its strategy of paying illegal remuneration to brokers like eHealth was successful in achieving sales that would not have happened absent the remuneration. As Humana's CFO, Brian Kane, commented at the Goldman Sachs 40th Annual Global Healthcare Conference on June 12, 2019, "[w]e spend a lot of time and effort with our brokers. We invest in the channel. I think they feel very good about us. We've seen multiple instances where we are not the #1 benefit even this year, where we're #2 or #3, even #4, and we still win a market share in a particular local market because of those broker relationships."

138.    As Mr. Kane intimated, the additional remuneration from Humana to eHealth achieved its intended purpose. In the fourth quarter of 2017, for example, Humana's share of all eHealth Advantage plan sales was 27.8%. On information and belief, the vast majority of those sales consisted of enrollments effective January 1, 2018. As of January 1, 2018, Humana's share of all Advantage plan enrollments nationwide was just 19.1%. In other words, on a relative basis, Humana's share of sales at eHealth was more than 45% (27.8% – 19.1% / 19.1%) higher than Humana's national enrollment share during the fourth quarter of 2017. That pattern continued in subsequent years: through at least 2020, Humana's share of all Advantage plan sales at eHealth was substantially higher than Humana's share of all Advantage plan enrollments nationwide.

139.    In the period from January 1, 2018, through December 31, 2020, Humana paid eHealth a total of at least $37,000,000 in MDF, and eHealth referred to Humana approximately

273,483 Advantage plan enrollment applications that Humana approved. eHealth forecasted

receiving an additional $10,825,000 from Humana in calendar year 2021, in exchange for

delivering 45,500 additional Advantage plan enrollments to Humana.

### d.    Wellcare's Kickbacks To eHealth

140.    Wellcare's Code of Conduct recognized that, under "federal and state anti-

kickback laws and regulations . . . a person generally may not . . . [g]ive anything of value to

encourage someone to buy, rent or recommend an item or service that may be paid for by a

government health care program." The Code of Conduct thus cautioned that "You may not offer

anything of value to a provider, member or other person that could be seen as a bribe or other

improper inducement. If one purpose of the offer is to pay or compensate for a referral, then the

transaction is not allowed."

141.    In 2010, Wellcare and eHealth entered into an agreement pursuant to which

WellCare paid eHealth commissions and annual renewal commissions at the maximum

allowable amounts, plus administrative overrides, for each Advantage plan enrollment eHealth

generated for Wellcare.

142.    In June 2020, eHealth's Mr. Rooney reported to Relator that Wellcare was paying

commissions and renewal commissions at the maximum allowable amount, plus administrative

overrides of $150 or $200 per plan member, depending on the state.

143.    Like Aetna and Humana, Wellcare also paid eHealth substantial amounts of MDF

to induce eHealth to steer Medicare beneficiaries to Wellcare Advantage plans. Wellcare and

eHealth papered the MDF payment arrangements in a series of agreements, each called either an

"Advertising Agreement" or a "Producer Marketing Agreement." Each agreement covered only a

part of a year (in some cases, the periods overlapped). These agreements included the following:

- Advertising Agreement for $450,000 for eHealth to "conduct a search marketing program related to [WellCare's] Medicare products in all regions in the United States where [WellCare] offers Medicare Advantage products through eHealth with a goal of attracting [customers who are Medicare eligible] to the eHealth Call Center" during the period from June 20, 2016, through December 31, 2016.

- Amendment to Advertising Agreement for $25,000 for eHealth to "(a)increase its level of effort in performing the Search Marketing Services in Mississippi, Tennessee and Arkansas; and (b) perform certain marketing services related to [Wellcare's] Medicare products in Mississippi, Tennessee and Arkansas, also with a goal of attracting users to the eHealth Call Center" during the period from December 8, 2016, through December 31, 2016.

- Advertising Agreement for $700,000 for eHealth to "conduct a search marketing program related to WellCare's Medicare products in all regions in the United States where WellCare offers Medicare Advantage products through eHealth with a goal of attracting [customers who are Medicare eligible] to the eHealth Call Center" during the period from February 1, 2017, through December 31, 2017.

- Advertising Agreement for $120,000 for eHealth to "conduct a search marketing program related to WellCare's Medicare products in Texas with a goal of attracting [customers who are Medicare eligible] to the eHealth Call Center" during the period from February 15, 2017, through June 15, 2017.

- Producer Marketing Agreement for $300,000 "for overhead and administrative services" during the period from January 20, 2018, through April 30, 2018.

- Producer Marketing Agreement for $25,000 "for overhead and administrative services" during the period from February 1, 2018, through March 1, 2018.

- Producer Marketing Agreement for $845,000 "for overhead and administrative services" during the period from May 1, 2018, through December 30, 2018.

- Producer Marketing Agreement for $500,000 "for overhead and administrative services" during the period from June 1, 2018, through December 31, 2018.

- Producer Marketing Agreement, for $775,000 "for overhead and administrative services" during the period from January 1, 2019, through June 30, 2019.

- Producer Marketing Agreement, for $2,500,000 "for overhead and administrative services" during the period from July 1, 2019, through December 31, 2019.

- Producer Marketing Agreement, for $600,000 "for overhead and administrative services" during the period from January 1, 2020, through March 31, 2020.

44

- Producer Marketing Agreement, for $600,000 "for overhead and administrative services" during the period from April 1, 2020, through June 30, 2020.

- Producer Marketing Agreement, for $1,200,000 "for overhead and administrative services" during the period from April 1, 2020, through June 30, 2020.

144.    The payments Wellcare made pursuant to these agreements were on top of the per-enrollment administrative overrides that Wellcare already was paying to eHealth. In other words, although the agreements purported to call for Wellcare to pay fair market value for administrative costs eHealth incurred, Wellcare already was separately paying eHealth purported fair market value to cover those costs.

145.    The real consideration for Wellcare's additional payments was new Advantage plan enrollments that eHealth generated for Wellcare. For example, in the fourth quarter of 2018, eHealth committed to referring 6,900 Medicare beneficiaries for enrollment in Wellcare Advantage plans. In the fourth quarter of 2019, that figure had jumped to 10,000 new Wellcare Advantage plan enrollments.

146.    The additional remuneration from Wellcare achieved its intended purpose. In the fourth quarter of 2017, for example, Wellcare's share of all eHealth Advantage plan sales was 7.6%. On information and belief, the vast majority of those sales consisted of enrollments effective January 1, 2018. As of January 1, 2018, Wellcare's share of all Advantage plan enrollments nationwide was just 3.2%. In other words, during the fourth quarter of 2017, Wellcare's share of Advantage plan sales at eHealth was more than double its national enrollment share. That pattern continued in subsequent years: through at least 2020, Wellcare's share of all Advantage plan sales at eHealth was two to three times Wellcare's share of all Advantage plan enrollments nationwide.

147.    In January 2021, Mr. Shasha explained to Relator that Wellcare was paying an administrative override of $250 per enrollment, plus approximately $200 in MDF per enrollment. Shortly thereafter, Wellcare ceased paying MDF to eHealth, but increased its administrative override to $500 per enrollment.

148.    During an eHealth meeting on April 22, 2021, Tom Loach, an eHealth Director of Carrier Relations, explained Wellcare's transition from paying MDF to paying higher administrative overrides:

> [J]ust a quick note on WellCare. Just to give you an idea of what, how the contracts are working. WellCare, when they basically moved all their sponsorship into the override, that came with, on paper at least, a lot of additional tasks and items that we're expected to cover in the pre-enrollment and the first 90 days of the application receipt date. So, that's their way of kind of getting around this FMV and not tying it straight through a sponsorship or marketing per app piece. So there are some additional items there. I would say it was pretty creative in the way it was written. But at least there's something, they've got some place to defend.

149.    On information and belief, eHealth did not, in fact, provide any additional administrative services in exchange for Wellcare's increased administrative override per enrollment. The new payment rubric did, however, enable the parties to ensure that Wellcare paid eHealth for exactly the number of Advantage plan enrollments that eHealth generated for Wellcare.

150.    In or about the summer of 2021, Wellcare also agreed to pay eHealth "renewal bonus[es]" on top of the annual renewal commissions that the Medicare regulations permit. *Cf.* 42 C.F.R. § 422.2274(d)(3). As Mr. Shasha explained in a chat with Relator on August 10, 2021, "WellCare provided us a huge renewal bonus at $125 for month 15 and another $125 at month 26."

151.    These renewal bonuses incentivized eHealth not to recommend competing plans to existing eHealth clients who had a Wellcare Advantage plan that was up for renewal, even though plan benefits and costs changed from year to year and plans offered by other carriers might have been better-suited for those clients. In other words, the payments were merely a reward for eHealth achieving a financially-desirable outcome for Wellcare, regardless of the interests of Medicare beneficiaries.

152.    In the period from January 1, 2018, through December 31, 2020, Wellcare paid eHealth a total of at least $15,165,001 in MDF, and eHealth referred to Wellcare approximately 117,192 Advantage plan applications that Wellcare approved. eHealth forecasted receiving an additional $10,964,546 from Wellcare's parent, Centene, in calendar year 2021, in exchange for delivering 37,000 additional Advantage plan enrollments to Wellcare and Centene.

### e.    Anthem's Kickbacks To eHealth

153.    In July 2010, Anthem and eHealth entered into a Field Marketing Organization Agreement pursuant to which Anthem agreed to pay eHealth commissions and annual renewal commissions at the maximum allowable amount, plus administrative overrides of $200 per Advantage plan enrollment and $100 more per member per year after the first year.

154.    Beginning at least as early as 2017, Anthem also paid eHealth substantial additional amounts in exchange for eHealth's commitment to generate new Advantage plan enrollments for Anthem and Amerigroup, a carrier that Anthem acquired in 2012. Apart from the Field Marketing Organization Agreement, Anthem and eHealth entered into a series of separate agreements, each called an "Advertising Agreement." Each of these Advertising Agreements called for eHealth to "conduct a marketing program related to Anthem's [or Amerigroup's] Medicare products . . . with a goal of attracting [Medicare eligible people] to the eHealth Call

Center" during a particular period of time, and sometimes in particular regions, in exchange for a

specified sum of money. These agreements include the following:

- For the period October 15, 2017, through December 7, 2017, $250,000 for a "marketing program . . . in Georgia, Indiana, Kentucky, Missouri, Ohio, Tennessee, and Wisconsin."

- For the period October 15, 2017, through December 7, 2017, $100,000 for a "marketing program . . . in Connecticut, Maine, New Hampshire, New Jersey and Virginia."

- For the period September 1, 2017, through December 7, 2017, $150,000 for a "marketing program . . . in Texas."

- For the period November 14, 2017, through March 31, 2018, $350,000 for a "marketing program" without any geographic limitation.

- For the period February 1, 2018, through March 31, 2018, $250,000 for a "marketing program . . . in Georgia, Indiana, Kentucky, Missouri, Ohio, Tennessee, and Wisconsin."

- For the period February 1, 2018, through March 31, 2018, $150,000 for a "marketing program . . . in California, Nevada, Colorado, New Mexico, Texas and Washington."

- For the period April 1, 2018, through June 30, 2018, $250,000 for a "marketing program . . . in Georgia, Indiana, Kentucky, Missouri, Ohio, Tennessee, and Wisconsin."

- For the period June 1, 2018, through September 30, 2018, $650,000 for a "marketing program" without any geographic limitation.

- For the period September 1, 2018, through September 30, 2018, $750,000 for a "marketing program" without any geographic limitation.

- For the period October 1, 2018, through December 31, 2018, $2,000,000 for a "marketing program" without any geographic limitation.

- For the period January 1, 2019, through June 30, 2019, $2,800,000 for a "marketing program" without any geographic limitation.

155.    Anthem's purpose in making these various MDF payments was, as eHealth's

Ms. Dean reported in an email on August 21, 2017, "to drive additional sales."

48

156.    For example, on August 23, 2017, Mr. Hakim told Relator that Anthem's Central Region had agreed to pay eHealth $250,000, and "[f]or the $250K they are expecting between 2,750 and 3,000 MA's from us."

157.    Similarly, after Anthem agreed to pay eHealth $150,000 for a marketing program in Texas from September 1 through December 7, 2017, Ms. Dean explained that "[t]he expectation Anthem [h]as is 500-600 submits in Q4."

158.    The additional remuneration from Anthem achieved its intended purpose. In the fourth quarter of 2017, Anthem's share of all eHealth Advantage plan sales was 8.1%. On information and belief, the vast majority of those sales consisted of enrollments effective January 1, 2018. As of January 1, 2018, Anthem's share of all Advantage plan enrollments nationwide was just 4.3%. In other words, during the fourth quarter of 2017, Anthem's share of Advantage plan sales at eHealth was nearly double its national enrollment share.

159.    Mr. Hakim later reported that, in negotiating a contract that ultimately covered Georgia, Indiana, Kentucky, Missouri, Ohio, Tennessee, and Wisconsin during the period February 1, 2018, through March 31, 2018, "[w]e told them we could do between 1,750 and 2,000 MA's in the Central Region for 1-1 effective dates with their $250K investment which they have agreed to pay us."

160.    In early 2018, eHealth presented Anthem with a proposal for Anthem to make a "$2.4M investment" with eHealth so that eHealth could "grow sales to over 13,000 total sent applications" for Anthem. The proposal further noted that the "[c]lose rate is obtained based upon Anthem branded advertising, dedicated 800# into call center, whisper into agent identifying caller as Anthem lead, [and] agent screen pop with only Anthem plans displayed." On information and belief, eHealth did not end up running Anthem branded advertising, but did

engage in the rest of the tactics it had proposed to steer Medicare beneficiaries to Anthem plans after the beneficiaries responded to eHealth's carrier-agnostic advertising.

161.    About a year later, in the summer of 2019, Mr. Rooney sent an email to Relator about "Anthem Medicare Investments" and said: "As a reminder, Q4 volume commitment is 19K sent MA apps."

162.    In an email chain in November 2019, when it appeared eHealth might miss this 19,000 Advantage plan application commitment, Mr. Ratkovic sent an email to several eHealth executives saying that "I believe Anthem is the highest or near the highest in comp, so we would see meaningful impact in revenue and EBITDA in leaning into Anthem as well as the largest opportunity for eH in 2020 for sponsorship revenue."

163.    An eHealth spreadsheet from 2021 noted that, for the fourth quarter of 2020, Anthem had paid eHealth "$400/Sent App Prefund." According to the spreadsheet, however, eHealth had not fulfilled its sales commitment to Anthem in 2020, and consequently "[h]ad to pay back apps not acheived [*sic*]." An image of an excerpt from that spreadsheet is below:



164.    On June 11, 2021, Anthem and eHealth entered into an "Anthem Agency Call Development Program Agreement." Ostensibly, this agreement required Anthem to pay eHealth $1,774,490 to cover expenses eHealth incurred during the second and third quarters of 2021 in generating a minimum number of calls to eHealth call centers "from markets where Anthem or its applicable affiliates are actively marketing Medicare Advantage plans."

165.    On October 13, 2021, Anthem and eHealth agreed that Anthem would pay eHealth an additional $6,761,300, ostensibly to cover expenses for generating additional calls in the fourth quarter of 2021.

166.    In fact, Anthem's payments to eHealth under the Anthem Agency Call Development Program Agreement were not contingent merely on eHealth generating calls to eHealth call centers, but also on eHealth generating applications specifically for Anthem Advantage plans. For example, on information and belief, during the third quarter of 2021, eHealth generated far more than the number of calls specified in the Anthem Agency Call Development Program Agreement for that quarter, but eHealth did not generate the number of Anthem sales on which the parties had reached an extra-contractual agreement. Thus, Relator and Mr. Loach had the following instant message chat at the end of that quarter, on September 30, 2021:

| | |
|---|---|
| Relator: | I disconnected from the team meeting right as you were giving an update about Anthem marketing money. . . . |
| Mr. Loach: | we lost $400K due to Q3 mniss [*sic*] but I was able to clawback $154k for Q4. |
| Relator: | What was Q3 miss? Applications you mean? |
| Mr. Loach: | yes. We fell short of our commitments based on their investment. |

167.    Similarly, during a telephonic meeting on October 28, 2021, Mr. Shasha confirmed that, "with Anthem there is a performance piece – it's just achieving the [sales] goal and then how they deal with it next year. Right. Are we coming into next year with another deficit and we owe them production? Are we gonna be able to negotiate some of that away? Are they just gonna say they're not gonna do it anymore?"

168.    As noted above, Mr. Shasha subsequently elaborated:

I'm worried about Anthem. We monetized to the max to forecast with them on a pre-fund. And it was split this year. Half goes into the override, half goes in the pre-fund. But they're still funding that pre-fund at a max so there's an expectation that we get to that max production level. I think it's 24,000 apps. . . .

169.    Anthem paid remuneration to induce eHealth to steer Medicare beneficiaries to its Advantage plans even though it was Anthem's policy for agents that "[a]t all times you must keep your client's best interest in mind. You have an obligation to enroll your client into the Medicare plan that best fits the client's healthcare needs. At no time should you enroll a Medicare beneficiary in a plan based on the plan's compensation amount, or refer a client to a provider in exchange for referral rewards paid to you from the provider. Steering Medicare beneficiaries based on the promise of incentives or enticements from any party is not allowed. . . ."

170.    In the period from January 1, 2018, through December 31, 2020, Anthem paid eHealth a total of at least $37,468,266 in MDF, and eHealth referred to Anthem approximately 82,629 Advantage plan applications that Anthem approved. During that period, Anthem's share of all Advantage plan sales at eHealth was substantially higher than Anthem's share of all Advantage plan enrollments nationwide. For calendar year 2021, eHealth forecasted receiving an additional $10,159,211 from Anthem in exchange for delivering 22,000 additional Advantage plan enrollments to Anthem.

### 2.    The Carriers' Kickbacks To GoHealth

171.    Like eHealth, GoHealth took kickbacks from the Carriers in exchange for referring Medicare Advantage business to them.

172.    GoHealth's 2020 Annual Report asserted that "[t]he Company . . . has arrangements with certain carriers that allow the Company to increase marketing efforts, including through direct mail, television advertisements, and online advertising for various insurance products that are being offered by these carriers. The Company is reimbursed by carriers for the incremental marketing efforts and records the amounts received as a reduction of the marketing costs incurred."

173.    In fact, the payments GoHealth obtained from the Carriers were not merely to cover the cost of its "incremental marketing efforts," but also for referral of specific numbers of Medicare beneficiaries to the Carriers' Advantage plans.

174.    Thus, eHealth's Brian Shasha, who previously worked at Molina Healthcare, a Medicare Advantage carrier, described how GoHealth took MDF money from carriers in exchange for commitments to deliver Medicare policies to them, and then steered Medicare business away from those carriers if GoHealth had satisfied its sales commitments to them or if the carriers ceased paying GoHealth MDF. In an email on November 12, 2020, Mr. Shasha noted that "[t]hey [GoHealth] are willing to turn off their carriers when they hit their targets." In other words, when GoHealth fulfilled its Advantage plan application submission commitment to a particular carrier during a particular period of time, GoHealth would curtail its referrals of Medicare beneficiaries to that carrier's Advantage plans for the rest of the period unless the carrier made an additional payment to GoHealth.

175.    In a call on September 16, 2021, Mr. Shasha elaborated on this practice, based on his prior experience working at Molina:

> I can tell you directly, within the last four years, the business presentation that was put in front of me by GoHealth when I was at Molina was, "here's the amount of money we want, this is the amount of apps we'll drive for that." My questions back were, "Well, what if you get over that number?" "We turn you off." "What if we decide not to fund you next year?" "We turn you off."

176.    Similarly, in a text message exchange on September 21, 2021, when Relator asked Josh Matthews, SelectQuote's Executive Vice President of Medicare Sales and Operations, whether it was GoHealth's practice to "[h]it a minimum with some carriers and then turn them off so they maximize the more lucrative ones," Mr. Matthews responded "[s]pot on."

177.    In September 2021, in response to a question about how GoHealth obtained money from carriers, eHealth's Mr. Kinkead, who worked closely with his Humana counterpart, Mr. Breunig, explained to Relator that GoHealth had "a dedicated model. The higher the marketing dollars, the more agents they'll dedicate into that particular pod. . . . And they will just drive all Humana, right? So they will have different pods for different carriers that are willing to invest. If Humana is willing to invest . . . $25 million for 90,000 apps, . . . then they'll put a bunch of agents into one pod and make sure that those folks are selling Humana. . . . If for whatever reason Humana either doesn't exist in that market or it's an absolute wrong fit for that consumer – and I don't think they care if it's the wrong fit – they're just gonna push Humana until they hit that number."

178.    In an email on October 19, 2019, eHealth's Mr. Ratkovic reported that "I have heard from multiple sources that they [GoHealth] have received between $75-90M from Anthem to deliver between 150-180K enrollments for 2020 effective dates."

179.    In a similar vein, during the eHealth company meeting on May 12, 2021, James Fagan, a former Aetna executive who was consulting for eHealth, said "I will tell you our competitors, I know for a fact, don't give a shit about a choice model. They will take Anthem's five million, ten million dollars. They'll deliver the numbers. And that's where Anthem will spend the money, because they'll deliver it, will feature Anthem products [as] number one."

### 3.    The Carriers' Kickbacks To SelectQuote

180.    SelectQuote, too, took kickbacks from the Carriers in exchange for referring Medicare beneficiaries to those Carriers' Advantage plans. Conversely, if a Medicare Advantage carrier did not pay SelectQuote as much MDF as SelectQuote wanted, SelectQuote steered Medicare beneficiaries to the Advantage plans of other carriers who paid it more. Thus, for example, on October 19, 2019, Mr. Ratkovic reported to Relator that SelectQuote "told me that they would pivot away from Humana because of the reduced marketing $$'s they received this AEP."

181.    Select Quote's annual report from August 26, 2021, explained that carriers provided it "with marketing development funds as additional compensation to deliver policies. Marketing development funds are similar to production bonuses in that they are based on attaining various predetermined target sales levels or other agreed-upon objectives for individual insurance carrier partners." In other words, SelectQuote took money from carriers that was separate from commissions and, in exchange, referred Medicare Advantage business to them.

For the year ended June 30, 2021, SelectQuote reported that it received $19.5 million in such "marketing development funds."

182.    SelectQuote's public filings did not explain, however, that SelectQuote steered Medicare beneficiaries to carriers that it paid it MDF.

183.    In an instant message exchange with Relator on October 19, 2021, eHealth's Mr. Kinkead explained that SelectQuote would "lean into carriers more, hard filter [*i.e.*, prevent agents from seeing plans offered by carriers not paying MDF], agent pods [*i.e.*, groups of agents who received calls generated by carrier-agnostic marketing but who could sell only plans offered by a limited number of carriers who were paying MDF] ...do whatever [t]o drive volume to carriers that are willing to invest."

184.    On August 27, 2021, Relator and his eHealth colleague, Mr. Streich, spoke by telephone with SelectQuote's Mr. Matthews about MDF that brokers received from Medicare Advantage carriers. Mr. Matthews explained that, "five years ago you did these deals, small handshake deals in dark back rooms," but he predicted that, "because the money is so big now . . . [t]here's more scrutiny, gonna be more scrutiny . . . [and] I don't think it'll last, no." Mr. Matthews further described these payment arrangements as a "loophole," *i.e.* a way to collect otherwise prohibited remuneration under the guise of administrative overrides .

185.    During Relator's text message exchange with Mr. Matthews on September 21, 2021, Relator asked "who is the highest [payer of MDF] for you?" Mr. Matthews responded that "[r]ight now it's a tight race between [H]uman[a] [W]ellcare UHC and [A]nthem. Aetna is a distance behind everyone." Mr. Matthews added that Anthem was the most generous of these carriers in terms of cash paid per policy.

4.    **Defendants' Kickback Arrangements Harmed Medicare Beneficiaries, Harmed Competition In The Medicare Advantage Market, And Wasted Scarce Taxpayer Dollars.**

186.    The Carriers' kickbacks to the Brokers incentivized those Brokers and their agents to sell the Carriers' plans even when those plans were not necessarily in the best interests of the Brokers' Medicare beneficiary clients. In fact, as the Defendants were well aware, the Advantage plans that eHealth, GoHealth, and SelectQuote sold as a result of the Carriers' kickbacks often did not work out well for the Medicare beneficiaries who enrolled in them.

187.    At the Goldman Sachs 14th Annual Healthcare CEOs Unscripted Conference on January 6, 2022, Humana CEO Bruce Broussard commented that telephonic brokers like the Brokers represent "a distribution channel that is really encouraging churn, with a large marketing orientation to create shopping, it's sort of the perfect storm." Mr. Broussard elaborated that "[i]t's part of the distribution industry's motivation, they want to create churn. . . . [I]t is what it is." He later added that, "[f]rom a regulatory point of view, and I will tell you what we have seen in the company in this channel is . . . higher compliance issues. We've seen sales that have been sold that people didn't even know they were being sold. So it's an aggressive channel."

188.    Similarly, one former GoHealth agent commented that GoHealth "wants you to consistently flip the same people into new policies even if the one they have is the best one for them."

189.    eHealth had a particularly high churn rate, *i.e.*, the annual rate at which eHealth loses customers. From the fourth quarter of 2018 through the first quarter of 2021, eHealth's churn rate ranged from 31% to 38%. By the second quarter of 2021, according to an eHealth earnings call transcript, eHealth's churn rate had increased to 42%. On information and belief, eHealth's churn rate was far higher than the national average for Medicare Advantage brokers.

190.    Another consequence of eHealth's aggressive, carrier-fueled sales tactics was a consistently high rate of complaints from Medicare beneficiaries who interacted with eHealth agents. Many of the complaints involved allegations of enrollment without consent, beneficiaries whose providers were not in their new Advantage plans' networks, and abusive/high pressure sales tactics. For example, in just the first half of 2021, eHealth received more than 2,000 complaints of enrollment without consent, and more than 500 complaints of abusive/high pressure sales tactics. eHealth compliance personnel investigated and substantiated many of these complaints, including the following:

- In May 2019, an independent insurance agent in Kansas complained that, after an eHealth agent convinced a Medicare beneficiary, who was undergoing expensive cancer treatment, to switch from original Medicare and TRICARE (which covered the beneficiary's Medicare co-pays) to a Humana Advantage plan, the beneficiary suddenly faced $17,000 in out of pocket costs because the beneficiary's providers were out of network.

- In October 2019, a Medicare beneficiary's son complained that the beneficiary felt misled because the eHealth agent told him his coverage would not change with an Anthem Advantage plan, and "[n]ow he has found out that he has to use doctors and hospitals that are in network. This was never explained."

- In September 2019, a Medicare beneficiary complained that she felt misled because she sought a plan with prescription drug coverage, and the agent enrolled her into an Advantage plan without drug coverage.

- In April 2019, a Medicare beneficiary complained that "she never completed an application or gave anyone permission to enroll her into the Aetna plan."

- In June 2019, a Medicare beneficiary complained that she called eHealth for free information and later discovered that the agent enrolled her in a Humana Advantage plan without her permission. In fact, the beneficiary told the agent that she wanted to keep her UnitedHealthcare plan, and the agent promised her insurance would not change.

- In October 2019, a Medicare beneficiary complained that an eHealth agent had convinced him to switch from a Humana Advantage plan to a Wellcare Advantage plan only to find out that the Wellcare plan's provider network did not include his providers.

- In September 2019, a Medicare beneficiary complained that an eHealth agent failed to disclose to her that she would lose her employer-sponsored health care coverage if she enrolled in an Aetna Advantra Advantage plan.

- In January 2020, a Medicare beneficiary complained that an agent told her that enrolling in a Humana Advantage plan would not affect her Medicare, but then she found out that she could not have a surgery she had scheduled for January 28, 2020, because the providers did not accept the new plan.

191.    As Mr. Broussard acknowledged at the Goldman Sachs conference, the Carriers were well aware of the beneficiary complaints that the Brokers generated. Humana's broker scorecards, for instance, reported on the number of complaints each of its brokers had generated. By way of example, as of February 16, 2021, Humana's scorecard for eHealth showed that eHealth had generated 12.41 complaints for every 1,000 enrollment applications eHealth had submitted to Humana in 2020, and that this rate had been increasing steadily since at least 2018. An image of that scorecard is below:



192.    The MDF from the Carriers to the Brokers also stifled competition in the Medicare Advantage market, because the Defendants fostered a "pay to play" marketplace in which, with the Carriers' tacit, and sometimes explicit, support, the Brokers refused to sell Advantage plans offered by carriers who did not agree to pay MDF to the Brokers.

193.    Furthermore, with tens of millions of dollars in extra revenue from the Carriers, eHealth, GoHealth, and SelectQuote were able to flood cable television channels with commercials, pay vendors to make millions of outbound telemarketing calls, and send out millions of direct mail pieces to encourage Medicare beneficiaries to call agents in their call centers. Meanwhile, independent insurance agents – who often met with their clients in person, devote significant effort to finding plans that would best serve their clients, and generally had far

lower churn and complaint rates – had no ability to engage in such marketing activities because they did not receive the same amounts of MDF from the Carriers.

194.    Had the Carriers not wasted tens of millions of dollars paying kickbacks to the Brokers, that money would have benefited Medicare beneficiaries and United States taxpayers. The Medicare Advantage statute permits carriers to include legitimate "administrative costs" in their plan bids. *See* 42 C.F.R. § 422.254(b)(3). On information and belief, the Carriers abused that provision by including their illegal MDF payments in the "administrative costs" that they factored into their annual plan bids. Had the Carriers not included their outlays on MDF kickbacks in their plan bids' administrative costs, the bids necessarily would have been lower. To the extent the lower bids were below the benchmarks, the additional reductions from not including the MDF kickbacks as administrative costs would have inured to the benefit of (1) Medicare beneficiaries in the form of lower premiums and supplemental benefits, including potential reduction in cost sharing, *see* 42 C.F.R. § 422.266(b)(1), and (2) United States taxpayers in the form of lower reimbursement to the Carriers, *see* 42 C.F.R. § 422.264. To the extent the lower bids were above the benchmarks, the amount by which each bid exceeded the benchmark would have been lower, and each enrollee in the Carriers' Advantage plans would have paid a commensurately lower premium. *See* 42 C.F.R. § 422.262(a)(2).

### B.    Aetna And Humana Pressured eHealth To Discriminate Against Disabled Medicare Beneficiaries.

195.    Both Aetna and Humana made clear to eHealth that their ongoing MDF payments to eHealth were contingent on eHealth minimizing the proportion of Advantage plan applications from disabled, or "U65," Medicare beneficiaries that eHealth referred to the carriers. Aetna, Humana, and eHealth all knew that disabled Medicare beneficiaries often suffered from mental illness, physical or intellectual disability, or chronic pain, and tended to have health care needs

that were more costly and more difficult to manage than those of people who were Medicare-eligible solely because of age. Even though Medicare Advantage is guaranteed issue, and even though Medicare Advantage carriers' reimbursements from CMS were adjusted to account for differences in health status among enrolled beneficiaries, Aetna and Humana did not want to incur the costs and administrative burdens of covering the care for disabled beneficiaries and instead wanted other Medicare Advantage carriers, or Original Medicare, to cover the care those beneficiaries needed.

**1.    Aetna's Pressure On eHealth To Discriminate Against Disabled Medicare Beneficiaries**

196.    eHealth's own compliance policy made clear that "fraud, waste, and abuse" included "[s]electing or denying beneficiaries based on their health profile or other discriminating factors."

197.    Similarly, consistent with the law and Aetna's contractual obligations to CMS, Aetna's Medicare Marketing Code of Conduct directed Aetna agents and brokers not to "engage in discriminatory marketing practices" such as "focusing only on aged Medicare-eligible population and not disabled beneficiaries." Aetna's Code of Conduct further directed that its agents and brokers "not engage or implement marketing practices that discriminate based on . . . disability" and "not engage or implement marketing practices . . . [that] exclude people or treat them differently." Aetna's 2016 Individual Medicare Producer Guide likewise provided that "Any broker that engages in prohibited discrimination in connection with the marketing of an Aetna covered program will be subject to disciplinary action including the termination with cause of his or her Producer Agreement." Nonetheless, Aetna consistently undermined its own Code of Conduct and Individual Medicare Producer Guide by pressuring eHealth not to refer disabled Medicare beneficiaries to Aetna Advantage plans.

62

198.    When, as noted above, Relator learned in early 2017 that Aetna had agreed to pay

eHealth $1.4 million in exchange for a commitment by eHealth to generate 17,164 new

Advantage plan enrollments for Aetna, he also learned that Aetna was concerned about the "U65

mix" (*i.e.*, the proportion of disabled Medicare beneficiaries) in the Advantage plan applications

eHealth was submitting to Aetna.

199.    Relator's eHealth colleagues told him that Aetna managers in two large markets,

New Jersey and Texas, were so unhappy about the U65 mix in the Advantage plan enrollments

eHealth was generating for Aetna in those states that the managers did not want eHealth to

market Aetna Advantage plans in those states at all. Thus, on February 24, 2017, Relator

received the following email from Ms. Dean, the e-Health Senior Director for Medicare Carrier

Relations:

> I spoke with Amy [Ike] my contact at Aetna this morning and wanted to get over
> some agenda items for our March 7th meeting in Orlando. She stressed that our
> mix is a daily topic of discussion within Aetna and anything we can do to talk
> through how we are managing/monitoring the mix would be helpful. . . . The
> other items they would like to discuss are -
> ...
> •    How can we meet and exceed 2017 goals, is there anything Aetna can do
>       to help us get beyond our goals
> •    Mix and how we are addressing the spike in under 65 sales
> •    Marketing analysis by channel, which channels are driving the most under
>       65 leads/sales

200.    Relator and his colleagues knew that one way to lower the U65 percentage would

be to reduce eHealth's use of direct response television advertising (which could be seen by

anyone and tended to generate a relatively high percentage of calls from U65 beneficiaries) and

to rely more on direct mail advertising (which could be targeted to people who were at least 65

or about to turn 65).

201.    As Melissa Wong, an eHealth Senior Carrier Account Manager, observed in an instant message chat with Relator on September 13, 2021, "[I] think when we were doing that old DRTV [advertising] it was capturing the <65 sick people, so costing the carriers more money. When we pushed more on DM [direct mail], it evened out. . . ."

202.    On March 7, 2017, Relator and Mr. Hakim met with several Aetna executives, including Ms. Ike and John Sowell, Aetna's Head of Individual Medicare Strategic Distribution. During the meeting, Mr. Sowell reiterated Aetna's concerns about the U65 mix in the Advantage plan applications coming from eHealth and said that Aetna's managers in the Texas and New Jersey markets were particularly upset about that mix.

203.    Relator presented slides during the meeting with Aetna on March 7, 2017. In the slides, Relator recognized Aetna's desire to "[a]ddress concerns with U/O 65 mix," and he outlined plans for an eHealth direct mail campaign that would have a "100% focus on age 64+." At the conclusion of the meeting, as Relator reported in an email to Mr. Hurley, eHealth "secured at least $500,000 in new co-marketing dollars (to support a few specific direct mail initiatives)."

204.    On April 18, 2017, Aetna's Ms. Ike sent an email to e-Health's Ms. Dean: "I am checking in to see if the marketing plan is available for you to share? (For the $500K)." Ms. Dean forwarded this email to Relator, who, knowing that Aetna did not want eHealth to market to disabled Medicare beneficiaries or to anyone in Texas or New Jersey, responded that "We're going to drop approximately 425[],000 packages to people age 67+. . . . We're also sending roughly 41,000 packages to people approaching their Medicare [Initial Enrollment Period]. . . . We are only mailing in the counties Aetna shared and excluding TX + NJ."

205.    In May 2017, eHealth undertook an effort to market to previously "unconverted" leads who had consented to a follow-up call, but eHealth tailored the effort in an attempt to satisfy Aetna's (and Humana's) aversion to disabled Medicare beneficiaries. Thus, before sending the lead list to a telemarketing vendor who would refer interested Medicare beneficiaries back to eHealth, an eHealth employee removed from the list all individuals who were under 64 years old.

206.    Notwithstanding eHealth's incipient efforts to reduce the proportion of disabled Medicare beneficiaries it was referring to Aetna for its Advantage plans, Aetna continued to express concern about the U65 mix and even threatened to stop using eHealth as a broker if the U65 mix did not go down.

207.    On May 3, 2017, Ms. Dean sent an email to Relator reporting that she had just spoken with Ms. Ike at Aetna and that "there are a few things we need to address," including "[o]ur under 65 mix for 2/1-5/1 is at 46% which is significantly higher than our 1/1 mix which was 32% for under 65. Can you take a look at what is driving this mix to increase and is there anything we can do without impacting sales to help improve this before the Direct mail hits?"

208.    On May 16, 2017, Ms. Dean sent an email to Relator and Mr. Hakim reporting that "we are behind 2900 MA's for Aetna. . . . John [Sowell] is holding the payment for $250K until we discuss the mix and the mail drop."

209.    On May 17, 2017, Relator and Mr. Hakim had a call with Aetna, and Mr. Hakim then sent an email to several senior eHealth executives reporting that "we had a call with Aetna today and they were extremely clear that if we do not start making a significant dent in the mix of our business with them by June 30th we will most likely not be able to sell their MA products in most of the country for AEP." After discussing potential tactics to "drive >65 leads,"

Mr. Hakim concluded his email by stating that eHealth "now need[s] to do something pretty significant or we will lose one of the top carriers in the MA business. In addition there is $1M of sponsorship revenue in our plan for Q4 which is at risk as well."

210.    On May 18, 2017, Relator reported to two of his colleagues that "we're no longer allowed to sell Aetna products in TX or NJ." At the time, Aetna offered some of the most attractive Advantage plans available to Medicare beneficiaries in New Jersey and Texas, but eHealth clients were not able to enroll in those plans through eHealth agents because Aetna did not want eHealth's disabled clients.

211.    Also on May 18, 2017, Dave Francis, then eHealth's Chief Financial Officer and Chief Operating Officer, sent an email to Relator and other senior eHealth executives affirming that eHealth "intended . . . to address the mix issues raised by Aetna" and that "[o]ur strategy in moving toward more partnership driven business [*i.e.*, getting more MDF from carriers] has among its goals capturing an improved mix of business."

212.    The next day, May 19, 2017, Relator sent an email to his eHealth marketing colleagues outlining some of the tactics eHealth was employing to address Aetna's "dissatisfaction with our application mix."

213.    Aetna continued closely monitoring the success of eHealth's efforts to reduce the proportion of Advantage plan applications from disabled Medicare beneficiaries. On June 12, 2017, Aetna's Ms. Ike sent eHealth's Ms. Dean an email showing "your [U65] MA mix week to week for 2017 submissions." At that point, the average for the year was 46.04%.

214.    On June 16, 2017, Ms. Dean forwarded Ms. Ike's email to Relator, and she added that she had spoken with Ms. Ike, who conveyed that Aetna's Mr. Sowell "was interested in touching base and wanted to review where we are with the direct mail and overall mix strategy."

215.     Ten days later, on June 26, 2017, Ms. Ike reported to Ms. Dean that: "You are averaging about 45-46% for the year. The last full 4 weeks are averaging at 41%."

216.     Two days later, on June 28, 2017, Ms. Ike sent Ms. Dean an email breaking down "your 2017 submission" by age group:

- • I see 124 submissions that are age 64
- • 2283 submissions are ages 22-63
- • 3378 submissions are ages 65-100
- • There are 206 'submission only' (never made it to an active status) that did . . . not have a DOB.

217.     Ms. Dean promptly forwarded Ms. Ike's email to Relator and Mr. Hakim, and she commented that "[w]e aren't seeing movement on the mix and it looks like removing Aetna from DRTV may be the only way to bring down the percentage."

218.     On information and belief, "removing Aetna from DRTV" meant that, when an eHealth agent received a call on a telephone number that eHealth used in its television advertising, eHealth ensured that the agent would not see any Aetna Advantage plans available in the caller's zip code.

219.     Ms. Dean's suggestion concerned Relator, and he responded to Ms. Dean and Mr. Hakim as follows:

I have a very specific and passionate point of view. I recognize that there are other business considerations in place but here's my POV anyway.

1.     We should do whatever is reasonable to help with mix.

2.     We should not exclude them from DRTV (it's not reasonable).

3.     The Medicare guidelines state very clearly that a carrier cannot force a broker to cherry pick beneficiaries. They can ask us to get better at serving the 65+ crowd and we should work on that but my understanding is that they may not shut us off in any region due to undesirable mix. In my experience, CMS would take this seriously.

4.      I believe it would be improper for us to make major changes to our
marketing efforts (for Aetna) because of the compliance risks to our
company. Plus, limiting these people to other carriers just sends more
difficult members their way, which seems unfair to me.

220.    On July 14, 2017, notwithstanding Relator's previously-expressed compliance

and policy concerns about Aetna's demands on eHealth, Mr. Hakim sent Relator an email

discussing the possibility of "turning some things [*i.e.*, DRTV] off" to satisfy Aetna because

"[w]e really need their $750K."

221.    Relator responded to Mr. Hakim as follows:

You may consider the following:
...
2.      We've found two solid direct mail pieces and will introduce a new series
of packages ahead of the next AEP. The mix is exactly as we anticipated …
virtually 100% age 64+. We will invest more than $2 million in direct mail.

3.      Threatening to shut us off isn't just bad business for Aetna. It's also
improper and very likely illegal. I would be surprised if a more widespread shut
down didn't force our compliance folks to self-report the matter to CMS, which
wouldn't be good for anyone and certainly not for Aetna. So it's in our mutual
best interest to figure out a proper compromise that doesn't run afoul of the law.

    a. A reasonable compromise cannot be to shut off a bunch of markets or to
abstain from major marketing campaigns. The last thing we want is to be dragged
into a bunch of compliance drama thanks to Aetna making us do questionable
things.

222.    Mr. Hakim ignored Relator's cautionary statements and responded by instead

suggesting that eHealth also would have to reduce the U65 percentage for Humana: "Thanks for

sending. Humana just called me about this same topic and we need to assure them we will be in

the mid 30% range to get marketing $$'s so these items will be good for them as well."

223.    For much of the rest of 2017, Aetna continued to condition its payment of MDF to

eHealth on eHealth not marketing for Aetna in New Jersey or Texas, as well as on eHealth

reducing the U65 mix in other markets. Thus, in an email about Aetna to Relator and Ms. Dean on November 6, 2017, Mr. Hakim reiterated that "we do not sell them in NJ and TX."

224.    In late February 2018, Aetna temporarily allowed eHealth to market Aetna plans in Texas, but not through television advertisements.

225.    As of June 21, 2018, however, eHealth understood that it could not market Aetna plans in either Texas or New Jersey.

226.    Late in 2018, Aetna permitted eHealth to engage in limited marketing on behalf of Aetna in New Jersey, but only so long as eHealth targeted its marketing to Medicare beneficiaries who were 65 or over. Thus, on November 1, 2018, Mr. Rooney reported that, "[d]espite my best efforts, Aetna wants us to turn off TV in NJ."

227.    In an instant message chat that same day, Mr. Rooney and Relator further discussed Aetna's directive, and eHealth's understanding that it needed to comply with the directive in order to continue receiving MDF from Aetna:

| Rooney: | hey. if needed, can we remove Aetna from TV channel in NJ? is that easily done at the alliance id level? |
|---|---|
| Relator: | It can be done but not great for our business. . . . |
| Rooney: | I hear you. they are freakout about <65 business. we were actually not supposed to turn tv on for them to begin with. ok. I am pushing back but may have to do it. |
| Relator: | isn't direct mail helping? |
| Rooney: | absolutely |
| Relator: | The DRTV enrollments should pale in comparison |
| Rooney: | only 2 of the apps from tv are <65.<br>They are being unreasonable.<br>but they are giving us lots of $! |

| Relator: | That region is nuts in my opinion and they should be reminded that asking us to do these things is not legal[.] The money is great but they can't cherry pick their members and it's not even a gray area. They know this. |
|---|---|
| Rooney: | got it |

228.    The next day, Ms. Wong, the eHealth Senior Carrier Account Manager, sent an email to a group of eHealth employees stating: "We need to turn off all TV marketing for ***ONLY Aetna New Jersey***. This is due to the mix of business we send to that state, so they want to turn off the TV marketing. We need to do this ASAP. . . ." (Emphasis and coloration in original.)

229.    As late as mid-2019, eHealth still felt pressure from Aetna to discriminate against disabled Medicare beneficiaries. On June 24, 2019, Relator, who was one of many eHealth executives involved in a working group preparing for that year's AEP, received a "tracker" of initiatives eHealth was working on to prepare forAEP. Among those initiatives was eHealth's "need to reduce <65 mix to ensure high level of continued sponsorship commitment" from Aetna. An image of that tracker, with Relator's highlighting and a notation of when he received the document, is below:

70



### 2. Humana's Pressure On eHealth To Discriminate Against Disabled Medicare Beneficiaries

230. Like Aetna, Humana ostensibly prohibited discrimination based on health status. For example, the 2010 Marketing & Distribution Agreement between Humana and eHealth required eHealth to "make all reasonable efforts to ensure that [eHealth] agents . . . [u]nderstand that it is a violation of CMS regulations and they are strictly prohibited from discriminating against any Medicare eligible prospect . . . based upon their health status, except as permitted by CMS." In 2018, the parties amended their agreement to require that eHealth "make all reasonable efforts to ensure that [eHealth] agents . . . [u]nderstand that it is a violation of CMS regulations and they are strictly prohibited from discriminating against any Medicare eligible prospect . . . based upon their . . . age, mental or physical disability, health status, receipt of health care, claims experience, [or] medical history." Similarly, Humana's Sales & Marketing Code of Ethics for Plan Year 2020 provided that "Agents understand that it is a violation of CMS regulations

and are strictly prohibited from discriminating against any eligible prospect from enrolling in an MA and/or PDP, based upon their health status, except as permitted by CMS. Any personal information obtained about a prospect as a result of discussion/application for any other product distributed by Humana MarketPoint will in no way be used to discourage their enrollment in a Humana MA and/or PDP plan." In the same vein, Humana's 2020 External Partner Guardrails warned that "Lead Sources MUST NOT . . . [r]equire consumers to give any health status, gender, date of birth information, or any other information that would give the appearance of cherry picking, to solicit for Medicare Advantage or Prescription Drug Plans."

231.    Nonetheless, like Aetna, Humana repeatedly expressed concern to eHealth about the percentage of disabled individuals among the Medicare beneficiaries eHealth was referring to Humana for enrollment in Humana Advantage plans. Humana made it clear that eHealth risked losing Humana's MDF money if eHealth did not reduce that percentage. For example, as noted above, Mr. Hakim reported to Relator on July 14, 2017, that "Humana just called me about this same topic [the U65 mix] and we need to assure them we will be in the mid 30% range to get marketing $$'s."

232.    Mr. Hakim subsequently monitored the U65 mix in the Advantage enrollment applications eHealth was delivering to Humana. On December 14, 2017, for example, Mr. Hakim sent Relator a table showing that U65 Medicare beneficiaries accounted for 33.4% of all the beneficiaries eHealth referred for enrollment in Humana Advantage plans during the fall 2017 AEP, and that U65 Medicare beneficiaries accounted for 32.5% of the business that came through eHealth's direct mail channel. In his cover email, Mr. Hakim asked "why isn't our DM <65% way lower then [*sic*] this? I would expect that to be in the 20% range."

233.     On February 27, 2018, Relator and several other eHealth executives met with a large group of Humana executives at Humana's offices in Louisville, Kentucky. During the meeting, Humana executives presented a PowerPoint slide deck concerning eHealth's performance during the fall 2017 AEP. The deck included a slide showing the "eHealth Percentage of Sales Under Age 65" for each month from January 2011 through February 2018, as reproduced below:



According to the slide, 47% of the Humana Advantage plan enrollments generated by eHealth in 2017 were "Under Age 65." The presence of this slide in Humana's presentation to eHealth thus reaffirmed that the mix of disabled Medicare beneficiaries in the eHealth referrals to Humana remained a significant concern for Humana.

234.     On May 1, 2018, Mr. Breunig, the Humana National Sales Manager, sent his eHealth counterpart an email with an update that the "U65 [is] 37.6% [and] going in very positive directions in comparison to the past and expect to continue to get better." Mr. Breunig's email attached a "Scorecard," which is reproduced below:



One of the metrics on the Scorecard was "Under 65%," and it showed, among other things, that eHealth's Under 65% in fall 2016 AEP ("2017" column, because applications generated in the fall 2016 AEP were for plan enrollments effective January 1, 2017) was 45.6%, and had decreased to 37.6% in the fall 2017 AEP.

235.     In January 2019, Mr. Breunig provided eHealth with an updated table showing that the U65 percentages in the business from eHealth had declined in recent months, as shown below:

| Month | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|-------|------|------|------|------|------|------|------|------|------|
| JAN | 32% | 39% | 36% | 31% | 40% | 45% | 40% | 38% | 26% |
| FEB | 58% | 49% | 47% | 44% | 50% | 56% | 56% | 47% | |
| MAR | 60% | 48% | 44% | 47% | 51% | 54% | 55% | 49% | |
| APR | 33% | 41% | 41% | 47% | 59% | 56% | 55% | 49% | |
| MAY | 49% | 42% | 35% | 42% | 58% | 56% | 55% | 47% | |
| JUN | 50% | 44% | 43% | 46% | 62% | 53% | 51% | 42% | |
| JUL | 32% | 44% | 36% | 36% | 58% | 53% | 49% | 28% | |
| AUG | 37% | 43% | 36% | 40% | 57% | 53% | 50% | 39% | |
| SEP | 49% | 44% | 37% | 44% | 56% | 56% | 49% | 28% | |
| OCT | 43% | 43% | 36% | 45% | 57% | 54% | 47% | 27% | |
| NOV | 44% | 47% | 44% | 46% | 58% | 55% | 48% | 35% | |
| DEC | 45% | 46% | 43% | 52% | 55% | 54% | 48% | 33% | |
| TOTAL | 42% | 42% | 38% | 37% | 50% | 52% | 47% | 38% | 26% |

Mr. Breunig commented that this was a "great change" and he concluded by saying "Appreciate the efforts!" Mr. Rooney, the eHealth Vice President of Carrier Relations, forwarded Mr. Breunig's email to Relator with a comment that "[t]his is a huge help as we look to grow the business / relationship."

236.    In the fall 2020 AEP, as Mr. Kinkead told Relator in a September 2021 instant message chat, eHealth brought the Humana U65 mix down to 13.5%, a "huge improvement."

237.    Humana's Scorecards also continued to track the U65 mix in the Medicare Advantage business eHealth sent to Humana. According to the Scorecard that Humana provided to eHealth on or about February 16, 2021, eHealth's U65% was 25.8% in the fall 2018 AEP, 20.1% in the fall 2019 AEP, and 13.5% in the fall 2020 AEP. The same scorecard also showed that Humana's medical expense ratio ("MER") for Advantage plan members referred by eHealth was 87.4%. On information and belief, Humana's only purpose in showing these broker-specific MERs to eHealth and other brokers was to discourage them from referring Medicare beneficiaries with relatively high expected medical costs to Humana.

C.    **SelectQuote Discriminated Against Disabled Beneficiaries On Behalf Of The Carriers.**

238.    On information and belief, SelectQuote, like eHealth, regularly received Scorecards from Humana showing SelectQuote's U65%, and SelectQuote understood that Humana and the other Carriers would be unwilling to continue providing MDF to SelectQuote unless it reduced its percentage of Advantage plan sales to Medicare beneficiaries who were under 65.

239.    Accordingly, notwithstanding Humana's directive that its lead vendors not require date of birth information while soliciting for Humana Advantage plans, SelectQuote screened Medicare beneficiaries by their age. SelectQuote effected this screening by directing its call screeners, including both its own screeners and its lead sources, such as TogetherHealth, to ask callers their age, even when the callers said that they had Medicare Parts A and B and thus were eligible for enrollment in an Advantage plan regardless of their age. At least in 2019, and, on information and belief, in years prior and after, too, SelectQuote would not provide a Medicare beneficiary with information about Advantage plans unless the beneficiary provided his or her age to the call screener. On information and belief, information about the Medicare beneficiaries' age served no purpose at the screening stage other than to enable SelectQuote to discriminate against disabled Medicare beneficiaries on behalf of the Carriers.

VI.    **THE CARRIERS' FALSE REPRESENTATIONS TO CMS THAT THEY HAD COMPLIED WITH MATERIAL CONDITIONS OF PAYMENT**

240.    By virtue of the Advantage plan contracts each of the Carriers signed with CMS, (a) each time that Aetna and Humana submitted a monthly Advantage plan enrollment attestation to CMS, they represented that they were in compliance with the legal and contractual prohibitions on discrimination against Medicare beneficiaries with disabilities, and (b) each time that any of the Carriers submitted a monthly Advantage plan enrollment attestation to CMS, they

represented that they were in compliance with the anti-kickback statute. Further, in their assurances on Form HHS 690, the Carriers agreed to comply with the legal prohibitions against discrimination based on disability, and they recognized that compliance with those prohibitions was a condition of their continued receipt of payments from CMS.

241.    These representations were false because (1) Aetna and Humana were not in compliance with the legal and contractual prohibitions on discrimination against Medicare beneficiaries with disabilities, and (2) each of the Carriers was not complying with the anti-kickback statute.

242.    CMS paid the Carriers' claims based on their Advantage plan enrollment attestations without knowledge of the falsity of the Carriers' representations.

243.    The Carriers' false representations were material to CMS's payment decisions.

244.    On information and belief, if CMS had been aware of the Carriers' false representations, CMS would not have reimbursed the Carriers based on their monthly Advantage plan enrollment attestations, and CMS would not have entered into, or renewed, Advantage plan contracts with the Carriers.

245.    By way of example, below is a table of certain contracts that Wellcare entered into with CMS during the period from 2018 to 2020:

| Contract | Effective Date | Organization Name |
|---|---|---|
| H0088 | 1/1/2018 | Wellcare Health Insurance of New York, Inc. |
| H0111 | 1/1/2018 | Wellcare of Georgia, Inc. |
| H5199 | 1/1/2018 | Wellcare Health Insurance of Arizona, Inc. |
| H7326 | 1/1/2018 | Wellcare of South Carolina, Inc. |
| H0270 | 1/1/2019 | Wellcare Health Insurance Company of America |
| H9364 | 1/1/2019 | Wellcare of Maine, Inc. |
| H0969 | 1/1/2020 | Wellcare Health Insurance Company of New Hampshire |
| H1914 | 1/1/2020 | Wellcare Health Insurance of Connecticut, Inc. |

## VII.    EXAMPLES OF THE CARRIERS' FALSE CLAIMS

246.    While eHealth was receiving kickbacks from Aetna and discriminating against disabled Medicare beneficiaries at Aetna's behest, eHealth arranged for the enrollment of the following Medicare beneficiaries in Aetna Advantage plans:[1]

| Medicare Beneficiary Name | State | Plan Name | Plan Effective Date |
|---|---|---|---|
| 1 | OR | Aetna Medicare Value HMO | 1/1/2021 |
| 2 | FL | Aetna Medicare Premier Plus PPO | 1/1/2021 |
| 3 | MO | Aetna Medicare Elite PPO | 1/1/2021 |
| 4 | MO | Aetna Medicare Premier Preferred HMO | 1/1/2020 |
| 5 | SC | Aetna Medicare Premier PPO | 1/1/2020 |
| 6 | TN | Aetna Value | 2016 |
| 7 | VA | Aetna Medicare Select HMO | 1/1/2017 |
| 8 | VA | Aetna Medicare UVA Health System Prime Plan HMO | 1/1/2019 |
| 9 | GA | Aetna Medicare Select Plan HMO | 1/1/2018 |

On information and belief, through its monthly enrollment attestations, Aetna requested payment from CMS for each of these beneficiaries after eHealth arranged for their enrollment in Aetna Advantage plans.

247.    While eHealth was receiving kickbacks from Humana and discriminating against disabled Medicare beneficiaries at Humana's behest, eHealth arranged for the enrollment of the following Medicare beneficiaries in Humana Advantage plans:

| Medicare Beneficiary Name | State | Plan Name | Plan Effective Date |
|---|---|---|---|
| 10 | LA | Humana Gold Plus SNP-DEH | 1/1/2021 |
| 11 | IL | Humana Gold Plus HMO | 1/1/2021 |
| 12 | IL | Humana Gold Plus HMO | 1/1/2020 |
| 13 | LA | Humana Honor PPO (MA Only) | 1/1/2020 |
| 14 | NY | Humana Gold Plus HMO | 1/1/2019 |
| 15 | IL | Humana Gold Plus HMO | 1/1/2018 |
| 16 | TN | Humana Gold Plus HMO | 1/1/2017 |

---

[1] For each Medicare beneficiary referenced in this complaint by number, Relator has provided, or will provide, the patient's name and other identifying information to the government and will do the same for the Defendants and/or the Court upon request.

On information and belief, through its monthly enrollment attestations, Humana requested payment from CMS for each of these beneficiaries after eHealth arranged for their enrollment in Humana Advantage plans.

248.    While eHealth was receiving kickbacks from Anthem, eHealth arranged for the enrollment of the following Medicare beneficiaries in Anthem Advantage plans:

| Medicare Beneficiary Name | State | Plan Name | Plan Effective Date |
|---|---|---|---|
| 17 | MO | Anthem MediBlue Plus HMO | 1/1/2021 |
| 18 | WI | Anthem MediBlue Plus HMO | 1/1/2021 |
| 19 | FL | Anthem Simply Complete HMO-DSNP | 1/1/2020 |
| 20 | KY | Anthem MediBlue Plus HMO | 1/1/2020 |
| 21 | IN | Anthem HMO | 2017 |
| 22 | NV | Anthem Start-Smart Plus HMO | 1/1/2019 |
| 23 | OH | Anthem MediBlue Essential HMO | 1/1/2018 |

On information and belief, through its monthly enrollment attestations, Anthem requested payment from CMS for each of these beneficiaries after eHealth arranged for their enrollment in Anthem Advantage plans.

249.    While eHealth was receiving kickbacks from Wellcare, eHealth arranged for the enrollment of the following Medicare beneficiaries in Wellcare Advantage plans:

| Medicare Beneficiary Name | State | Plan Name | Plan Effective Date |
|---|---|---|---|
| 24 | CT | Wellcare Premier PPO | 1/1/2021 |
| 25 | KY | Wellcare Premier PPO | 1/1/2021 |
| 26 | NY | Wellcare Today's Options Advantage Plus 550B PPO | 1/1/2020 |
| 27 | FL | Wellcare Elite HMO | 1/1/2020 |
| 28 | FL | Wellcare Dividend Prime HMO | 2017 |
| 29 | FL | Wellcare Essential HMO-POS | 1/1/2019 |

On information and belief, through its monthly enrollment attestations, Wellcare requested payment from CMS for each of these beneficiaries after eHealth arranged for their enrollment in Wellcare Advantage plans.

## VIII.   CAUSES OF ACTION

### COUNT I
**Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**
**(False Claims Resulting From Kickbacks)**

250.     Relator re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

251.     By virtue of the acts described above, Defendants knowingly and willfully violated the anti-kickback statute, 42 U.S.C. § 1320a-7b(b), and accordingly they then presented, or caused to be presented, to the United States false claims that resulted from their anti-kickback statute violations, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

252.     Payment of the false and fraudulent claims was a reasonable and foreseeable consequence of Defendants' conduct.

253.     By reason of the foregoing, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false or fraudulent claim.

### COUNT II
**Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**
**(False Or Fraudulent Claims)**

254.     Relator re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

255.     Compliance with applicable statutes, regulations, and the provisions of the Carriers' contracts with CMS was a condition of the Carriers' eligibility to participate in Medicare Part C as Medicare Advantage organizations and to receive reimbursement from the United States for providing Medicare insurance to Medicare beneficiaries.

256.     The Carriers' representations of compliance with applicable statutes, regulations, and the provisions of the Carriers' contracts with CMS were knowingly false.

257.    Furthermore, the Brokers, by virtue of their conduct, knowingly caused the Carriers falsely to represent their compliance with applicable statutes, regulations, and the provisions of the Carriers' contracts with CMS.

258.    Because the Carriers' representations of compliance with applicable statutes, regulations, and the provisions of the Carriers' contracts with CMS were knowingly false, the Carriers' claims to CMS, in the form of enrollments and monthly Advantage plan enrollment attestations, were false.

259.    The United States, unaware of the falsity of claims made or caused to be made by Defendants, paid claims that it would not have paid had it known of Defendants' illegal conduct.

260.    By virtue of the acts described above, Defendants knowingly submitted, or caused to be submitted, false claims to CMS in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), and the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false or fraudulent claim.

### COUNT III
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
### (False Records Or Statements Material To False Claims)

261.    Relator re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

262.    Compliance with applicable statutes, regulations, and the provisions of the Carriers' contracts with CMS was a condition of the Carriers' eligibility to participate in Medicare Part C as Medicare Advantage organizations and to receive reimbursement from the United States for providing Medicare insurance to Medicare beneficiaries.

263.    The Carriers' representations of compliance with applicable statutes, regulations, and the provisions of the Carriers' contracts with CMS were knowingly false.

264.    Furthermore, the Brokers, by virtue of their conduct, knowingly caused the Carriers falsely to represent their compliance with applicable statutes, regulations, and the provisions of the Carriers' contracts with CMS.

265.    The United States, unaware of the falsity of the records, statements, representations, and claims made or caused to be made by Defendants, paid claims that it would not have paid had it known of Defendants' illegal conduct.

266.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), and the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false or fraudulent claim.

## COUNT IV
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
### (False Claims Resulting From Fraudulent Inducement)

267.    Relator re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

268.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements concerning the Carriers' compliance with the requirements of applicable statutes, regulations, and the provisions of the Carriers' contracts with CMS.

269.    Defendants knowingly made, used, or caused to be made or used these false records or statements with the intent to induce CMS to enter into, or to renew, contracts with the Carriers.

270.    The United States was unaware of the falsity of these records or statements.

271. Had it been aware of the falsity of the records or statements that Defendants knowingly made, used, or caused to be made or used, CMS, on information and belief, would not have entered into, or renewed, contracts with the Carriers for their Advantage plans, and the United States would not have paid claims the Carriers submitted pursuant to those contracts.

272. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), and the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false or fraudulent claim.

### COUNT V
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C)
### (Conspiracy To Violate 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B))

273. Relator re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

274. By virtue of the acts described above, the Carriers and the Brokers violated 31 U.S.C. § 3729(a)(1)(C) by conspiring together to violate the anti-kickback statute and the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A).

275. By virtue of the acts described above, the Carriers and the Brokers violated 31 U.S.C. § 3729(a)(1)(C) by conspiring together to violate applicable statutes, regulations, and the provisions of the Carriers' contracts with CMS concerning compliance with the anti-kickback statute, and thus to violate the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B).

276. By virtue of the acts described above, Aetna and eHealth violated 31 U.S.C. § 3729(a)(1)(C) by conspiring together to violate applicable statutes, regulations, and the provisions of Aetna's contracts with CMS concerning discrimination against disabled Medicare

beneficiaries, and thus to violate the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B).

277.    By virtue of the acts described above, Humana and eHealth violated 31 U.S.C. § 3729(a)(1)(C) by conspiring together to violate applicable statutes, regulations, and the provisions of Humana's contracts with CMS concerning discrimination against disabled Medicare beneficiaries, and thus to violate the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B).

278.    By reason of the foregoing, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false or fraudulent claim.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Relator demands and prays for the following relief:

1.    That judgment be entered in favor of the United States for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper;

2.    An award to Relator of a percentage of the proceeds of the action in accordance with 31 U.S.C. § 3730(d);

3.    An award to Relator of his costs and reasonable attorney fees for prosecuting this action; and

4.    All other relief as may be required or authorized by law and in the interests of justice.

## X.    DEMAND FOR JURY TRIAL

Relator hereby demands a trial by jury.


Dated: April 29, 2025                     Respectfully submitted,

                                          ANDREW SHEA

                                          By his attorney

                                          /s/ *Gregg Shapiro*
                                          Gregg Shapiro (BBO No. 642069)
                                          Gregg Shapiro Law, LLC
                                          101 Federal Street, Suite 1900
                                          Boston, MA 02110
                                          Tel: 617-582-3875
                                          gshapiro@greggshapirolaw.com


## **Certificate of Service**

I hereby certify that, on April 29, 2025, I emailed a copy of this document to Assistant United States Attorneys Charles Weinograd and Julien Mundele.

                                          /s/ *Gregg Shapiro*
                                          Gregg Shapiro