# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* ANDREW SHEA, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| eHEALTH, INC., eHEALTH INSURANCE SERVICES, INC., CVS HEALTH CORPORATION, AETNA LIFE INSURANCE COMPANY, AETNA, INC., HUMANA INC., ELEVANCE HEALTH, INC., GOHEALTH, INC., and SELECTQUOTE, INC., | ) ) ) ) ) ) ) ) ) ) | No. 21-cv-11777-DJC |
| Defendants. | | |

## COMPLAINT IN PARTIAL INTERVENTION OF THE UNITED STATES OF AMERICA

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

I.      JURISDICTION AND VENUE.................................................................3

II.     PARTIES ....................................................................................................3

        A.      Plaintiff and Relator ......................................................................3

        B.      Defendants .....................................................................................4

III.    LEGAL FRAMEWORK AND INDUSTRY BACKGROUND....................5

        A.      The False Claims Act .....................................................................5

        B.      The Anti-Kickback Statute .............................................................7

        C.      Medicare ......................................................................................10

                1. Overview of Medicare Advantage ..........................................10

                2. Broker Operations Within Medicare Advantage ....................13

                3. Statutes and Regulations Related to Broker Compensation and
                   Payments to Brokers............................................................18

                4. Statutes and Regulations Related to Discrimination Against Disabled
                   Beneficiaries........................................................................21

                5. Contractual and Claim Requirements for MAOs....................23

IV.     KICKBACKS AND DISCRIMINATION BY THE DEFENDANT INSURERS
        AND DEFENDANT BROKERS.................................................................24

        A.      Humana .........................................................................................25

                1. Humana Paid Kickbacks to the Defendant Brokers to Steer Medicare
                   Beneficiaries to Humana Plans and Limit Enrollments in
                   Competitors' Plans...............................................................25

                2. Humana's Kickbacks to GoHealth..........................................28

                3. Humana's Kickbacks to SelectQuote.......................................45

                4. Humana's Kickbacks to eHealth..............................................58

                5. Humana Conspired with the Defendant Brokers and Others to
                   Discriminate Against Medicare Beneficiaries with Disabilities ..............68

B.     Aetna ..................................................................................................85

1. Aetna Paid Kickbacks to the Defendant Brokers to Steer Medicare
Beneficiaries to Aetna Plans and Limit Enrollments in
Competitors' Plans ...............................................................................85

2. Aetna's Kickbacks to eHealth..............................................................88

3. Aetna's Kickbacks to SelectQuote.......................................................95

4. Aetna's Kickbacks to GoHealth..........................................................105

5. Aetna's "Bonuses," "Rewards," and "Kickers".............................108

6. Aetna Conspired with the Defendant Brokers and Others to
Discriminate Against Medicare Beneficiaries with Disabilities.............112

C.     Anthem ...............................................................................................134

1. Anthem Paid Kickbacks to GoHealth and eHealth to Steer Medicare
Beneficiaries to Aetna Plans and Limit Enrollments in
Competitors' Plans ...............................................................................134

2. Anthem's Kickbacks to GoHealth .....................................................135

3. Anthem's Kickbacks to eHealth .......................................................166

D.     The Defendants' Kickback Schemes Harmed Medicare Beneficiaries .............173

V.     THE DEFENDANTS MADE MATERIAL FALSE CLAIMS ...................................178

A.     The Defendants Made, or Caused to Be Made, Material False Claims
Because They Violated the Anti-Kickback Statute ...........................................178

1. The Defendant Insurers' Contracts with CMS Required Each Defendant
Insurer to Agree to Comply with the AKS .............................................178

2. The Defendant Insurers Certified in Their Claims for Payment That the
Information They Provided Was Truthful .............................................180

B.     Aetna, Humana, and the Defendant Brokers Made, or Caused to Be Made,
Material False Claims Because They Violated Anti-Discrimination Laws,
Regulations, and Contractual Provisions ........................................................182

1. Aetna and Humana Agreed in Contracts with CMS to Comply with
Anti-Discrimination Laws and Regulations...........................................182

2. Aetna and Humana Conspired with the Defendant Brokers to Discriminate Against Medicare Beneficiaries with Disabilities in Violation of Contractual Requirements .................................................. 183

VI.  EXAMPLES OF FALSE CLAIMS TO THE GOVERNMENT ................................... 184

    A.  Humana and GoHealth ................................................................................. 184

    B.  Humana and SelectQuote ............................................................................ 186

    C.  Humana and eHealth .................................................................................... 188

    D.  Aetna and eHealth ....................................................................................... 190

    E.  Aetna and SelectQuote ................................................................................ 192

    F.  Aetna and GoHealth .................................................................................... 194

    G.  Anthem and GoHealth ................................................................................. 195

    H.  Anthem and eHealth .................................................................................... 196

VII.  CAUSES OF ACTION ........................................................................................ 198

VIII.  PRAYER FOR RELIEF ..................................................................................... 211

IX.  JURY DEMAND ................................................................................................. 213

## PRELIMINARY STATEMENT

Thirty-three million elderly and disabled Americans receive their health care benefits through the Medicare Advantage program, where private insurers offer government-approved insurance plans within Medicare. Every year, millions of these beneficiaries rely on insurance brokers to help them navigate the complexities of the Medicare Advantage program and find the health insurance plan that best meets their individual needs. These insurance brokers wield considerable influence over our nation's most vulnerable citizens as they choose from many different health plan options—a decision that can have significant health and financial consequences. For that reason, Congress expressly called for regulations that create incentives for brokers to "enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w–21(j)(2). Our nation's citizens trusted that the insurance brokers helping them select a plan were unbiased and acting in their best interests. Defendants violated that trust.

From 2016 through at least 2021, three of the nation's largest health insurance companies offering Medicare Advantage plans—Aetna, Anthem, and Humana—(together, the "Defendant Insurers")—knowingly and willfully paid hundreds of millions of dollars in kickbacks to some of the nation's largest insurance brokers—eHealth, GoHealth, and SelectQuote (together, the "Defendant Brokers")—to induce them to steer beneficiaries into the Defendant Insurers' Medicare Advantage plans. In public statements, the Defendant Brokers claimed to be "unbiased," "carrier-agnostic," and to "have your best interests in mind." In private, however, the Defendant Brokers repeatedly directed Medicare beneficiaries to the plans offered by insurers that paid them the most money, regardless of the quality or suitability of the insurers' plans. They incentivized their agents to sell those plans; set up teams of agents who could sell only those plans; and at times "shut off," or refused to sell, plans of insurers who did not pay or did not pay enough in kickbacks.

As one broker executive explained about Aetna, for example, "more money will help drive more sales [be]cause your product is dog sh[*]t."

Defendants hid the true nature of agreements behind contracts and invoices that purported to cover only the cost of marketing or administrative services. All the while, Defendants knew what they were doing was illegal. For example, when discussing a purported "marketing" agreement with Humana, one eHealth executive joked that Humana was paying eHealth "$15M/year for a [web]site that drives 15 enrollments per year. CMS will surely never figure that one out. . . . Luckily the govt are generally morons." Meanwhile, when discussing Aetna's sham agreements, another eHealth executive wrote that the "marketing" payment model was "not even a little compliant. . . . I'm pretty sure if Aetna got audited by cms, they'd be fu[**]ed." And though Anthem kept the true purpose of its "marketing" payments out of its contracts with brokers, Anthem executives often referenced the "underlying business agreement" of money for sales.

Further, Aetna and Humana used their kickbacks to the Defendant Brokers not only to buy enrollments in their plans, but also to pressure brokers to enroll fewer Medicare beneficiaries with disabilities, whom the insurers perceived as more expensive to cover. Because Medicare Advantage is a guaranteed issue program for all Medicare-eligible beneficiaries, federal law bars insurers from favoring enrollment of healthier beneficiaries and discriminating against beneficiaries with disabilities who might be less profitable. But Aetna and Humana did just that. In response to these financial inducements from Aetna and Humana, the Defendant Brokers rejected referrals of disabled beneficiaries, filtered telephone calls from disabled beneficiaries, and strategically directed disabled beneficiaries away from Aetna and Humana plans. These actions illegally reduced the ability of disabled Medicare beneficiaries to access and enroll in Aetna and Humana plans.

The United States brings this complaint under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733, and the common law to guard Americans from the pernicious effects of bribes in health care, to protect Americans with disabilities from discrimination in the receipt of health care, and to recover taxpayer dollars wrongfully obtained by the Defendants.

## I.    JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1367(a) because the United States is the plaintiff.  In addition, the Court has subject matter jurisdiction over FCA claims for civil damages and penalties pursuant to 31 U.S.C. § 3732 and 28 U.S.C. §§ 1331, 1345, and 1355, and over the common law claim pursuant to 28 U.S.C. §§ 1331, 1345, and 1367(a).

2.    This Court may exercise personal jurisdiction over all the Defendants pursuant to 31 U.S.C. § 3732(a).  The Court may exercise personal jurisdiction over all the Defendants because multiple defendants transacted business in this District and committed some of the actions described herein, which are proscribed by 31 U.S.C. § 3729, in this District.  For example, the Defendant Insurers enrolled Medicare beneficiaries in Massachusetts through the Defendant Brokers, and eHealth maintained an office in Westford, Massachusetts.

3.    Similarly, venue is proper in this jurisdiction under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b).

## II.    PARTIES

### A.    Plaintiff and Relator

4.    Plaintiff is the United States of America.  Through the Department of Health and Human Services ("HHS"), and more specifically through the Centers for Medicare and Medicaid Services ("CMS"), a component agency within HHS, the Government administers the Health

Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* ("Medicare").

5.      Relator Andrew Shea ("Relator") is a resident of Missouri and a former employee of eHealth.  In November 2021, Relator filed an action in this Court alleging violations of the FCA on behalf of himself and the United States pursuant to the *qui tam* provision of the FCA, 31 U.S.C. § 3730(b)(1).

**B.      Defendants**

6.      Defendant Aetna Inc. is a Pennsylvania corporation headquartered in Hartford, Connecticut.  It is a subsidiary of CVS Pharmacy, Inc., which is in turn a subsidiary of Defendant CVS Health Corporation ("CVS Health").

7.      Defendant Aetna Life Insurance Company is a wholly owned subsidiary of Aetna Inc.  Aetna Life Insurance Company is a Connecticut corporation.  Aetna Inc., Aetna Life Insurance Company, and their affiliates or subsidiaries (collectively, "Aetna") market, sell, and operate health insurance plans, including within the Medicare Advantage program, under the Aetna name and under the brand name Coventry.

8.      Defendant CVS Health is a Delaware corporation headquartered in Woonsocket, Rhode Island.

9.      Defendant Elevance Health, Inc. is an Indiana corporation headquartered in Indianapolis, Indiana.  Elevance Health, Inc. was known as Anthem, Inc. until the company changed its name on June 28, 2022.  Elevance Health, Inc. and its affiliates or subsidiaries (collectively, "Anthem") market, sell, and operate health insurance plans, including within the Medicare Advantage program.

10.     Defendant Humana Inc. is a Delaware corporation headquartered in Louisville, Kentucky.  Humana Inc. and its affiliates or subsidiaries (collectively, "Humana") market, sell, and operate health insurance plans, including within the Medicare Advantage program.

11.     Defendant GoHealth, Inc. ("GoHealth") is a Delaware corporation headquartered in Chicago, Illinois.  GoHealth is an insurance broker and sells Medicare Advantage and other health insurance plans online and by telephone.

12.     Defendant SelectQuote, Inc. ("SelectQuote") is a Delaware corporation headquartered in Overland Park, Kansas.  SelectQuote is an insurance broker and sells Medicare Advantage and other health insurance plans online and by telephone.

13.     Defendant eHealth, Inc. is a Delaware corporation headquartered in Austin, Texas. eHealth, Inc. is an insurance broker that sells Medicare Advantage and other health insurance plans online and by telephone.

14.     Defendant eHealthInsurance Services, Inc. (together with eHealth, Inc., "eHealth") is a Delaware corporation and a subsidiary of eHealth, Inc.

## III.    LEGAL FRAMEWORK AND INDUSTRY BACKGROUND

### A.    The False Claims Act

15.     The FCA was originally enacted in 1863 to address fraud on the Government during the Civil War, and it reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government."  S. Rep. No. 99-345, at 1 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266.  The FCA broadly creates liability for "all types of fraud, without qualification, that might result in financial loss to the Government."  *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).

16.     The FCA provides, in pertinent part, that any person who "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly

makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or] (C) conspires to commit a violation of subparagraph (A) [or] (B)" is liable to the United States Government for damages and penalties.  31 U.S.C. § 3729(a)(1).

17.    The FCA defines "knowingly" to include "actual knowledge of the information," as well as actions taken in "deliberate ignorance of the truth or falsity of the information" or in "reckless disregard of the truth or falsity of the information."  *Id.* § 3729(b)(1)(A).  "No proof of specific intent to defraud" is required to establish liability.  *Id.* § 3729(b)(1)(B).

18.    The FCA defines a "claim" to mean:

any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that

(i)     is presented to an officer, employee, or agent of the United States; or

(ii)    is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

(I)     provides or has provided any portion of the money or property requested or demanded; or

(II)    will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded[.]

*Id.* § 3729(b)(2).

19.    The FCA defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  *Id.* § 3729(b)(4).

20.    Violations of the FCA carry mandatory per-claim civil penalties, plus three times the amount of damages that the Government sustains as a result of a defendant's actions.  *Id.* § 3729(a).  Based on statutory adjustments for inflation, for violations occurring after November 2, 2015, and assessed after February 12, 2024, the minimum per-claim penalty is $13,946 and the maximum per-claim penalty is $27,894.  89 Fed. Reg. 9764 (Feb. 12, 2024).

### B.    The Anti-Kickback Statute

21.    The federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), was enacted in 1972 following congressional concern that remuneration provided to those who can influence health care decisions would create incentives in conflict with the best interests of patients or would result in goods and services being provided that are medically unnecessary, of poor quality, or harmful to a vulnerable patient population.

22.    Congress strengthened the AKS by amendments in 1977, 1987, and 2010, to ensure that kickbacks masquerading as legitimate transactions did not evade the statute's reach.  *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a–7b; Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93; Patient Protection and Affordable Care Act, Pub. L. No. 111-148.

23.    Section (b) of the AKS bars the solicitation, receipt, offer, or payment of "illegal remunerations."  42 U.S.C. § 1320a–7b(b).

24.    Specifically, Subsection (b)(1) bars the solicitation or receipt of illegal remuneration:

(1)    Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

(A)    in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B)    in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not
more than $100,000 or imprisoned for not more than 10 years, or both.

*Id.* § 1320a–7b(b)(1).

25.    And Subsection (b)(2) bars the offer or payment of illegal remuneration:

(2)    Whoever knowingly and willfully offers or pays any remuneration
(including any kickback, bribe, or rebate) directly or indirectly, overtly or
covertly, in cash or in kind to any person to induce such person—

(A)    to refer an individual to a person for the furnishing or arranging for
the furnishing of any item or service for which payment may be
made in whole or in part under a Federal health care program, or

(B)    to purchase, lease, order, or arrange for or recommend purchasing,
leasing, or ordering any good, facility, service, or item for which
payment may be made in whole or in part under a Federal health
care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not
more than $100,000 or imprisoned for not more than ten years, or both.

*Id.* § 1320a–7b(b)(2).

26.    The AKS does not define or otherwise restrict the broad ordinary meanings of
"item," "service," or "good."

27.    The AKS defines a "Federal health care program" to mean "any plan or program
that provides health benefits, whether directly, through insurance, or otherwise, which is funded
directly, in whole or in part, by the United States Government," except for the health insurance
program for federal employees. *Id.* § 1320a–7b(f). The Medicare program, as well as the Medicare
Advantage program, is a "Federal health care program" under the AKS.

28.    The AKS provides that "a person need not have actual knowledge of this section or
specific intent to commit a violation of this section." *Id.* § 1320a–7b(h).

29.    Referrals or recommendations need not be the sole or primary purpose of a
kickback for a violation of the AKS. Instead, courts consider "whether at least one purpose of the

payment could be to induce or reward the referral or recommendation of business payable in whole or in part by a federal health care program." *Guilfoile v. Shields*, 913 F.3d 178, 189 (1st Cir. 2019) (cleaned up).

30.     In 2010, Congress reiterated the centrality of the AKS to a claims payment decision by amending the AKS to provide that any "claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a–7b(g). Accordingly, claims submitted to federal health care programs that result from violations of the AKS are per se false or fraudulent within the meaning of 31 U.S.C. § 3729(a).

31.     Compliance with the AKS is a material condition of payment by Medicare. *E.g.*, *Guilfoile*, 913 F.3d at 190–91 ("[Section] 1320a-7b(g)'s obviation of the 'materiality' inquiry essentially codifies the long-standing view that AKS violations are 'material' in the FCA context.").

32.     In addition to proving that a claim "includes items or services resulting from a violation [of the AKS]," 42 U.S.C. § 1320a–7b(g), a second and distinct "pathway to FCA liability for an AKS violation [exists] when someone falsely represents compliance with a material requirement that there be no AKS violation in connection with the claim." *United States v. Regeneron Pharms., Inc.*, 128 F.4th 324, 333 (1st Cir. 2025) (citing *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 392–94 (1st Cir. 2011)). Even without an express representation of compliance, one can be liable under the FCA if one "makes specific representations about the goods or services provided" but "fail[s] to disclose noncompliance with material statutory, regulatory, or contractual requirements" in a way that "makes those representations misleading half-truths." *Universal Health Servs., Inc. v. United States*, 579 U.S.

176, 190 (2016).  This second pathway "require[s] no proof of causation."  *Regeneron*, 128 F.4th at 334.

33.    The Government regularly enforces the AKS and pursues FCA liability based on underlying violations of the AKS.

**C.    Medicare**

34.    Medicare is a federally funded health insurance program administered by CMS.  42 U.S.C. § 1395c *et seq.*  To be eligible for Medicare, a person must be over the age of sixty-five, be disabled, or have end-stage renal disease.  Individuals who are insured or receive benefits through Medicare are often referred to as "Medicare beneficiaries."

35.    The Medicare Program has four "Parts."  Parts A and B are commonly known as "traditional" or "original" Medicare.  Part A primarily covers inpatient and institutional care, and Part B primarily covers physician, outpatient, and ancillary services and durable medical equipment.  Under Medicare Parts A and B, CMS generally reimburses health care providers directly based on payment rates predetermined by the Government.

36.    This case involves Medicare Part C, which is an alternative to traditional Medicare.  Part C is also known as the Medicare Advantage program.

**1.    Overview of Medicare Advantage**

37.    Under the Medicare Advantage program, Medicare beneficiaries can elect to opt out of traditional Medicare and instead receive their Medicare benefits through privately run insurance plans.  *See* 42 U.S.C. §§ 1395w-21–1395w-28; 42 C.F.R. § 422.50(a).  An individual is eligible to elect a Medicare Advantage plan if she is "entitled to Medicare under Part A and enrolled in Part B" of traditional Medicare.  42 C.F.R. § 422.50(a).

38.     Today, approximately half of all Medicare beneficiaries are enrolled in Medicare Advantage plans.  In 2024, Medicare paid approximately $462 billion to Medicare Advantage Organizations ("MAOs"), representing more than half of the Government's total Medicare outlay.

39.     Medicare Advantage plans are operated and managed by MAOs that contract with CMS.  *E.g.*, 42 C.F.R. §§ 422.2, 422.503(b)(2).

40.     The Defendant Insurers—Humana, Aetna, and Anthem—all operate as MAOs within Medicare Advantage.  MAOs (sometimes referred to as insurance "carriers," in addition to "insurers") may offer one or more Medicare Advantage plans.  Each Defendant Insurer offered multiple plans.

41.     Under Medicare Advantage, when a health care provider furnishes medical services to a Medicare beneficiary, the provider submits information from the patient encounter directly to the MAO that operates the beneficiary's Medicare Advantage plan.  The provider then receives payment from the MAO, instead of directly from CMS.

42.     To compensate MAOs for providing coverage for beneficiaries on their plans, CMS makes monthly payments to the MAOs in a capitated (i.e., fixed) amount, per beneficiary enrolled in each Medicare Advantage plan.

43.     Unlike under Medicare Parts A and B, these per-member, per-month payments do not depend on the number or type of services provided to a specific beneficiary.  Instead, the base capitated rate is determined through comparing a bid submitted to CMS by an MAO with an administratively set benchmark established under the Medicare Advantage statute.  *See* 42 U.S.C. § 1395w-23(a)(1)(B); 42 C.F.R. §§ 422.254, 425.304.

44.     Within this structure, which Congress has mandated since 2000, *see* 42 U.S.C. § 1395w-23(a)(1)(C), CMS uses a risk adjustment payment system to determine the total capitated

payments based on the expected health risk of each beneficiary. In other words, CMS adjusts the capitated payments for each beneficiary to ensure that MAOs are paid more for sicker beneficiaries expected to incur higher health care costs and less for healthier beneficiaries expected to have lower health care costs.

45. In 2010, Congress added Medical Loss Ratio (or "MLR") requirements for Medicare Advantage plans. 42 U.S.C. § 1395w–27(e)(4) (requiring "a medical loss ratio of at least .85").

46. A Medical Loss Ratio for a Medicare Advantage plan is the percentage of capitated payments made by CMS for all beneficiaries enrolled in the plans which are spent on clinical services and quality improvement.

47. MAOs must report their Medical Loss Ratios to CMS and are subject to financial and other penalties for any failure to meet the statutory requirement that they have a Medical Loss Ratio of at least 0.85. *E.g.*, 42 C.F.R. § 422.2410. The statutory Medical Loss Ratio requirement incentivizes MAOs to reduce administrative costs and devote the bulk of payments from the Government to patient care. This requirement helps ensure that beneficiaries (and, ultimately, American taxpayers) receive appropriate value from Medicare Advantage plans.

48. A particular Medicare Advantage plan's provider network, drug coverage, other benefits, and premiums may change from year to year. Most Medicare beneficiaries may switch Medicare Advantage plans once each year, during the Annual Enrollment Period (sometimes called "AEP"), which runs from October 15 to December 7. *See* 42 U.S.C. § 1395w–21(e)(3)(B)(v); 42 C.F.R. § 423.38(b)(3). Medicare beneficiaries who are also eligible for Medicaid may switch Medicare Advantage plans up to four times each year: during the first,

second, and third quarters of the year, and again during the Annual Enrollment Period.  *See* 42 C.F.R. § 423.38(c)(4).

49.    A beneficiary who is dissatisfied with her Medicare Advantage plan has at least two options.  Medicare beneficiaries may generally disenroll from a Medicare Advantage plan during either the Annual Enrollment Period or during an Open Enrollment Period ("OEP") between January 1 and March 31.  *See generally id* § 422.66(b).  Beneficiaries may disenroll, for example, because they prefer a different plan's provider network or because they did not fully understand the benefits and premiums of a chosen plan upon enrollment.

50.    Beyond disenrollment, beneficiaries may also complain to CMS based on conduct of MAOs or their affiliates.  These complaints are tracked with CMS's "Complaints Tracking Module" (or "CTM").  *See id.* § 422.125.  Depending on the urgency of the complaint as determined by CMS, complaints must be resolved by the MAO in two days, seven days, or thirty days.  *Id.* § 422.125(b).  Complaints may relate to conduct by brokers who act on behalf of MAOs.

51.    The rate of complaints that CMS receives relating to a particular Medicare Advantage plan can affect the plan's "Star Rating," a quality rating which can affect payment from CMS.  *Id.* § 422.166(e); *see also id.* § 422.162(b) (describing contract ratings by CMS).

## 2.    Broker Operations Within Medicare Advantage

52.    Many Medicare beneficiaries seek help from private insurance brokers in considering their health plan options, as there may be multiple available Medicare Advantage plans with distinct provider networks and benefits.

53.    Certain MAOs employ their own brokers, known as "captive" brokers, who only sell their employers' plans.  Other brokers, like the Defendant Brokers, are formally independent and may sell multiple MAOs' plans.  Independent insurance brokers typically must be "appointed" by a particular MAO to sell plans from that MAO.

54.    These independent brokers, including the Defendant Brokers, must connect with beneficiaries to provide sales and enrollment services.  In order to generate telephone calls or digital outreach from Medicare beneficiaries, the Defendant Brokers created and published advertisements, including on television, in mailers, in health care providers' offices, and on the internet.  In 2022, brokers and other third parties aired more than 130,000 advertisements related to Medicare Advantage.

55.    Most of the Defendant Brokers' advertisements were not specific to, or co-branded with, a particular MAO.  Instead, the advertisements promoted the broker's services or advertised the Medicare Advantage program generally without referencing a specific plan.  Some advertisements promised, for example, to help beneficiaries in "compar[ing] Medicare plans from the nation's top insurers," although the Defendant Brokers often sold a subset of available Medicare Advantage plans.

56.    Many beneficiaries contacted the Defendant Brokers directly using the telephone numbers found in these advertisements and, on information and belief, the majority of the Defendant Brokers' contacts with beneficiaries stemmed from carrier-neutral advertisements.

57.    In addition to running advertisements, the Defendant Brokers also purchased beneficiary contact information from third parties such as "lead vendors"—who typically sold vetted beneficiary contact information—or from other partner broker organizations, which the Defendant Brokers sometimes referred to as "downline" agencies.

58.    The Defendant Brokers completed the majority of their Medicare Advantage sales by telephone, though each also operated an online platform.  During a typical phone call with a Medicare beneficiary, an insurance agent working for the Defendant Brokers would ask for the beneficiary's biographical and health information and then recommend a Medicare Advantage

plan.  If the beneficiary gave her consent, the agent would prepare and submit an enrollment application to an insurer on the beneficiary's behalf.

59.     When beneficiaries called a Defendant Broker, such as in response to a television advertisement, each of the Defendant Brokers had complex technological methods for answering calls from Medicare beneficiaries and setting relative priorities of incoming calls.  Before reaching an agent, beneficiaries typically provided personal information through a "phone tree" or interactive voice response (IVR) system, including their date of birth and zip code.  The brokers would use this information and any additional information from the lead vendor to "score" calls based on several metrics, reject or not answer certain calls, match or "route" the calls they accepted to particular agents, and otherwise manage call queues.

60.     For example, eHealth designed a "Lead Scoring System" to predict the likelihood that a given caller would enroll in a Medicare Advantage plan and the caller's tendency to choose a particular MAO.  eHealth also developed a related score based on expected revenue from a call.

61.     As its Chief Marketing Officer, Tim Hannan, described in a 2018 document, eHealth would "evaluate each incoming call for its propensity to create revenue" for eHealth and route it accordingly.  Mr. Hannan explained that "[w]here the predicted value of any one carrier conversion is sufficiently high . . . the first routing should be to the limited agents" at eHealth who only sold plans for that MAO.  "Value" referred to potential revenue for eHealth of an enrollment for a particular MAO.

62.     If eHealth wanted to shift or "disproportionately drive . . . enrollments" to a particular MAO, it could use various "levers," including "more aggressively answer[ing]/rout[ing] the calls that are likely to yield those carriers."

63.     GoHealth similarly maintained what it called an "advanced call routing methodology." GoHealth grouped calls based on, among other things, the amount of payments it received from the MAOs and "[c]ounties where GoHealth carriers are outperforming their national market share."

64.     As GoHealth's President of Medicare & Internal Distribution, Jake Gudmundsen, explained, sometimes GoHealth received more calls than it could answer and sometimes left "two times the amount of people" in a call holding queue than those who had their calls answered. To determine which of these calls to answer, in what order, and where to send the calls among GoHealth's employees, GoHealth "would prioritize the calls . . . based on the value of that call to the business."

65.     At times, GoHealth "determine[d] which carriers to slow down or stop and how we can maximize cash" to GoHealth based on call scoring. At other times, GoHealth inserted positive bumps for a preferred MAO within its call scoring system, such as inserting an "Anthem override" into GoHealth's system, which would "give [the call] a higher overall value."

66.     SelectQuote also used lead scoring and "dynamic" lead routing tactics for calls coming from Medicare beneficiaries. SelectQuote made "call routing changes" based both on call volume and the company's relationships with MAOs, including "tiering of [certain] calls" based on "large discrepancies in value" to SelectQuote. SelectQuote also worked to "identify which leads have a higher . . . propensity" for picking certain MAOs.

67.     As CMS has recognized, brokers selling Medicare Advantage plans "play a significant role in providing guidance and advice to beneficiaries when selecting health plan options. This unique position allows them to influence beneficiary choices." 73 Fed. Reg. 28556, 28583 (May 16, 2008). This broker influence over beneficiaries is further bolstered when brokers

claim to offer unbiased, carrier-neutral recommendations that are in the best interests of a beneficiary.

68.    Each Defendant Broker claimed to be unbiased, and each generally claimed to seek to match a beneficiary's needs to an insurance plan.

69.    For example, during an interview on the Fox Business channel in May 2019, eHealth's Chief Executive Officer, Scott Flanders, stated that beneficiaries "are assured of getting in the right plan" by contacting eHealth and that eHealth was "here to make it easy for you to get in to the right plan."  In a 2020 press release, Mr. Flanders asserted that "[w]e've helped to drive an industry toward greater transparency and choice as an advocate and unbiased resource for health insurance consumers."

70.    Similarly, in the company's Annual Report for 2020, eHealth asserted that "[o]ur mission is to connect every person with the highest quality, most affordable health insurance and Medicare plans for their life circumstance."  In advertisements, eHealth described itself as a "Medicare Matchmaker" providing "unbiased, personalized recommendations" so that beneficiaries can "find the healthcare plan that fits their needs at a price they can afford."

71.    GoHealth similarly promised to "simplify the difficult and confusing process by offering . . . unbiased advice informed by consumers' specific needs" and to be a "top choice[] for unbiased insurance advice to help navigate one of the most important purchasing decisions individuals make."  GoHealth's website described it as taking an "[u]nbiased, carrier agnostic approach" and providing "unbiased advice from any one of our licensed insurance agents."  Its stated "purpose" was to "compassionately ensure peace of mind in our consumers' healthcare decisions."

72.     In a television advertisement targeting Medicare beneficiaries, GoHealth stressed that "[w]e're not here to push you into a particular plan from a certain insurance carrier.  We're here to help you find the right Medicare Advantage plan for you from thousands of available options."

73.     SelectQuote likewise asserted in its Registration Statement with the U.S. Securities and Exchange Commission that it "provide[d] unbiased comparison shopping for Medicare Advantage . . . insurance plans."

74.     Its website and advertisements described SelectQuote as offering "unbiased plan options" and "serv[ing] as your advocate" in reviewing Medicare Advantage options.  SelectQuote claimed that "[a]t SelectQuote, we can do the work for you.  We offer unbiased coverage comparisons . . . ."

> **3.     Statutes and Regulations Related to Broker Compensation and Payments to Brokers**

75.     CMS requires that MAOs "oversee first tier, downstream, and related entities that represent the MA organization to ensure agents and brokers abide by all applicable State and Federal laws, regulations, and requirements."  42 C.F.R. § 422.2274(c).

76.     MAOs are permitted to provide limited compensation to insurance brokers for their services.  Congress required CMS to promulgate broker compensation guidelines that "ensure that the use of compensation creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs."  42 U.S.C. § 1395w-21(j)(2)(D).

77.     In accordance with this statutory mandate, CMS promulgated regulations that impose a cap on the amount that an MAO can pay a broker as "compensation" for enrollment of a beneficiary in one of its Medicare Advantage plans.  This cap on "compensation" covers all

"monetary or non-monetary remuneration of any kind," such as commissions, bonuses, gifts, prizes, or awards.  42 C.F.R. § 422.2274(a) (2021).  For example, the national cap in 2021 was $539 per enrollment, with a lower cap ($370 per enrollment) in two territories and a higher cap (up to $672 per enrollment) in California and New Jersey.

78.    Further, "[f]or each enrollment in a renewal year, MA plans may pay compensation at an amount up to 50 percent of [the compensation cap for an initial enrollment]."  42 C.F.R. § 422.2274(d)(3).

79.    In addition to this "compensation" for enrollments, MAOs could pay brokers for certain bona fide administrative services other than enrollment of beneficiaries.  Such service payments are often called "administrative payments" or "overrides."

80.    Prior to 2021, "[i]f the MA organization contracts with a third party entity such as a Field Marketing Organization or similar type entity to sell its insurance products, or perform services (for example, training, customer service, or agent recruitment) . . . [t]he amount paid to the third party for *services other than selling insurance products*, if any, must be fair-market value and must not exceed an amount that is commensurate with the amounts paid by the MA organization to a third party for similar services during each of the previous 2 years."  42 C.F.R. § 422.2274(b)(1)(iv) (2020) (emphasis added).

81.    After January 2021, the rules around administrative payments were placed under a heading titled "[p]ayments other than compensation (administrative payments)."  *Id.* § 422.2274(e) (Mar. 2021).  The updated regulations similarly provided that "[p]ayments made for *services other than enrollment of beneficiaries* (for example, training, customer service, agent recruitment, operational overhead, or assistance with completion of health risk assessments) must not exceed the value of those services in the marketplace."  *Id.* § 422.2274(e)(1) (emphasis added).

- 19 -

Administrative payments could be determined "based on enrollment provided payments are at or below the value of those services in the marketplace." *Id*. § 422.2274(e)(2).  In other words, enrollment figures may be used as a proxy for fair market value of a bona fide non-enrollment service, such as "training" of agents, but cannot not be paid in exchange for enrollments or enrollment-related services. *Id.*

82.    CMS has warned that MAOs must "not use these administrative payments as a means to circumvent the limits on compensation to agents and brokers."  86 Fed. Reg. 5864, 5994 (Jan. 19, 2021).  Further, MAOs "must limit these payments to the amounts that would be fairly negotiated on the open market *for the administrative services being performed* and should be able to demonstrate that the administrative payments were made for actual performance when necessary."  *Id.* (emphasis added).

83.    In 2008, when CMS first published its regulations on agent and broker compensation, the agency warned that excessive payments from MAOs to agents and brokers could violate the AKS:

> The compensation structure is designed to help prevent inappropriate moves of beneficiaries from plan-to-plan. Parties remain responsible, however, for compliance with fraud and abuse laws, including the Anti-Kickback Statute. Depending on the circumstances, agent and broker relationships can be problematic under the Anti-Kickback Statute if they involve, by way of example only, compensation in excess of fair market value, compensation structures tied to the health status of the beneficiary (for example, cherry-picking), or compensation that varies based on the attainment of certain enrollment targets.

73 Fed. Reg. 54226, 54239 (Sept. 18, 2008).  Shortly thereafter, CMS reiterated that MAOs "should be mindful that their compensation arrangements including arrangements with [brokers] and other similar type entities must comply with the fraud and abuse laws, including the anti-kickback statute."  73 Fed. Reg. 67406, 67410 (Nov. 14, 2008).

###### 4.  Statutes and Regulations Related to Discrimination Against Disabled Beneficiaries

84.    MAOs generally cannot turn away eligible individuals.  They must accept anyone who meets the basic Medicare eligibility requirements and lives within a plan's geographic service area, regardless of the person's health status or pre-existing conditions.  *E.g.*, 42 C.F.R. § 422.2 ("Each MA plan must be available to all MA-eligible individuals within the plan's service area."); *see also* 42 U.S.C. § 1395w–21(g)(1) (providing that Medicare Advantage plans must "accept without restrictions individuals who are [Medicare] eligible").

85.    By federal statute, MAOs and brokers cannot discriminate against beneficiaries with disabilities in connection with enrollment in Medicare Advantage plans.  42 U.S.C. § 18116 ("Section 1557"); 45 C.F.R. § 92.207; *see also* 29 U.S.C. § 794 ("No otherwise qualified individual with a disability in the United States, . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .").

86.    In the context of Medicare's prohibition on discrimination against disabled individuals, a person is considered to have a disability if that person has "a physical or mental impairment that substantially limits one or more major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment."  45 C.F.R. § 92.4.  This definition is broader than the Social Security Act, which states: "the term 'disability' means (A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months, or (B) blindness."  42 U.S.C. § 416(i)(1).

87.     Conditions that may qualify as a disability include leukemia, cerebral palsy, Down syndrome and other catastrophic congenital disorders, muscular dystrophy, spinal cord injuries resulting in paralysis, cystic fibrosis, and Huntington's disease.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.

88.     People under the age of sixty-five become eligible for Medicare based on a disability only after having received Social Security Disability Insurance payments for twenty-four months.  42 U.S.C. § 1395c.  Eligibility to receive these disability payments begins five months after the onset of a qualifying disability.  *Id.* § 423(c)(2).

89.     Pursuant to the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, "[a] Medicare Advantage organization may not deny, limit, or condition the coverage or provision of benefits under this part, for individuals permitted to be enrolled with the organization under this part, based on any health status-related factor described in section 2702(a)(1) of the Public Health Service Act."  *Id.* § 1395w-22(b)(1).

90.     In 2005, CMS promulgated regulations implementing the 2003 Act.  Specifically, CMS regulations provide that MAOs "may not deny, limit, or condition the coverage or furnishing of benefits to individuals eligible to enroll in a Medicare Advantage plan offered by the organization on the basis of any factor that is related to health status, including, but not limited to . . . disability."  42 C.F.R. § 422.110(a)(7).

91.     In 2016, CMS promulgated further regulations providing that an MAO may not discriminate on the basis of disability, and specifically may not "deny, cancel, limit, or refuse to issue or renew" a policy on the basis of disability or "[h]ave or implement marketing practices . . . that discriminate on the basis of . . . disability."  45 C.F.R. §§ 92.207(a), (b)(1)-(2).

5.    **Contractual and Claim Requirements for MAOs**

92.    To participate in Medicare Advantage, MAOs must execute a written agreement with CMS on an annual basis for each Medicare Advantage plan they operate.  The Defendant Insurers have each executed such agreements or renewals annually for all of the Medicare Advantage plans that they have operated.

93.    CMS regulations list provisions that contracts between MAOs and CMS "must contain."  42 C.F.R. § 422.504.

94.    These provisions include: (1) an agreement to comply with "Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including . . . the False Claims Act (31 U.S.C. §§ 3729 et seq.), and the anti-kickback statute," 42 C.F.R. § 422.504(h); and (2) an agreement to "comply with the prohibition in § 422.110 on discrimination in beneficiary enrollment," *id.* § 422.504(a)(2).

95.    Further, "[a]s a condition for receiving a monthly payment," the MAO must certify to the accuracy, completeness, and truthfulness of the data submitted to CMS, including data relating to enrollment.  Specifically:

> the [MAO] agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to such officer, must request payment under the contract on a document that certifies (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of relevant data that CMS requests.  Such data include specified enrollment information, encounter data, and other information that CMS may specify.

*Id.* § 422.504(*l*).

96.    Moreover, the MAO "must certify that each enrollee for whom the organization is requesting payment is validly enrolled in an MA plan offered by the organization and the information relied upon by CMS in determining payment (based on best knowledge, information, and belief) is accurate, complete, and truthful."  *Id.* § 422.504(*l*)(1).  "If such data are generated

by a related entity, contractor, or subcontractor of an MA organization, such entity, contractor, or subcontractor must similarly certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data." *Id.* § 422.504(*l*)(2).

97.    Compliance with these provisions is material to the performance of the contracts between MAOs and CMS to operate Medicare Advantage plans. *Id.* § 422.504(a).

## IV.    KICKBACKS AND DISCRIMINATION BY THE DEFENDANT INSURERS AND DEFENDANT BROKERS

98.    From 2016 through at least 2021, the Defendant Insurers knowingly and willfully offered and paid hundreds of millions of dollars in kickbacks—often disguised and referred to as "marketing," "co-op," or "sponsorship" payments—to the Defendant Brokers to induce them to steer beneficiaries to the Defendant Insurers' Medicare Advantage plans, and to "box out" competing insurers.

99.    From 2016 through at least 2021, the Defendant Brokers knowingly and willfully solicited and received kickbacks from the Defendant Insurers in return for steering beneficiaries to the Defendant Insurers' Medicare Advantage plans and for "boxing out" competing insurers.

100.    These kickback payments were in addition to, and separate from, permissible per-enrollment compensation (e.g., commissions) that the Defendant Insurers paid to the Defendant Brokers.  Brokers generally understood that most insurers were willing to pay the maximum compensation permitted by CMS for each enrollment in their plans, so making those payments did not distinguish an insurer or incentivize brokers to steer beneficiaries to that insurer's plans.  In order to influence the market, the Defendant Insurers understood that they needed to make greater, illicit payments in addition to the permitted (but capped) commissions.

101.    From 2016 through at least 2021, Aetna and Humana further conditioned some of their kickbacks on the Defendant Brokers reducing or limiting the proportion of persons with

disabilities that the brokers enrolled in their plans. Aetna and Humana did so because they perceived Medicare beneficiaries with disabilities to be more costly and less profitable than beneficiaries who were eligible for Medicare due to age.

102.    The Defendant Insurers received money from Medicare based on the presentation of false claims tainted by kickbacks or rendered false by illegal discrimination against persons with disabilities. Examples of such false claims are provided below in Section VI.

A.    **Humana**

1.    **Humana Paid Kickbacks to the Defendant Brokers to Steer Medicare Beneficiaries to Humana Plans and Limit Enrollments in Competitors' Plans**

103.    From 2016 through at least 2021, Humana paid the Defendant Brokers hundreds of millions of dollars in "co-op" money or "market development funds" (which Humana also called "MDF") in exchange for extra-contractual commitments to sell specific quantities of Humana Medicare Advantage policies. Humana intended this money not only to induce the Defendant Brokers to steer Medicare beneficiaries to Humana plans, but also to "box out" competing carriers so that the brokers would not recommend those carriers' plans.

104.    Humana knew that the AKS applied to Medicare Advantage plans and enrollments, including these payments to the Defendant Brokers. For example, Humana's standard "producer" (i.e., insurance broker or agent) marketing agreements assumed that both the FCA and AKS applied to the sale of Medicare Advantage plans: "The Company will pay Producer using federal funds it receives in connection with the performance of its obligations under CMS's contract with the Company [Humana]. As a result, Producer shall also comply with all obligations under other federal laws, including the False Claims Act [and] the Anti-Kickback Statute . . . ." As a Humana compliance advisor explained to Humana sales managers when discussing broker compensation, "the AKS . . . is yet another consideration when we talk about payment" to brokers.

105.    Further, at least since 2019, Humana's Sales & Marketing Code of Ethics for External Distribution Agents provided that "[a]gents representing Humana MA . . . plans must be free from any financial or other conflict of interest in the marketing, sales or support of the MA . . . plan products.  Agents must be able to perform an objective needs analysis free of personal financial gain when recommending a plan to a Medicare beneficiary."

106.    To disguise the true nature of their agreements, Humana and each Defendant Broker drafted and signed numerous "marketing" contracts in which they avoided including language about quantities of Medicare Advantage policies, let alone references to commitments to sell Humana policies or to limit sales of competing insurers' plans.  Humana and the Defendant Brokers structured their contracts in this manner because, as Evan Mohl (a Humana Sales Channel Development Lead) explained to a colleague, "[p]er compliance, we cannot pay any fee per sale so marketing agreements are tied to marketing reimbursements essentially" and "[p]er compliance, we can't have any sales expectations around co-op [funding]."

107.    Mr. Mohl and others at Humana knew such "marketing reimbursements" were pretenses, as the parties instead "back[ed] in to" a dollar figure for enrollments and a desired cost-per-enrollment.  Various discussions between Humana and each Defendant Broker referred to payments directly for enrollments rather than for purported marketing or administrative services.

108.    The intended and actual result of these illicit payments was that the Defendant Brokers, each of whom claimed to be unbiased and acting in the best interests of Medicare beneficiaries, directed certain beneficiaries to Humana Medicare Advantage plans, regardless of the quality or suitability of Humana's plans.

109.    Humana sought preferential enrollment treatment from the Defendant Brokers based on these kickbacks, including by paying the brokers to establish "pods" or "teams" of agents

- 26 -

who either only sold Humana plans or received extra remuneration for selling Humana's plans. As Mr. Mohl explained in a text message to his manager, Humana began "deploying co op in 2017 to create pods (semi exclusivity) to scale [Medicare Advantage] growth in a challenged product year." That is, Mr. Mohl and others at Humana recognized that the company intended its kickbacks to induce sales of Humana plans, even where those plans (or "products") were weaker than competitors' plans.

110.    Humana knew that its strategy of paying illegal kickbacks to the Defendant Brokers succeeded in generating sales of Humana Medicare Advantage plans that would not have happened but for the kickbacks. For example, a Humana employee explained that, without certain purported marketing payments to SelectQuote—some of which were paid to create and reward a "pod" of agents who sold only Humana plans—Humana's market share from SelectQuote "would look more like 30% total. The pod allows us to be at 47% total [of SelectQuote's sales]."

111.    Furthermore, Humana used its kickbacks to induce brokers to decrease or limit the proportion of disabled Medicare beneficiaries referred to Humana.

112.    The effect of this inducement, as Humana intended, was to reduce the proportion of Medicare beneficiaries with disabilities who signed up for Humana's plans.

113.    Humana knew that this discriminatory conduct violated the law and its contracts with CMS, but it persisted in the discrimination until brokers had reduced the proportion of Medicare beneficiaries with disabilities that the brokers referred to Humana to a level that Humana viewed as satisfactory.

### 2.      Humana's Kickbacks to GoHealth

114.    Humana and GoHealth began what GoHealth termed their "MDF-focused relationship" in 2016.

115.    From that time forward, Humana and GoHealth typically negotiated the amounts that Humana would pay GoHealth as "marketing" payments in exchange for the number of beneficiaries GoHealth promised to enroll in Humana plans in a particular time period.  If GoHealth did not reach that number of enrollments in a particular time period, GoHealth generally committed to making up the difference later.

116.    Meanwhile, both Humana and GoHealth understood that they could not include these enrollment-based terms in their contracts, because it was illegal for an MAO to pay a broker purported "marketing" payments in exchange for enrollments.

117.    The parties created an artifice.  Instead of truthfully stating that Humana was paying GoHealth compensation (e.g., commissions) in exchange for Medicare Advantage sales, the "marketing" contracts typically stated that Humana was reimbursing GoHealth, in advance, for the purchase of leads, marketing campaigns, or other marketing expenses.

118.    **2016**.  In early 2016, Humana began negotiating with GoHealth for "marketing" funding in exchange for specific quantities of Medicare Advantage plan sales and promises to prioritize Humana over other carriers.

119.    On January 12, 2016, Clint Jones, GoHealth's cofounder and Chief Executive Officer, had an email exchange with Michael Chinigo, a Humana National Sales Manager responsible for the GoHealth account.

120.    Mr. Jones wrote in part, "The model is built off of a 'marketing bonus' that is tied to production so we can easily back in to a CPA [cost per acquisition].  I assume this would be how to best set it up?"  Mr. Chinigo responded in part, "So you have the right idea, it just all

depends on how we describe it.  CMS has very strict rules on how we compensate partners and can't hold them to a specific production #'s per say [sic]."

121.    The next day, Michael Owens, GoHealth's General Manager for Agent Services, cautioned his boss, Mr. Jones, that "Humana may be sensitive about the way the model is laid out/worded.  It appears that we're requesting a bonus based off a certain number of Advantage sales, which is strictly against CMS regulations."

122.    Although GoHealth and Humana both understood that Humana was already paying GoHealth commissions at, or close to, the maximum permissible amount and that CMS regulations prohibited payment of "a bonus based off a certain number of Advantage sales," Mr. Jones nonetheless sent Mr. Chinigo and his supervisors—Craig Uchytil (Humana's Sales Vice President) and Robin Reece (Humana's National Sales Director for External Distribution)—a proposal of a $250 "Marketing Bonus" for every Humana Medicare Advantage policy that GoHealth sold.

123.    On January 29, 2016, despite Mr. Chinigo's earlier warning to GoHealth that CMS rules proscribed non-commission payments in exchange for "specific production #'s," Mr. Chinigo reported GoHealth's proposal to Mr. Uchytil and Ms. Reece as just that: "2,897 MA policies during ROY [i.e., for the rest of the year other than the Annual Enrollment Period].  The marketing [a]sk would be $724,356."  In other words, GoHealth proposed that Humana pay $724,356 for the production of 2,897 enrollments—or $250 per beneficiary enrolled.

124.    In response to this proposal, Mr. Uchytil asked about "exclusivity."  Mr. Chinigo explained that the deal could be structured so that "Humana is given 'First Look' for all Sales."  And throughout the course of negotiations in 2016, GoHealth and Humana repeatedly discussed Humana receiving a "'First Look' for all Sales" as part of the consideration for the alleged

marketing payments, and that GoHealth would "[a]lign agent incentive structure with Humana Medicare Advantage priority."

125.    Mr. Uchytil also asked: "What would be our sales expectation from them without marketing? We need to demonstrate an incremental lift with marketing dollars."  Ms. Reece responded: "Here is what I know . . . we put them down for 1,000 MA sales as a projection based on earlier discussions with GoHealth."  Humana believed that, if it paid $724,356 in kickbacks, GoHealth would provide about 1,897 extra Medicare Advantage enrollments (i.e., the commitment of 2,897 enrollments minus the projection of 1,000 enrollments without kickbacks) in exchange.

126.    Humana and GoHealth recognized that the enrollments they were negotiating were a commitment and that, "[i]f targets not hit, remaining 'Balance' of funds would be rolled in to AEP [Annual Enrollment Period]."  So, if GoHealth did not deliver the target number of enrollments, GoHealth could earn the balance by delivering additional enrollments during the Annual Enrollment Period.

127.    On March 9, 2016, Mr. Uchytil signed Amendment 20 to a "Marketing Development Agreement" with GoHealth.  This amendment stated, in relevant part, that GoHealth "will conduct a targeted marketing campaign between March 15, 2016 and October 1, 2016 in Services Areas agreed to by the Parties in advance.  The campaign shall include the purchase and use of three hundred thousand (300,000) leads.  During this campaign, Humana shall reimburse [GoHealth] $1.00 for every $1.00 spent by [GoHealth] up to a maximum contribution by Humana of seven hundred fifty thousand dollars ($750,000.00)."

128.    Although the amendment referred to GoHealth's "purchase and use of three hundred thousand (300,000) leads," the parties never seriously discussed or considered "leads" in their negotiations.  Rather, their negotiations focused on (1) how many Humana Medicare

Advantage enrollments GoHealth would deliver in exchange for Humana's payment, with a roll-over if the enrollment target was not met, and (2) how GoHealth would favor Humana over other insurers.

129.     GoHealth also understood this arrangement.  As slides for a GoHealth board meeting in September 2016 observed, "GoHealth was given $750k in SEP [i.e., the Special Enrollment Period for Medicare Advantage] to drive 3,000 Humana Enrollments."

130.     Internally, GoHealth regularly referred to this and other purported marketing payments from Humana as a "Medicare Bonus Program" through which "we will receive bonuses for every Humana Medicare Advantage policy submitted."

131.     Consistent with its commitment to Humana to "[a]lign agent incentive structure with Humana Medicare Advantage priority," during the months after Humana agreed to pay GoHealth $750,000 for 3,000 enrollments, GoHealth offered its agents monetary inducements for steering Medicare beneficiaries to Humana Medicare Advantage plans.  In April, May, and June 2016, for example, GoHealth paid its agents commissions that were fifty percent higher for Humana sales than for sales of other carriers' Medicare Advantage plans, plus volume bonuses for monthly Humana sales, as reflected in its internal charts excerpted below:

| Product Type | Commission |
|---|---|
| Humana MA | $30 |
| Medicare Advantage | $20 |
| Medicare Supplement | $20 |
| PDP | $10 |
| Final Expense (Med Supp Only) | $15 |
| Dental / Vision | $5 |

| April Humana MA Volume Bonus | |
|---|---|
| 20 Humana MA | $100 |
| 25 Humana MA | +$50 |
| 30 Humana MA | +$50 |
| 35 Humana MA | +$50 |
| 40 Humana MA | +$50 |

132.     On July 13, 2016, Mr. Mohl sent Mr. Uchytil and others an invitation for a meeting to discuss "2017 AEP Marketing."  For GoHealth, the spreadsheet showed "Proposed Marketing" of $2,300,000.  As a "Sales Justification/Strategy" for this amount, the spreadsheet noted both an

"Exclusive relationship" and an agreement for GoHealth to generate an "8,244 lift in sales YOY [year over year]" during the Annual Enrollment Period at a cost of $250 per sale.

133.    In September 2016, GoHealth issued a $2,300,000 invoice to Humana, ostensibly for "46,000 live transfers at an average internal cost of $50 to produce." On September 19, 2016, Humana and GoHealth entered into a contract amendment providing for Humana to pay GoHealth $2,300,000, allegedly for "marketing services." Neither the invoice nor the contract amendment referenced the actual consideration of a "8,244 lift in sales," a "$250 CPS [cost per sale]," or an "[e]xclusive relationship."

134.    In justifying Humana's payments to GoHealth, Mr. Uchytil and others at Humana continued to emphasize GoHealth's preferential treatment of Humana. As Mr. Uchytil explained to colleagues via email, "we have 2 new noteworthy relationships to support exclusivity. We have done deals with GoHealth and Select Quote, both call centers, that have established Humana exclusive agents. We will support these partners with coop marketing dollars which will generate calls *and only Humana will be offered*" (emphasis added)—regardless of beneficiaries' individualized needs.

135.    **2017**. The parties continued their kickback relationship in 2017. That year, Humana paid GoHealth $8.5 million in alleged marketing funding. As in 2016, the written contracts between the parties promised a "targeted marketing campaign" and similar services, but did not mention any sales figures or preference for Humana above other carriers.

136.    The parties continued to agree upon extra-contractual commitments of sales in 2017, though the parties' efforts to paper over the actual purpose of the payments led to some confusion for Humana's contracting staff.

137.    For example, on March 16, 2017, Scott Thomas, a Humana contracts administrator, sent Mr. Chinigo an email about a proposed $1.5 million contract with GoHealth for the second quarter of the year:

> I am a bit confused by this GoHealth request and I hope you can help me clear up the confusion.  The Excel spreadsheet attached to the request references a purchase of 800,000 Direct Mail Marketing Pieces at a total cost of $3M of which Humana would reimburse GoHealth $1.5M, or 50%.  The invoice attached to the request references 25,000 live transfers at an average internal cost of $60/each for a total of $1.5M, of which Humana would pay $1.5M, or 100%.

138.    Mr. Chinigo responded that "800,000 Direct Mail pieces will generate 25,000 Live transfers."  Mr. Thomas forwarded Mr. Chinigo's response to Jennifer Leszczynski, another Humana contracts administrator, and asked: "Am I missing something here?  When did we start equating Direct Mail Marketing Materials to Live Transfers?"  Ms. Leszczynski responded: "I have no idea.  They make this stuff up as they go along."

139.    Internally, GoHealth employees explained to their colleagues that the true consideration being offered in exchange for the alleged marketing funds paid by insurers would not be reflected in "signed contracts," but would instead appear as "an invoice for a wire, likely stating the funds are for lead purchases, or something like that."

140.    In September 2017, Humana executed a contract with GoHealth for $4 million.  In emails leading up to the contract, Mr. Uchytil explained that "[t]he sales must align with coop spend so we will want agreement from . . . GoHealth . . . on total expected sales."  The written agreement, however, did not refer to any agreement on "total expected sales" from GoHealth and instead stated that the payments were only for "the production and distribution of direct mail pieces of marketing literature, the production, distribution of direct response television advertisements and the purchase, generation and use of leads."

141.  **2018.**  In 2018, Humana paid GoHealth a total of $14.75 million in purported marketing funding.  As in 2017, GoHealth continued to pay its agents greater amounts when they sold Humana plans as compared to competitors' plans.

142.  For 2018, GoHealth proposed a funding structure where it would be paid "prior to each quarter, with any 'miss' in production being trued-up in the following quarter."  Forwarding GoHealth's request to one of his colleagues, Mr. Uchytil noted that the "[t]arget is $250 CPS [cost per sale] . . . with some guarantees."  As previously, "production" meant sales or enrollment production, with the "guarantees" relating to the true-up proposal.

143.  At Humana, Mr. Chinigo's April 16, 2018, internal spreadsheet reflected exactly what GoHealth had proposed: payments aimed at $250 per sale throughout 2018.

| Partner | Co-Op | 2018 AEP | | | Quarter 1 2018 | | | Quarter 2 2018 | | | Quarter 3 2018 | | | 2019 AEP | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Oct '17 | Nov '17 | Dec '17 | Jan '18 | Feb '18 | Mar '18 | Apr '18 | May '18 | Jun '18 | Jul '18 | Aug '18 | Sep '18 | Oct '18 | Nov '18 | Dec '18 |
| GoHealth | Marketing $$ | $4,000,000 | | | $1,875,000 | | | $2,475,000 | | | $3,150,000 | | | $7,500,000 | | |
| | Projected Enrollments | 4,000 | 8,000 | 4,000 | 2,500 | 2,500 | 2,500 | 3,300 | 3,300 | 3,300 | 4,200 | 4,200 | 4,200 | 9,000 | 14,000 | 7,000 |
| | Total Projected | 16,000 | | | 7,500 | | | 9,900 | | | 12,600 | | | 30,000 | | |
| | Projected CPS | $250.00 | | | $250.00 | | | $250.00 | | | $250.00 | | | $250.00 | | |
| | Actual Enrollments | 5,364 | 6,803 | 3,453 | 2,139 | 2,187 | 2,661 | 1,236 | | | | | | | | |
| | Total Actual | 15,620 | | | 6,987 | | | 1,236 | | | 0 | | | 0 | | |
| | Actual CPS | $256.08 | | | $268.36 | | | $2,002.43 | | | #DIV/0! | | | #DIV/0! | | |

144.  On April 18, 2018, Ms. Reece forwarded an updated version of Mr. Chinigo's spreadsheet to Mr. Uchytil.  In an accompanying Word document, Mr. Chinigo explained that Humana and GoHealth had agreed that GoHealth would not sell certain competitors as part of the payment relationships: "Marketing $$ support/request continues to increase based on Volume [i.e., enrollment] potential.  Right now, Humana represents over 90% of [GoHealth's] total production. *Current 'Handshake' agreement where they will not Contract with certain Large Competitors*.  If we are unable to provide Marketing support, we run the risk of loss in volume as that would cause them to contract with those 'Named Competitors'" (emphasis added).

145.    In commenting on a later draft of this document, Mr. Chinigo likewise noted that "GoHealth just has handshake agreement not to contract with [Aetna] & [UnitedHealthcare]."

146.    For the third quarter of 2018, Humana ultimately agreed to pay GoHealth $2.75 million, rather than the $3.15 million that the parties had contemplated earlier. Consistent with the "true-up" concept that GoHealth had suggested during the parties' negotiations, Humana reduced its payment because GoHealth had failed to hit its enrollment commitment, not because of any reduction in GoHealth's marketing expenses.

147.    For example, on July 20, 2018, when Marcelle Gathing (a Humana National Sales Manager and Mr. Chinigo's successor on the GoHealth account) asked Mr. Chinigo "how [GoHealth Chief Executive Officer Clint Jones] took it not being the full amount," Mr. Chinigo responded that "[h]e was good! Basically we said that we were paying him roughly 85% of the 3rd qrtr ask . . . as th[at] was the % of goal he hit during q1 and q2."

148.    Despite this understanding, when the Humana sales employees communicated with Humana's contract staff, they generally did not tell them that these payments to GoHealth were in exchange for sales. For example, on July 25, 2018, Mr. Thomas, the contracts administrator, sent Mr. Gathing and other Humana sales employees a draft contract providing that Humana would pay GoHealth $2,750,000 in the third quarter for a "targeted marketing campaign between July 1, 2018 and September 30, 2018." In his cover email, Mr. Thomas asked the sales executives to "[p]lease review this carefully to make sure it captures the spirit of the deal(s) as we expect." None of the sales executives responded by explaining that the actual "spirit of the deal[]" was for Humana to pay GoHealth for delivering a specific number of Humana Medicare Advantage enrollments. Such exchanges between Mr. Thomas and Humana sales employees were common.

149.    In return for "marketing" payments from Humana in 2018, GoHealth continued to pay its agents extra when they sold Humana plans rather than competing insurers' plans, and GoHealth also incented its own "downline" insurance agency partners to sell Humana plans.

150.    For example, in an email on July 25, 2018, Ben Miller, GoHealth's Director of Strategy and Operations, told Ryan Watts, President of Choice Health (a GoHealth downline agency) that GoHealth would pay Choice Health volume-based, tiered compensation for Humana sales during August and September 2018.  Mr. Miller suggested that Mr. Watts talk with Zachary Lessem, GoHealth's Manager of Strategy and Operations, about "some agent contests you could structure around it."  Similarly, in an email on August 10, 2018, Tim Parker, GoHealth's Senior Director of Business Development, explained to several executives of AssuranceIQ, another downline agency, that GoHealth would pay a $100 "Humana and Anthem MA Bonus" for each sale of a Humana or Anthem Medicare Advantage policy.

151.    For the next Annual Enrollment Period, which would take place in the fall of 2018, Humana initially had agreed to GoHealth's proposal for $7.5 million in exchange for 30,000 sales of Humana Medicare Advantage policies.  On July 26, 2018, however, Humana instead agreed to pay GoHealth $6 million for that period.

152.    On August 1, 2018, in an email to one of his Humana colleagues, Mr. Mohl noted that, if GoHealth reached the 30,000 sales "goal, [GoHealth] will get additional 1.5M in Q4" on top of the $6 million.

153.    On November 18, 2018, Humana agreed to pay this $1.5 million bonus to GoHealth for meeting its fourth quarter Humana sales target, but the parties' subsequent contract falsely stated that the sole consideration for this payment was marketing expenses.

154.    In requesting that Mr. Thomas prepare a contract for the additional $1.5 million, Mr. Gathing accurately explained that "[t]his money was actually promised to GoHealth prior to AEP if they were *producing at a run-rate* we were comfortable with during the AEP period.  We are comfortable so we'd like to pay now as promised" (emphasis added).  The resulting contract, however, did not mention GoHealth's production "run rate" or the additional Humana Medicare Advantage sales that were conditions of GoHealth receiving the extra $1.5 million.

155.    **2019.**  In 2019, Humana paid GoHealth at least $20.25 million in purported marketing funding.

156.    On November 1, 2018, GoHealth's Mr. Jones sent Ms. Reece a "2019 Forecast," in which GoHealth requested $18.75 million in exchange for 75,000 enrollments (again, $250 per sale).  Internally, as Humana considered this request, it discussed how to "grow our business and box out other carriers while spending responsibly" with brokers such as GoHealth.  Humana, however, did not immediately agree to GoHealth's proposal. But by December 2018, Humana was planning to pay GoHealth $15 million for 64,489 enrollments in 2019.

157.    On February 19, 2019, Ms. Reece told her boss, Mr. Uchytil, that she had met the day before with Mr. Jones and Mr. Gudmundsen, then GoHealth's Senior Vice President of Internal Distribution and Product Strategy.  Based on that meeting, Ms. Reece reported, among other things, that "[t]here is an opportunity to get 100,000 policies in 2019, 40,000 more than the current MDF commitment" and that "GoHealth is a committed partner who currently does not sell United or Aetna," with Humana's available payment options aimed at "keeping United and Aetna off of their platform."

158.    Humana and GoHealth continued to negotiate throughout 2019, and Humana eventually agreed in the summer of 2019 to pay GoHealth greater amounts to induce additional Humana sales.

159.    On July 30, 2019, for example, Mr. Jones sent an email to Humana noting that "[w]e have $18.75M committed in MDF from Humana this year that will drive ~102,000 policies [and] [a]n additional $17.25M in MDF will drive our total volume to ~161,000 policies."

160.    As in earlier years, Humana continued to stress the importance of exclusivity, using kickbacks to limit or block other insurers' from GoHealth's platform.  For example, on October 22, 2019, when preparing slides for a meeting of Humana's senior management, Humana's Director of Retail Strategy, Emraan Khan, asked Mr. Mohl for "an example or two of big co-op marketing commitments secured or semi-exclusive relationship formed."  Mr. Mohl responded that "[w]e could use the GoHealth example, which you are familiar with, upping [our] marketing dollars to box out Aetna and UHC [i.e., UnitedHealthcare]."

161.    In or about early November 2019, Humana and GoHealth began discussing the possibility of paying GoHealth even more money to generate additional Medicare Advantage enrollments during the remainder of the Annual Enrollment Period in six states.  On November 5, 2019, Mr. Miller conveyed to Humana's Mr. Gathing the following proposal:

| State | GoHealth Current Q4 Humana Run-Rate | Potential Submission Lift | Lifted Total Q4 Total Run-Rate | Approx. CPS of Lift | MDF Required for Lift |
|---|---|---|---|---|---|
| IN | 3,348 | 660 | 4,008 | $300 | $198,050 |
| KY | 3,062 | 604 | 3,665 | $280 | $169,060 |
| MI | 4,870 | 960 | 5,831 | $375 | $360,158 |
| OH | 4,521 | 892 | 5,413 | $325 | $289,765 |
| PA | 5,811 | 1,146 | 6,957 | $375 | $429,731 |
| WV | 2,025 | 399 | 2,424 | $265 | $105,800 |
| Total | 23,636 | 4,661 | 28,297 | $333 | $1,552,566 |

162.    Humana understood that paying additional money to GoHealth would cause GoHealth to steer additional Medicare beneficiaries to Humana plans and away from other insurers' plans in the targeted states.  After Mr. Gathing circulated this proposal within Humana, Mr. Mohl asked if it was "safe to assume that the lift causes no degradation to their current pace and national number?"  Mr. Gathing responded that "[t]his would only negatively impact other carrier[s'] production, not ours."

163.    On November 21, 2019, Humana entered into a contract to pay GoHealth $1.1 million.  As before, the written contract did not reference the Humana sales GoHealth had promised to deliver in exchange for the kickbacks, and instead indicated that the payment was for "a targeted marketing campaign between November 1, 2019 and December 7, 2019 in Services Areas agreed to by the Parties in advance."

164.    In an email attaching GoHealth's invoice for the $1.1 million, however, Mr. Miller told Mr. Gathing that, consistent with the parties' discussions, the money was "for Q4 additive production," meaning for additional enrollments. Mr. Mohl subsequently calculated that this payment led to "3,037 incremental sales in the states we invested in."

165.    Similarly, on November 13, 2019, Mr. Gathing asked Mr. Miller for additional sales in four states: Arizona, Colorado, New Mexico, and California.  Mr. Miller responded that "I believe we could add just over 1,000 submissions for just under $400,000 in these markets at this point in AEP with only 3 weeks left."

166.    On November 20, 2019, GoHealth sent Humana a corresponding $400,000 invoice. The invoice did not mention the "1,000 submissions" to which the parties had agreed a week earlier.  Instead, the invoice referenced "8,000 live transfers at an average internal cost of $50 to produce."

167.  **2020**.  Humana continued its kickback relationship with GoHealth in 2020, providing $43.7 million in purported marketing funding.

168.  Humana continued its focus on using its payments to GoHealth as a lever to "box out" competitors, particularly UnitedHealthcare.  On January 29, 2020, Alan Wheatley (Humana's President of Retail), Mr. Uchytil, Mr. Mohl, and others received a calendar invitation for a meeting on February 17, 2020, to discuss "Beat United a.k.a Operation Overload."  Accompanying the invitation was a slide presentation entitled "Operation 'United Front,'" which discussed Humana's strategy against UnitedHealthcare.

169.  Slide 5 posed several questions, including: "Is co-op marketing an area we want to continue focusing?"  The slide stated that Humana's "Current Approach" was "Yes.  Consider MDF a key negotiation lever, successfully boxing out competitors, however opportunity to more closely tie to retention and diversify funding."  The slide also posed the question: "Do we relax 'HUM-only' [i.e., Humana-only] strategy through various channels?"  To this question, the slide stated that Humana's "Current Approach" included "[b]oxing-out competing carriers through exclusive / semi[-]exclusivity."

170.  All the while, Humana understood that the AKS applied to such conduct.  For example, on February 6, 2020, in response to an inquiry from Lisa Stoner, a Humana Investor Relations employee who was facing questions from an investment bank's analyst, Mr. Uchytil wrote that the Medicare Marketing "guidelines are relatively silent on marketing reimbursement[,] however the limitations may be better defined by the Anti-Kickback Statute.  In short we would be limited to FMV [fair market value] of the actual marketing activity."

171.  Humana also discussed "reward[ing]" GoHealth for its past sales performance through alleged marketing funding.  For example, on March 25, 2020, Mr. Mohl wrote to

Mr. Uchytil that "I almost feel we have to reward GoHealth for their performance. I don't know it

needs to be in the range of what Clint [Jones] would want. But I think an additional $5M." Such

a "reward" had no connection to marketing or administrative expenses.

172.    On June 3, 2020, Ms. Reece sent Mr. Wheatley a set of slides that GoHealth would

be presenting to him later that day. The slides included the following tabular summary of the

parties' relationship, including the cost-per-acquisition (CPA):

|  | 2016 | 2017 | 2018 | 2019 | 2020E |
|---|---|---|---|---|---|
|  | 2016 | 2017 | 2018 | 2019 | 2020E |
| Humana MA Submissions | 16,749 | 33,632 | 59,000 | 210,742 | 233,740 |
| Humana MDF Funds | $3,100,000 | $8,500,000 | $14,750,000 | $20,250,000 | $20,250,000 |
| CPA | $185 | $253 | $250 | $96 | $87 |

173.    In the slides, GoHealth proposed that Humana increase its total 2020 marketing

funding to $40 million, which would generate 288,740 sales for Humana.

174.    Humana understood that it maintained a strong position on GoHealth's platform,

with Humana constituting approximately forty percent of GoHealth's sales in 2020. Humana

further understood that, as of June 2020, GoHealth still did not sell for Aetna and only sold

UnitedHealthcare plans to a relatively small subset of Medicare beneficiaries.

175.    On June 26, 2020, Humana signed a contract amendment in which it agreed to pay

GoHealth $40 million in purported marketing funding. The contract stated that the money was for

"a targeted marketing campaign to end no later than December 31, 2020."

176.    In August 2020, shortly after becoming a public company, GoHealth announced on

an investor call that it planned to "have expanded coverage with many of the top carriers" in 2021,

including UnitedHealthcare and Aetna. When a Humana executive asked Mr. Mohl about this

development, noting that it was a "meaningful risk heading into AEP," Mr. Mohl reported that

GoHealth was "only using downlines for AET [Aetna] and UHC [UnitedHealthcare]" and

explained that "[t]here was a sense that [GoHealth] had to come out and talk about being multi-carrier to the street [i.e., to public investors]."  Mr. Mohl went on to say that GoHealth still "believe[s] they will hit the [288,740] number.  And it's a big one.  If they don't, consequences."

177.    On November 9, 2020, Mr. Uchytil asked Ms. Reece about termination rates for Humana policies sold by brokers: "Would also like to understand if they are intentionally moving Humana members to other carriers?  We have invested in plans this year and they better not be moving our members to satisfy other commitments."  In other words, Mr. Uchytil understood that brokers could steer Medicare beneficiaries because of how much money the brokers received from carriers such as Humana.  Because Humana was paying kickbacks to GoHealth and other brokers, Mr. Uchytil wanted to ensure that these brokers were not steering beneficiaries away from Humana.

178.    **2021**.  In 2021, Humana paid GoHealth approximately $53 million in supposed marketing funding.

179.    In early 2021, however, Humana wanted GoHealth to "make up the difference" between the 150,000 sales GoHealth had promised for the fourth quarter of 2020 and the 127,076 sales GoHealth actually delivered.

180.    Humana executives also developed concerns with GoHealth's business practices. In March 2021, Mr. Uchytil reported to Ms. Reece that he had met with senior Humana executives and compliance personnel about the number of consumer complaints to CMS (also called "CTMs," typically shorthand for CMS's "Complaints Tracking Module" or "Complaints to Medicare") that GoHealth was generating: "GoHealth is an absolute outlier on CTM's and [Humana CEO] Bruce [Broussard] is not happy.  Some of his direct quotes were….. [sic] what is our acceptable threshold for CTM's per thousand?  Why would we even consider doing business with a company like this?"

- 42 -

181.    Despite its CEO's expressed concerns, Humana resumed paying kickbacks to GoHealth in the guise of marketing payments during the third quarter of 2021.

182.    On May 26, 2021, Mr. Miller sent Mr. Gathing GoHealth's "Baseline" proposal of $17,250,000 for 150,000 sales for the fourth quarter of 2021.

183.    On July 8, 2021, Mr. Chinigo informed Mr. Mohl by instant message that "Gohealth is $1.8M for 45K," meaning 45,000 enrollments for the third quarter of 2021.

184.    About a week later, Humana formally agreed to pay GoHealth $1.8 million for that quarter.  The parties' contract, however, did not mention the 45,000 enrollments that GoHealth had committed to delivering for Humana.  Instead, the contract referenced "digital advertisements and utilization of search engine optimization" for the third quarter of 2021.

185.    On August 23, 2021, Mr. Chinigo recommended that Humana pay GoHealth "their Baseline ask of $17.25M" for the fourth quarter of 2021.

186.    On September 5, 2021, Humana formally agreed to pay GoHealth $17,300,000, for "Marketing Expenses," but the agreement did not refer to the 150,000 sales GoHealth had committed to delivering in exchange for that payment.

187.    Throughout the rest of 2021, Humana continued to discuss the enrollment or sales "commitment" from GoHealth.

188.    On September 15, 2021, Mr. Miller asked Mr. Gathing for additional funding for the fourth quarter of 2021 in exchange for additional Humana sales.  After Mr. Gathing conveyed this request to Mr. Uchytil, Mr. Uchytil said, "I would like to understand the commitment from them on 3, 4, or $5M."

189.    Humana then considered the following options for "additive submissions," comparing the number of additional submissions and the cost-per-submission (CPS) for each MDF funding level:

| MDF | CPS | Total Additive Submissions |
|---|---|---|
| $3,000,000 | $120 | 25,000 |
| $4,000,000 | $130 | 30,769 |
| $5,000,000 | $150 | 33,333 |

190.    Mr. Uchytil instructed Mr. Gathing to "[m]ove forward with option 2 ($4M). Please provide me with their original and total sales commitment." Mr. Gathing responded that the original commitment had been 148,000 and the total was now 178,769.

191.    On October 15, 2021, Humana formally agreed to pay GoHealth $4 million, but the signed agreement made no mention of the additional 30,769 sales GoHealth had committed to deliver in exchange for that payment.

192.    On November 15, 2021, Mr. Gathing asked Mr. Miller to make a proposal for additional sales GoHealth could deliver to Humana during the ongoing Annual Enrollment Period in exchange for additional remuneration from Humana.

193.    Mr. Miller responded by providing the following options:

**Additive Q4 MDF Growth Options**

| Q4 MA Subs | MDF $ | CPS |
|---|---|---|
| 19,000 | $4,275,000 | $225 |
| 28,000 | $6,720,000 | $240 |
| 35,000 | $9,100,000 | $260 |
| 44,000 | $12,320,000 | $280 |

194.    On December 3, 2021, Humana signed a contract amendment in which it agreed to pay GoHealth an additional $12.32 million for a "targeted marketing campaign" during the

remainder of the fourth quarter of 2021.  As previously, the agreement did not mention the 44,000 additional Humana sales GoHealth had promised to deliver in exchange for that remuneration.

195.    Humana's senior executives weighed in on funding decisions like this.   For example, on November 18, 2021, Megan Reid, a Humana Senior Vice President, reported to Mr. Wheatley that "[w]e have been working with our external partners and to date have been able to get a commitment of 66k incremental sales for $20M.  A majority of this is with GoHealth."

196.    Mr. Wheatley forwarded this message to Humana's CEO, Mr. Broussard, and Chief Financial Officer Susan Diamond.  He asked about a marketing request from GoHealth and TRANZACT (another broker organization): "Marketing request is $30M.  Would get you a minimum of 95,000 sales . . .  While we may not like the terms rates or channel [i.e., broker sales channel], by all accounts this is a good growth and financial decision."

197.    Senior executives agreed, and on November 20, 2021, Ms. Diamond sent Mr. Uchytil and others an email stating that "[w]e will move forward with the additional $30M marketing spend."

### 3.    Humana's Kickbacks to SelectQuote

198.    SelectQuote and Humana first entered into a broker agreement in or around 2015. Over the next six years, Humana agreed to pay tens of millions of dollars in kickbacks to SelectQuote, ostensibly for the purpose of conducting "marketing" campaigns involving the purchase or generation of "leads."

199.    In reality, Humana conditioned those payments on (1) SelectQuote delivering specific quantities of Medicare Advantage enrollments for Humana, (2) SelectQuote maintaining a "pod" of agents that sold only Humana policies, and (3) SelectQuote's other "multi-carrier" agents steering a substantial share of their overall business to Humana.

200.    In return for the payments, SelectQuote both promised to and did take specific actions to steer Medicare enrollments to Humana.  For example, Josh Matthews, SelectQuote's Executive Vice President of Medicare Sales and Operations, assured Humana in 2018 that "getting Humana to [a] 47% [market share within SelectQuote] has required a long list of intentional moves internally on our side. Without our internal drivers, I would expect to see something closer to 30% of market share."  SelectQuote described, for example, "build[ing] out suppression tools" that allowed SelectQuote to remove a competing insurer from its internal quoting tool for agents. Further, as Megan Kute, a Humana National Sales Manager, reported to her boss, SelectQuote was favoring Humana over other carriers, including Aetna:  "They are only selling Aetna right now in markets where we do not have strong footprint.  They turned Aetna off earlier this year and when they turned them back on for AEP, they reached out to us specifically to ask where we wouldn't have footprint as they did not want to turn them on in markets where they would compete with us . . . ."

201.    **2016**.  In 2016, Humana paid SelectQuote about $1.65 million in purported marketing funding.

202.    Humana and SelectQuote's arrangement in 2016 included establishing a "pod" of SelectQuote agents that would focus on selling only Humana policies, starting with fifteen and growing to thirty-five agents.  In March 2016, SelectQuote projected that these exclusive agents would sell 7,049 Humana policies in 2016 that SelectQuote otherwise would not have sold.

203.    Humana's Ms. Reece subsequently summarized SelectQuote's proposal: "They are asking for $316,525 in ROY [rest of year] for an additional of 1,151 MA sales at a $275 CPS [cost per sale].  Their ask for AEP is $1.3 million for an additional 5,898 MA sales at a $225 CPS."

204.    On June 16, 2016, Humana agreed to pay SelectQuote $316,525, supposedly for SelectQuote to "conduct a targeted marketing campaign between May 15, 2016 and October 1, 2016" that would "include the purchase, generation and use of eleven thousand five hundred ten (11,510) leads." Humana's Ms. Kute later explained that "[w]e aren't able to define any sort of production [in Medicare Advantage contracts with brokers] so we do it as a reimbursement for leads." The June 2016 agreement made no mention of SelectQuote setting up a group of agents to sell exclusively Humana plans or of the sales commitments.

205.    In July 2016, SelectQuote established a wholly owned subsidiary called Tiburon Insurance Services ("Tiburon") to operate its exclusive pod of agents for Humana. Tiburon was purportedly a separate company that sold a smaller number of insurers' plans than SelectQuote did through its multi-carrier platform. The separation between Tiburon and SelectQuote was a pretense, however. SelectQuote executives decided which insurers' plans Tiburon agents would sell and approved Tiburon agents' compensation. In fact, Tiburon did not have a single contract with the Defendant Insurers—the relevant contracts were with SelectQuote. In the end, SelectQuote simply used Tiburon to steer beneficiaries to plans offered by the MAOs willing to pay SelectQuote sufficient remuneration.

206.    For years, the Tiburon pod sold only Humana plans. Despite this, agents in the pod did not clearly inform beneficiaries of this limitation. As SelectQuote's then Senior Vice President, Paul Gregory, explained: "We do not use the Humana brand. We answer the phone as Tiburon."

207.    As Mr. Matthews testified, Tiburon was appealing to Humana in particular because Humana was focused on loyalty, where loyalty meant exclusivity and otherwise favoring Humana over other MAOs.

208.     Humana was keenly interested in the "pod," up to its CEO level.  For example, on October 25, 2016, Ms. Reece wrote to several SelectQuote executives under the subject line, "IMPORTANT – Please Read":  "Our VP is meeting weekly with our CEO, Bruce Broussard, and all eyes are on Select Quote [sic] and a couple other partners that have the Humana PODS . . . .  It is very important for SQ Humana POD to deliver the results proposed and above the goal would be even better!  In addition, your Multi-Carrier CC [i.e., call center] needs to produce at the 45% of share as you have done in the previous years."

209.     In December 2016, as SelectQuote's President, Tom Grant, explained to Humana's Ms. Reece and Ms. Kute, if SelectQuote had shifted its agents from the Tiburon pod, where nearly all of their sales were Humana, back to SelectQuote's multi-carrier platform, Humana would have received only about twenty-six percent of those agents' sales.  In other words, but for the kickbacks that induced SelectQuote to establish the Tiburon pod of Humana-exclusive agents, approximately seventy-four percent of the Tiburon sales would have gone to other carriers.  SelectQuote and Humana did not mention the Tiburon pod in their contracts, however.

210.     It was also important to Humana that SelectQuote's "Core," or multi-carrier, agents continued to sell large proportions of Humana plans.  On December 20, 2016, Ms. Reece asserted that "[o]ur agreement for this arrangement was that the Core would continue to produce the same amount of Humana MA sales, and the marketing dollars we invested would drive incremental sales from the Humana POD."

211.     SelectQuote trained Tiburon agents to "think eat sleep and be Humana" and to "[t]ransfer [to SelectQuote's multi-carrier agents] as a last resort."  Consistent with this training, SelectQuote paid Tiburon agents much more to sell a Humana Medicare Advantage plan than to transfer a caller to a multi-carrier agent who might have been able to offer a more suitable plan

option.  And SelectQuote disciplined Tiburon agents if they transferred too many beneficiaries to the multi-carrier "Choice" agents.

212.    Tiburon's exclusive sale of Humana plans, without adequate notice to beneficiaries, vitiated beneficiary choice.  As one SelectQuote pod agent pointed out in a January 2017 email, "we are not benefiting by transferring [beneficiaries to "Choice" agents] instead of trying to sell them a Humana plan that isn't right for them.  The sale should be in the interest of the client [i.e., beneficiary] and not the agent, and I feel that it has been a bit contradictory over here.  From talking with others, I don't believe I'm the only one.  Someone actually said, they 'feel like they are kind of getting penalized for transferring [to "Choice" agents] instead of selling Humana.'"

213.    Internally, Humana recognized that its sham "marketing dollars" would generate situations where "only Humana will be offered" by SelectQuote, regardless of the needs of a beneficiary.  As Mr. Uchytil expressed, "I do not want to put money towards the non-exclusive area . . . .  I want to use the dollars to drive additional calls into the exclusive call center," meaning the Tiburon "pod" of agents.

214.    Nevertheless, the contracts between the parties referred only to "targeted marketing campaign[s]" and generation of "leads."

215.    **2017**.    In 2017, Humana agreed to pay SelectQuote $1,212,750 in January, $742,500 in June, and $2,000,000 in October, all purportedly for marketing.

216.    Internally, Humana justified the first of these payments as creating "a unique opportunity because they [i.e., SelectQuote] will have a dedicate[d] team of 15 Exclusive agents that will be a Humana exclusive pod."

217.    In exchange for its payments to SelectQuote, Humana sought a greater sales share even from the purportedly neutral "Choice" agents at SelectQuote.  On March 14, 2017, Mallory

Strange (a Humana National Sales Manager) told Mr. Uchytil that SelectQuote was "[l]ooking at if they can potentially turn off a carrier to have a bigger focus on Humana. This would be where we could see an additional lift in sales in addition to what we have already agreed to[]."

218.    On April 7, 2017, Mr. Matthews sent Ms. Strange a proposal stating that, in exchange for $742,500 from Humana, SelectQuote would generate 4,210 Humana sales. Mr. Matthews further explained that SelectQuote's tactics to achieve Humana sales would include that "one of our carrier partners [Aetna] will be temporarily removed from our platform[.]" Mr. Matthews also proposed that SelectQuote could sell an additional 2,500 Humana policies "at a rate of $75 more per policy."

219.    Internally, SelectQuote described the "strategic changes that we would undertake to help us hit the additional goal of 2,000-2,500" for Humana, including buying incremental leads in areas where Humana was successful and, though Mr. Matthews was "[n]ot sure if we want to put this in the deck or not[,] the suspension of one of our [other] MA carriers off of our platform."

220.    Regardless of any purported marketing campaign or lead generation, Humana required a "true-up" for enrollments in exchange for pre-payment of funds, with the "true-up" to be suspended if SelectQuote met a 50 percent Humana market share target. On May 18, 2017, for example, Humana's Ms. Strange wrote to SelectQuote that "[i]n regards to the 'true-up' ask where we would go ahead and fund now for AEP, we are willing to do this and propose that if 50% of your book of business is trending Humana, then we won't hold you responsible to pay back any funds if policy count is short." In other words, if SelectQuote did not meet its enrollment commitment, it would not need to pay Humana back for missed enrollments so long as SelectQuote successfully boxed out Humana's competitors such that Humana made up 50% of all SelectQuote sales. This condition was untethered to bona fide administrative expenses.

221.    On June 16, 2017, Humana formally agreed to pay SelectQuote $742,500.  The signed agreement omitted any mention of the sales or "true-up" terms that the parties actually negotiated and instead still referenced a "targeted marketing campaign" for a number of "leads."

222.    Although Humana's share of all SelectQuote sales had fallen to about thirty percent in the period leading up to this agreement, the share promptly recovered to over fifty percent.

223.    In October 2017, Humana agreed to pay SelectQuote $2 million in exchange for what Ms. Kute called an "18,000 sales commitment."

224.    That fall, SelectQuote resumed selling Aetna plans in some states, but SelectQuote's Chief Revenue Officer, Robert (Bob) Grant, instructed Mr. Matthews "not [to] turn on additional states and cause damage to Humana."

225.    The graph below demonstrates how SelectQuote's steering worked.   When SelectQuote began to "turn Aetna back on" in late 2017, there was no "damage to Humana" and the new Aetna sales came largely at the expense of UnitedHealthcare, which on information and belief was not paying SelectQuote kickbacks at this time.



226.    **2018.**  In 2018, Humana agreed to pay SelectQuote $1 million for each of the first and second quarters, $1.5 million for the third quarter, and $5.82 million for the Annual Enrollment Period at the end of the year.

227.    Again, the parties' contracts described the consideration for Humana's payment as "targeted marketing campaign[s]" for specified numbers of "leads."  Internally, though, Humana employees described the first $1 million payment accurately as "for an increase in sales in January, February, March of 2,850 sales" on top of the "3,150 projected sales"  SelectQuote otherwise would have made for Humana.

228.    Humana continued to focus on securing an excess share of SelectQuote's business in exchange for the "marketing" payments, and understood that it would not have received a greater share but for these kickbacks.  For example, in April 2018, Ms. Reece explained that Humana's payments to SelectQuote enabled Humana to obtain a higher share of SelectQuote's Medicare Advantage sales than Humana would have received but for the kickbacks: "without pod and marketing dollars it would look more like 30% total.  The pod allows us to be at 47% total," as "the pod allows them to shift and increase our market share."

229.    On July 23, 2018, Sarah Anderson, a SelectQuote Director of Marketing, wrote to her colleagues, including Bob Grant and Mr. Matthews, that "[i]n AEP 2018 we have a target of achieving 24K Humana policies from October 1st - December 31st to achieve a significant bonus," meaning the alleged marketing funding.  Ms. Anderson also provided a list of enrollment-related "actions" SelectQuote could take to achieve this "bonus."  Among those actions was to route certain calls to SelectQuote's Humana-exclusive agents.  Beneficiaries would not be told about this routing.

230.    By early August 2018, Humana and SelectQuote had informally agreed that Humana would pay SelectQuote $5.82 million for the Annual Enrollment Period, and Ms. Kute at Humana asked Bob Grant at SelectQuote to draft a justification that she could submit internally for this payment.

231.    According to Bob Grant's draft justification, "[t]he total spend . . . [is] for an increase in sales in AEP of appx. 13,000 sales bringing the total sales to 25,000 during the AEP timeframe.  This will entail a $232 CPS [cost per sale] during AEP and allow Humana to stay competitive on the platform and will allow SelectQuote to have the exclusive pod with roughly 70 agents."  Thus, Humana paid not merely for a "targeted marketing campaign," as stated in the parties' contract, but for an increase in sales, "to stay competitive on the platform," and for an "exclusive pod."

232.    Humana stressed internally that its ongoing payments meant that "SelectQuote is committed to Humana," so SelectQuote "only offers a few other carriers on their platform *to increase their Humana production*" (emphasis added).  Comments like these laid bare the sham of such marketing arrangements: whether SelectQuote was "committed to Humana" or "offer[ing] a few other carriers" had little to do, of course, with whether and the manner in which SelectQuote would spend nearly $6 million in purported marketing money.

233.    **2019**.  In 2019, Humana initially planned to pay SelectQuote $9 million over the course of that year, but ultimately paid SelectQuote $12.9 million, separate and apart from its commissions and administrative payments.

234.    As in the previous years, negotiations focused on sales and cost per sale while the contracts obfuscated the true purpose by describing a "targeted marketing campaign" and "leads."

235.    For example, on February 19, 2019, Ms. Kute reported to Mr. Uchytil and Ms. Reece that she had conferred with Bob Grant of SelectQuote, and "[w]e decided on $2,925,000 with an increase of 6500 sales and total sales of 13,000 for Q1."

236.    On March 5, 2019, Humana formally contracted to pay SelectQuote $2,925,000, ostensibly for "a targeted marketing campaign between January 1, 2019 and March 31, 2019" that would "include the purchase, generation and use of one hundred ten thousand (110,000) leads."

237.    SelectQuote, however, had invoiced Humana for "13,000," meaning 13,000 sales per the parties' extracontractual agreement by email, as excerpted below.

| SelectQuote Senior (A Division of SelectQuote Insurance Services) | | | INVOICE |
|---|---|---|---|
| Humana Marketpoint, Inc. | **DATE:** | | January 29, 2019 |
| | **INVOICE #** | | 20190129 |
| | **FOR:** | | *Marketing* |
| | **Due Date:** | | *On Delivery* |
| **Pay to:** | | | |
| SelectQuote Senior c/o Theresa Breski | | | |
| 6800 W. 115th Street, Suite 2511 | | | |
| Overland Park, KS 66211 | | | |

| DESCRIPTION | QTY | AMOUNT |
|---|---|---|
| Marketing; 2019 Marketing Plan (First Quarter of 2019; Jan through Mar) | 13,000 | $          2,925,000.00 |

238.    On March 6, 2019, Ms. Kute submitted this invoice for payment, which prompted a Humana Senior Sales Support Professional, Deanna Grayson, to ask "what the 13000 Qty. means on the invoice?  The [contract] amendment says this was for the purchase o[f] 110k leads."

239.    In response, Ms. Kute offered to "have them update it with the leads # instead," and Ms. Grayson replied that "[i]f you don't mind, it'd be better."   Ms. Kute then instructed SelectQuote's Mr. Matthews that "[t]he quantity should say 110K leads instead of 13,000 (I think that was sales)."

240.    Two days later, Ms. Kute and Mr. Matthews exchanged texts to the same effect, with Ms. Kute asking for the change to the invoice but declining Mr. Matthews' offer to change a presentation slide that stated, "SelectQuote will deliver 13,000 Humana MA policies." SelectQuote changed the invoice, replacing 13,000 policies with 110,000 leads, even though, as Mr. Matthews testified, nothing about the services that SelectQuote provided had changed and even though "[t]he commitment [to Humana] was for 13,000 policies."

241.    By mid-2019, Ms. Kute had concerns that, although "Bob [Grant] is asking for 6 million more (total of $8,225,000) for a total of 40,000 + sales in order to keep us closer to 45 – 50% marketshare," remuneration from Aetna might result in a decrease of Humana's Medicare Advantage market share at SelectQuote.

242.    At this time, Humana paid SelectQuote kickbacks in the guise of marketing fees at $194 per sale, whereas Aetna paid kickbacks of $290 per sale for each of SelectQuote's incremental sales between 19,000 and 25,000.  Just as Ms. Kute predicted, SelectQuote shifted sales to Aetna and other carriers and its relative performance for Humana worsened in late 2019. Moreover, by this time, SelectQuote had added other carriers to its Tiburon pod and was paying pod agents more for sales of those carriers' plans than for sales of Humana plans.

243.    **2020**.  In 2020, Humana sought more sales from SelectQuote and a return to being SelectQuote's favored MAO.    Humana therefore agreed to pay SelectQuote a total of approximately $18.7 million in purported marketing funding over the course of that year.

244.    For the first quarter of 2020, Humana agreed to pay SelectQuote $2.5 million.  In return for these kickbacks, as SelectQuote subsequently reported, SelectQuote expressly "committed to and delivered a major shift in Humana's percentage of the platform" throughout the first few months of 2020.

245.    Still, in January 2020, Humana's Ms. Kute expressed to her colleagues her concern that "[i]f we want to remain their [SelectQuote's] top carrier we need to look at opportunities with co-op and other unique ideas."

246.    On March 16, 2020, Bob Grant told Ms. Kute that Humana could cause SelectQuote to "drive additional volume to [Humana]" by providing "additional marketing dollars, and we will put you back at the top of the pod, and we can give you significant volume starting today."

247.    As in prior years, the parties continued to sign contracts that ostensibly provided for Humana to pay SelectQuote in exchange for a "targeted marketing campaign."  For example, on June 5, 2020, Humana agreed to pay SelectQuote $4 million, which it described in the contract as payment for "a targeted marketing campaign between April 1, 2020 and June 30, 2020" that would "include the purchase and use of one hundred fifty thousand nine hundred forty three (150,943) leads."  Internally, however, SelectQuote accurately characterized this $4 million as a "production bonus."

248.    Again and as in prior years, both Humana and SelectQuote knew that Humana intended its remuneration to be consideration for enrollments and for preferential treatment.  For example, on October 26, 2020, Mr. Mohl told his colleagues that Humana used its alleged marketing funding to "maintain[ ] several [relationships with brokers] that are semi-exclusive or preferential, which has worked to our advantage to ensure *we earn more than our fair share of sales* while driving down CPS [cost per sale].  For example, without SelectQuote exclusive pod of agents, we would not be their No. 1 carrier" (emphasis added).

249.    Later that month, Mr. Uchytil sent an email to Ms. Kute and others with the following request: "I need your help quickly. We need to understand our ability to build a contingency plan for more sales if possible.  Please speak to our partners (the productive ones) and

ask them if we gave them more money could they drive more Humana sales?  What would the new CPS be to get more?  How many more could they get?"  Ms. Kute responded that "SelectQuote believes they can do an additional 15,000 sales for Humana over the next 3 quarters . . . at a CPS of $250 (incremental sales only)."

250.    By December 2, 2020, according to Mr. Mohl, Humana had decided to pay SelectQuote an additional $6 million in alleged marketing funding, with $4.7 million of that amount to be allocated to sales in the first three quarters of 2021.

251.    **2021**.  In 2021, Humana paid SelectQuote approximately $29.5 million in purported marketing funding.

252.    On January 13, 2021, Ms. Reece told her colleagues that, separate and apart from other agreements in December 2020, Humana had the following understanding with SelectQuote for the first three quarters of the year: "Q1 CY21 – 47,000 sales ($7,050,000)[,] Q2 CY21 – 25,250 sales ($3,787,500)[,] Q3 CY21 – 26,250 sales ($3,937,500)."  SelectQuote was keenly aware of these enrollment commitments to Humana.

253.    Nonetheless, the parties continued their artifice of contracting for "leads" but negotiating about, and paying for, enrollments.  For example, on July 14, 2021, Josh Kopmeyer, SelectQuote's Senior Vice President of Carrier & Strategic Partnerships, asked a colleague in SelectQuote's finance department to "please create an invoice for us to send to Humana.  They do NOT want a timeframe (I can explain this offline) but the invoice should be for **$1,860,000** and the number of leads we can generate for this amount of $ - should be roughly 150K for leads."  Mr. Kopmeyer added that "this is for 12,400 submissions….incremental to our current AEP commitment of 70K."  The written agreement for $1,860,000, effectuated about a month later, made no mention of incremental submissions or enrollments.

254.    Following several other agreements in the year, on September 1, 2021, Humana agreed to pay SelectQuote $10 million, allegedly for "a targeted marketing campaign between October 1, 2021 and December 7, 2021" that would "include the purchase and use of leads."

255.    On top of this agreement, SelectQuote offered Humana the chance to pay larger kickbacks in exchange for more enrollments into Humana's Medicare Advantage plans.  On October 20, 2021, Mr. Kopmeyer proposed to Ms. Kute that "for an investment of $500K we could commit an incremental ~2,500+ enrollments."

256.    Following negotiation of these figures, SelectQuote Senior Account Manager, Laura Bourdelais, reported to her colleagues that "Humana is paying us an additional $500,000 in MDF for an additional 3,500 submissions," on top of prior enrollment commitments.

### 4.    Humana's Kickbacks to eHealth

257.    eHealth and Humana first entered into a broker agreement in 2010.  On August 25, 2011, Humana agreed to pay eHealth $900,000, purportedly "[i]n consideration for the development and implementation of" a Humana-branded "Mini-Site" on eHealth's website.

258.    Over the next decade, Humana paid eHealth tens of millions of dollars ostensibly to maintain that "Mini-Site" and to drive web traffic to it.  In reality, however, neither of the parties cared much about the "Mini-Site," which functioned largely as a landing page.  Instead, the payments were kickbacks that Humana paid in exchange for commitments from eHealth to sell specific numbers of Medicare Advantage policies and to prioritize Humana over other carriers, even in years when Humana's policy offerings were weak.

259.    eHealth also hosted a UnitedHealthcare Mini-Site, but UnitedHealthcare did not pay eHealth in exchange for the creation or maintenance of that Mini-Site.

260.    Further, contract managers at Humana raised concerns that the per-day cost for the same Mini-Site services varied widely across contracts, with no answer as to "why the cost is so

much higher" for certain periods of the same putative service.  As eHealth's former General Manager for Medicare, Chris Hakim, later explained, the variance was ultimately "just a function of negotiations" rather than reflective of a different service or value.

261.    **2016**.  In 2016, Humana paid eHealth $250,000 in each of the first three quarters and $3 million in the fourth quarter, all purportedly "for the development, maintenance and implementation of the Mini-Site."   Despite these significant payments, the parties' communications during that time made little or no mention of the "Mini-Site." Instead, the parties focused on sales.

262.    In an agreement effective February 15, 2016, Humana agreed to pay eHealth $250,000.  In response, two days later, eHealth's Mr. Hakim told several eHealth colleagues, including Brooke Thomas (eHealth's Director of Medicare Sales), "I need to get Humana more sales so please give me about 5-7 states that I can shut off another carrier to drive them."  Around the same time, Ms. Thomas likewise told colleagues, "[w]e have committed to drive more sales to Humana.  We need to turn off some carriers in 5-7 states to do so. What states would you suggest?"

263.    A week later, Mr. Hakim directed Alexei Barnes, an eHealth Content Manager, to "turn off the regular United MA plans in TN, IN and NC in the call center."  eHealth's sales for Humana increased immediately after eHealth stopped selling UnitedHealthcare Medicare Advantage plans in certain states, which limited choice for Medicare beneficiaries who sought plans from eHealth in those states.

264.    Humana monitored eHealth closely.  On March 15, 2016, Jason Breunig, the Humana National Sales Manager responsible for the eHealth account, emailed Mr. Hakim that "we are about half way through March and right about 1,500 MA sales which would mean around 3K

MA for March.  The monthly goals (below again so you can see) was just over 2K so keep up the good work!"

265.    Shortly thereafter, on April 1, 2016, Mr. Breunig reported to his supervisors on "where eHealth ended each month . . . with the new ROY [rest of year] goals which were the % they were up already in 2016 (10%) *plus 300 sales/month for the Marketing $*" (emphasis added).

266.    On October 4, 2016, when Mr. Breunig submitted eHealth's $3 million invoice for the fourth quarter, a Humana administrator asked: "Is this for 2017 AEP Coop Marketing? I am asking because the invoice says 'Development maintenance and implementation of the Mini-Site.'"  In response, Mr. Bruenig confirmed that "Yes this is 2017 coop marketing money to be used during AEP for selling 2017 plans."

267.    **2017**.  In 2017, Humana agreed to pay eHealth $2.75 million, again ostensibly for "the development, maintenance and implementation of the Mini-Site."

268.    These payments aimed to incent and compensate sales.  In an email to his colleagues on March 20, 2017, eHealth's Mr. Hakim expressed concern that eHealth's failure to achieve the agreed-upon sales for Humana would jeopardize future payments: "Humana has given us $250K for Q1 and we are more than 50% off of what they want us to do so the $250K for Q2 is in jeopardy."

269.    Mr. Mohl and others at Humana similarly acknowledged the real purpose of these payments: not for the alleged Mini-Site service, but for sales.  For example, on April 14, 2017, Mr. Mohl sent to Mr. Uchytil and others a spreadsheet tracking Humana's purported marketing payments to brokers compared to their Humana sales.  As to eHealth, the spreadsheet stated: "250,000 per quarter, *$ is really for 3,000 additional sales* at about $250 CPS [cost per sale]" (emphasis added).

270.    Internally at eHealth, employees acknowledged that "sponsorship dollars" like these payments from Humana were "budgeted as 100% profit," rather than reimbursing or paying for a bona fide service.

271.    Around the middle of the year, though, Humana had concerns that eHealth would miss its sales commitments to Humana.  On June 5, 2017, Mr. Breunig told Mr. Hakim that "we still are under 60% of goal and down about 35% YOY [year-over-year] for May."

272.    Humana originally had planned to pay eHealth $2.75 million for the end of 2017, but, as Mr. Uchytil wrote to Mr. Wheatley on September 5, 2017, "EHealth actually needs the wake up because they have slid downward the previous 3 years.  Ironically they added United during that same time period."  So in turn, Humana reduced its "marketing" payment for eHealth to $2.5 million for the fourth quarter.

273.    On October 6, 2017, Mr. Hakim at eHealth reported to his CEO, Scott Flanders, that "[t]hey have given us $2.5M for Q4 marketing support for AEP . . .  They are expecting 14K MA sales with this financial commitment."

274.    **2018**.  eHealth had relatively poor enrollment performance for Humana in 2017. Due to this performance, Humana did not provide eHealth any additional "Mini-Site" funding for the first three quarters of 2018 (even though eHealth continued to maintain that Mini-Site).  Then, Humana paid eHealth $5 million for the fourth quarter of 2018.

275.    On February 27, 2018, Humana and eHealth executives met for an "AEP Debrief." That same day, Sukie Dean, an eHealth Senior Director of Medicare Carrier Relations, texted Mr. Hakim that "Robin [Reece] and I spoke separately and they are good with the numbers and want to see a scenario where the $4M is pushed entirely to the dedicated call center team with incremental growth on the retail side."  That is, at least $4 million of Humana's payment—

purportedly to reimburse for a Mini-Site—would in fact compensate enrollments made by a "dedicated" team of agents selling only Humana plans.

276.    On March 12, 2018, Mr. Hakim and Ms. Dean proposed to Mr. Breunig that Humana pay eHealth $5 million in exchange for 25,000 Medicare Advantage plan sales during the fourth quarter of 2018.

277.    On May 30, 2018, in advance of a call with several senior eHealth executives, Mr. Hakim circulated a spreadsheet showing 2018 "Sponsorship . . . commitments" eHealth had received from several carriers, including Humana, and eHealth's associated "Enrollment Commitments" to three of those carriers, including Humana.  The eHealth spreadsheet noted that, due to eHealth's "Enrollment Commitments" to Humana and other carriers that were paying eHealth so-called "sponsorship" money, eHealth "will be shifting Market Share from other carriers to hit these numbers."

278.    Humana continued to seek sales in direct exchange for its "Mini-Site" payments. Mr. Uchytil and others justified these payments internally as not only supporting incremental sales of Medicare Advantage plans, but also "boxing out" other insurers.  For example, on June 8, 2018, Jeff Fernandez, a Humana Senior Vice President, circulated to other senior Humana executives a table of Humana's payments to eHealth and the sales eHealth made in return for Humana's payments, showing $2.75 million in payments in 2017 and $5 million for 2018.

279.    Mr. Fernandez asked the group: "We almost doubled their support, but sales only went up 9k or so.  Should we be asking for more sales?  Or is the $5 mm too much of an increase all at once?"  Mr. Uchytil responded that "Ehealth CPS [cost per sale] going up but we are also boxing out United.  Intense Humana commitment means less focus on others."

280.    The parties continued negotiations in this period.   Robert Hurley, eHealth's Executive Vice President of Sales and Operations (and later president of its Medicare business), wrote to colleagues that Humana was "pushing for a 20% increase in our production goal from the original commitment of 25,000," but that he "countered them that we'd deliver between 25k and 30k for the $5m, given they pay most of it in Q3.  This morning they responded and are insisting on the $5m for a commitment of 30,000 enrollments."

281.    In July 2018, following further discussion, eHealth's Chief Operating Officer, Dave Francis, reported that eHealth and Humana "are in agreement for $5m for 25k apps.  $4m in Q3."

282.    Around this time, even eHealth managers had little understanding of the sham Mini-Site that such payments purportedly supported.  For example, Jeet Mansharamani, eHealth's Vice President of Digital and Affiliate and Retention Marketing, indicated that he knew little about the mini sites. "What is the deal with these mini sites," wrote Mr. Mansharamani.  "Can you share it with Sara [Haddox, eHealth's Digital Acquisition Marketing Manager] and myself in regards to expectation on driving traffic (if any) to these?"

283.    On August 6, 2018, Humana entered into a contract amendment agreeing to pay eHealth $5 million, ostensibly "[i]n consideration for the development, maintenance and implementation of the Mini-Site for the period running from August 1, 2018 through December 31, 2018."  The contract amendment made no mention of eHealth's commitment to sell 25,000 Humana Medicare Advantage policies.

284.    eHealth took steps to ensure it fulfilled that enrollment commitment, including preferential call routing for Humana and maintaining agents who would only sell Humana plans. For example, on August 2, 2018, Mr. Hakim reported to several senior eHealth executives,

including Chief Marketing Officer Tim Hannan, that eHealth would have eighty-two agents "scoped to Humana only" for the upcoming Annual Enrollment Period.

285.    eHealth reported selling 30,800 Humana policies during the last three months of 2018. Moreover, as Mr. Hakim had promised, Humana's share of eHealth's Medicare Advantage sales did "shift[]," from about twenty-five percent in the third quarter of 2018 to thirty-six percent in the fourth quarter of 2018.

286.    On a relative basis, then, Humana's proportion of eHealth's overall sales increased by over forty-five percent in a single quarter, after Humana paid $5 million on the false premise that the money was for a Mini-Site.

287.    **2019**. Over the course of 2019, as eHealth's sales for Humana increased, Humana agreed to pay eHealth more money, ostensibly for the same Mini-Site but actually for sales. Thus, on January 28, 2019, eHealth's Mr. Hurley wrote to eHealth's Mr. Flanders that one of the "[k]ey items to stay in Alan [Wheatley]'s ear about" was "[s]ponsorship money- it must go up this year in return for higher sales volume."

288.    Humana continued to understand, and prefer, that eHealth favor its plans over the plans of other carriers, even if that favoritism limited beneficiary choice. On May 7, 2019, Humana's Mr. Wheatley participated in a "fireside chat" session with eHealth's CEO, Mr. Flanders, at an eHealth investor presentation. Before that session, according to a transcript of the presentation, eHealth's Mr. Francis spoke to the audience and said that

> [t]here is no other company in the market that has the choice of product and carrier, the tools to research and shop and the enrollment capability, whether it be telephonic or online, for a consumer to come in and believe that they have the confidence that they have made the best, most-informed decision relative to what insurance product th[ey] could have at that stage of their life.

Mr. Francis then reiterated that "[t]here's only one trusted place that customers can go to have all of the choice that they want."

289.    Mr. Francis' statements about customer choice were false, as eHealth's use of dedicated agents and shutting off of certain carriers demonstrated.  After Mr. Francis finished speaking, Humana's Mr. Wheatley texted Mr. Uchytil: "Thank god he's off the stage.  If he said 'choice model' one more time I was going to leave. . . .  Didn't love hearing e-health has the broadest choice of product and carrier.  That runs counter to my message."

290.    Throughout 2019, the parties continued to pretend that Humana's payments to eHealth were for the Mini-Site or concomitant marketing.  On September 16, 2019, Humana agreed to pay eHealth $4 million, ostensibly for eHealth "hosting a Minisite" and "undertak[ing] marketing efforts to drive customer traffic to that Minisite" during the fourth quarter of that year.

291.    Humana employees continued to pay scant attention to the Mini-Site, and Mr. Breunig—Humana's principal contact with eHealth at that time—did not even know where the Mini-Site was located or what it looked like.  As Humana was discussing this $4 million contract amendment internally, a Humana employee asked Mr. Breunig to "send me the mini site link?"  Mr. Breunig replied that "I don't have a mini site link but I believe it is just the normal site but with just Humana showing."

292.    **2020 and 2021**.  Humana and eHealth continued their kickback relationship in 2020 and 2021.  Internally, Mr. Breunig at Humana acknowledged that "[i]n the past when we had a much worse product eHealth still wrote a lot of Humana," including "more than our fair share from eHealth during a bad product year."  Similarly, Brian Shasha, eHealth's Vice President of Carrier Distribution, explained in a recorded conversation with a colleague that eHealth's "messaging to Humana always is that they're number one in our environment and United is always one app [i.e., application] behind them . . . because that's their expectation."

293.    Humana continued to discuss "investments" for enrollments, such as an eHealth proposal for an "[a]dditional $3.1M investment to drive market share at additional 21k apps at $150 COA [cost of acquisition] level," while the parties' written contracts still referenced the Mini-Site.

294.    On June 28, 2020, Humana agreed to pay eHealth $18 million, allegedly for "(a) eHealth hosting a Minisite; and (b) eHealth undertaking marketing efforts to drive customer traffic to that Minisite" for the period from "June 1, 2020 through and including December 31, 2020." In fact, the parties intended $10 million of this amount to be for 2020, with the remainder set for the first half of 2021.

295.    For 2021, Humana ultimately agreed to pay eHealth total purported marketing funds of $18.1 million (including the $8 million paid in advance in June 2020). In exchange, eHealth "committed to 40k" applications for Humana.

296.    On January 15, 2021, William Kinkead, eHealth's Director of Carrier Development, reported to his boss, Mr. Shasha, that "Humana approached eHealth for an opportunity to drive 500 incremental sales into the TN [Tennessee] market. The incremental sales would be paid at $250CPS ($450 Total)."

297.    On January 26, 2021, Mr. Breunig sent Mr. Kinkead a draft contract. Despite their agreement on incremental sales and cost per sale, Mr. Breunig explained that "[w]e list the mini site as it has allowed us not to run into other verbiage in the past."

298.    On February 17, 2021, Humana formally agreed to pay eHealth $125,000. The written agreement stated that the payment was for eHealth to "host a Minisite and undertake certain marketing efforts to drive customer traffic to such Minisite." As Mr. Breunig explained to his

colleague, National Account Executive Holly Kropp, on January 22, 2021, "[b]asically the TN market is giving us $125K for an additional 500 sales in that state."

299.    On August 24, 2021, Mr. Shasha confirmed to Mr. Uchytil that Humana's "Current Funding" was "$8m @ $200 COA = 40,000 sent applications," but their written agreements continued to reference the sham Mini-Site.

300.    Thus, on August 25, 2021, Mr. Kinkead explained to Andrew Shea, eHealth's Senior Vice President of Marketing, that "we usually work the agreement where it isn't explicitly called out on pay per app," and the agreement instead referenced "marketing services or lead services, etc." Similarly, in an instant message on August 23, 2021, Mr. Shasha told Mr. Shea that "these agreements with Humana are not so specific. They are all verbal and the written is general."

301.    When asked by a colleague, "[c]an't we just say the money is for whatever and then we avoid the scrutiny?  Like say it's for training or some bullshit whatever," Mr. Kinkead explained similarly:  "That's how we do it today.  Humana for example they are paying for the mini site[.]  Nothing more nothing less[.]  The commitments on production are verbal over the phone and on spreadsheets - but nowhere on contract[.]"

302.    Just as Humana did, eHealth understood that the Mini-Site arrangement remained an artifice.  In an instant message exchange on September 21, 2021, Mr. Kinkead told Derek Streich, an eHealth Director of Business Development, that "you can skirt around the regs so long as it's not tied to apps . . . Humana for instance is paying us for the carrier minisite . . . Based on contract."  Mr. Streich responded, apparently tongue-in-cheek, that Humana "[p]ay[s] eHealth $15M/year for a minisite that drives 15 enrollments per year.  CMS will surely never figure that one out. . . COA = $1M . . . Luckily the govt [sic] are generally morons."  Mr. Kinkead concurred:  "But [they] aren't paying for enrollments . . .  They are paying for the technology . . . Wink wink."

Similarly, eHealth's Jake Roberts, Director of Strategic Carrier Programs, stated that "if we ask carriers for additional investment dollars[,] we have to be able to tie that back to apps [i.e., applications] and deliver those apps."

303.    Indeed, even in December 2021, eHealth's employees continued (as they had in 2017) to describe sponsorship as pure profit.  In a recorded conversation on December 9, 2021, Mr. Shasha told his colleagues, "I would argue that the sponsorship dollars hold a lot of value because it's coming after the investment, and *it goes right to the bottom line*" (emphasis added).

304.    On December 19, 2021, Mr. Kinkead provided Mr. Uchytil and Mr. Breunig an "OEP [Open Enrollment Period] Funding" proposal for eHealth to submit 36,400 Humana Medicare Advantage applications at a "CPS" of $275, for a total of $10 million, and for eHealth to "develop a Humana Dedicated Pod of Agents Focused on Southeast Market."  The "dedicated pod" was a group of agents selling only Humana's plans.

### 5.    Humana Conspired with the Defendant Brokers and Others to Discriminate Against Medicare Beneficiaries with Disabilities

305.    From 2016 through at least 2020, Humana conspired with the Defendant Brokers and other brokers to limit the enrollment of persons with disabilities in Humana plans, in violation of federal law and Humana's contracts with CMS.

306.    Because Humana perceived Medicare beneficiaries with disabilities to be less profitable than beneficiaries who qualified for Medicare based on their age, Humana worked together with its broker partners systematically to enroll fewer disabled Medicare beneficiaries into its Medicare Advantage plans.

307.    Humana, together with eHealth, GoHealth, SelectQuote, and other brokers, knowingly entered into unlawful agreements to present false or fraudulent claims to the Government and performed acts in furtherance of this conspiracy.  Humana and each broker agreed

to a plan by which they would: (1) track the percentage of Medicare beneficiaries with disabilities enrolled in Humana plans by the broker; (2) take steps to lower those percentages by, for example, filtering out calls, rejecting leads, and strategically altering the broker's marketing methods to avoid enrolling beneficiaries with disabilities; (3) conceal or cover up evidence of their scheme; and (4) submit, or cause to be submitted, the resulting false or fraudulent claims for payment or approval to CMS.

308.    Humana and the Defendant Brokers frequently referred to disabled Medicare beneficiaries as "U65," a shorthand for individuals who were under sixty-five years old and eligible for Medicare based on a disability.

309.    Over the relevant time period, Humana closely tracked its medical expense ratios ("MER") for beneficiaries enrolled in its plans. Similar to the Medical Loss Ratio, an MER is a ratio that is calculated by dividing the claims paid by an MAO for a given beneficiary or group of beneficiaries by the capitated payments the MAO received for that beneficiary or group. In other words, the MER is the percentage of premiums that an MAO spends on medical services. A lower MER indicates that the MAO spent a smaller percentage of premiums on medical expenses, so the beneficiary is more profitable for the MAO. A higher MER indicates that the MAO spent a larger percentage of capitated payments on medical claims, so the beneficiary was less profitable. An MER greater than 100% indicates that the cost of the beneficiary's medical claims exceeded the capitated payments for that beneficiary, resulting in a financial loss.

310.    Through its tracking, Humana determined that beneficiaries with disabilities had a higher MER and were therefore less profitable and that decreasing the number and percentage of Medicare beneficiaries with disabilities enrolled in its plans would be financially beneficial for its business.

311.    For example, on July 26, 2017, Humana's Mr. Mohl stated in an email to his colleagues that "u-65 . . . does have a negative impact on MER and thus quality business."

312.    That same day, in an internal email to Marshall Page (a Humana Finance Director for Group Medicare), Ms. Reece inquired about "a report that outlines by partner the U65 business and the MER on the U65 as well as the same for O65 [over sixty-five years old] business by each partner." Mr. Page replied, "there has been some improvement in disabled member MERs, both for [20]16 and [20]17, from the very high numbers they had been in [20]15 and before, but still pretty high MER and big difference vs non-disabled members, so my take is that it[s] still a valid cut to look at."

313.    In other words, despite the higher capitated rates Humana received for its Medicare beneficiaries with disabilities, Humana still found that these beneficiaries generated relatively high MERs, at least for Humana, and were therefore less profitable. Consequently, Humana pressured brokers to sell fewer Humana plans to Medicare beneficiaries with disabilities.

### i.    Humana and the Defendant Brokers Knew It Was Illegal to Discriminate Against Medicare Beneficiaries with Disabilities

314.    From 2016 through at least 2020, Humana and the Defendant Brokers knew it was illegal to discriminate against disabled Medicare beneficiaries.

315.    In each year of the relevant time period, Humana had a "Code of Ethics" that applied to all sales agents. The 2019 version of Humana's Sales & Marketing Code of Ethics stated:

> Agents understand that it is a violation of CMS regulations and are strictly prohibited from discriminating against any eligible prospect from enrolling in an MA [Medicare Advantage] and/or PDP [Prescription Drug Plan] plan based on their health status, except as permitted by CMS. Any personal information obtained about a prospect as a result of discussion/application for any other product distributed by Humana MarketPoint will in no way be used to discourage the enrollment in a Humana MA and/or PDP plan.

316.    This Code of Ethics expressly applied to all of Humana's "External Distribution Agents" (including brokers) and required them to sign and acknowledge their "commitment to the Humana Sales & Marketing Code of Ethics" and that they "have read each item and agree to comply with its content."

### ii.    Humana Pressured the Defendant Brokers and Others to Limit Enrollment of Beneficiaries with Disabilities

317.    Humana employed various tactics to decrease the percentage of Medicare beneficiaries with disabilities enrolled in its plans and ensure that its broker partners participated in the discriminatory practices.

318.    Humana performed acts in furtherance of this conspiracy by, among other things, often conditioning the payment of substantial "marketing" funds on the brokers' commitment to reduce sales of Humana plans to disabled Medicare beneficiaries.

319.    On March 29, 2016, Humana's Mr. Uchytil emailed his colleagues a spreadsheet that showed the percentage of Medicare beneficiaries with disabilities enrolled by each of Humana's broker partners.  Mr. Uchytil made it clear that there would be repercussions for the brokers who did not reduce these sales.  He wrote, "I would like you guys to review and think about what is the best way to get after some of the extraordinarily high U65% we are seeing in the ROY from a few partners. . . . We will measure these results monthly to see if we can move the needle with dialogue or we will be forced to take other action."

320.    In a follow-up email to Ms. Reece, Mr. Uchytil added, "I will also say I see some big offenders that are getting marketing dollars.  They need to fix immediately or funds will dry up quickly."  Ms. Reece replied, "Yes sir.  On it."

321.    Mr. Uchytil later testified that Ms. Diamond and the Humana finance team did not want to use "co-op marketing dollars" to generate a "high" number of disabled beneficiaries because they considered it to be "bad business."

322.    In sworn testimony, Ms. Diamond also acknowledged that Humana worked with brokers that it considered to have a "high" proportion of beneficiaries with disabilities to reduce that to a proportion "lower and more reflective" of Humana's expectations. Ms. Diamond further explained that if brokers "weren't willing to work with us [as to the proportion of disabled beneficiaries], then, certainly that would have been something we would have, I'm sure, considered in terms of our ongoing relationship."

323.    Humana understood such conduct was unlawful, so its employees took steps to conceal their efforts to discriminate against disabled beneficiaries, including by limiting written communications and being discreet in their messaging to brokers.

324.    For example, in an email dated March 28, 2016, Laurel Durham, a Humana Operations Director, asked Mr. Uchytil, "[h]as a benchmark range [of U65 sales] that we'd like to be within been shared (knowing that we have to be careful how we communicate?)"

325.    In an email to Mr. Uchytil and Ms. Durham that same day, Mr. Mohl noted that "some of our partners had a fairly high u65% based on sales." Mr. Mohl further relayed that, when Humana's Chief Accounting Officer asked "if we had taken any action in the past with partners" due to their U65 sales, he and a colleague cautioned that "we had to be very careful and judicious about these types of conversations." Ms. Durham, Mr. Mohl and other Humana employees knew that Humana had to be "careful and judicious" in their conversations because asking brokers to limit enrollment of beneficiaries with disabilities was unlawful.

326.    Similarly, on March 29, 2016, Ms. Kute confirmed in an email to Ms. Reece and other Humana employees that she had reached out to SelectQuote and would contact another broker partner, Educator Group Plans, about the high proportion of disabled beneficiaries that broker was enrolling in Humana plans.  But Ms. Kute knew enough to ask, "I am assuming you want us to have this dialogue over the phone as I recall that we don't really want to put this in writing?"  Ms. Reece responded, "That is right.  The messaging has to be sensitive to the fact that we do accept everyone, but we do expect the partners to have their fair mix."

327.    Likewise, in January 2018, Ms. Kute noted to another one of her colleagues that "[w]e don't share the info [about U65%] . . . in writing around what their targets should be."

328.    Despite Humana's clear understanding that it should not be pressuring brokers to discriminate, Humana consistently pressured brokers to enroll fewer Medicare beneficiaries with disabilities in Humana plans.

329.    For example, in an email dated January 13, 2016, Humana's Mr. Chinigo asked GoHealth CEO Clint Jones to include in GoHealth's "marketing" proposal its plan to focus on Medicare beneficiaries over sixty-five rather than disabled beneficiaries.  Mr. Chinigo wrote, "I am still working on getting you the Under 65 disabled number for what you did during AEP. . . . Anyway, would be good to put in the proposal how you plan on focusing in on the Turning 65 Eligible."

330.    Humana had similar discussions with other brokers, including HealthPlanOne and SelectQuote.  On March 2, 2016, Ms. Strange, a National Sales Manager at Humana, emailed HealthPlanOne to suggest it take fewer leads for disabled Medicare beneficiaries.  She wrote, "Overall your 2015 book of business is at 45% u65.  This is substantially higher than any of our other Partners, the bulk of them under 20%.  I know that you take the bulk of these leads, but *we*

- 73 -

*have to get . . . this % lower.*  Obvious quick options- write more regular business to offset this, or reduce your intake of these leads" (emphasis added).

331.    The next year, when HealthPlanOne's percentage of disabled beneficiaries did not satisfy Humana, Ms. Reece related to her team that "[t]he message from Craig [Uchytil] is if we can't get that portion under control, we will not be able to do business with them."  Thus, on July 13, 2017, Ms. Reece notified Tom Malczewski, Director of National Accounts at HealthPlanOne, that "the report I am receiving is indicating that HP1 [HealthPlanOne] (total sales including exclusive and multi-carrier pods) is coming in at over 50% of U65. . . .  *It will be impossible to secure marketing dollars with the U65 % that high*" (emphasis added).

332.    On March 29, 2016, in an email exchange with Ms. Kute about SelectQuote's "marketing" proposal, Mr. Uchytil asserted that SelectQuote would "need to demonstrate their ability to send a fair mix of business and not an exorbitant amount of U65.  We will want some specifics around how they intend to market because their % of U65 is going up along with others."  Ms. Kute replied, "I will . . . be sure to address the % of Under 65."

333.    On April 5, 2016, Ms. Kute sent Mr. Uchytil an updated proposal from SelectQuote and assured him that SelectQuote would be "keeping a close eye on" its proportion of sales to disabled beneficiaries.  SelectQuote's proposal contained a slide titled "Pre-65 Disabled Mix," which acknowledged that its percentage of beneficiaries with disabilities enrolled in Humana plans grew from the previous year.  On January 19, 2017, Humana still was not satisfied with SelectQuote's efforts to reduce the number of Medicare beneficiaries with disabilities it was enrolling in Humana plans, and Ms. Kute warned SelectQuote's Bob Grant that "[w]e will want to monitor under 65 activity monthly."

334.    As Bob Grant would later testify, Humana was "worried about the profitability of that customer group," meaning beneficiaries with disabilities.  While he received messages like that described above most typically from Mr. Uchytil, Ms. Reece, and Ms. Kute, it was clear to Bob Grant that such concerns "came from Alan Wheatley" at Humana.

335.    Meanwhile, Humana also pressured eHealth to decrease its proportion of disabled beneficiaries.  On March 31, 2016, Humana's Mr. Breunig wrote to eHealth's Mr. Hakim, "I wanted to see if you have a month by month % of new sales in 2015 (possibly first few months of 2016) with the % of under 65. . . .  We are reaching out to some partners that are higher as you already know we take everyone and expect a good amount of this business but we are working to be sure we are only getting our fair %."

336.    Despite Mr. Breunig's assurance that Humana "take[s] everyone," eHealth understood its marketing funds were at risk if it did not comply with Humana's veiled demands to enroll fewer disabled Medicare beneficiaries.  For example, on February 17, 2016, in an internal Humana email about eHealth's U65 sales, Mr. Breunig told Mr. Uchytil and Ms. Reece, "I have also let Chris [Hakim] know that under 65% for them raising so much during ROY [rest of year] and also retention [of beneficiaries] are two of the largest issues in regards to what hurts them in regards to getting marketing $ when we have to make those tough decisions."

337.    In an internal eHealth document dated July 31, 2016, eHealth's Mr. Hurley, President of eHealth's Medicare division, wrote as a message for eHealth's CEO, "Humana reported to us our book of MA business has gone from 37% <65 to 43% <65.  Informed us our Advertising money can be in jeopardy in future."

338.     Similarly, on July 14, 2017, eHealth's Mr. Hakim told Mr. Shea that "Humana just called me about this same topic [U65%] and we need to assure them we will be in the mid 30% range to get marketing $$'s."

iii.     **At Humana's Behest, the Defendant Brokers and Others Limited Enrollment of Disabled Beneficiaries in Humana Plans**

339.     In response to Humana's demands, eHealth, GoHealth, SelectQuote, and other brokers implemented various practices in furtherance of the conspiracy to lower the percentages of beneficiaries with disabilities they enrolled in Humana plans.  Several brokers used filters to wholly reject or otherwise reroute calls and leads based on an individual's date of birth.

340.     GoHealth, for example, began "kicking . . . out" leads for Medicare beneficiaries with disabilities due to profitability concerns and related pressures from Humana to keep its percentage of disabled beneficiaries low.

341.     On March 7, 2016, in an internal email about U65 leads from TogetherHealth, Scott Sullivan, GoHealth's Senior Vice President of Sales and Business Development, asked his colleague Mr. Gudmundsen, "Jake, can we monetize [TogetherHealth's] u65 Medicare eligible leads at all?  I realize we are kicking those out currently but [TogetherHealth] won't continue with us long term or expand if we continue to do so."  Mr. Gudmundsen responded, "It is very unprofitable to consume any of his U65 Calls. . . ."  Mr. Jones added, "Scott, are you referring to actual Medicare calls that are under 65?  If so, we should be able to take them as long as they remain less than 30% of our overall Medicare sales.  If the % is greater than that, Humana will have issues."

342.     GoHealth was incentivized to limit enrollment of beneficiaries with disabilities because the marketing funds it received from Humana were contingent on GoHealth's success in doing so—even though GoHealth knew such practices constituted unlawful "cherry picking" of

beneficiaries. ("Cherry picking" refers to the unlawful practice of selecting healthier, more profitable beneficiaries over beneficiaries with greater health expenditures who are less profitable.)

343.    On March 18, 2016, the GoHealth Senior Manager of Strategic Programs, Susan Kroc, sent an email to Mr. Gudmundsen about a U65-related question raised by one of GoHealth's referral sources. She wrote, "they posed a good question about our explanation of carriers not wanting a significant portion of u64 [M]edicare eligible customers on their books. They posed the question about this being carriers cherry picking populations/gaming the system? [T]hey know that there isn't commission variations between both sets of consumers so they see us as participating. We didn't tell them about the bonus of course, but it does bring up a good discussion point we'll need to be able to address effectively as to why we need to support this customer mix." The "bonus" referred to a payment from Humana to GoHealth.

344.    In the same email, Ms. Kroc asked Mr. Gudmundsen for more details regarding the Humana "bonus" conditioned on GoHealth's enrollment numbers for disabled beneficiaries. She asked, "[i]s [H]umana's [M]edicare bonus hinged on less than 20% u64 indefinite or only for a certain period of time?" Mr. Gudmundsen answered, "[i]t isn't in the contract, they just verbally told us that they didn't want the book being more than 20% U65 (we are looking to get bigger bonuses later so we want to keep them happy)."

345.    HealthPlanOne likewise implemented controls specifically designed to turn away disabled beneficiaries who contacted it for Humana plans via website or by phone. In an email to Humana dated May 12, 2016, Mr. Malczewski of HealthPlanOne detailed the actions it was taking to decrease its U65 numbers. He wrote, "We have put controls in place on our end to collect no more than 25% of the u64 leads generated from our website. . . .  We are in process of testing a change to our IVR [interactive voice response] on our inbound calls which will identify if a

consumer is under or over 64.  Once fully tested, we will push more of the u64 calls to the open marketplace."  An IVR, or interactive voice response, was an automated telephone system that used voice recognition or input from a caller to guide her through a menu of options.

346.    Pushing a call from a disabled beneficiary to "the open marketplace" essentially meant that HealthPlanOne agents would not answer the call.  In many cases, a disabled beneficiary pushed to the open marketplace or routed externally would only hear open ringing and never connect with a broker.

347.    Mr. Malczewski also asserted that HealthPlanOne would terminate its "relationship with a downline agency that was driving in 50-70 u64 Medicare sales per month."

348.    Humana knew that HealthPlanOne was engaging in these discriminatory selective enrollment practices at its direction.  For example, after Mr. Malczewski asked for additional guidance on whether Humana rated various U65 beneficiaries differently based on additional factors like age, Ms. Strange forwarded the email to Ms. Reece.  Ms. Strange asked, "[W]hat is the u65 disabled unfavorable age?  Is it someone in their early 60's or anyone 50 or younger?  Do we have a population of the disabled showing worse claims?  Just curious if our message is just anyone u65 or if there are any bracketed age groups."

349.    Over the next few months, HealthPlanOne further refined its methods of rejecting leads from beneficiaries with disabilities once it had accepted a certain amount.  On August 16, 2016, Mr. Malczewski wrote to Humana employees Ms. Strange and Ms. Reece that "[o]ur under 65 production has decreased from 57% of total sales in May, to 51% of total sales in June, to 43% of total sales in July.  We expect this trend to continue through the rest of 2016 as we are limiting the total number of under 65 leads that are [sic] brokerage is able to receive per day to 25% of our total. . . .  Our marketing team is testing changes to our IVR which prompt customers to select

whether they are over or under 65 on inbound calls. This will allow us to route under 65 calls externally once we have reached our 25% target for the day." (Routing calls "externally" is another way of describing routing calls "to the open marketplace.")

350.    Ms. Strange did not question these discriminatory tactics. Instead, in response, she thanked HealthPlanOne for its "dedication to manage the mix of membership."

351.    Similarly, in 2017, after Humana expressed concerns about HealthPlanOne's proportion of disabled beneficiaries being too high for Humana's liking, HealthPlanOne managed to reduce that percentage. On October 25, 2017, Ms. Strange told Mr. Malczewski that she had "spoke[n] with Craig [Uchytil] last Friday and he mentioned that the Value of the business you are bringing is demonstrating great Partnership. (u65 mix) Another pat on the back to you all."

352.    TruBridge, Inc., another one of Humana's broker partners, used similar tactics to weed out leads of Medicare beneficiaries with disabilities at Humana's request. On April 6, 2016, Mr. Uchytil asked Joe Grosko, Executive Vice President of Trubridge, to explain the "uptick in [TruBridge's] ROY [Rest of Year] percentage (although still within tolerance) of U65 members" and determine whether it was caused by the broker's Medicare Advantage website. Mr. Grosko responded, "as you can see the U65% is trending down and should continue to do so. As it relates to Medicareadvantage.com, in order to actively manage the U65% we made a change to our lead form to include DOB [date of birth] as well as Gender."

353.    Similarly, in July 2017, Ms. Kute reported to Ms. Reece that another Humana broker, Educator Group Plans, "shared they will be exclusively utilizing leads during AEP that are age specific (65+). He cannot guarantee that they will not enroll anyone that is U65, but does guarantee that the % of U65 enrollments that they will submit during AEP will be significantly lower which will bring their book of business number down."

354.    SelectQuote, too, changed its marketing strategies to favor Medicare beneficiaries over sixty-five and thus meet its goal of having disabled beneficiaries constitute a lower proportion of its enrollments in Humana plans.  On August 15, 2016, SelectQuote's then Vice President of Sales Operations and Business Development, Mr. Gregory, told Ms. Reece by email that "I wanted to follow-up on our call from Friday regarding our U65 mix. . . .  Over time we believe we can improve our mix through a change in marketing efforts.  We have some new partnerships that should skew to an older demographic and we can look to drive leads with a higher age range to Humana competitive states."

355.    eHealth, like Humana's other broker partners and at Humana's behest, also took numerous actions to prioritize enrollment of age-eligible Medicare beneficiaries over the enrollment of beneficiaries with disabilities.

356.    On July 26, 2017, in response to a request from Mr. Breunig for information about eHealth's "changes to help the U65%," Mr. Hakim emailed his colleague Ms. Dean a list of key initiatives eHealth implemented "to drive our mix in a different direction."  These initiatives included changes to eHealth's direct mail marketing and direct response television messaging specifically intended "to drive >65 enrollments" and avoid enrolling disabled beneficiaries.

357.    Throughout the relevant time period, Humana continued to communicate closely with GoHealth, SelectQuote, eHealth, and other broker partners about the intentional actions brokers took to enroll fewer Medicare beneficiaries with disabilities—all for the sake of Humana's profits.

### iv.    Humana and the Defendant Brokers Were Successful in Their Scheme to Limit Enrollment of Beneficiaries with Disabilities

358.    Humana's discriminatory scheme succeeded in reducing the proportion of persons with disabilities who enrolled in Humana plans through brokers.

359.    For example, on June 7, 2016, Mr. Chinigo emailed several Humana colleagues with a GoHealth update. He wrote, "As of 6/6/16, they are running at an U65 rate of 35%. This is a 7% drop from the last report of 4/18/16, while adding 544 new MA policies." Mr. Uchytil replied, "It is good to see continued growth while a decreasing U65%. Looks like they are fishing in the right ponds."

360.    Despite these decreasing percentages of beneficiaries with disabilities, Humana continued pressuring GoHealth to get the proportion even lower. On June 21, 2016, Ms. Reece emailed Mr. Jones about GoHealth's annual metrics. She mentioned, "GoHealth U65 is sitting at 38.6% which we would like to see it get down to at least 25%."

361.    GoHealth thus continued its efforts to limit the enrollment of disabled beneficiaries and, by the following year, dramatically decreased its enrollments of Medicare beneficiaries with disabilities. In an internal August 1, 2017 email titled "Coop Marketing Opportunities," Ms. Reece wrote to Mr. Uchytil, "GoHealth is performing extremely well in the U65%. Currently for ROY [rest of year] 2017 they are at 21.8%."

362.    Ms. Reece provided similar updates in the same report for SelectQuote, eHealth, and other brokers.

363.    By March 12, 2018, Mr. Chinigo circulated a GoHealth "scorecard" to GoHealth's Mr. Gudmundsen and Mr. Owens. The scorecard showed that GoHealth's proportion of disabled beneficiaries for the 2018 Annual Enrollment Period was only eighteen percent. In his cover email, Mr. Chinigo asserted that the "u65 numbers look great[.]"

364.    HealthPlanOne achieved a similar downward trajectory for enrollments of beneficiaries with disabilities.  On November 2, 2016, Ms. Strange forwarded a HealthPlanOne "monthly mix tracking" report to Ms. Reece.  The report showed that HealthPlanOne's proportion of beneficiaries under sixty-five decreased from fifty-one percent for plans effective May 2016 to thirty-three percent for plans effective January 2017.  Ms. Strange wrote, "Look how beautiful this u65/o65 mix is!  They are doing excellent keeping it low.  Again, if we want to gain more sales, we can take the u65 up to 40%, but understand if want to keep it at this spot!!"

365.    On March 5, 2017, before approving another "co-op marketing deal" with HealthPlanOne, Mr. Uchytil inquired about its "U65" numbers.  Ms. Strange replied, "The under 65 for the Dedicated team is less than 20% and the brokerage continues to decrease this percentage and currently at 41%."

366.    HealthPlanOne's enrollment of beneficiaries with disabilities remained a focus for Humana in the following months.  On October 16, 2017, when commenting on Annual Enrollment Period results from HealthPlanOne, Ms. Strange wrote to Ms. Reece, "Also, icing on the cake… their mix is 70% over 65."  Ms. Reece forwarded this information to Mr. Uchytil and described the steps HealthPlanOne took to decrease its proportion of beneficiaries with disabilities enrolling in Humana plans.  She explained in part that HealthPlanOne's "dedicated team" for Humana "is accounting for more of their business.  Part of that agreement is they have to maintain a low under 65 lead count."

367.    In 2018, Humana acknowledged that HealthPlanOne made continuing efforts to participate in this scheme.  On January 14, 2018, Ms. Strange wrote to her colleagues, "We've been drastically reducing the u65 percentage with Health Plan One.  While it shows to be 52.5% overall for the BOB [book of business], we've worked with them to reduce that percent since 2016.

This past AEP, the multi-carrier call center kept the u65 percentage to 30% of the business coming to Humana."

368.    Humana also recognized SelectQuote's lower U65 percentages and inquired about the changes SelectQuote made to achieve those numbers.  On July 26, 2017, Humana's Ms. Kute asked SelectQuote's Mr. Matthews, "Are there any specific changes SelectQuote made to their marketing approach in order to lower the percentages in the ROY [rest of year] this year?  We are trying to learn specifically if the types of marketing you used have changed.  Were there any specific changes that were made this ROY to see that shift in U65 percentage to decrease to 40.7% in 2017 ROY vs. 50.6% in 2016 ROY?"

369.    Mr. Matthews replied, "During the post AEP meeting, Humana reiterated the desire to have SelectQuote's book of under 65 business below 40 percent.  Following that meeting, we relaunched the target marketing efforts and began the process of lowering our under 65 book with Humana. . . .  Our plans moving forward into AEP this year will be to fine tune the target marketing efforts and continue to drive the appropriate levels and types of business that our partners desire."

370.    On March 1, 2018, Ms. Kute circulated a SelectQuote scorecard to a few Humana colleagues.  The scorecard showed that SelectQuote successfully decreased its percentage of disabled beneficiaries to thirty percent for the 2018 Annual Enrollment Period (in the fall of 2017).  In her cover email, she wrote, "2017 AEP, 40.4% , 2018 AEP 30%, drop of 10% for AEP!!"

371.    eHealth also succeeded in driving down its proportion of beneficiaries with disabilities, again in response to pressure from Humana.

372.    On July 25, 2017, despite Humana's overall dissatisfaction with eHealth's U65 numbers, Ms. Reece acknowledged that eHealth already had decreased its U65 percentage that year by more than 10 percent.  She wrote to Mr. Hakim and Ms. Dean, "While I am seeing your

overall book at 51.5% U65, I have seen a decrease in the U65% in the ROY [rest of year] 2017 down to 43.4% from 2016 ROY being 54.6%. What specific changes did EHealth make in your marketing approach in order to lower the percentages in the ROY this year? . . . Do you anticipate that marketing approach to decrease the U65% for 2018 AEP?" In response, Ms. Dean listed various initiatives eHealth implemented, including its strategic use of direct mail and television messaging designed to decrease the percentage of Medicare beneficiaries with disabilities enrolled in Humana's plans.

373.    eHealth did, in fact, continue to decrease its proportion of disabled beneficiaries enrolling in Humana Medicare Advantage plans in 2018. On February 18, 2018, Mr. Breunig sent eHealth a scorecard that illustrated how eHealth decreased its percentage of disabled beneficiaries from 45.6 percent for the 2017 Annual Enrollment Period (in the fall of 2016) to 37.8 percent for the 2018 Annual Enrollment Period (in the fall of 2017). In his cover email, Mr. Breunig wrote, "Some positive improvements and some areas we can still continue to work on but directionally headed in the right direction!"

374.    On November 13, 2018, Mr. Breunig emailed an updated scorecard to Paul Rooney, eHealth's Vice President of Carrier Relations, and highlighted eHealth's ongoing success in lowering its U65 percentages. He stated, "U65% continued to decrease through 2018 ROY which was always an issue for eHealth and I know Chris [Hakim] has stated this year should be much lower during AEP due to direct mail and other things happening."

375.    By May 6, 2019, in an email to Mr. Wheatley and Mr. Uchytil, Ms. Reece listed eHealth's lower proportion of beneficiaries under sixty-five as an "accomplishment." She wrote, "26% U65 for 2019 AEP on scorecard, this has dropped significantly each of the last two years."

376.    eHealth likewise interpreted its continuous reduction of Medicare beneficiaries with disabilities as an "improvement" and a positive for its relationship with Humana.  On June 5, 2020, eHealth's Senior Vice President of Carrier and Business Development, Gregg Ratkovic, sent talking points for an upcoming Humana presentation to eHealth's CEO, Mr. Flanders.  The points included: "We continue to make tremendous improvement in our Under 65 business mix in 2020 at 20%, down 5% Y/Y [year over year]."

377.    The chart below, created by Humana, shows just how effective eHealth's efforts to limit or otherwise discourage enrollment of disabled beneficiaries were over the years. Beneficiaries with disabilities made up 52% and 47% of eHealth's Medicare Advantage enrollments for Humana in 2016 and 2017, respectively, but only 23% in 2020 and 13–18% at the beginning of 2021.

| 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|------|------|------|------|------|------|
| 45% | 40% | 38% | 26% | 19% | 13% |
| 56% | 56% | 47% | 35% | 27% | 18% |
| 54% | 55% | 49% | 23% | 27% | |
| 56% | 55% | 49% | 25% | 26% | |
| 56% | 55% | 47% | 27% | 29% | |
| 53% | 51% | 42% | 30% | 26% | |
| 53% | 49% | 28% | 30% | 24% | |
| 53% | 50% | 39% | 29% | 25% | |
| 56% | 49% | 28% | 31% | 25% | |
| 54% | 47% | 27% | 33% | 27% | |
| 55% | 48% | 35% | 29% | 22% | |
| 54% | 48% | 33% | 30% | 18% | |
| **52%** | **47%** | **38%** | **27%** | **23%** | |

## B.    Aetna

### 1.    Aetna Paid Kickbacks to the Defendant Brokers to Steer Medicare Beneficiaries to Aetna Plans and Limit Enrollments in Competitors' Plans

378.    From 2016 through at least 2021, Aetna knowingly and willfully paid the Defendant Brokers more than eighty million dollars in kickbacks—purportedly for "marketing" services—to

induce the Defendant Brokers to enroll Medicare beneficiaries in Aetna Medicare Advantage plans. And each Defendant Broker knowingly and willfully solicited and received such kickbacks from Aetna in return for steering Medicare beneficiaries to Aetna plans.

379. From at least 2016, eHealth was Aetna's leading broker partner. SelectQuote sold Aetna plans in 2016, but significantly increased its Aetna sales only after Aetna began paying it "marketing" money in late 2017. GoHealth began selling Aetna plans in material amounts only in the fall of 2020, after Aetna began paying it "marketing" money.

380. Aetna and the Defendant Brokers knew the true nature of the arrangements was "pay for performance" or "P4P," and that the Defendant Brokers were being paid to "turn on" the "spout" of sales for Aetna, often while "turning off" other carriers who were paying less or no money. Aetna even created self-described "incentive" programs through which it paid the Defendant Brokers for each sale in specific geographic regions.

381. The impetus for the kickbacks was clear: Aetna wanted a shortcut to increase sales of its Medicare Advantage plans, instead of attracting beneficiaries through policy improvements or other legitimate avenues. As eHealth's William Kinkead told his colleague, Mr. Roberts, in a February 2021 instant message exchange, "more money will help drive more sales [be]cause your [i.e., Aetna's] product is dog sh[*]t."

382. As an Aetna executive explained in speaker notes for a February 2021 presentation, the company could either invest in a better product or pay brokers for sales of its existing product: "Strong product can pay for itself. NDP [i.e., field sales] will sell hot product. Strategic [i.e., online and telephonic brokers] is the channel you can pay for production[.] Buy product or buy sales." Aetna bought sales.

383. Aetna knew that the AKS applied to Medicare Advantage plans and enrollments.

384.    The contracts that Aetna entered into with each Defendant Broker recognized that the Aetna-broker relationship implicates both "the False Claims Act (32 U.S.C. §§ 3729 *et seq.*)[] and the Anti-Kickback Statute (Section 1128B(b) of the Social Security Act)."

385.    Because Aetna's "marketing" payments to the Defendant Brokers were illegal, they attempted to hide the true purpose of the payments in their written contracts, often by stating that Aetna was reimbursing the Defendant Brokers for the cost of purchasing or generating "leads" or calls.    Aetna and the Defendant Brokers knew, however, that describing the contracts as "marketing" agreements and referencing reimbursement for sales "leads" was a fiction.    For example, as one eHealth employee (Jake Roberts) told another (Mr. Kinkead), Aetna's "marketing" payment model was "not even a little compliant. . . .   I'm pretty sure if Aetna got audited by cms, they'd be fuc[**]ed."   In sworn testimony, John Sowell, Aetna's Executive Director of the Strategic Sales Channel, confirmed that he did not really care what leads eHealth reported that it generated because Aetna had "no evidence to validate whether [those leads] were beneficial to our organization or not," i.e., whether the leads resulted in issued enrollments in Aetna Medicare Advantage plans.    Aetna was paying for enrollments, not leads, and knew it was illegal. Indeed, Aetna would "reconcile" purported "marketing" payments at the end of specific periods— not looking to marketing expenditures but to enrollments, adjusting up for sales in excess of commitments or withholding future payments when brokers missed commitments.

386.    This quid pro quo model benefited Aetna and the Defendant Brokers.    Indeed, Mr. Sowell testified that the pay-for-performance model was at least in part driven by the Defendant Brokers:   "[T]he partners [i.e., brokers] put us in a pay for performance mindset.   The cost of securing business, therefore supporting business, went up year over year.   Other carriers

were paying them earlier. *And the only way to participate and to have a seat at the table was to support them with marketing funds*" (emphasis added).

### 2.    Aetna's Kickbacks to eHealth

387.    Aetna began paying kickbacks to eHealth in exchange for sales of its Medicare Advantage plans at least as early as 2016. Between 2016 and 2021, Aetna's annual payments to eHealth for so-called "marketing" services increased from $1.4 million in 2016 to approximately $14.5 million in 2021.

388.    **2016**. In 2016, Aetna paid eHealth at least $1.4 million in purported "marketing" or "sponsorship" money.

389.    In an email dated October 6, 2016, Mr. Sowell directed Amy Ike, an Aetna National Sales Director, to "reach out to Chris [Hakim of eHealth] for a fire drill we are working. . . .   We need some help with additional sales in the following markets. We may need more and will pay per sale, based on our ask. They are already on the hook for 2153 [enrollments] in these markets and we would pay $175 per sale for the additional 646 (or more)." Ms. Ike promptly responded: "eHealth will do it. I just talked to Chris."

390.    **2017**. In 2017, Aetna again paid eHealth at least $1.4 million in "marketing" or "sponsorship" money.

391.    On March 20, 2017, Mr. Hakim emailed several eHealth employees stating that "Aetna is giving us $500K for Q2 and Q3, (Andy you have the numbers we need to hit for them). Bottom line is we need to spend incrementally this year in their markets or the $$ will be taken back or not continue giving to us."

392.    On May 3, 2017, eHealth's Ms. Dean emailed Mr. Hakim "a spreadsheet with recommendations on where we should turn off Anthem or [United] supply to help boost sales for

Aetna, Humana and Wellcare." Mr. Hakim testified that these were business decisions made because of marketing payments that eHealth received, including from Aetna.

393. **2018**. In 2018, Aetna nearly doubled its purported "marketing" or "sponsorship" payments to eHealth to $2.5 million.

394. In 2018, Aetna's contracts with eHealth claimed that Aetna was paying eHealth "for the operation and maintenance" of a custom "Mini-Site," purportedly an Aetna-specific website. In reality, Aetna was paying kickbacks to induce eHealth to increase enrollments in Aetna Medicare Advantage plans.

395. For example, on April 4, 2018, Mr. Sowell reported to Ms. Ike and Laura Garlich, an Aetna National Sales Director, that Aetna management had approved, among other things, payment of an additional $500,000 to eHealth, but he added that "we will need to structure a deal with eHealth around mix to not pay until rapid disenrollment period has passed[.]" The next day, Ms. Ike asked Mr. Sowell for advice on how to respond to a funding proposal from eHealth, and Mr. Sowell replied that "[w]e also do not want to pay for any business that doesn't stick for 90 days[.]" Ms. Ike then acknowledged that Aetna "do[es] have leverage with the remaining $500K."

396. On July 16, 2018, Mr. Hakim emailed his eHealth colleagues about "Carrier Sponsorship Calls." He and Mr. Rooney were meeting with Aetna the next day, and, according to Mr. Hakim, the "Bottom line is that these $$'s are for selling [Medicare Advantage] plans and if we miss their targets for [Medicare Advantage] the $$'s will not flow next year."

397. On December 14, 2018, Ms. Ike notified Mr. Rooney that "[w]e are able to provide $2M for eHealth to continue with the marketing programs." Although Ms. Ike referred to "marketing programs," Mr. Rooney subsequently explained to his eHealth colleagues that Aetna

was paying for enrollments: "In return [for the $2 million], Aetna is looking for 11,429 issued apps."

398.   **2019**.   In 2019, Aetna's purported "marketing" or "sponsorship" payments to eHealth more than doubled once again, rising to $5.6 million.

399.   On January 24, 2019, Ms. Ike told Mr. Sowell that eHealth was requesting an additional "$800K for 4000 enrollments."   In a brief prepared for eHealth's Mr. Flanders on January 30, 2019, eHealth executives advised that "[w]e have a proposal into [Aetna] for an additional $800K," and they suggested that, in an upcoming discussion with Aetna, Mr. Flanders should "[m]ake clear that we will expect $5M+ this year.   In return, we will increase our commitment."

400.   In a similar vein, in slide presentations that Mr. Sowell gave to his managers in late 2018 and early 2019, he observed that "strategic distribution partners [such as eHealth] operate in a direct-response, pay-for-play environment, with a $250 CPA [cost per acquisition] expectation." He added that "Strategic partners are a pay-for-play channel."   Matthew Feret, then Aetna's Executive Director and Medicare Chief Sales Officer, forwarded this presentation to Armando Luna, Aetna's Vice President of Individual Medicare Sales and Distribution, on April 26, 2019. Mr. Luna transmitted a version of the slide to Chris Ciano, Aetna's Senior Vice President of Medicare.   As Mr. Feret explained to Mr. Luna approximately two weeks later, Aetna could use $1 million in "marketing" money "to get an enormous share from [SelectQuote] and eHealth and slide into their #2 partner as they're really unhappy with [United]. . . .   If we don't show up, they will revert right back to [United] and [Humana] and look for a different #2, #3 partner (Anthem, Cigna, etc.)."

401.    Mr. Feret testified that Aetna's "pay-for-performance" model meant that "if you pay them marketing fees, they will sell more policies for you."

402.    On June 19, 2019, when Aetna's Ms. Garlich was reviewing a slide presentation with the file name "Pay-for-Production funding for Strategic Partners_v2.pptx," she commented to Mr. Sowell that she "thought we needed to back into a CPL [cost per lead] structure."  Under the "CPL structure," she wrote, "[r]ather than invoicing marketing dollars for 100 policies @ $200 per, Partner would send an invoice for 1000 leads @ $20 per. Math would play out the same, but in the P4P model it would keep true to marketing reimbursement rather than straight policy reimbursement."

403.    In response to Ms. Garlich, Mr. Sowell confirmed that "[i]t's really semantics in the agreements.  They have to be built around lead generation but we can do all of the counting of apps inside.  The organization understands CPA [cost per acquisition] and CPS [cost per sale] but not CPL [cost per lead] and conversion."  When Mr. Sowell was asked during sworn testimony whether his team stayed away from language suggesting "straight [Medicare Advantage] policy reimbursement" because of concern that a straight policy reimbursement would violate laws against paying for policies, he testified: "Absolutely. Absolutely."

404.    On June 25, 2019, Mr. Feret relayed to Mr. Sowell and Ms. Ike that Mr. Luna had approved the following "pay for performance model":

> [W]e are willing to pay $200 marketing fee per sale above and beyond their 1/1/20 goals and throughout the year.  This has no cap.  If their allocation is $1MM for an AEP goal of 5,000 [plan] sales, and they end up selling 10,000 [plan] sales, we will pay them an additional $1MM in Q1.
>
> If they sell an additional 80,000 [plan] sales over their 5,000 goal, we'd pay them $16MM in Q1.  Again, no cap.

> John, got your texts - this is what Armando [Luna] is willing to do so at this point.
> We'd love the sales, but we cannot give them $16MM up front for 80,000 sales -
> but we ARE willing to pay for it… in Q1.

In other words, Mr. Luna had authorized paying eHealth $200 for each beneficiary eHealth

enrolled in an Aetna plan, with no cap, even if that meant paying eHealth millions of dollars.

405.    On November 6, 2019, in an email discussion about paying eHealth for sales at a

"$200 CPA," Mr. Sowell reminded Ms. Ike that it had to be "[i]nvoiced compliantly," meaning in

terms of "leads" rather than sales.  As he later testified, however, Aetna would only pay for leads

that were reverse engineered from sales.

406.    On November 12, 2019, Aetna agreed to pay eHealth an additional $900,000.

Ms. Ike explained to Mr. Rooney that the money was "to use towards generating new (to Aetna)

sales" and that "at the end of the year when we settle up, the incentives and the CPA we track for

you is all based on new (to Aetna) sales."

407.    In other words, the metric by which Aetna measured performance was not calls, not

leads, not submitted applications, and not even enrollments generally; it was *new* enrollments.

Aetna would only pay "marketing" money for the broker's new-to-Aetna issued enrollments.  It

did not matter how much the broker spent on marketing because ultimately, only completed

enrollments generated revenue for Aetna.

408.    **2020**.  In 2020, Aetna's "marketing" or "sponsorship" money again nearly doubled:

Aetna paid eHealth approximately $11 million in "sponsorship" money.

409.    On March 19, 2020, eHealth's Jake Roberts sent Ms. Ike a request for additional

sponsorship money and described what he called the "'maximum possible' plan.  It's what eHealth

can do to drive the highest amount of business to Aetna."  Mr. Roberts followed up with a proposal

projecting exactly how many additional Aetna enrollments eHealth could deliver if Aetna increased its cost of acquisition ("COA") from $250 to $400 per policy.

410.    On April 14, 2020, Mr. Roberts sent Ms. Ike an email explaining that, because Aetna was only paying "marketing" funding of $200 per enrollment, Aetna had "lost market share" on the eHealth sales platform.  Mr. Roberts warned that if Aetna did not increase its payments to eHealth, this trend likely would continue and eventually would impact the Annual Enrollment Period.

411.    On September 25, 2020, Aetna presented eHealth with a plan for the upcoming Annual Enrollment Period:

## 2021 DEFCON Funding for Issued Sales

**Aetna is prefunding 10K issued sales @ $2M.**

**The Breakdown for Reconciliation Purposes:**

- 19K issued sales –eHealth will receive MDF up until 19K.

- 19,001 - 29K issued sales –Between 19K - 29K, they will not receive MDF because eHealth was pre-funded $2M for these enrollments.

- At 29,001 issued sales eHealth will start to receive MDF, again.

- If eHealth misses the target 29K issued sales for AEP, we will hold additional MDF into 2021 until 29K issued sales are reached.

♥aetna

412.    This plan—involving "prefunding" for "issued sales"—makes clear that Aetna was paying kickbacks for sales, and if eHealth "misse[d] the target 29K issued sales" for the Annual Enrollment Period, Aetna would withhold purported "marketing" money until eHealth made up those sales.  There was no discussion of any marketing activities or how much money eHealth

actually would spend on marketing because that was irrelevant to the true nature of the arrangement.

413.    When Ms. Ike sent this plan to Mr. Kinkead on November 5, 2020, she expressed the concern that eHealth would cease its efforts on Aetna's behalf as soon as eHealth reached Aetna's target: "By all means, please do not turn off the spout when you hit 29K!  If you can do more, please do more."  And, as the plan makes clear, Aetna would pay for more once eHealth exceeded the agreed-upon 29,000 sales.

414.    By the end of the Annual Enrollment Period in the fall of 2020, eHealth's sales for Aetna were about 4,000 less than the 29,000 "issued sales" commitment.  Consistent with the parties' extra-contractual agreement, Aetna wanted to count the shortfall against any money it would owe eHealth for future sales in the first quarter of 2021.

415.    On April 14, 2021, when Mr. Kinkead conveyed Aetna's position to eHealth's Vice President and Corporate Controller, Jazlin Gue, she questioned the basis for Aetna's position, noting that the parties' written contract said nothing about a 29,000 "issued sales" commitment or the consequences of a shortfall.  Mr. Kinkead then provided Ms. Gue with a copy of the "DEFCON" slide above and explained that it contained "the 'rules' behind the $2m prefund from Aetna."  Ms. Gue responded, accurately, that "this 'rule' is not anywhere in the agreement."  Mr. Kinkead conceded to Ms. Gue that "[y]ou're correct," and he added that "I'm not sure why it was left out."

416.    In fact, Mr. Kinkead knew exactly why it was left out.  As Mr. Kinkead once explained to Mr. Shea: "[W]e usually work the agreements where it isn't explicitly called out on pay per app . . . .  The commitments on production are verbal over the phone and on spreadsheets – but nowhere on contract."  Or, as Mr. Streich put it in a November 2021 recorded phone call,

"it's not like there's a contract where we are like, 'Yes we'll give you this many apps.'  It's like most of these are handshakes—but, like, it's Will [Kinkead]'s handshake."

417.    **2021**.  In 2021, Aetna paid eHealth approximately $14.5 million in "marketing" or "sponsorship" payments.

418.    By 2021, Aetna was feeling pressure to pay brokers more money, lest eHealth and other brokers steer business away from Aetna.  As Mr. Feret wrote to Mr. Luna and others in an email on March 2, 2021, "The 'reality' is that our competitors are - **RIGHT NOW - making 8-figure deals** with national distribution partners to double production in x amount of time, increase retention by y and guarantee preference in call center percentage of share of z."

419.    On March 15, 2021, Mr. Luna conveyed a similar message to his boss, Mr. Ciano: "The issue again is that we are working to get our partners to sell a product that is not as competitive and we are paying them the lowest rates of the industry."  In other words, because Aetna's "product"—its Medicare Advantage plans—was not competitive, it had to increase its kickbacks to induce the Defendant Brokers to steer beneficiaries to those non-competitive plans.

420.    In a November 2021 email to several eHealth executives, Ms. Ike wrote: "I am seeing eHealth at #1 position for submits!  Great news.  However, eHealth drops to #2 for Issued sales.  As you know, our eye is always on Issued sales and *we compensate on Issued*" (emphasis added).

### 3.    Aetna's Kickbacks to SelectQuote

421.    **2017**.  Beginning in the fall of 2017, Aetna paid SelectQuote kickbacks disguised as "marketing" money to induce SelectQuote to steer business to Aetna.  In return for "marketing" money, SelectQuote did just that.

422.    In April 2017, before Aetna had agreed to pay SelectQuote any "marketing" money, SelectQuote temporarily "paused" Aetna on its platform. SelectQuote cited, among other reasons, "customer level persistency issues that are outside of our locus of control."

423.    On October 12, 2017, however, SelectQuote sent its first "marketing" invoice to Aetna for $120,000 and set a "Target of 3,000 [Aetna] Policies During AEP." SelectQuote immediately resumed selling Aetna policies in certain states.

424.    Though Aetna began paying "marketing" funding to SelectQuote in the fall of 2017, and SelectQuote started selling Aetna Medicare Advantage plans again, the parties did not enter into a written contract until July 2020. As SelectQuote's Mr. Matthews would later explain in an August 2021 telephone call, "five years ago you did these deals, small handshake deals in dark back rooms."

425.    SelectQuote had many tools by which it accomplished steering in return for "marketing" money from Aetna. For instance, on November 2, 2017, Brian Wright (a SelectQuote Senior Operations Analyst) touted to a colleague the deployment of a new feature in SelectQuote's "Quote Engine" to "suppress MA [Medicare Advantage] and PDP [Prescription Drug Plan] carriers at a state level." Mr. Wright explained that "[w]e'll be able to turn plans off whenever we want to[.]"

426.    In November 2017, SelectQuote was considering whether and how much additional "marketing" money to take from Aetna—either $150,000 for 700 policies, or $500,000 for 2,500 policies—before the end of the Annual Enrollment Period. The dilemma was that SelectQuote had already accepted kickbacks to sell policies for another carrier—Humana. On November 15, 2017, Mr. Matthews wrote to several of his colleagues that "we need to see if we feel confident in our abilities to drive an incremental 2500 Aetna policies without sacr[i]ficing any Humana volume.

My suggestion would be to start with the areas that Aetna is strong, knowing that we can turn off [United] if/when needed." Ultimately, as alleged above, Mr. Matthews's boss, Bob Grant, told him to "do the [$]150k [from Aetna] and try to work around Humana and not turn on the additional states and cause damage to Humana." Then, on November 15, 2017, a SelectQuote analyst circulated a table in which she recommended "counties (and states) that should be targeted to increase Aetna volume by an incremental 700 policies without cutting into Humana."

427.     **2018**.  In 2018, Aetna paid SelectQuote approximately $3.5 million in purported "marketing" money.

428.     In January 2018, SelectQuote solicited additional "marketing" money from Aetna, and offered to "delay the[] launch" of a competing MAO on SelectQuote's platform in return for more money.

429.     On February 1, 2018, an Aetna executive told Bob Grant and Mr. Matthews that "I am asking for an extra 500 sales for $130,000."

430.     SelectQuote then began considering how many additional states it needed to "turn on" for Aetna to generate those additional 500 sales.  As of February 13, 2018, SelectQuote still had Aetna "turned off" in numerous states, including Texas, Illinois, and California.  That day, Mr. Matthews wrote to Mr. Wright and David Cable, a SelectQuote Finance Manager, that "[w]e told Aetna we would deliver 950 policies for Feb/March.  According to David's original analysis, we were naturally going to hit roughly 525, so we need to get an additional 425 policies over the next 7 weeks."  Mr. Matthews asked: "Can the two of you connect on what the best strategy would be in terms of turning Aetna on and [United] off in certain states."

431.    On April 2, 2018, Mr. Sowell sent Mr. Feret and other Aetna employees a slide deck noting that SelectQuote was "[s]hifting sales focus from [United] and Humana sales to Aetna" and had given Aetna a "[c]ommitment to give us [a] larger share."

432.    On July 24, 2018, Bob Grant sent an email to Ms. Ike soliciting additional "marketing" money in return for a commitment to sell 7,000 Aetna Medicare Advantage policies. Mr. Grant attached to his email a spreadsheet describing that SelectQuote could increase its sales of Aetna plans by 2.23% by "shut[ting] off" UnitedHealthcare in certain states.

433.    A few weeks later, Ms. Ike and Mr. Matthews exchanged emails about how to structure a $1.5 million marketing payment in return for 7,000 sales of Aetna plans.  Ms. Ike proposed a tiered payment method:

> I have approval to move forward for this marketing proposal.
> 7000 sales @ $1.5M
>
> Are you agreeable to receive payments on this schedule?
> • Release $500K now.
> • Ramp up for 10/15.
> • Hit 2000 apps by 11/1 to trigger another $500K.
> • Hit 6000 apps by 12/1 and we release the final $500K

Mr. Matthews later forwarded this exchange to Bob Grant.

434.    Bob Grant confirmed in sworn testimony that if under this structure SelectQuote made 5,000 sales of Aetna Medicare Advantage plans, Aetna would only owe $1 million, leaving "a gap of 3,000 policies we spent the money on and that they are not reimbursing us for."  In other words, the parties did not intend the money to reimburse SelectQuote for expenses it incurred in marketing Medicare Advantage plans, but instead Aetna paid the money to induce (and SelectQuote received the money in return for) enrollments.

435.    After Aetna promised SelectQuote $1.5 million for 7,000 sales, Aetna's share of Medicare Advantage sales on the SelectQuote sales platform more than doubled, from thirteen

percent in September 2018 to an average of twenty-seven percent during the last three months of the year.

436.     As Bob Grant had foreshadowed to Ms. Ike, this growth came almost entirely at the expense of UnitedHealthcare, which saw its share of Medicare Advantage sales on the SelectQuote sales platform drop from forty-three percent in September 2018 to an average of twenty-four percent during the last three months of the year.  In other words, because Aetna paid SelectQuote this additional money, SelectQuote steered beneficiaries that would have signed up for other carriers' Medicare Advantage plans to Aetna Medicare Advantage plans.  But for the bribe, the inversion of sales demonstrated in the graph below would not have happened.



437.     **2019**.  In 2019, Aetna paid SelectQuote approximately $5.8 million in purported "marketing" money.

438.     In late 2018, Aetna agreed to pay SelectQuote $1 million each quarter for 4,000 policies per quarter during the first half of 2019.  As Mr. Matthews observed, "[t]hat backs into

250 per." However, as Mr. Matthews also observed, if SelectQuote "over deliver[ed]," Aetna had not promised to pay more. So, in the second quarter of 2019, when it appeared that SelectQuote would make more Aetna sales than it had promised, SelectQuote steered away from Aetna.

439.     On May 9, 2019, Mr. Feret and Mr. Matthews exchanged text messages about an upcoming meeting between Mr. Matthews and Mr. Luna. Mr. Feret told Mr. Matthews to "drive home how you [w]ant us to be #2 on your platform." Mr. Feret testified that this meant that Aetna would have the second highest share of SelectQuote's Medicare Advantage sales.

440.     Soon after this exchange, SelectQuote and Aetna negotiated a "pay for performance" arrangement, through which Aetna would pay "marketing money" for each enrollment to induce SelectQuote to sell an unlimited number of Medicare Advantage plans.

441.     On May 21, 2019, Mr. Feret sent Mr. Matthews a text message asking him to "develop or show a proposal for pay for performance." Mr. Feret explained that "Armando [Luna] is finding the funding but needs to fund it in a graduated way like pay for performance." In response, on May 24, 2019, Mr. Matthews proposed that Aetna pay SelectQuote "$250 per submission." If SelectQuote exceeded its commitment, the invoice would be adjusted for "credit owed," and if SelectQuote underperformed, "the next month's invoice will be reduced . . . to cover the shortage." In describing this plan, Mr. Matthews made no mention of reimbursement for marketing expenses, instead describing Medicare Advantage "enrollments" and Medicare Advantage plans "sold."

442.     However, Mr. Matthews explained how the parties could hide the fact that Aetna would be paying SelectQuote for enrollments: "the key to making this work while staying within CMS guidelines is to have Aetna reimburse us for a portion of our lead cost associated with the cost of the policies sold, i.e.[,] rather than invoicing marketing dollars for 100 policies @ $250

per, we would send an invoice for 1000 leads @ $25 per. Math would play out the same, but in the P4P model it would keep true to marketing reimbursement rather than straight policy reimbursement."

443.    Later in 2019, SelectQuote again solicited additional money from Aetna. This time, it offered to employ a more aggressive steering methodology. SelectQuote had added Aetna to its Tiburon pod in or around August 2018. But up until August 2019, SelectQuote was still paying its Tiburon agents twice as much to sell Humana Medicare Advantage plans. For more "marketing" money, however, SelectQuote would place Aetna in a "preferred carrier spot" in the Tiburon pod.

444.    Over text messages on September 17, 2019, Mr. Sowell informed Mr. Matthews that Aetna would pay the additional "marketing" money, and Mr. Matthews confirmed that he had already "started the pod training." A few weeks later, Mr. Sowell sent a follow-up email to confirm Aetna's agreement with SelectQuote: Aetna agreed to pay SelectQuote $215 per sale for the first 19,537 sales, $290 per sale for the next 5,477 sales, and $360 per sale for the next 4,224 sales.

445.    As of September 17, 2019, SelectQuote set itself a "Target" of selling 23,000 Aetna policies during the upcoming Annual Enrollment Period. SelectQuote recognized that its "Organic Forecast" was just 16,000 sales—7,000 short of its goal. In September 2019, SelectQuote described its Annual Enrollment Period plan for the Tiburon pod, including that SelectQuote would "route volume for Aetna." Although Tiburon previously sold only Humana policies, Humana was now "low priority and no volume routed," because Aetna was then willing to pay more for each sale.

446.    SelectQuote's "intentional efforts" for Aetna included paying Tiburon agents more to sell Aetna Medicare Advantage plans. First, on September 30, 2019, SelectQuote told its

Tiburon agents that it would pay one hundred percent commissions on sales of Aetna and Blue Cross Blue Shield of Michigan plans, seventy-five percent commissions on sales of UnitedHealthcare and Anthem plans, and only fifty percent commissions on sales of Humana plans. Then, on November 2, 2019, Ron Maurno, SelectQuote's Director of Medicare Sales, notified the Tiburon agents that "you will be paid an additional $5 for each [Aetna] sale . . . . Of course, this is in addition to the 100% comp." This per-policy bonus further increased to $20 per sale for fifty or more Aetna sales.

447. Following these changes in agent compensation, Aetna's share of SelectQuote's overall Medicare Advantage sales increased.

448. SelectQuote accomplished this shift to Aetna even though, as Tiburon Sales Manager Haya Da'as noted, UnitedHealthcare and Humana plans offered better benefits for low income Medicare beneficiaries, who constituted the majority of SelectQuote's client base. As Ms. Da'as explained, "the majority of our clients have Medicaid or are low income" and "UHC/Humana offers more benefits such as dental, vision, transportation, OTC, meal benefits, whereas with Aetna if they provide these benefits it's through a reimbursement program which the low-income clients can not afford."

449. On the morning of October 16, 2019, after the first day of the Annual Enrollment Period, Mr. Matthews texted Mr. Feret that SelectQuote had sold about 600 Aetna Medicare Advantage policies that day. Mr. Feret responded that "[t]hat's a big number. . . . You beat everyone else day 1." In response, Mr. Matthews explained that "[w]e made intentional efforts to put y'all at #1. ROI [i.e., return on investment] game. The $ makes it a win for both."

450. Mr. Matthews later testified what this text message meant to convey: "We're a business, they're a business. We both have to make money. They make money on getting

enrollments.  We're going to make money on being able to convert the money that we're spending at the highest efficiency as possible.  Because their plans are prioritized in the pod and because their plans are winning, we're both going to make money."

451.  **2020**. In 2020, Aetna paid SelectQuote nearly $4.9 million in "Market Development Funding."

452.  On March 10, 2020, Mr. Matthews advised Sarah Anderson (by that time, SelectQuote's Vice President of Marketing) that "[t]he goal for the pod should be to maximize Aetna production for the remainder of [Open Enrollment Period].  As it stands now, we are globally over producing for Humana, which is watering down our MDF per from them. Aetna is our only carrier at the moment that we maintain per unit economics with scale."

453.  Mr. Matthews later testified that this meant that "there is a cap for the amount of marketing dollars that are available from Humana . . . 31,000 [enrollment submission] is the max we want to try to produce for them."  He went on to explain under oath how, in return for the marketing money, SelectQuote would then use the Tiburon pod to steer away from Humana and to Aetna: "We're globally overproducing means we probably well exceeded the 31,000. . . .  Each policy that we sell, every lead that we buy that's going towards Humana, is going to have depressed economics.  So in this situation it's how do we utilize the pod to try to sell as much Aetna as possible because we wouldn't have depressed economics when we sell an Aetna plan whereas we would with Humana."  SelectQuote did not have "depressed economics when [it] sell[s] Aetna" because Aetna, unlike Humana, did not cap the number of sales for which it would pay marketing money.

454.  On April 3, 2020, Mr. Kopmeyer sent Ms. Ike an invoice for $420,110 with the description "2020 March Marketing (FY2020)."  Ms. Ike forwarded the invoice to Bradford Hull,

an Aetna Senior Manager of Medicare, who asked: "Are these for leads at $25/lead or 16,804 leads?" Ms. Ike forwarded Mr. Hull's email to Mr. Sowell on April 6, and reminded him of the parties' actual agreement: "Between us, this is $215 x 1,954. (1954 sales abo[ve] 16,690[])."  But, when on April 6, 2020, Mr. Hull sent Mr. Sowell an email that asked for approval of SelectQuote's invoice "for 1,954 Issued Sales @ $215 per sale totaling $420,110," Mr. Sowell responded that he would "not approve [an invoice] for sales as that is a non-compliant activity."  Aetna ultimately paid this invoice, however.

455.    SelectQuote's loyalty to Aetna went only as far as Aetna's willingness to pay more "marketing" money than other MAOs.  So when Aetna dropped its payments to $200 per policy for the 2021 Annual Enrollment Period (in the fall of 2020), SelectQuote limited its steering to Aetna plans.  According to an email from SelectQuote's Mr. Maurno to Mr. Matthews on April 6, 2021, "[f]or Tiburon Pod, Aetna was dropped to 'Priority 4' and only paid at 50% commission for this past AEP."  Aetna's market share on the SelectQuote sales platform was just 9.8 percent in the last quarter of 2020, compared to 15.9 percent during the same period a year earlier.

456.    **2021**.  In 2021, Aetna paid SelectQuote approximately $7.4 million in "marketing" money.

457.    Well into 2021, SelectQuote made clear that it would not steer to Aetna unless doing so made financial sense to SelectQuote.  For instance, on May 11, 2021, Mr. Kopmeyer sent Mr. Sowell a lengthy email with a veiled threat to reduce sales of Aetna policies if Aetna did not increase its payments to SelectQuote: "With Aetna either paying less or not participating in ways that help our LTVs [lifetime values], it currently has the lowest LTV of all of our key carrier partners.  Not only that, there are meaningful deltas between Aetna and its competitors.  This puts

pressure on [SelectQuote] to maintain and grow Aetna's market share; in fact, being financial stewards of the company would drive opposite behavior."

### 4.    Aetna's Kickbacks to GoHealth

458.    From 2016 through September 2020, GoHealth sold only a handful of Aetna policies each month.

459.    However, in the fall of 2020, Aetna and GoHealth began negotiating a "Marketing Services Agreement" through which Aetna would pay "marketing" money to induce GoHealth to steer Medicare beneficiaries into Aetna Medicare Advantage plans.  And in return for those payments, GoHealth did just that.

460.    **2020**.  GoHealth recognized the potential liability that could result from accepting payments for enrollments.  In an email to Mr. Sowell on October 15, 2020, Aetna's Ms. Garlich explained that GoHealth wanted a hold harmless provision in the agreement that would "essentially say that we are the only entity responsible for compliance with CMS compensation and that if we pay them for marketing and CMS deems it out of compliance they are not responsible.  Fun."  Five days later, on October 20, 2020, Aetna and GoHealth entered into a Marketing Services Agreement that did not contain the hold harmless provision GoHealth had requested.

461.    An exhibit on page 12 of the October 2020 Marketing Service Agreement provided that "The Marketing Fee shall be $200 in consideration of a minimum of eight (8) Quality Leads at a rate of $25 each."  The reference to "Leads" was a sham; both Aetna and GoHealth recognized that the money was for enrollments.  As Hannah Heider, GoHealth's Manager of Business Development and Carrier Relations, later explained to one of her colleagues, "it's like an unwritten agreement of how many submissions/enrollments we want to achieve, but that backs into call or lead volume."

462.    The Marketing Services Agreement further provided for a "90-Day Reconciliation Period," so that Aetna ultimately would pay the $200 "marketing" fee only for new issued policies that remained in effect for at least 90 days.  Such a reconciliation period would not make sense if the purpose of the marketing payments truly were to reimburse GoHealth for leads or other marketing expenses, because GoHealth would incur those expenses regardless of whether a particular Medicare beneficiary decided to stay with Aetna for at least 90 days.

463.    **2021**.  Thus, in an email on February 2, 2021, GoHealth's Ms. Heider commented to her colleagues that per their agreement with Aetna, "we only get paid on 'New to Aetna Issued Policies' that don't result in a rapid disenrollment."  Indeed, earlier, when a draft agreement between Aetna and GoHealth was under consideration, Ms. Heider wrote that "[t]his looks very close to a commission" (on top of the maximum-allowable commissions Aetna already was paying GoHealth).  Ms. Heider continued, "The actual funding paragraph, where it is written that it will be a one-time fund for generating leads is probably OK, but once you include a reconciliation for failure to write policies, then it essentially just becomes Aetna paying for issued policies."  In short, Aetna's "Marketing Fee" functioned as payment for enrollments that stuck for at least 90 days, not as a means of reimbursement of marketing expenses that GoHealth incurred.

464.    GoHealth referred and recommended Aetna Medicare Advantage plans in return for these kickbacks.  Almost immediately after Aetna began paying GoHealth "marketing" money in 2020, GoHealth's sales of Aetna plans began to increase dramatically, from nearly zero in October 2020 to a peak of more than 35,000 in a month in the following year.  In addition, GoHealth's relative proportion of sales for Aetna spiked from zero to well above Aetna's national market share for Medicare Advantage, as the graph below demonstrates.



465.    GoHealth had committed 5,800 sales to Aetna during the Annual Enrollment Period in the fall of 2021.  However, during that period, GoHealth steered over 50,000 sales to Aetna. The increase in sales was so outsized that it raised red flags of immediate concern to Mr. Sowell.

466.    The consequences of GoHealth's steering for beneficiaries were soon apparent. Mr. Sowell testified that there was "a significant number of complaints to Medicare from [Aetna's] GoHealth enrollments; a highly disproportionate number, to the extent that it became an all-consuming exercise to just manage the GoHealth complaints."  In other words, GoHealth's steering put beneficiaries in plans that so badly misaligned with their needs that those beneficiaries complained to CMS.

467.    In approximately November 2021, Mr. Sowell raised his concerns about GoHealth with his supervisor, Mr. Feret.  But Aetna did not stop paying GoHealth to induce it to refer and recommend Aetna Medicare Advantage plans.

### 5.    Aetna's "Bonuses," "Rewards," and "Kickers"

468.    In addition to the pay-for-performance model, Aetna also offered and paid the Defendant Brokers bonuses, rewards, and kickers—all under the guise of "marketing" funding—to incentivize Medicare Advantage sales in specific geographic regions.

469.    One such example was Aetna's Heartland/Midlands campaign.  In a November 4, 2020 email, Mr. Sowell explained to the leaders of the Heartland/Midlands region that implementing a $150 "kicker"—paying brokers an extra $150 for each sale—could make up for sales that field sales agents were not delivering.

470.    Rich Sloma, Aetna's Chief Medicare Officer for the Heartland/Midlands region, approved Mr. Sowell's proposal almost immediately.  That same day, Mr. Feret provided his direct reports with a slide describing the "Strategic 'kicker'" as a "[p]erformance based incentive[]" that Aetna put in place as part of an "investment to drive 36K Enrollments."

471.    The Heartland/Midlands "kicker" program launched on November 5, 2020. Aetna's flyer for the program called it the "Aetna Heartland/Midlands Close-the-Gap *Incentive* Program" (emphasis added).  After asserting that the program was "designed to increase your marketing fees for lead generation," the flyer stated that, for "newly issue[d] sales with submit dates of 11/5/2020 – 12/9/2020" Aetna would pay "$150 for additional services provided with respect to each new issued sale."  The flyer further explained that, "[f]or Partners that have a Market Development Fund agreement, this $150 incentive will be paid in addition to the Marketing Development Fund agreement in place that equates to $200 for additional services provided with respect to each new issued sale," so that brokers like eHealth would receive "$350 maximum for services attributed to the Marketing Development Fund and this program."

472.    Also on November 5, 2020, Mr. Sowell proposed to the managers of Aetna's New England region that they implement a "kicker" in Massachusetts "to juice more sales."  Mr. Sowell

subsequently forwarded this email to his team with the following cover note: "We just bomb MA [Massachusetts] with money.  My next step would be to go to $400 CPA [cost per acquisition]. Don't have any better ideas at present.  Remain open to them but had to move on this."  On November 9, 2020, Ms. Ike emailed eHealth's Mr. Kinkead a flyer for a New England kicker that was essentially identical to the Heartland/Midlands kicker:  "Here is the document for New England. Go get 'em!"

473.    Mr. Sowell testified about this incentive flyer, saying "this should have never gone out the door. . . .  My [broker] partner should never have received anything labeled incentive program."  When asked to clarify whether it should never have gone out the door because it is against the law to pay incentives like these, Mr. Sowell responded, "It is. That was a very bad wording choice."

474.    eHealth shared Aetna's understanding that the purpose of the "kicker" program was to incentivize sales.   In an internal eHealth document, Mr. Kinkead described the Heartland/Midlands kicker as an "*incentive* [that] will follow true to the existing MDF but with an additional $150 on top of the benchmark $200" (emphasis added).

475.    eHealth did not intend to incur any material additional marketing expenses as part of the Heartland/Midlands campaign.  On September 16, 2021, Mr. Shasha explained to Mr. Shea that the Heartland/Midlands kicker program involved "no immediate rise in admin costs, it's just an additional incentive to 'drive more sales.'"

476.    Around this same time, Mr. Shea asked Mr. Kinkead: "Will we need to run more marketing for the Aetna kicker thing?  Or is it just more money that we throw in the bigger company pot[?]"  Mr. Kinkead confirmed, "between you and I – it['s] just more money in the general pot."  Similarly, during an internal eHealth call on September 23, 2021, Mr. Shasha noted

that, "[w]ith Aetna, we took advantage of a particular kicker campaign that Aetna had put out there for distribution.  It was a bonus that was in effect this year."

477.    The kicker/incentive program worked as Aetna and eHealth intended, with eHealth steering additional enrollments to Aetna Medicare Advantage plans.  As Mr. Kinkead explained to Mr. Shea in September 2021, the kicker campaign in 2020 "worked out in our favor and painted a narrative that was helpful in some of these local market discussions."  Mr. Kinkead then sent Mr. Shea the following chart.



478.    Mr. Kinkead explained that, but for the kickers and incentive payments, eHealth would not have enrolled nearly as many beneficiaries in Aetna Medicare Advantage plans:  "you can see where sales were trending in those markets prior to the campaign...and you can see how sales trended afterwards.  [I]t appears those funds were used to drive additional volume in that particular market."  Mr. Kinkead then confirmed that the parties knew this campaign was illegal: "so long as they don't explicitly call out app count for funding against production...they should be able to skirt around the regs."

479.    SelectQuote also understood the kicker money to be a "bonus."  On November 9, 2020, after receiving notice of the Heartland/Midlands kicker, SelectQuote's Ms. Bourdelais asked Ms. Ike if the kicker money would "be paid via increased MDF or production bonus revenue?" Ms. Ike responded that "[i]t will be paid separate from MDF."

480.    These practices continued well into 2021.  For instance, in November 2021, Mr. Sowell sent Mr. Feret a slide deck with a cover email stating that he was "recommending $50-100 to partners beyond eHealth to juice new sales and end up with the appropriate net membership."

481.    In sworn testimony, Mr. Sowell explained that this message and the associated slide deck related to an effort to move beneficiaries from an Aetna Medicare Advantage preferred provider organization ("PPO") plan, which was losing membership, to an Aetna Medicare Advantage health maintenance organization ("HMO") plan.  As the slide deck explained, Aetna intended to pay brokers "a minimum one time $200 marketing fee" to induce the switch to another Aetna plan rather than to another carrier's plan.

482.    Mr. Sowell also explained in sworn testimony that it was brokers who solicited these "switching" fees, under the guise of marketing.  In fact, Mr. Sowell specifically remembered eHealth and SelectQuote telling Aetna that other MAOs were paying such remuneration.

483.    Mr. Sowell recalled in sworn testimony having "discomfort" with the switching fees, and that he did not want his name on the slide deck.  This, he testified, was because "we can't pay incentives" with marketing money or, put more succinctly, "it's illegal to pay incentives" and "paying a broker any incentive to move someone is inappropriate and illegal."

6.    **Aetna Conspired with the Defendant Brokers and Others to Discriminate Against Medicare Beneficiaries with Disabilities**

484.    From 2016 through at least 2021, Aetna conspired with the Defendant Brokers and others to limit the proportion of beneficiaries with disabilities enrolled in Aetna Medicare Advantage plans, in violation of federal law and Aetna's contracts with CMS.

485.    As noted above, CMS pays MAOs a capitated amount for each beneficiary enrolled in their plans.  The capitated payment is risk adjusted based on beneficiary health status, meaning that payments to MAOs for disabled beneficiaries are generally higher than capitated payments for age-eligible Medicare beneficiaries.  Even with these payment adjustments to account for health status, Aetna still perceived the cost of covering disabled beneficiaries to be too high.

486.    Just like Humana, Aetna closely tracked its MLR, or the percentage of capitated payments dollars it received from CMS that were spent on medical claims.  Aetna sometimes referred to this metric as the "medical benefit ratio" or "MBR" for the beneficiary.  A lower MBR indicated that a smaller percentage of the capitated payments was spent on medical claims, and the beneficiary was more profitable for Aetna.  A higher MBR indicated that a larger percentage of the premium was spent on medical claims, and the beneficiary was less profitable for Aetna. Starting at least as early as 2016, Aetna made the determination that Medicare beneficiaries with disabilities generally had relatively high MBRs and were therefore less profitable than age-eligible Medicare beneficiaries.  Aetna and the Defendant Brokers often referred to Aetna's desire to reduce the number of beneficiaries with disabilities as a "mix" or "U65 mix" issue.

487.    Aetna, one of the nation's largest managed care companies, took steps to stop beneficiaries with disabilities from enrolling in Aetna Medicare Advantage plans and to transfer the costs of covering those beneficiaries to CMS or other MAOs.

488.    To accomplish this goal, Aetna pressured the Defendant Brokers to limit enrollment of disabled beneficiaries into Aetna Medicare Advantage plans, including by conditioning "marketing" funding on the proportion of disabled beneficiaries enrolled in Aetna's Medicare Advantage plans.  The directive to engage in this pressure on the Defendant Brokers came from Aetna's most senior Medicare executives, and it was driven by the company's desire for profits. In fact, Mr. Feret and Mr. Sowell testified that the message came from Nancy Cocozza (Senior Vice President of Medicare), Emanuel ("Manny") Germano (Vice President of Medicare Performance), Chris Ciano (Senior Vice President of Medicare following Ms. Cocozza), Chris Campbell (Executive Director of Medicare Performance Management), and Mr. Luna.  In response to pressure from Aetna, the Defendant Brokers and others took affirmative steps in furtherance of the conspiracy to reduce enrollment of disabled beneficiaries in Aetna plans.

489.    Therefore, in order to limit the number and percentage of disabled beneficiaries enrolled in its plans, Aetna not only conditioned the Defendant Brokers' "marketing" funding on the *number* of beneficiaries the brokers enrolled in Aetna Medicare Advantage plans, but also on the *type* of Medicare beneficiary that the brokers enrolled in Aetna Medicare Advantage plans. Aetna set goals for brokers to ensure that the number of disabled Medicare beneficiaries did not exceed a certain percentage of beneficiaries enrolled in Aetna Medicare Advantage plans and told them that it would not pay "marketing" money if the ratio of disabled to non-disabled beneficiaries was higher than what Aetna deemed acceptable.

490.    Aetna, the Defendant Brokers, and others attempted to limit any written evidence of this selective enrollment.  As eHealth Vice President of Business Development, Alisha Mecier, wrote of steering Medicare beneficiaries with disabilities away from Aetna: "we should have calls

with these partners [lead vendors], not send anything in email about this since it is against CMS regulations to discriminate on this type of traffic."

### i. Aetna and the Defendant Brokers Knew It Was Illegal to Discriminate Against Medicare Beneficiaries with Disabilities

491.    From 2016 through at least 2021, Aetna and the Defendant Brokers knew it was illegal to discriminate against disabled Medicare beneficiaries.

492.    In its "Aetna Medicare Marketing Code of Conduct," Aetna required brokers that sold Aetna Medicare Advantage plans, including the Defendant Brokers, to "be knowledgeable of all applicable Medicare laws, CMS Medicare Marketing Guidelines, and all federal health care laws."  The Code of Conduct also specifically stated that: "You will not engage in discriminatory marketing practices.  This includes . . . focusing only on aged Medicare-eligible population and not disabled beneficiaries."

493.    eHealth and Aetna knew that they were engaged in unlawful discrimination that was inconsistent with the fundamental precepts of the Medicare Advantage program.  For example, on May 27, 2016, CMS distributed an alert regarding the agency's "Final Rule, Nondiscrimination in Health Programs and Activities, implementing the prohibition on discrimination under Section 1557 of the Affordable Care Act of 2010," effective on July 18, 2016.

494.    The CMS alert was forwarded to Mr. Luna.  In internal communications involving Mr. Luna, Aetna recognized that the prohibition on discrimination against disabled beneficiaries extended to "marketing practices."  Ms. Ike, in turn, forwarded Aetna's own alert on Section 1557 to eHealth's Mr. Hakim on June 30.  The same day, Mr. Hakim forwarded Aetna's alert to Mr. Hurley, then eHealth's President of the Medicare Business Unit.

495.    Two key Aetna sales executives—Mr. Feret and Mr. Sowell—variously described any differential treatment of beneficiaries with disabilities as "a compliance risk," something "[w]e

should NOT be talking about," and a "[v]ery big no-no." In a September 7, 2018 email, Mr. Sowell acknowledged that "we can't tell [broker partners] not to offer the product to U65, as that is non-compliant, cherry-picking."

> ### ii.    Aetna Pressured the Defendant Brokers and Others to Limit Enrollment of Beneficiaries with Disabilities

496.    Motivated by financial considerations, senior executives from Aetna's business and actuarial teams pressured Mr. Luna to reduce enrollments of disabled beneficiaries in Aetna Medicare Advantage plans. Mr. Luna then pushed down this pressure to sales executives on his own team, especially Mr. Feret and Mr. Sowell, who became responsible for ensuring that the Defendant Brokers and other brokers reduced the proportion of disabled beneficiaries they enrolled in Aetna Medicare Advantage plans.

497.    For example, on February 4, 2016, Mr. Luna emailed Mr. Sowell and Ms. Ike a table showing that, for beneficiaries under sixty-five who had been enrolled by eHealth, Aetna's MBR was over 130%. In other words, Aetna was spending 30 percent more on these beneficiaries than it was receiving from CMS. Mr. Luna commented that "[w]e are not doing well on the Under 65 business . . . We really need to follow up with e-Health to under[stand] how we are getting this disproportional Under 65 enrollment."

498.    On or about February 23, 2016, Ms. Ike met with eHealth's Mr. Hakim to "work with" eHealth on the "issue" of disabled beneficiaries enrolled in Aetna Medicare Advantage plans. Before this meeting, Mr. Luna instructed Ms. Ike to "be very tactful on how you approach this topic," as he did not want Aetna to "come across as not wanting those members," but that "[w]e just need to make sure that we get a mix that is consistent with the market."

499.    On March 9, 2016, Mr. Luna noted internally that "[s]ome of the markets are looking at their MBR (loss ratio) and they are seeking to restrict sales from eHealth because of the financial impact" of enrollments of disabled beneficiaries.

500.    On April 21, 2016, Mr. Luna asked Mr. Sowell in an email, "Can we create a report on eHealth disabled mix by week?  I want to see if they are improving on reducing the disabled mix."  After Mr. Sowell replied that he had asked some of his colleagues to create such a report, Mr. Luna added that "[t]hey should do the report for you but you should be the one keeping eHealth to their commitment."

501.    A few days later, on April 26, 2016, eHealth's Mr. Hakim wrote to Ms. Ike that "I spoke to Armando [Luna] at this Med Supp conference and told him we were about 30 days from making a big dent into this.  I asked him if he was ok taking a sales hit to get this right and he said that he would prefer margin over sales so that is how we will implement."

502.    Mr. Sowell reported the same the next day: "eHealth owes us a description of their strategies to suppress reach to this segment, especially in areas of high impact.  It will reduce volume, but trend toward raising [profit] margins."

503.    Aetna put similar pressure on SelectQuote.  For example, in 2019, Mr. Feret told SelectQuote's Mr. Matthews that Mr. Luna wanted to fill a 20,000–25,000 Medicare Advantage plan enrollment "gap."  Mr. Feret further explained that Mr. Luna "might ask you [Mr. Matthews] about our advertising- how you ensure you don't attract U65 biz. . . .  About 20% [disabled beneficiaries] if you can."  Mr. Matthews then assured Mr. Feret by text message that SelectQuote "[c]an direct certain traffic to other folks who have the appetite for it."

504.    Aetna also made clear to GoHealth that the marketing remuneration was contingent on GoHealth referring a proportion of disabled beneficiaries that was low enough to be acceptable

to Aetna.  On November 4, 2020, soon after Aetna had agreed to pay "marketing" money to GoHealth, Mr. Feret noted in an email to Mr. Sowell and Ms. Garlich that GoHealth was "popping up early with some mix issues."  Ms. Garlich responded that "[y]es, they're showing up and I am keeping an eye on the mix issues and discussing with them as I cannot send this particular issue to them in writing to the best of my knowledge."

### iii.    At Aetna's Behest, the Defendant Brokers and Others Limited Enrollment of Disabled Beneficiaries in Aetna Plans

505.    From at least 2016 through at least 2021, Aetna and the Defendant Brokers took affirmative steps to reduce the proportion of Medicare beneficiaries with disabilities enrolled in Aetna Medicare Advantage plans.  These included, among other things: (1) Aetna directing eHealth not to sell Aetna Medicare Advantage plans in certain states where a relatively high number of Medicare beneficiaries with disabilities were enrolling; (2) installing filters to route calls from beneficiaries with disabilities away from agents selling Aetna Medicare Advantage plans; and (3) modifying online platforms to prevent agents from enrolling disabled beneficiaries in Aetna plans.

506.    For example, on April 22, 2016, Mr. Hakim noted to Gary Matalucci, eHealth's Senior Vice President for Customer Engagement, that Eric Howell, eHealth's Vice President of Product Development, was working on "[r]educing <65 MA sales by carrier" by "ask[ing] for DOB [date of birth] before all quotes are generated" and by "hav[ing] the ability to turn carriers off or on by market by product depending on DOB."

507.    A few days later, on April 25, 2016, Ms. Ike followed up on eHealth's "U65 Strategy," telling Mr. Hakim that "Armando [Luna] and John [Sowell] asked me to stay close to that one."  Mr. Hakim forwarded this email to Mr. Hurley and Mr. Matalucci, telling them that "Aetna is definitely expecting results on this reduction."

508.    Mr. Hurley responded, "We've got to launch this soon and be aggressive. I think they're going to tell us to get the mix right AND make sales- but we'll see. I have to believe mix is job one." Mr. Matalucci stated that he understood, and stated that "after some further review, we agreed to NOT remove Aetna plans from showing in the agent quoting, BUT to disable the enroll button." This action limited disabled beneficiaries from being able to enroll in these plans through eHealth.

509.    On April 27, 2016, Mr. Hakim proposed that eHealth cease making Aetna's Medicare Advantage plans available for telephonic sales to Medicare beneficiaries under sixty-five years old by "turn[ing] off" certain states and "keep[ing] on" others. Mr. Hakim recommended "turn[ing] off" New Jersey and Texas, among others.

510.    On May 31, 2016, Trever Lee, an eHealth Senior Product Manager, noted that "[w]e have an urgent request from Aetna to greatly decrease our sales of Medicare products to the under 64 market." In response to this request, on June 3, 2016, eHealth modified its agent quoting tool to "filter out Aetna plans for age-ins<65." Consequently, for at least a month, when a Medicare beneficiary called eHealth, depending on that beneficiary's state of residence and date of birth, eHealth removed Aetna plans from among the options available to eHealth's agents on a call with that beneficiary, in order to prevent beneficiaries with disabilities from choosing Aetna plans, even when those plans would have suited them well.

511.    Aetna was aware of the steps eHealth was taking at its behest. And it was willing to accept a reduction in the overall number of beneficiaries that eHealth enrolled in Aetna Medicare Advantage plans rather than continue enrolling disabled beneficiaries at a rate higher than it deemed acceptable. For example, after Ms. Ike spoke to Mr. Hakim on June 1, 2016, she reported

to Mr. Luna and Mr. Sowell that "[w]e will see eHealth production drop 30-40% starting this Friday night, June 3." Mr. Luna replied, "That is what we had expected."

512.    When eHealth's proportion of beneficiaries with disabilities did not drop as quickly as Aetna expected, Aetna expressed its displeasure that eHealth was not being more aggressive in its discrimination, and Aetna exerted more pressure on eHealth to decrease enrollments of disabled Medicare beneficiaries. For example, on June 3, 2016, Thomas Kowalczyk, Aetna's Medicare General Manager for New Jersey, sent an email to Mr. Sowell stating, "John, I am not seeing any improvement from the % of U65 sales from ehealth. This is killing me. They are my #1 external producer each month but 40% of their sales are U65 membership. I thought they were going to commit to improving their mix significantly?"

513.    Mr. Sowell forwarded Mr. Kowalczyk's email to Ms. Ike. He wrote, "This makes me most displeased and will reach out to Chris [Hakim]. What burns me the most is that they are trying to maintain volume without truly redirecting their marketing. As a marketer, I know full well that they could have turned this much more aggressively since we reached out. Plus, I have managed too many telesales and telemarking organizations to know that you can redirect them, too." Mr. Sowell further stated that "I do plan to be very direct with Chris [Hakim] that I will move all of their funding if they do not stop jerking us around."

514.    By September 2016, Aetna remained dissatisfied with the proportion of disabled beneficiaries eHealth was enrolling in Aetna Medicare Advantage plans. On September 7, 2016, Ms. Ike directed eHealth to "suppress" Aetna's New Jersey and Texas Medicare plans for 2017, which meant that Aetna plans would not be available to any beneficiaries from those states who called eHealth during the upcoming Annual Enrollment Period. Lest there was any doubt about why, Mr. Sowell explained, "I have cut eHealth in half and will likely cut more. . . . You didn't

think I would let them get away with a bad mix, now did you? They had it too good for too long and working weekly to get it in line or replaced."

515.    Mr. Luna was part of this decision-making process. On September 7, 2016, Mr. Sowell sent Mr. Luna a meeting agenda from the previous day. In his cover email, Mr. Sowell noted that Aetna was "removing eHealth from TX and NJ per the markets['] vehement requests. . . . As they continue to run 47-52% on sales, even with their supposed 'marketing changes,' we cannot tolerate U65 sales at this level." The same day, Ms. Ike sent an email to Mr. Hakim and others at eHealth: "To our call earlier today, I am sharing the list of [30] NJ & TX Medicare Advantage plans. Please suppress these plans for 2017."

516.    On September 19, 2016, Aetna and eHealth met to discuss Aetna's demand that eHealth reduce sales of Aetna Medicare Advantage plans to beneficiaries with disabilities. Two days later, Jeff Bernstein, eHealth's Senior Vice President of Marketing, sent a draft presentation to Mr. Hakim and noted, "I've kept it short on detail given the sensitivity of what we are discussing." Mr. Bernstein told Mr. Hakim that the "overall narrative" would include the following: "We are aggressively moving the shift per our conversation of a few months ago…compliance is why we haven't seen impact yet."

517.    Still unhappy with the pace of eHealth's discrimination efforts, Aetna in late 2016 began to tie eHealth's purported "marketing" compensation directly to eHealth's success in decreasing enrollments of Medicare beneficiaries with disabilities.

518.    On October 7, 2016, Mr. Luna told several senior Aetna executives that "[w]e spoke with eHealth and we agreed to enter into a pay for performance deal where based on the mix of disabled we will payout. If their mix is higher than our other partners, they do not get paid."

Mr. Germano replied: "Great solution….thanks."   Mr. Luna then forwarded the exchange to Mr. Sowell.

519.    Later that day, Mr. Sowell reported to Ms. Ike that "Armando [Luna] has socialized to Manny [Germano] and Nancy [Cocozza, Senior Vice President of Medicare] that we are holding [eHealth] to a P4P [pay for performance] on the U65 mix."   Ms. Ike conveyed the message to eHealth's Mr. Hakim that "John [Sowell] dropped on me this morning that the payment would be contingent on being at 27% or below for U65 mix.  So, he is looking at a pay for performance for those dollars."   And Mr. Hakim then forwarded Ms. Ike's email to his boss, Mr. Hurley, with a note that it "[l]ooks like they want to tie the <65 for the additional $113K."  The next day, October 8, 2016, Ms. Ike commented to Mr. Hakim that "We probably would not want to put the 27% mix in a contract."

520.    By the end of 2016, Aetna appeared satisfied with eHealth's efforts to decrease enrollment of beneficiaries with disabilities.  On November 25, 2016, Ms. Ike sent Mr. Hakim and eHealth's Ms. Dean a table showing that, for weeks 43 through 47 of 2016, eHealth's average "U65 mix" had dropped to 35.15%.  Ms. Ike commented that "your U65 mix . . . appears to be tracking better than it has in the past.  Thank you for recognizing and managing!"

521.    By early 2017, however, Aetna again became dissatisfied with eHealth's enrollment of disabled beneficiaries.  On February 7, 2017, Ms. Ike emailed Ms. Dean: "The U65 mix is still of concern since it's spiked up in your post AEP business.  I am worried that will hurt your funding.  Are you taking actions to manage the mix?"   Here, "funding" referred to the purported "marketing" funding provided by Aetna.

522.    The next day, Ms. Ike reported to Mr. Sowell that, following her outreach, eHealth was "aggressively managing the mix on a daily basis."

523.    On May 16, 2017, after receiving a report showing that more than 46% of eHealth enrollments were for beneficiaries with disabilities, Mr. Sowell told Ms. Ike that Aetna was contemplating withholding a $250,000 payment for eHealth until eHealth could "put four weeks of 30% or less U65 together."  In his email, Mr. Sowell mentioned that many Aetna markets "want them cut" due to issues with the "mix."

524.    The next day, Mr. Hakim emailed Mr. Hurley, Mr. Francis, Ms. Mecier, and others within eHealth.  He explained, "we had a call with Aetna today and they were extremely clear that if we do not start making a significant dent in the mix of our business with them by June 30th we will most likely not be able to sell their MA products in most of the country for AEP."  He then directed Ms. Mecier that "my ask is any partner [i.e., lead vendor] that we are paying on a CPL [cost per lead] to let them know we will not pay them for <65 leads.  Same for CPA [cost per acquisition] deals."

525.    The following day, on May 18, 2017, Mr. Francis sent several senior eHealth executives an email affirming that eHealth "intended . . . to address the mix issues raised by Aetna" and that "[o]ur strategy in moving toward more partnership driven business has among its goals capturing an improved mix of business."

526.    Also on May 18, 2017, Mr. Hakim asked Ms. Mecier to "reach out to [certain lead suppliers] and let them know to stop sending <65 leads to us."  Later that day, in an email with the subject line "Driving down U65 for Aetna," Ms. Mecier reported to Mr. Hakim, Ms. Dean, and others that "we can start talking to [lead generation] partners tomorrow to see if they will add an IVR [interactive voice response] or filter for U65 calls and filter them away from us."  She also requested "the list of all Aetna counties" so that eHealth could "direct partners to not send us u65

traffic in these counties"—that is, not send calls from persons with disabilities in counties where Aetna had an operative Medicare Advantage plan.

527.    On May 21, 2017, Mr. Hurley conveyed to Mr. Flanders, eHealth's CEO, the plans that Ms. Mecier and Mr. Hakim had to reduce sales of Aetna plans to Medicare beneficiaries with disabilities.  Mr. Hurley added that Mike Lowry, eHealth's Vice President of Medicare Sales, planned to "Help with Aetna U65 issue.  Drive away from <65."

528.    On May 23, 2017, Ms. Mecier made the following requests to one of her eHealth colleagues, Alexis Gruetzmacher, a Senior Partner Manager:

> For the calls we buy, can you ask your top 10 partner[s] if they have an IVR they can put in place *[to] route the U65 calls away from us*, if they cannot do this in an IVR, then we want to give them the attached list of counties and let them know we do not want calls in these markets (please remove the 'Aetna' part of the attached spreadsheet before sending to a partner).
>
> For partners that are posting us leads and paid on a CPA . . . Can you please have them stop sending us U65 leads immediately.  (Emphasis added.)

529.    Ms. Mecier concluded her email by noting that these actions were illegal and eHealth needed to limit evidence of such action: "Also, we should have calls with these partners, not send anything in email about this since it is against CMS regulations to discriminate on this type of traffic."

530.    On May 25, 2017, Ms. Gruetzmacher stated that certain lead vendors had made the requested adjustments and were either rejecting calls from Medicare beneficiaries under age sixty-five or not sending them to eHealth.

531.    This conduct was not cabined to eHealth's middle ranks.  On May 26, 2017, Seth Teich, eHealth's Senior Vice President for Business & Corporate Development, reported in a weekly update to eHealth's Mr. Francis that "U65 mix—team reached out to many partners to convey mix issue and importance."  Similarly, on June 2, 2017, Ms. Mecier reported in a weekly

update to Mr. Hurley that her team had "[c]ompleted speaking to all our worst offending partners to cut out u65 traffic."

532.    All the while, both eHealth and Aetna well understood that the actions they took to discriminate against beneficiaries with disabilities for the sake of profits were illegal.  For instance, on May 24, 2017, Mr. Shea cautioned Mr. Hurley and Mr. Hakim that "we need to internally align about how we'll respond if Aetna is unhappy in 30 days. If they say they need to turn us off, I think we need to have a very candid conversation about why that's not really an option … remind them of the Medicare rules around anti-discrimination."

533.    On June 28, 2017, Mr. Shea warned Mr. Hakim and Ms. Dean, "[t]he Medicare guidelines state very clearly that a carrier cannot force a broker to cherry pick beneficiaries."  A month later, on July 14, 2017, Mr. Shea again complained to Mr. Hakim that "[t]hreatening to shut us off isn't just bad business for Aetna.  It's also improper and very likely illegal."

534.    On October 19, 2017, Mr. Hakim reported to Mr. Sowell that, in addition to eHealth's increased sales for Aetna, "one more piece of great news is the mix. We can safely say that all the marketing changes have started to pay off."  Mr. Hakim included data showing that, on a daily basis between October 15 and October 18, 2017, eHealth's "Under 65" sales for Aetna ranged from 26.9 percent to 35.4 percent of its total Aetna sales.  Mr. Sowell responded, "That is some of the best news of the year!  Great job on the marketing and the mix[.]"

535.    On December 5, 2017, after the circulation of a weekly "U65 Report" to his team, Mr. Sowell commented that, "if you look at the CMS enrollment reports, you will note that the industry has been about 32-33% for the last 13 years.  Our clients need to be no greater than 40%.  If they are, you need to address this mix with them, as the MLR [Medical Loss Ratio] is extremely

challenging.  We have had partners [i.e., brokers] dismissed from markets due to bad mixes, so always make this a priority and that is the purpose of this regular report."

536.    On March 14, 2018, Mr. Luna advised that the issue of eHealth "disproportionally attracting disabled enrollment" was "coming up again on the [plan] bid discussions" and asked for an update on that issue.

537.    Mr. Sowell responded that "after three years of hammering on this issue and multiple senior leadership meetings, their production remains 47% U65.  Only slightly modified reductions have occurred and have not been sustainable."

538.    On April 4, 2018, Mr. Sowell reported to Ms. Ike and Ms. Garlich that Aetna management had approved payment of an additional $500,000 to eHealth, but added that "we will need to structure a deal with eHealth around mix to . . . not pay for U65 sales above the 32% national average on a weekly basis.

539.    The next day, Mr. Sowell made clear that "[w]e also do not want to pay for . . . any U65 above 35%."

540.    On August 17, 2018, Mr. Luna forwarded a report to Mr. Feret showing that the percentage of sales for disabled beneficiaries was increasing over time.  Mr. Luna commented that it was "[n]ot a good outcome. . . .  We lose money on this membership so we need to ensure that our sales mix is more representative of the market mix than higher than the market availability of disabled folks.  In the past we had issues with eHealth but I believe John [Sowell] has addressed some of those items."

541.    On August 17, 2018, Mr. Luna forwarded the same report to a colleague and noted that "[w]e lose money on this membership since we do not get enough revenue adjustments so we want to ensure that our enrollment mix is not disproportionally high," while acknowledging that

"from a compliance perspective we are required to enroll them but if our target lists are disproportionally high on them we are creating our own adverse selection." He subsequently added that "[w]e need to plan the approach moving forward so we do not over sample the Under 65."

542.    On September 7, 2018, Mr. Sowell forwarded the same report to his team and wrote the following in his cover email:

> This was shared by Larry [Holmes] and discussed on Armando [Luna]'s team call today. *We will not send this to partners and we can't tell them not to offer the product to U65, as that is non-compliant, cherry-picking.* However, we can advise them of where they stand in discussion only and the variance from the national average of 32%.
>
> We will get this report more regularly and it is NOT to be shared externally. (Emphasis added.)

543.    On October 14, 2018, Mr. Ciano, who had recently replaced Nancy Cocozza as Aetna's President of Medicare, sent Mr. Luna an email asking how Aetna "ensure[s] balance of pre-65 and post-65 sales through AEP. What monitoring systems do you have in place?"

544.    Mr. Luna responded that, due to compliance issues, Aetna educated brokers "on the fact that we do not want to disproportionally attract pre-65 (we cannot say we do not get any)." He then asserted that although "it is a compliance risk," Aetna was "working on increasing the partner awareness of the mix and just suggesting that we do not disproportionally enroll pre-65. In the cases that we have suspended partners for doing so it has [been] in a specific state but we do not directly tell them the reason but rather speak to the quality of the enrollment to avoid getting us into hot waters."

545.    In or around November 2018, certain Aetna employees, including Mr. Feret and Mr. Sowell, began to push back on the pressure from Mr. Luna and other senior Aetna leaders to discriminate against disabled Medicare beneficiaries.

546.    For example, on November 29, 2018, in response to a question from Alaina Maggard, an Aetna Manager of Medicare Product Implementation, about whether there was "an ideal distribution of <65 enrollees you'd expect to see" enrolled in Aetna Medicare Advantage plans, Mr. Feret responded that "we cannot engage in 'cherry-picking' our membership as you know, so we'd want to stay away from any type of benchmarking."

547.    Despite this, Aetna continued threatening to penalize eHealth for enrolling too many Medicare beneficiaries with disabilities in Aetna plans, and eHealth continued participating in the discriminatory scheme.

548.    On November 1, 2018, Mr. Rooney, eHealth's Vice President of Carrier Relations, reported to his colleagues, "Despite my best efforts, Aetna wants us to turn off TV [advertising] in NJ." In a subsequent instant message chat, Mr. Shea told Mr. Rooney that this "can be done but not great for our business." Mr. Rooney replied, "I hear you. [T]hey are freakout [sic] about <65 business. [W]e were actually not supposed to turn tv on for them to begin with." This prompted Mr. Shea to comment, "[t]hat region is nuts in my opinion and they should be reminded that asking us to do these things is not legal[.] The money is great but they can't cherry pick their members and it's not even a gray area. They know this."

549.    The next day, Melissa Wong, an eHealth Senior Carrier Account Manager, sent an email to a group of eHealth employees stating, "We need to turn off all TV marketing for ***ONLY Aetna New Jersey***. This is due to the mix of business we send to that state, so they want to turn off the TV marketing. We need to do this ASAP. . . ."

550.    Around this same time, and at Aetna's direction, eHealth also suppressed access to Aetna Medicare Advantage plans in Cook County, Illinois, specifically because "Aetna does not want <65 business."

551.    On March 6, 2019, Mr. Luna advised Robin Curtis, an outside marketing consultant for Aetna, that they would be meeting with eHealth in person the following week "so they can work with us on the issue of minimizing enrolling disabled folks."

552.    After some delay, Aetna hosted a "workshop" meeting with eHealth on April 30, 2019, with eleven Aetna and six eHealth attendees.  The minutes describe the steps eHealth took to minimize the mix of disabled beneficiaries it was enrolling in Aetna Medicare Advantage plans. These included the statement that "marketing is over 65," with a focus on "age-in marketing," meaning people within two months of turning sixty-five and becoming eligible for Medicare by age.   The minutes described an "improvement due to diversification" within television advertisements, meaning a lower proportion of disabled beneficiaries signing up for Aetna Medicare Advantage plans through eHealth.

553.    On October 7, 2019, Mr. Sowell advised his team that, in meetings with brokers, they should not discuss any broker's "actual percentage MLR" and that they should "[e]nsure that none of your comments, direction or feedback indicates any suppression, discrimination or steerage implications. We can only advise partners that their block [of business] is good/bad/acceptable to the standard industry economics and we seek a continuation of or migration to best practices in securing and retaining members from them."

554.    On November 8, 2019, an Aetna data analyst sent Mr. Campbell, Mr. Luna, and Mr. Feret a report showing that eHealth's "Below 65" sales of Aetna Medicare Advantage plans had dropped from 19.9% in 2018 to 18.9% in 2019.

555.    Mr. Campbell responded with disappointment: "[T]his is not the improvement I thought we would get from all the work on this topic earlier this year, and with the surge in volume I would have expected to get closer to the mix we get from traditional brokers.  I believe that the

math is going to paint all this growth on eHealth very poorly." Mr. Feret pushed back: "I also remain very uncomfortable even talking . . . internally and externally [about] it as it pertains to sales and account management efforts."

556.    Mr. Feret then sent a separate email only to Mr. Luna, warning him:

> We should 100% NOT be talking about U65 "improvement" as it pertains to any sales partner. I basically told Chris [Campbell] that below, but if you have the opportunity to do so, please remind him? This is a dangerous and inappropriate topic for him to be even talking about. Just trying to make sure we all understand the risks of doing so. This should be about the appropriate management of these members, not the management of the salesforce.

557.    On November 8, 2019, Mr. Feret reiterated to Marci Carlson, an Aetna Senior Director of Strategic Programs, that "[w]e should NOT be talking about getting sales and distribution to ask partners to curtail U65 sales. Very big no-no. Hope Chris [Campbell] understands this. If not, I can explain but it's pretty readily apparent."

558.    Even after this express and emphatic pushback, Aetna's management continued to pressure Mr. Feret to reduce the proportion of Medicare beneficiaries with disabilities who signed up for Aetna plans.

559.    In a November 2020 email exchange with a Vice President of Clinical Analytics, Mr. Luna explained that, when Aetna enrolled Medicare beneficiaries with disabilities, "we lose money today and we have high customer complaints since we really do not seem to deliver on their expectations." Mr. Luna then noted: "All I can do today is restrict the volume but it will be nice to be able to address their needs."

560.    This conduct continued into 2021. On the morning of January 19, 2021, Aetna's Tracy Kosofsky sent an email to Mr. Feret with the subject line "Strategic - MBR/U65" and asked if he had "any talking points about mitigating actions for MBR for strategic." Mr. Feret responded:

Frankly, no. This topic should be off-limits for sales. MA is GI [i.e., guaranteed issue]. Medicare rules are crystal clear around MA eligibility and any/all efforts to [underwrite].

I'm extremely uncomfortable talking about this with partners, they are extremely uncomfortable talking to us about these items and we shouldn't be talking about these at all when it comes to sales.

For some reason, this company is pretty fast and loose with this and these topics and it's wholly inappropriate and dangerous. This approach, in my experience, makes us a huge outlier

This is a conversation between actuary, finance and leadership. Sales should be completely left out of this.

As you can tell, I feel very strongly about the topic.

561. Mr. Feret testified that Aetna was an "outlier," in "that no other company that [I] had been affiliated [with] spoke about this internally or externally as much as we have as a carrier."

562. Aetna's conspiracy to discriminate against beneficiaries with disabilities was not limited only to eHealth. For example, on October 4, 2016, as Aetna was considering whether to do more business with GoHealth, Mr. Sowell wrote to Cheryl Howard, an Aetna National Sales Director, that she should "advise [GoHealth] that exceeding 30% U65 will create intense scrutiny. Over 40% and we will likely term the contract. They should get us the industry average or less, or their marketing is not appropriate." Ms. Howard responded that "I'll make sure to communicate our expectations around U65 enrollment. We definitely don't need another partner with high ratios of that type of business."

563. On March 20, 2018, GoHealth's Peter Filippini sent an email to himself with the subject line "Aetna." In the email, he wrote: "32% below 65 is what they want. U65 - Not in tx or Jersey."

564. Aetna terminated its contract with GoHealth in July 2018. On November 4, 2020, soon after Aetna agreed to resume paying "marketing" money to GoHealth, Mr. Feret noted in an

email to Mr. Sowell and Ms. Garlich that GoHealth was "popping up early with some mix issues." Ms. Garlich responded that "[y]es, they're showing up and I am keeping an eye on the mix issues and discussing with them as I cannot send this particular issue to them in writing to the best of my knowledge."

565.    Mr. Sowell subsequently added that "[p]art of the reason for their [GoHealth's] prior termination was mix – always way out of line due to their ACA business and marketing approaches - but we are the only carrier enforcing this.  When we push back, they shut down.  We don't put these requests in writing but they have not proven themselves trustworthy and continue to see everything in writing."

566.    Aetna's discrimination against beneficiaries with disabilities also extended beyond the Defendant Brokers.  For example, on June 13, 2017, Mr. Sowell wrote to another Medicare Advantage broker, Clearlink, that its MBRs were the "second highest we have among strategic accounts," and that Clearlink should have a "U65 mix" below 32%.

567.    After exchanging several emails, Ben Henderson, Clearlink's President, wrote to Mr. Sowell on June 20, 2017: "As of 6/15[/17], we put filters in place to *reject all calls/leads for consumers under 65*, so this should eliminate this type of business completely on these campaigns" (emphasis added).  Mr. Sowell responded, "Sounds great Ben."  Further, Mr. Henderson explained that prior to Aetna raising the issue, "the U65 stat wasn't one that we were proactively monitoring until last week[.]"

568.    When he testified about this exchange, Mr. Sowell explained that he had the conversation with Clearlink because he was concerned that senior Aetna management—Ms. Cocozza, Mr. Germano, and Mr. Campbell—would influence Mr. Luna to terminate Aetna's contract with Clearlink because its U65 mix was higher than Aetna wanted.  As Mr. Sowell also

testified, anti-discrimination laws "absolutely" prohibited discrimination against individuals with disabilities and Aetna had promised in its contracts with CMS that it would not violate anti-discrimination laws.

569.    Aetna remained dissatisfied with Clearlink's proportion of disabled beneficiaries enrolling in Aetna plans. On March 14, 2018, Mr. Luna asked Mr. Sowell and Mr. Feret, "Can we also look at adjusting our broker [payments] to be based on enrollment mix in a compliant manner?" Mr. Sowell then told one of his direct reports, Tausha Mitcham, that Clearlink "must get to 32% of below or we will need to enforce repercussions." Clearlink subsequently assured Aetna that "[w]e are addressing this by putting partnerships into place to send this traffic elsewhere" since "[s]ending that traffic elsewhere before it ever reaches the agent will be the most effective." After learning that Clearlink expected this action to bring the "mix" down to 30% within one to two months, Mr. Sowell replied, "This is acceptable. Just need to keep them honest."

570.    Tascha Mitcham, Aetna's National Sales Director for Medicare Strategic Distribution, told colleagues on April 26, 2018 that she had "been working on helping Clearlink lower their U65% mix. They are currently at 39%. Clearlink is working with another vendor where they are transferring U65 Medicare eligible prospects, so that Clearlink is not writing them with Aetna to help lower their U65%." That is, at Aetna's direction, Clearlink was rejecting calls and leads from disabled beneficiaries to "help lower" the percentage that signed up for Aetna's plans. Ms. Mitcham further noted, however, that "[t]heir compliance team is concerned about age discrimination and wants any recommendations on what they can do to help decrease their U65%."

571.    Aetna also had a financial relationship with Carezone, a broker platform that sold Aetna Medicare Advantage plans. After receiving Mr. Luna's email on March 14, 2018, Mr. Sowell told one of his national sales directors that he wanted an "action plan" for Carezone's

enrollments of disabled beneficiaries or "advise them they will be termed."  Upon being told that Carezone was "addressing" the problem, Mr. Sowell responded that "addressing doesn't cut it," and that "[w]e will need to be extremely aggressive in our handling of this as it is a very ugly picture on the product and market radar."

572.    On April 18, 2018, Mr. Sowell reported to his colleagues that he was meeting with the president of Carezone and "plan[ned] to completely rip him a new one over not only their volume but also their extreme[] U65 mix.  I am making them beg to not be term[inat]ed essentially."

### iv.    Aetna Was Successful in Its Scheme to Limit Enrollment of Beneficiaries with Disabilities

573.    In late February or early March 2019, Mr. Sowell gave a presentation to his Aetna colleagues on Aetna's ongoing efforts to reduce its exposure to the "<65" population. Mr. Sowell noted that, for the strategic channel, the proportion of Aetna Medicare Advantage sales to people with disabilities had fallen from 35 percent in 2017 to 29 percent in 2019.

574.    On May 3, 2019, eHealth's Mr. Rooney reported to his boss, Mr. Ratkovic, that he had "[m]et with Aetna senior leadership to discuss mix and retention of MA business. Our <65 MA mix is approx. 22% YTD (down 50%+ since Q1 2017). Aetna would like [us] to be in the 13-15% range."

575.    On August 19, 2019, Mr. Sowell emailed Aetna's Head of Georgia Market that "[w]ith greatly intensified pressure [eHealth's] U65% has dropped from 35 to 25% since 2017. So, the concern remains that we have a disproportionate amount of U65 on the books. However, we can drive focus in the markets with stronger MBR and risk scores in terms of prioritization."

576.    On November 2, 2020, Mr. Sowell wrote to eHealth's Mr. Shasha, "You guys have . . . done a super job with U65 mix for us.  We have a really, really strong expectation and you

have had a massive turnaround. It is likely to produce more funding for you. . . ."  Mr. Shasha forwarded this email to Mr. Ratkovic, noting that "Aetna is jazzed that our U65/ESRD mix is improving, down from 25% to 15% (not sure on the measurement period)."

577.    In a February 2021 slide presentation that Mr. Sowell prepared for his managers, and that Mr. Luna subsequently forwarded to Mr. Ciano, Mr. Sowell touted a "Key Improvement – U65 mix has remained under 21% for 2021, down from nearly 40% since 2017."

### C.    Anthem

#### 1.    Anthem Paid Kickbacks to GoHealth and eHealth to Steer Medicare Beneficiaries to Aetna Plans and Limit Enrollments in Competitors' Plans

578.    From 2017 through at least 2021, Anthem paid GoHealth and eHealth a combined hundreds of millions of dollars in exchange for their commitments to sell specific quantities of Anthem's Medicare Advantage plans.

579.    When negotiating each payment, Anthem typically agreed upon a certain number of sales—sometimes referred to as "production" targets or "commitments"—that GoHealth or eHealth was expected to achieve in exchange for the payments from Anthem.  Anthem often pressured GoHealth and eHealth to drive more Anthem sales by threatening to withhold future payments if the brokers failed to deliver the expected number of enrollments.

580.    In Anthem's written contracts with GoHealth and eHealth, however, they attempted to disguise these payments as reimbursement for bona fide "marketing" activities.  They knew that providing kickbacks for enrollments was unlawful, so they carefully avoided any reference to their underlying agreements for specific enrollment numbers.  Instead, Anthem's written agreements with brokers were intentionally drafted so that "the expense is tied to the reconciliation of the 'calls' vs the production of sales."

581.    Anthem, GoHealth, and eHealth knew that the references to "marketing" payments in the contracts were facades, and that Anthem was paying for enrollments of beneficiaries in Anthem's Medicare Advantage plans.  They knew that any marketing activities pursued and any marketing expenses incurred were not relevant to the contracts because the payments were contingent on the number of Medicare beneficiaries that GoHealth or eHealth enrolled in Anthem plans.

582.    Anthem also sought to induce sales by providing additional kickbacks intended for agents at GoHealth and eHealth, including reimbursements for gift cards, expensive consumer items, and meals.  Anthem knew that these kickbacks would "drive [agent] behavior" and induce sales of Anthem's Medicare Advantage plans regardless of whether its plans best served the needs of any given beneficiary.  As GoHealth's Ms. Heider explained to several Anthem employees in January 2021, such "promo" payments would be "put . . . to good use rewarding agents for Anthem sales."

583.    The intended and actual result of these illicit payments was that GoHealth and eHealth, each of whom claimed to be acting in the best interests of Medicare beneficiaries, steered beneficiaries to Anthem's Medicare Advantage plans, regardless of whether plans offered by competing insurers would have better served the health care needs of those beneficiaries.

### 2.    Anthem's Kickbacks to GoHealth

584.    From 2017 through at least 2021, Anthem paid GoHealth more than $230 million in kickbacks in return for commitments from GoHealth to meet specific targets for enrollment of beneficiaries in Anthem's Medicare Advantage plans.

585.    Anthem and GoHealth both knew these payments were illegal and drafted contracts that intentionally hid their true purpose.  On April 25, 2017, Rhonda Clark, an Anthem executive, explained to her staff that Anthem could provide funds "for **marketing reimbursement only**" and

that "[a]bsolutely nothing in writing or in verbal conversations internally or externally can refer to this as a bonus, incentive or anything other than marketing reimbursement."  Thus, the written contracts between Anthem and GoHealth were typically labeled as "Medicare Marketing Agreement" or "Call Development Program Agreement," the payments were typically identified as "marketing development funds" (or MDF), and the purported consideration was the generation of "call and lead volume."

586.    Anthem and GoHealth understood that the payments were not in exchange for marketing services, and were instead for enrollments in Anthem's Medicare Advantage plans. Indeed, Anthem's Ms. Clark confirmed that Anthem had no way to track or confirm the calls for which it was purportedly paying millions of dollars.

587.    Like many other brokers, GoHealth advertised its services primarily on television, online, and through mailers. At GoHealth, calls from these carrier-neutral advertisements were then funneled to its internal sales team, which GoHealth called its "captive team."  GoHealth was able to "dictate what products these agents write every day."

588.    GoHealth also contracted with downline agencies, which it often referred to as Virtual Marketing Organizations ("VMOs").  In addition, GoHealth had a program called "MaaS" (marketplace as a service), which was a hybrid channel between an internal GoHealth captive team and a VMO.   For its preferred carriers (i.e., carriers who paid GoHealth more money per enrollment), GoHealth created carrier-focused or carrier-dedicated teams.  Agents on these teams were provided carrier-neutral leads but were instructed to prioritize selling a specific carrier's plans.

589.    In particular, GoHealth created "Anthem-dedicated" and "Anthem-focused" teams to steer beneficiaries to Anthem's Medicare Advantage plans.  Agents on these teams were directed

to "lead with Anthem" when discussing Medicare insurance options with beneficiaries, often received additional compensation for Anthem sales, and had limited or no ability to sell other carriers' plans.  These practices contradicted GoHealth's numerous public statements that it used an "[u]nbiased, carrier-agnostic approach" that "empowers consumers to match with the right plan for their needs."

590.    Anthem viewed GoHealth's misleading statements about providing unbiased advice as a benefit.  Internally, an Anthem executive recognized the "significant [sales] growth" that came with paying brokers, such as GoHealth, who "highlight[ed] the perception of shopping everything within a market and picking the best plan," while in fact they steered beneficiaries towards Anthem plans in exchange for "[m]arketing investments."

591.    **2017**.  Anthem began paying GoHealth sham "marketing" dollars in 2017 after GoHealth made clear that it would increase its sales of Anthem plans only if Anthem provided that remuneration.  Anthem paid GoHealth $1.17 million in 2017 for alleged marketing services.

592.    On June 28, 2017, in connection with a meeting to discuss GoHealth sales for Anthem's West Region, Peter Filippini, GoHealth's Vice President of Business Development, met with several Anthem executives, including Rhonda Clark (Anthem's Vice President for National Medicare Sales) and Jon Barian (Specialty Sales Broker Director for Anthem Medicare Programs). In connection with this meeting, Mr. Filippini prepared a slide deck in which GoHealth requested "$350,000 in marketing development funds . . . leading to a production goal of 1,000 Medicare Advantage submissions."   Because the primary purpose of the payments was sales and not marketing, GoHealth's slides did not discuss what types of marketing activities GoHealth would offer.  Rather, Anthem and GoHealth discussed the number of enrollments or cost per enrollment that a specific amount of "marketing" funding would generate.  Two days later, on June 30, 2017,

GoHealth's Ben Miller told colleagues that Anthem had "proposed $200k in MDF for 1000 submissions (a $200 CPA)."

593.    On July 7, 2017, Mr. Barian explained to his colleagues, "I spoke with Peter [Filippini] this morning.  They are eager to get this rolling."  He explained the following proposal:

1.  Invoice us for Marketing leads or "live transfer leads"
2.  Language " Carrier X is sponsoring "x" amount of dollars going towards marketing expense["]
3.  Agree upon a sales target
4.  Has to be Submitted Apps as all deals have been submitted.
5.  Proposing 3 levels:
a.  200k= 900 submitted applications
b.  250k= 1,050 Submitted applications
c.  300k= 1,200 Submitted applications[.]

594.    On July 11, 2017, Anthem ultimately agreed to pay GoHealth $250,000 for 1,250 "Targeted Submissions."  Although Anthem and GoHealth expressly negotiated for 1,250 policy submissions, GoHealth stated on the invoice for this transaction, also dated July 11, 2017, that Anthem was paying for "5,000 live transfers at an average internal cost of $50 to produce."  "Live transfers" generally referred to phone calls to a representative.

595.    On August 22, 2017, GoHealth's Mr. Sullivan recounted to his colleagues that he had "just got off the phone with Rob Cleary who is the [Anthem] AVP of sales for the 7 central markets.  After a little back and forth on the CPA [cost per acquisition], we settled to start with them giving us $250k for 1000 app's (any type, any state) focused on a 1/1 effective date . . . .  He told me he had $13M in bonus dollars available for this year so the money will be there if we execute."  Even though Anthem and GoHealth agreed that the money was payment for 1,000 Medicare beneficiary enrollments, GoHealth's invoice for this transaction, dated August 31, 2017, again misleadingly described the $250,000 as being for "5,000 live transfers at an average internal cost of $50 to produce."

596.    GoHealth executives knew they could not lawfully solicit "marketing" dollars in exchange for Medicare Advantage sales, and they openly discussed their efforts to obscure the true nature of their agreements with Anthem in written documents to avoid CMS scrutiny.

597.    For example, on August 31, 2017, Mr. Miller emailed several GoHealth colleagues about whether to include a chart reflecting a "Targeted Cost per Acquisition" in an upcoming presentation to Anthem. Mr. Miller noted that "we typically try to avoid putting that in writing that blatantly, given CMS precautions." Mr. Owens responded that "no contract will ever contain that provision in writing." Mr. Filippini added that he was "all for being conservative with what we put in writing for Medicare."

598.    Anthem did not track or measure "live transfers" or "leads." Anthem measured the success of its purported marketing investments based upon the number of Anthem sales that GoHealth provided. Mr. Cleary, Anthem's Regional Vice President for Central Region Medicare Sales, explained this to GoHealth in an email on September 6, 2017: "The minute you hit 1000 sales effective 1-1-18 we will reimburse you the marketing funds and also start the clock again."

599.    Later in 2017, GoHealth proposed that Anthem agree to pay $250 per enrollment on an ongoing basis. On October 10, 2017, Mr. Filippini offered to Jarod Blue (an Anthem National Broker Sales Manager) that, in exchange for "$100k coop marketing development fund," GoHealth would agree to a "400 submitted application target" with the understanding that "[o]nce target is hit, program is funded with another $100k in perpetuity."

600.    In a subsequent email, Mr. Filippini explained that "[w]ith additional funding available once we burn through the first investment, we will be incentivized to write the business much quicker." Although the parties reached an understanding on a "400 submitted application target" in exchange for $100,000 (or $250 per submitted application), on or about November 1,

2017, GoHealth provided Anthem's East Region with a $100,000 invoice for "2,000 live transfers at an avg internal cost of $50 to produce."

601.    Anthem made it clear that if GoHealth did not reach the agreed-upon sales number for a particular payment, GoHealth would still owe those sales to Anthem in the following period.

602.    Thus, on January 2, 2018, Mr. Filippini explained to his GoHealth colleagues, "We owe the [Anthem] Central region an additional 147 apps to hit our commitment, which was originally set for 1/1 effective production." By January 11, 2018, according to Mr. Filippini, GoHealth "still owe[d] Anthem Central 54 apps to hit our Central 2017 commitment." GoHealth fulfilled that sales commitment the following week.

603.    **2018**. In 2018, Anthem paid GoHealth approximately $4.9 million for alleged marketing services in exchange for enrollments in Anthem plans.

604.    In February 2018, Anthem and GoHealth negotiated the terms of their next agreement. On February 6, 2018, Mr. Filippini reported to his GoHealth colleagues, "We received approval today for another $250k from the [Anthem] West Region in perpetuity (as long as our cancel rate is acceptable)."

605.    If Anthem did not provide GoHealth with additional kickbacks for sales, GoHealth would at times threaten to reduce Anthem production or otherwise slow down the number of additional sales it would provide. For example, in late March and early April 2018, Mr. Filippini sought to convince Anthem's East Region to pay additional money to GoHealth. On April 9, 2018, Mr. Filippini wrote to Anthem's Mr. Blue, "We're . . . now 187 submissions passed [sic] our 400 target in the East. I'm really trying to avoid a slowdown in the East, but it's not looking good." On April 24, 2018, Mr. Blue wrote to Mr. Filippini that "we have approval for an additional $750,000 MDF (Anthem National MDF $750K)."

606.    On May 1, 2018, GoHealth sent Anthem a $750,000 invoice.  The invoice did not mention the "submissions" that were the actual consideration for Anthem's payment but instead referenced "15,000 live transfers at an avg internal cost of $50 to produce."  Anthem paid this invoice on May 24, 2018.

607.    In September 2018, GoHealth continued to make commitments to sell specific quantities of Anthem's Medicare Advantage policies in exchange for marketing development funds.

608.    For example, on September 17, 2018, Mr. Filippini told Mr. Blue that GoHealth would be sending Anthem a $1.5 million invoice for the "Q4 2018 Anthem National MDF - Medicare Advantage and Medicare Supplement":

- •    Marketing Investment - $1,500,000 (NET30)
- •    Production target - 6,000 submissions
- •    Timeline - Q4 2018 (Active once MDF invoice #65465 is complete)

However, the invoice that GoHealth sent to Anthem did not reference "6,000 submissions," and instead stated the $1.5 million was for "30,000 live transfers at an avg internal cost of $50 to produce."

609.    On October 26, 2018, Mr. Blue (by that time, Anthem's Director of Sales) proposed that Anthem and GoHealth memorialize this agreement in writing, noting in his email to Mr. Filippini that, "[t]his agreement would cover the current investment of $1.5M already agreed to."  The written agreement, which was finalized on October 31, 2018, stated that Anthem would pay GoHealth a $1.5 million "Marketing Expense Fee," but made no mention of the "6,000 submissions" that GoHealth had agreed to deliver to Anthem in exchange for the $1.5 million.

610.    On November 13, 2018, Josiah Bush, Anthem's Staff Vice President for National Medicare Sales, reported to GoHealth's CEO Clint Jones and Mr. Filippini that "Rhonda [Clark]

and I just met with Marc Russo [Anthem's President of Medicare] and were able to secure an additional $1M in investment for incremental applications/sales from you all."

611. The next day, despite this acknowledgment of a payment for "incremental applications/sales," GoHealth sent Anthem a $1 million invoice for "20,000 live transfers at an avg internal cost of $50 to produce." By November 28, 2018, the parties had a fully executed written agreement covering the $1 million payment. Again, the agreement referenced "marketing and administrative reimbursement" and made no mention of the sales GoHealth had agreed to deliver in exchange for Anthem's money.

612. Anthem considered several ways to restructure the language in its "marketing service" agreements with GoHealth and other brokers, mostly as an attempt to allow Anthem to hold brokers accountable for their sales commitments while still obfuscating the actual goals of the transactions.

613. In particular, Anthem employees considered various ways to "claw back" or "true-up" marketing investments if sales targets were not reached, but they did not place those requirements in writing because they knew it was a violation of federal law.

614. In July 2018, GoHealth employees discussed the possibility of Anthem substantially increasing the payment per enrollment (or "submission") from $250 to $400, and how GoHealth could steer more beneficiaries to Anthem plans in order to capitalize the much higher payouts.

615. On July 27, 2018, in an internal chat with Mr. Miller, GoHealth's Jake Gudmundsen (then Vice President of Operations for Direct Sales) commented that "I[']m thinking we do a little less [H]umana . . . and more Anthem . . . if they are paying $400." Mr. Miller concurred that

"Anthem is going to be the next biggest area to push. I think our strategy should be to get to target at or slightly above the low case for Humana then put the rest to anthem."

616.    Two days later, on July 29, 2018, Mr. Gudmundsen wrote to several of his colleagues recounting a recent meeting where GoHealth's "Scott [Sullivan] mentioned that we may be able to boost Anthem's MDF commitment to $400 a submission if we move our target from 6k-12k policies."    Mr. Gudmundsen then proposed, "If we are able to secure that commitment, we should target the Humana Low case and pivot an additional 6k policies to Anthem.  This would drive an additional $1.8M in GAAP EBITDA this year without increasing aggregate production.  If we can secure this deal we should 100% pass on Cigna for 2018."  In other words, the additional payments would not require any additional effort by GoHealth to increase aggregate production.  Instead, GoHealth would simply shift beneficiaries to Anthem plans and away from the plans of MAOs that paid less money per enrollment.

617.    **2019.**  In 2019, Anthem paid over $64 million in supposed "marketing funds" to GoHealth in exchange for enrollments of Medicare beneficiaries in Anthem plans.

618.    On December 11, 2018, Anthem's Mr. Blue sent Mr. Filippini and Brad Burd, GoHealth's General Counsel, a draft contract for Anthem to pay GoHealth $7 million for "marketing and administrative investment" during the first half of 2019.

619.    Unlike the parties' prior two written contracts, Anthem included in the draft a "Production Target[]" of 17,500 applications.  In other words, Anthem would agree to pay the $400 per application that GoHealth had discussed earlier in the year, but Anthem wanted "some teeth" in the agreement to ensure that GoHealth met its production target.

620.    Anthem and GoHealth then discussed whether the agreement should reference the production target that the parties had negotiated.  On December 14, 2018, Mr. Burd returned a

redline to Anthem in which he struck the "Production Target[]" and commented that "these are marketing funds, which are purely for marketing reimbursement and cannot be tied to application counts." Anthem's Mr. Blue replied that, because of a recent change in the Medicare Marketing Guidelines, Anthem's "compliance [department] wants to keep the production targets included in the agreement." Mr. Burd then cautioned that "[m]any of the other carriers that we [GoHealth] work with do not interpret this [updated Medicare Marketing Guideline] language the same way." He said that GoHealth would only agree to expressly (and accurately) reference "production targets" in the agreement if Anthem agreed to indemnify GoHealth for any liability flowing from the unlawful payments.

621.    Anthem ultimately chose to hide the true purpose of the payments rather than indemnify GoHealth for any liability. The written agreement executed by the parties did not reference the agreed-upon "production target," and it also did not include an indemnification provision. And on January 2, 2019, GoHealth provided Anthem with a $7 million invoice for "140,000 live transfers at an avg internal cost of $50 to produce." Anthem paid that invoice on January 28, 2019.

622.    Later in 2019, Anthem changed the terminology in its contracts to refer to "minimum quarterly call volume" rather than "calls and lead volume." But its managers reassured GoHealth that although "the invoices will be for calls delivered . . . our underlying business agreement is still for sales." Several other communications to brokers stressed the same point: "push agreements" with brokers were "structured as marketing reimbursements [but were] based on actual sales."

623.    As part of the "Anthem Push" in January 2019, GoHealth paid agents more for each Anthem enrollment than for enrollments into other carriers' plans.

624.    On January 8, 2019, in "a quick update on our Anthem sales push in January so far," Eric Wagner, GoHealth's Vice President of Sales, told his sales management team that "THIS IS OUR BIGGEST INITIATIVE FOR THE YEAR!" and that "Compensation and commissions are setup [sic] to really favor Anthem sales."

625.    As Stephen Schmieg, a GoHealth Medicare Team Captive Manager explained to his agents in an email on January 10, 2019, their Anthem sales the previous day "made you more money because those apps are worth the most since Anthem is paying us more."

626.    Anthem was well aware of GoHealth's efforts to incentivize agents to favor Anthem plans.  On December 28, 2018, Mr. Miller reported to Mr. Blue that GoHealth was giving "Anthem incentives" to its downline agencies for sales in the first quarter of 2019.  In the same email chain, Mr. Gudmundsen added that "kicking off some large scale Anthem contests [for GoHealth's Captive sales force] in January will have a huge impact."

627.    On January 11, 2019, in the course of ongoing negotiations over the terms of a separate commission agreement between Anthem and GoHealth, GoHealth's Mr. Burd noted to several Anthem executives, including Mr. Bush and Mr. Blue, that "we [GoHealth] are making a substantial investment by increasing our Anthem production to the exclusion of other carriers." Similarly, that same day, Mr. Miller told Mr. Bush that GoHealth had achieved increased Anthem sales through various efforts to "shift volume from other carriers to Anthem."

628.    On the morning of January 30, 2019, Myra Reynolds, a GoHealth Captive Team Sales Manager, reminded her agents that "[i]t's all about Anthem!!!  Remember, when you get a call from an Anthem state- JUMP INTO YOUR ANTHEM PLANS!  Two more days, will you make it to your next pay out????"  Mr. Wagner received a copy of this email and replied to the

agents that "[y]ou should be targeting at least 70% [Anthem]. You are leaving money on the table if you aren't selling Anthem when you have the opportunity."

629.    In an email on March 13, 2019 to GoHealth managers at a regional office, GoHealth's Mr. Lessem directed that the managers "coach agents on pitching Anthem first on each call." Similarly, on March 18, 2019, an Anthem Team Manager in Utah told his agents that "If you get spotted leading your call with Anthem you can receive a bonus $25 gift card on the spot!"

630.    By May 5, 2019, GoHealth had exceeded the 17,500 "production target" on which the parties had agreed in exchange for Anthem's $7 million, and GoHealth was pushing to get more money from Anthem.

631.    On May 13, 2019, Anthem and GoHealth finalized a written agreement for Anthem to pay GoHealth $13 million.

632.    However, GoHealth's aggressive steering of beneficiaries to Anthem plans resulted in numerous beneficiary complaints, including by beneficiaries who asserted that they had not wanted to enroll in an Anthem plan. Also on May 13, 2019, Mr. Bush noted to his Anthem colleagues that "[w]e have seen a huge spike in [complaints to Medicare] from GoHealth where the beneficiary claims they did not request to enroll in the plan." Notwithstanding these complaints, Anthem continued paying GoHealth tens of millions of dollars to incentivize additional sales.

633.    On May 23, 2019, Mr. Bush sent Mr. Jones and Mr. Miller a draft contract providing for Anthem to pay GoHealth approximately $33.6 million, inclusive of the $13 million on which the parties already had agreed. Because this was lower than the $58.7 million that GoHealth had proposed a month earlier, Mr. Bush stated, "we understand [the reduced money] will come with a lower sales commitment."

634.   Anthem and GoHealth continued their struggle to negotiate contract terms that memorialized the parties' agreement without disclosing its true purpose.  As in earlier agreements, they omitted any reference to their agreed-upon "sales commitment" and instead stated that GoHealth would deliver a specified numbers of "calls" each quarter.  The contract defined what a "call" was, even though Anthem and GoHealth knew that this definition was irrelevant because they both understood that the payments were for sales—not calls.  Mr. Bush's comment on the new definition of "call" was that "I can live with this being here, however I don't want this to open us up to a debate on what is a call given *our underlying business agreement is sales*" (emphasis added).

635.   Similarly, an early draft of the contract included a provision that if the contract were terminated, GoHealth would keep any funds expended on marketing activities and return any funds not expended on marketing activities.  This draft provision was consistent with the purported consideration for the payments (reimbursement for marketing activities) but was contrary to the true purpose of the parties' agreement (payment for sales).  But as Anthem's Mr. Bush explained to GoHealth's Mr. Jones and Mr. Miller, "Our Legal believes this [provision] needs to be in here to avoid any anti-kickback risk."

636.   The parties finalized their new written contract on May 29, 2019.  The final contract did not contain the draft provision regarding the disposition of marketing funds upon the termination of the contract, but stated that "[u]nder no circumstances may payments made to Agency pursuant to this Program be shared with individual agents working for Agency as additional 'compensation.'"  Although the final contract ostensibly prohibited GoHealth from sharing "marketing" dollars with its agents, both Anthem and GoHealth knew that at least some of the funds would be used for precisely that purpose.

637. GoHealth often created sales contests where agents could receive additional compensation for prioritizing the sale of Anthem plans. These contests were often funded by payments Anthem made to GoHealth.

638. For example, on July 24, 2019, Craig Terry, a GoHealth Director for Captive Medicare in Utah (i.e., a supervisor of agent managers), reminded his Team Managers that "our July goal is to have 10 Anthem Apps/day from each team" and that "if we hit it we'll be getting at least $1000 in a kicker bonus."

639. Similarly, an August 2019 compensation plan for managers in GoHealth's Captive sales force provided for "Anthem Push Bonus[es]" for total sales in the month. And, for the fourth quarter of 2019, GoHealth's compensation plans for certain agent teams provided for higher per-sale bonuses for Anthem plans than for plans of Anthem's competitors. For at least the first week of November 2019, GoHealth also ran Anthem-focused sales contests for its agents and managers.

640. On August 5, 2019, Mr. Miller advised Mr. Blue that "we are providing more MDF [to GoHealth downline broker agencies] this year than ever before and have growth quarter over quarter, focusing that MDF growth on producers who deliver optimal Anthem production."

641. On August 28, 2019, Mr. Miller told Ms. Clark and Mr. Bush that, in exchange for an additional $11.275 million in marketing money from Anthem in 2019, GoHealth proposed to generate "an additional 20,000 2019 submissions" by executing a "Q4 Anthem Push" that would include "additional downline producer growth and incentives."

642. Mr. Blue explained to Anthem's internal accounting department that "[t]here will be a check request coming through for GoHealth for their Q4 payment for the sales they will deliver . . . . Because we are no longer referring to these as 'marketing agreements' the invoices will be calls delivered, but our underlying agreement is still for sales."

643.    On August 30, 2019, Mr. Miller reported to one of his GoHealth colleagues that he had "[j]ust closed a commitment for another $2.725M of Anthem Q4 MDF . . . drops straight to bottom line!"  In other words, this payment was not spent or used to reimburse actual marketing expenses.

644.    On September 19, 2019, Anthem agreed to pay GoHealth a total of an additional $6.2 million.  Mr. Blue then provided Mr. Bush with a draft email to his boss, Mr. Russo, explaining that Anthem's payment to GoHealth was for a total "sales target" of 9,500 sales.  Again, Mr. Blue clarified that "[b]ecause we are no longer referring to these as 'marketing agreements' the invoices will be for calls delivered, but our underlying business agreement is still for sales."

645.    On November 13, 2019, Mr. Blue again prepared a draft email for Mr. Bush to use to obtain approval of an additional $2.04 million payment to GoHealth.  Mr. Blue wrote that the payment was "for sales they will deliver," that there was a "5,100 additional Q4 submission target" for "4,080 incremental sales," and that "the invoices will be for calls delivered, but our underlying business agreement is still for sales."  The parties' final written agreement, finalized on November 13, 2019, made no mention of sales.

646.    On December 12, 2019, Mr. Miller reported to several of his GoHealth colleagues that a unit of GoHealth "ran a few Anthem-focused contests/bonuses from 12/3 - 12/7 to try to eat into the Anthem commitment as much as possible. From those contests, we got positive lift in Anthem mix and total volume that got us much closer to goal . . . ."  Mr. Miller added that "Anthem gave GoHealth $75,000 a few months back for 'Q4 incentives/contests' that this can come out of, and is exactly the kind of thing they wanted us to do with that money."

647.    In addition to understanding that "marketing development funds" would result in GoHealth steering beneficiaries to its plans over other MAOs' plans, Anthem also understood that

providing substantial funds would keep larger carriers, such as Aetna and UnitedHealthcare, off

GoHealth's platform, at least for a time.

648.    In an email to Felicia Norwood on August 14, 2019, Mr. Russo wrote, "Rhonda

[Clark] and her team . . . have concluded that we can confidently plan to spend an additional $67M

dollars through these partners in 2020 (on top of the $94M), and drive an incremental 126K sales."

He added:

> Go Health (the EMO [electronic marketing organization] partner that has driven the most
> sales for us) is currently not selling for United or Aetna.  Both United and Aetna have
> begun to aggressively knock on Go Health's door to begin working with them. Over half
> of the $67M incremental investment consideration is earmarked for Go Health.  They've
> indicated that if we were to commit to this increased spend, there would be no compelling
> reason for them to open the dialogue with United or Aetna.

649.    **2020**.  In 2020, Anthem paid GoHealth $90 million in alleged marketing funds in

exchange for commitments by GoHealth to sell specific quantities of Anthem's Medicare

Advantage plans.

650.    By the fall of 2019, Anthem and GoHealth were discussing the possibility of

Anthem paying GoHealth $90 million in exchange for 200,000 Medicare Advantage submissions

in 2020.  On October 21, 2019, Mr. Miller confirmed to Mr. Gudmundsen that "we committed to

200k MAs for anthem next year . . . for $90M."

651.    On March 10, 2020, Mr. Blue sent Mr. Miller a draft contract amendment providing

for Anthem to pay GoHealth $13.5 million for the second quarter of 2020 in exchange for 108,000

"minimum quarterly call/lead volume."   However, in his cover email, Mr. Blue confirmed that

Mr. Miller understood the real purpose of their agreement:

> [C]onfirm the underlying business agreement based on our prior conversations:
>   1. Timeline – April 1 – June 30, 2020 (Q2 2020)
>   2. 30,000 MA submission target
>   3. Investment - $13,500,000

On information and belief, the parties did not track the "call/lead volume" going forward.

652.    That same day, GoHealth provided Anthem with a $13.5 million invoice for "108,000 Medicare Calls." The next day, March 11, 2020, Mr. Bush told one of his colleagues that "[t]here will be multiple check requests coming through for the EMO Q2 Investments for sales each will deliver."

653.    On March 30, 2020, Anthem and GoHealth amended their agreement again to provide for a total payment of $14.5 million for the second quarter, and GoHealth duly provided Anthem with a $1 million invoice for "8,000 Calls."

654.    GoHealth had proposed to Anthem, in March 2020, that it would leverage a "Dedicated Anthem Team" to generate more enrollments for Anthem. Particularly, GoHealth explained that it would funnel calls generated from "non-Anthem branded" advertisements to a team where "GoHealth agents sell[] only Anthem products (no other carrier)."

655.    On April 1, 2020, GoHealth announced to its Program Managers that it was adopting a "carrier agnostic model" where compensation would be the same regardless of which MAO's plan an agent sold. GoHealth explained that this change would "encourag[e] agents to sell the best possible plan rather than the one that is incentivized the most." By this change, GoHealth implicitly acknowledged that its recent compensation structures, which compensated agents more for Anthem enrollments, induced agents to steer Medicare beneficiaries towards Anthem plans instead of enrolling them in "the best possible plan."

656.    When GoHealth did not compensate its employees more for Anthem sales, Anthem enrollments dropped. In April 2020, GoHealth's Mr. Wagner noted that Anthem sales by GoHealth's agents in Chicago had dropped "because of our new April comp plan that pays evenly across all carriers."

657.    Consequently, GoHealth's commitment to being "carrier agnostic" did not last long.  On April 13, 2020, Mr. Miller directed the distribution to GoHealth's VMO (i.e., downline broker agency) sales team of an email noting, among other things, that GoHealth's "Q2+ Go-Forward Strategy & Plan" for downline agencies was to "[c]ontinue focusing on growing Anthem submissions through both MDF allocation as well as carrier-varying commissions revenue shares to incent producer behavior (VMO increase is needed to hit Q2 commitments)."

658.    On April 15, 2020, Mr. Miller asked his colleague, Brian Rueth, to arrange a time to talk to another one of their colleagues, Ryan Murphy, a Senior Financial Analyst who was responsible for dealing with downline agencies, about the "[n]eed to get Anthem production up. Can do it via a handshake and MDF agreement after the fact or multiple times throughout the month/quarter."  Then, on April 28, 2020, Mr. Murphy noted to his colleagues that one particular downline agency "was able to pivot to more Anthem production after we pitched the special program on 4/15."  Later, GoHealth observed that this particular agency "hit highest production tier" during the April through June 2020 period.  GoHealth also financed various other Anthem contests for agents of its downline producers in 2020.

659.    To address the anticipated Anthem shortfall internally, GoHealth did exactly as Mr. Gudmundsen suggested: increase agent compensation and run contests focused on Anthem sales.  From May 11 to 15, 2020, GoHealth ran an Anthem contest for certain of its agents, so that they again received more money for selling Anthem Medicare Advantage plans than they received for selling other carriers' plans.  Mr. Wagner observed that the contest drove increased Anthem production.

660.    There was no contest in place on Monday, May 18, 2020, however, and Mr. Wagner observed that, on that day, the "Anthem numbers [were] lower [than on Friday May 15, 2020]

without contest." Thus, on May 20, 2020, GoHealth initiated another Anthem-focused contest that lasted through the end of that month.

661.    Still, GoHealth faced the prospect of not meeting its upcoming sales commitments to Anthem. In an instant message exchange on May 28, 2020, Mr. Miller told Mr. Gudmundsen that "Anthem is pissed . . . . [T]alked to them about Q3 production and the misses to expect . . . not a fun phone call." Mr. Gudmundsen responded that "if we incent . . . [I] can make it up."

662.    Later that day, Mr. Miller told two GoHealth colleagues, "I'm getting desperate for Anthem production in Q3 and Q4 to not miss our total MDF commitment." The next day, Mr. Gudmundsen remarked to Mr. Miller and others at GoHealth, "One of our biggest Q3 concerns is not receiving Anthem MDF in Q4 if we miss again in Q3. To hit Q3, we need to not only be feeding the full staffing numbers, but we have to incent a higher production of Anthem among those agents." Mr. Miller concurred, writing that "[w]e are at a flashing red alert with Anthem right now in terms of production misses and the relationship, given they put a lot of their eggs in our basket production-wise and us coming up short two quarters in a row would cause them to miss Street guidance and it's causing an absolute storm internally." Mr. Miller added that the "[o]fficial word from Clint [Jones] on Friday was to 'do whatever you need to do to not miss the Anthem commitment.' So, I am spinning up as many Anthem focused incentives on the VMO to try to close gap. Same as Jake [Gudmundsen] internally."

663.    Similarly, on June 1, 2020, Mr. Miller wrote to Mr. Jones that "[i]t is hugely important to close as much of the June-September gap as possible, as this now has the eyes of all of Anthem leadership. Jake and I are both putting in place aggressive Anthem incentives across internal and external that we can talk to."

664.    Later that day, Mr. Miller circulated to his GoHealth colleagues a "VMO 2020 Anthem Push" proposal for the third quarter of the year.  It contained tiered amounts of payment per Anthem sale for specific GoHealth partners, depending on the number of overall Anthem sales they delivered during the quarter.  For example, the plan contemplated paying one of GoHealth's downline agencies, Choice Health, $75 per Anthem sale if it delivered at least 996 Anthem sales during the quarter, $150 per sale if it delivered at least 1300 Anthem sales, and $200 per sale if it delivered more than 1,600 Anthem sales.

665.    In his cover email, Mr. Miller explained that he did not want to offer more because "[Ryan] Watts [the CEO of Choice Health] referenced '$200 of MDF and I'll juice Anthem as much as you want.'"  Mr. Miller asked Mr. Rueth to "tell him [Mr. Watts] to pump Anthem as much as physically possible."

666.    Anthem knew GoHealth was providing its downline agencies with these "aggressive Anthem incentives" to focus on selling Anthem plans over other plans.  On June 8, 2020, Mr. Miller provided an update directly to Ms. Clark, Mr. Bush, and Mr. Blue of Anthem, letting them know that GoHealth had "finalized 'production push' programs for June-Sept with 6 different key VMO partners, who will be scaling up additional production via marketing efforts and agent incentives . . . internal agent contests are underway . . . .  Lastly, we are in the process of rolling out a 25-50 agent 'Anthem focused' internal team that will serve in more of a dedicated capacity for Anthem and scale production and focus those agents."  Both Anthem and GoHealth knew that "agent incentives" to sell Anthem in exchange for Anthem's payments violated the law.

667.    GoHealth manipulated its agents' licensing and appointments to favor Anthem around this time, due to receipt of the "marketing" funding.  GoHealth's Mr. Miller wrote to his CEO, Mr. Jones, that GoHealth "will be starting new agents on an Anthem focus team before they

'earn' broader carrier appointments in order to focus more Anthem production from that group. CPAs [costs-per-acquisition] will be higher, but much is offset by the $450 in MDF per app we get from [Anthem] that simply wouldn't be earned otherwise if we don't produce the commitment." GoHealth also moved agents across its "focused" or "dedicated" teams in this period based on the "commitment" of marketing funding.

668.    During the second and third weeks of June 2020, GoHealth ran Anthem contests for its Captive agents "with thresholds and payouts as follows: 6 sales = $50, 8 sales = $100, 12 sales = $150, 15 sales = $200, 20 sales = $300."

669.    In turn, a GoHealth employee commented that "these funds will go a long way to incentivize our growing Anthem-focused team and top Anthem performers." The next quarter, Anthem provided similar support for Anthem sales contests, and GoHealth noted that "[t]hese budgets always help drive behavior and sales." Such contests, which provided cash awards, gift cards, and other prize giveaways, continued at least through 2021.

670.    GoHealth promised Anthem that "every possible lever is being pulled" for Anthem sales in August 2020, including paying agents "variably more on Anthem production above any other carrier" and incentivizing GoHealth's downline partners. As GoHealth's Mr. Miller told Mr. Blue, "all focus remains on Anthem production."

671.    Despite pulling "every possible lever" to steer sales to Anthem, however, GoHealth still fell short of its third-quarter 2020 sales commitment to Anthem. This sales deficit was rolled into the next quarter, meaning that GoHealth would make up the shortfall without additional payment. This maneuver was never directly acknowledged in the parties' marketing agreements because the parties knew that Anthem was not supposed to provide marketing funds in exchange for sales.

672.    On August 30, 2020, Mr. Blue sent Mr. Miller a draft contract amendment pursuant to which Anthem would pay GoHealth $42.5 million in the fourth quarter.  In his cover email, Mr. Blue made the following request:

> Please reply and confirm we are aligned on the underlying business agreement tied to the investments:
> Q4 Program Payment: $42,500,000
> Q4 Submission Target: 94,445
> Projected Submission Deficit (Q1-Q3): 8,933
> Total Q4 Submission Target: 103,378

Mr. Miller replied that GoHealth was "[a]ligned on the business language you stated below. Production is being ramped up to achieve that."

673.    Anthem knew that GoHealth continued to use its kickbacks to support, at least in part, "Anthem focused" and "Anthem dedicated" teams.  On September 10, 2020, as a follow-up to a meeting between GoHealth and Anthem executives earlier that day, Ms. Heider told Mr. Blue that "we are putting the steps in place now to help us achieve these [fourth quarter Anthem sales] targets, like increasing the size of the dedicated team to close to ~150 agents."  Similarly, on September 22, 2020, Mr. Wagner told Mr. Miller that he was "planning on 225 [agents] for [the] Anthem [focused team] with 60-75 [agents] in CLT [Charlotte]."

674.    Internally at Anthem, in an email to Ms. Norwood on September 14, 2020, Ulf Ester-Bode, an Anthem finance executive, noted the failures of GoHealth and other brokers to meet their Anthem sales commitments in July and August 2020.  He commented that "[w]e expect our EMO [i.e., broker] partners to make up the membership commitment in future months *given that their payment is dependent on hitting the targets*" (emphasis added).

675.    Around this time in September 2020, GoHealth had begun a call routing strategy to "balance and achieve all [its] 2020 MDF Commitments," including to Anthem, by using "advanced

call routing methodology."  GoHealth's methodology focused on the total funding received from insurers.

676.    On Sunday, September 20, 2020, Mr. Miller sent Mr. Bush and Mr. Blue a copy of the slides he had presented to them during a meeting on the preceding Friday.  In the slide deck, GoHealth listed various steps it was taking to generate more Anthem sales, including:

- Agents being paid 50% higher on Anthem policies over all other carriers . . .
- Agents continue to be added to the Anthem dedicated team, where the Anthem sales/day are ~1.5x that of multi-carrier Captive
  - Dedicated team will be ~150 agents by 10/15 . . .
- All AEP contests have been defined and scoped, with the vast majority of them being Anthem-focused.

677.    Continuing into late 2020, Mr. Miller stressed GoHealth's steering towards Anthem.  As he told Mr. Bush and Ms. Clark, the GoHealth "team continues to pull every lever within our power to maximize Anthem mix and volume."

678.    For agents on the Anthem focused team, GoHealth's October 2020 "Bonus Plan" again offered higher bonuses for Anthem sales than for sales of plans offered by other carriers.  GoHealth also offered a monthly "Anthem Kicker" of $500 if an Anthem focused team agent made at least sixty sales and Anthem accounted for at least eighty percent of those sales in October, November, or December 2020.  For team managers and program managers on the Anthem focused team, according to GoHealth's October 2020 compensation plans, GoHealth paid "100% of the quarterly bonus if the team/program hits 60% Anthem sales mix."

679.    The pressure to prioritize Anthem over other carriers met with resistance from some GoHealth agents, who had concerns about placing beneficiaries in Medicare Advantage plans that did not best suit their needs.

680.    On November 2, 2020, Mr. Gudmundsen (who by this point was GoHealth's President of Medicare and Internal Distribution) forwarded to two of his senior colleagues a message from an agent on the Anthem focused team:

> I wanted to chat about getting my Anthem volume up- I honestly don't know how anyone is having more Anthem than the other carriers, when the UHC and Humana Gold Plans I'm seeing 9/10 are better...I enroll them on the 'BEST' plan I have access to to prevent another agent calling them with the other carriers and switching them. It's important to me that I'm not just looking at today, but making sure they stay on the plan...I'm just not seeing that be Anthem too often!

> Have you heard this from others? I am struggling with the fact that my non-Anthem are paid so much less... What does the company want? Anthem now? Or retention long term? Seems they are more often than not one in the same... I would like to see a commission plan that compensates doing the best for the customer, company and myself are the same thing. *I don't like being incentived [sic] to push a plan that may not be best long term and the reality is this will cost me thousands of dollars over the course of AEP if I don't* (emphasis added).

681.    Similarly, in agent exit interview responses that Mr. Gudmundsen and Mr. Wagner received on June 14, 2021, one agent complained about having been "move[d] to a campaign which forced me to sell a sp[e]cific plan in order to earn a commission. I sold about 50% of my sales were uhc [i.e., UnitedHealthcare], they moved me to an anthem team which cut the commission to my uhc by 50%.  They tell us to sell the best program for our clients . . . ."

682.    On November 4, 2021, a GoHealth agent who was assigned to a dedicated agent team wrote similarly in a company chat forum:

> [W]e are supposed to be the one stop shop for [M]edicare where we are licensed with ALL of the major insurance carriers.  We are supposed to have our customer's backs and be able to give them impartial recommendations about which plan is going to be best for them.  Yeah, I understand that the leads are being generated by wellcare so we have to honor their marketing, but if we keep giving preferential treatment to companies like wellcare *and anthem*, it completely sullies the integrity of this enterprise and what we are supposed to be doing here. (emphasis added)

683.    Pooja Patel, a GoHealth Senior Manager of Commercial Strategy, noted that other GoHealth agents had expressed their agreement with this comment, indicating broader concern

with GoHealth's preferential treatment for Anthem because of its kickbacks. Nonetheless, GoHealth continued pushing its agents, including those both on and off its Anthem focused teams, to prioritize Anthem.

684.    On November 19, 2020, GoHealth's Matt Caton reported to his colleagues that one of GoHealth's "Anthem Focused team[s] turned around performance pushing above 65% Anthem for the first time since 11/6 by refocusing their agents and pushing back [o]n agent excuses for why they weren't selling Anthem." That same day, Mr. Miller reported to Mr. Gudmundsen that "[R]honda [Clark] thanked us yesterday . . . for 'being a good partner even when their product isn't the best.'"

685.    Ultimately, as Mr. Caton later reported, GoHealth "ended with 24.7% Anthem policies across Captive and the Anthem Focused team" during the 2020 AEP. Anthem's national market share in 2020 and 2021 was approximately six percent.

686.    **2021**. In 2021, Anthem paid GoHealth a total of $70.7 million in "marketing" funding in exchange for GoHealth enrolling specific numbers of Medicare beneficiaries in Anthem Medicare Advantage plans.

687.    On December 28, 2020, Anthem's Mr. Blue outlined for his managers the "underlying business agreements" with GoHealth and other brokers for the first quarter of 2021.

688.    Anthem's agreement with GoHealth was as follows:

- Q1 (Jan-March) submissions
- 36,500 submission target
- 29,000 baseline submission target
- 7,500 2020 gap submission target [for the sales "owed" from 2020]
- $9,550,000 Q1 Program Payment…
- ****Investment is based on $330 CPA [cost per acquisition] on the baseline targets **only**. This reduction in CPA from $450 **assumes approval of the 1st year override increase to $340**.

689.    In other words, Anthem and GoHealth were discussing an agreement where Anthem would pay GoHealth a $330 marketing fee and a $340 administrative fee per each Medicare Advantage enrollment.  Like the marketing fee, the administrative fee was allegedly to "reimburse" GoHealth for administrative costs related to selling Anthem's Medicare Advantage plans.  The administrative fee was often referred to by GoHealth and Anthem as an "override."

690.    This agreement, like the ones before it, had little to do with marketing services. Furthermore, while Anthem had increased its separate administrative override from $200 to $340 per sale, GoHealth did not pass the "override increase" through to partners or downline agencies, and thus, on January 25, 2021, Mr. Miller explained to one of his GoHealth colleagues that "immediately all this does is just increase our gross margin to VMO."

691.    GoHealth continued to provide misleading invoices for these transactions.  On December 30, 2020, GoHealth sent Anthem a $9,550,000 invoice for "76,400 Marketing Calls." On January 6, 2021, the parties executed a written agreement for over $9.5 million.  The contract made no mention of the parties' "underlying business agreement[]" for sales.

692.    GoHealth struggled to meet its 2021 first quarter Anthem sales goals and, therefore, felt tremendous pressure to "pull every lever" to generate the Anthem sales it had promised.  As Mr. Miller described in January 2021, Anthem would be a "no ceiling" insurer for GoHealth, because "we'll continue to get MDF upside perpetually the more we write."

693.    On January 13, 2021, when discussing how GoHealth's multi-carrier and Anthem focused teams' overall Anthem mix was under 20 percent, Mr. Gudmundsen asked, "What is our strategy to increase this?"  Kyle Webster, a GoHealth Strategy Associate, replied: "the action items that are currently in motion for addressing the low Anthem volume are as follows: 1. Expand the

Anthem Dedicated Team…2. Sales Team Contests: Anthem sales contests…3. Leaderboard Reminders: Anthem sales are worth 2x the other carriers on the leaderboards."

694.    Mr. Miller subsequently commented that "[w]hatever levers can be pulled, we need to pull them.  We CANNOT miss Q1 goal, after the large miss that 2020 was, and we are currently digging a ~100 policy/day hole here in January that is going to continue to get tougher to dig out of unless we see a lift across the business."  Mr. Webster then told his colleagues that GoHealth would be implementing new Anthem sales contests for GoHealth's general agents and its Anthem-Dedicated teams over the course of that week and the following week.

695.    Internally, GoHealth instructed its Anthem-focused team "that they need to lead with Anthem."  Furthermore, GoHealth set the "expectations that Anthem is number 1 choice as an Anthem team," "[c]ontinu[ed] to message the monetary impact of pitching and selling Anthem policies," and made "sure everyone knows their goals and are bought into the understanding why Anthem is so important to the company."  Thus, as Program Manager Steven Harrison's group of agents was transitioning from the GoHealth multi-carrier team to its Anthem-focused team in February 2021, he reported that the immediate goal was to "[i]mprove Anthem Mix from 10.75% to 40% on our way to ultimately hitting 70%."

696.    GoHealth shared with Anthem the steps it took to steer beneficiaries towards Anthem plans. For example, in a slide deck that GoHealth executives presented to Anthem executives in February 2021, GoHealth noted that its Anthem focused team had "agents selling only Anthem plans in top Anthem markets."

697.    In March 2021, Katrina Walter, a Director of Product Management at GoHealth, submitted a ticket within GoHealth's technical system requesting to "alter the marketplace to have Anthem + Anthem Subsidiary plans rise to the top when marketplace loads," so that agents could

"view Anthem plans easily."  Ms. Walter explained that "Anthem's MDF commitment is the largest of any carrier and it is critical that we achieve all targets."

698.    GoHealth's March 2021 "Bonus Plan" for its multi-carrier agents again offered higher bonuses for Anthem sales than for sales of other carriers' plans, and it offered monthly bonuses for total Anthem sales but not for total sales of other carriers' plans.  As a GoHealth sales trainer observed on April 29, 2021, "there are additional incentives in place for selling specific carriers, like Anthem so agents are driven to focus more effort on selling these plans to gain that monetary value."

699.    GoHealth's Anthem-focused teams prioritized profit over beneficiary needs.  For example, on March 17, 2021, GoHealth's Chief Operating Officer, Shane Cruz, asked his colleagues "what would happen if we decided to ramp down (or eliminate) that [Anthem] focused team and had everyone on the full multi-carrier model."  Matthew Van Der Bosch, GoHealth's Senior Director of Revenue and Customer Operations, stated that, while lifetime commission values for sales of agents on the Anthem-focused team were lower than those of other agents (because beneficiaries who had been sold Anthem plans by GoHealth's Anthem-focused agents tended to leave the plans relatively quickly), "this isn't enough to offset the higher Anthem MDF." Similarly, on the same day, Mr. Gudmundsen told Mr. Miller that pushing Anthem sales made financial sense for GoHealth because "Anthem MDF is worth 40% of a policy . . . so unless retention is 40% worse . . .  which it will never be . . . if anything we will increase that [Anthem focused] team."

700.    All the while, GoHealth's Anthem-focused team generated consumer complaints at a much higher rate than GoHealth's other sales teams. On July 12, 2021, one of Mr. Miller's GoHealth colleagues showed him a graph with complaint rates for GoHealth's various sales teams,

including an Anthem-focused team in Charlotte with complaint rates at nearly five times GoHealth's national rate.

701.    In response, Mr. Miller explained that "Anthem is the only dedicated program left (and those agents can sell other products) . . . .  I would love to not have that dedicated Anthem program anymore but it'd just come down to our ability to hit forecasted [Annual Enrollment Period] numbers that we set out at the beginning of the year and then committed to via carrier facing MDF."

702.    In April 2021, GoHealth attempted to mislead its own auditors about the "underlying business agreement" GoHealth had with Anthem.  Mr. Miller told Anthem's Mr. Blue that GoHealth's auditors at Ernst & Young had "requested a note from Anthem (from you is fine) regarding the most recent marketing agreement."  Mr. Miller then provided a draft of such a note, including the following language: "the spirit of the amendment is to compensate GoHealth for calls delivered during the period January 1, 2021 through June 30, 2021 effective 1/1/21.  Once the minimum call volume thresholds are met, GoHealth has satisfied its obligations to us and have earned the compensation as outlined in the amendment."

703.    Both Mr. Miller and Mr. Blue knew that this proposed note was false because Anthem's "marketing development funds" were provided in exchange for submissions or sales, and GoHealth's failure to deliver the agreed-upon number of submissions or sales in a quarter would result in GoHealth having to deliver those sales later— regardless of any "call volume," which Anthem was not even tracking.

704.    In May 2021, Ms. Clark forwarded to her boss, William Roth, tables showing how Anthem was shifting some of its compensation to GoHealth from marketing development funds to administrative overrides.  The new structure reduced the "MDF per Enrollment" amount from

$600 to $485 (and the "MDF per Submission" from $450 to $350) but increased the "override" for new business from $200 to $340. Ms. Clark explained that the tables "outline the methodology of the previous structure and the new structure, which is detail that is not included in the actual contract."

705. The "actual contract" referenced by Ms. Clark was a May 2021 contract amendment for an additional $38.9 million from Anthem to GoHealth over the course of the year. Mr. Miller explained to Ms. Heider that, for 2021, Anthem had "paid us MDF for the 87,500 subs," and would pay GoHealth "$350 MDF per submission above that."

706. On June 1, 2021, GoHealth provided Anthem with an $11 million "First Installment" invoice for "Calls to be delivered Apr - Dec 2021."

707. On June 18, 2021, Mr. Bush advised Elena McFann, Anthem's President of Medicare, that there would be a check request coming to pay this invoice and that "[b]ecause we are no longer referring to these as 'marketing agreements' the invoice[] will be for calls delivered, but our underlying business agreement is still for sales."

708. GoHealth continued to use Anthem's kickbacks, some in the form of "promo" or "contest" payments, to incentivize agents to sell Anthem plans—even as the parties' contracts continued to contain an explicit prohibition on such illegal behavior. On repeated occasions during October and November 2021, GoHealth's Ms. Heider told her Anthem counterparts that "[w]e're allocating some of the Q4 Contest/Incentive budget Anthem provided to some of our top performing VMO partners to drive additional production." Similarly, on December 7, 2021, GoHealth's Carson Toy told Mr. Blue and others at Anthem that GoHealth had "continu[ed] to run Anthem VMO incentives to drive production results through the end of AEP."

709.    Anthem's inducement of GoHealth's steering efforts proved to be very effective. As the Government's graph below demonstrates, after Anthem began offering GoHealth substantial kickbacks in the form of "marketing" dollars in 2017, Anthem Medicare Advantage plans consistently achieved a much higher share of sales at GoHealth (at times above thirty percent) than in the national marketplace (where it hovered between approximately four and six percent).



710.    Anthem and GoHealth knew that the marketing funding from Anthem caused Anthem plans to obtain a grossly disproportionate share of GoHealth sales compared to Anthem sales nationally.  As Mr. Gudmundsen explained to his colleagues in April 2020, "[i]n a perfect world I would assume that our production mirrors the market which would have United get to 40% of our current sales mix. . . . Our big issues are Anthem and Wellcare being way overproduced and United being underproduced."

711.    Similarly, GoHealth's CFO, Travis Matthiesen, observed that "in our 2021 assumptions we have our largest carriers starting to move closer to equilibrium with market share, Anthem is still skewed compared to their share of the market."

712.    As Anthem began providing substantial kickbacks in 2017, Anthem's share of GoHealth enrollments increased at a similar rate.  Likewise, when Anthem reduced its amount of purported marketing development funds, the overall share of Anthem Medicare Advantage plan enrollments on GoHealth's platform generally decreased.

### 3.    Anthem's Kickbacks to eHealth

713.    **2017 and 2018**.  In 2017 Anthem paid eHealth $600,000 for alleged marketing services, but really in exchange for enrollments of beneficiaries into Anthem's Medicare Advantage plans.  The parties continued their payment relationship in 2018, during which Anthem paid eHealth $6,950,000 for alleged marketing services in exchange for such enrollments.

714.    Throughout 2017 and 2018, eHealth and Anthem executed a series of "Advertising Agreements," often colloquially referred to as "marketing agreements" or "Mini-Site agreements," in which Anthem purported to reimburse eHealth for various marketing expenses.

715.    Some of these agreements were for "marketing program[s]" for Anthem Medicare products during a specified time period and within a particular geographic region, in exchange for a specific sum of money.  For example, in two separate contracts covering the period from February 1, 2018, through March 31, 2018, Anthem agreed to pay eHealth $250,000 for a marketing program related to Anthem's Medicare products in Georgia, Indiana, Kentucky, Missouri, Ohio, Tennessee, and Wisconsin, and $150,000 for a marketing program related to Anthem's Medicare products in California, Nevada, Colorado, New Mexico, Texas, and Washington.

716.    Other agreements were for eHealth to conduct marketing programs "related to [Anthem's] Medicare products with a goal of attracting Users to the eHealth Call Center" in exchange for a specific sum of money, but not within any specific geographic limits.  For example, in two separate contracts covering September 2018 and the period of October 1, 2018, through December 31, 2018, Anthem agreed to pay eHealth $750,000 and $2,000,000, respectively, for a "marketing" program related to Anthem's Medicare products with a purported goal of attracting beneficiaries to an eHealth Call Center.

717.    Notwithstanding the language of the written agreements, the parties' communications show that these so-called "marketing" reimbursements were merely smokescreens constructed to disguise the fact that Anthem was, in truth, providing remuneration to induce eHealth to sell specific numbers of Anthem's Medicare Advantage policies and to prioritize the sale of Anthem plans over competing carriers' plans.  The parties' communications about these agreements made little or no mention of any specific marketing services that eHealth was purportedly agreeing to provide.

718.    Anthem took these actions even though it was Anthem's policy for agents that, "[a]t all times[,] you must keep your client's best interest in mind.  You have an obligation to enroll your client in the Medicare plan that best fits the client's healthcare needs.  At no time should you enroll a Medicare beneficiary in a plan based on the plan's compensation amount, or refer a client to a provider in exchange for referral rewards paid to you from the provider.  Steering Medicare beneficiaries based on the promise of incentives or enticements from any party is not allowed."

719.    In contravention of its own policy, Anthem intended that its various "marketing" payments to eHealth would "drive additional sales" of Anthem's plans.  For example, in an email to colleagues summarizing expected marketing investments in the fourth quarter of 2017,

Anthem's David Lococo noted that Anthem would pay eHealth "$250,000 for 1,250 applications" in the West region, and "$250,000 for 2,750 applications" in the Central region.

720.    Anthem also made clear that it expected eHealth to meet its sales commitments and that future "investments" depended on eHealth's performance, meaning that eHealth achieved the agreed-upon sales goals for Anthem's plans.

721.    Upon the signing of one of these marketing agreements, eHealth's Ms. Dean indicated in an October 17, 2017, email to various Anthem employees that eHealth would immediately begin "pulling levers" to benefit Anthem.  On the same day, Anthem's Mr. Blue wrote to an Anthem colleague that Anthem would "keep an extremely close eye on [eHealth's] commitments."

722.    On January 9, 2018, Mr. Blue informed Ms. Dean (by that time, the Vice President of Partner Integrations) that Anthem had allocated a "$250,000 investment to drive 1000 new sales," to be followed by "[a]n additional $250,000 once the 'firm' 1000 sales goal is met."

723.    In mid-2018, eHealth provided Anthem with a proposal for a $2.4 million payment in exchange for a commitment of over 13,000 new Anthem applications.  In the proposal, eHealth indicated that it would achieve these sales increases through a dedicated Anthem enrollment team and an Anthem-only "Mini-Site" to "help limit competitors."  Ms. Dean noted in an email regarding this proposal that "[t]he carriers are looking at the total sent application number and not the sent apps by mini-site or one marketing effort."

724.    In an email to colleagues on July 16, 2018, regarding carrier-specific sponsorships, eHealth's Mr. Hakim noted "[b]ottom line is that these $$'s are for selling MA plans and if we miss their targets for MA the $$'s will not flow next year."

725.    **2019, 2020, and 2021**.   In 2019, eHealth and Anthem began executing "Call Development Agreements."   Rather than referring to nebulous "marketing programs," these contract documents and invoices contemplated a specific number of "calls delivered" during a particular period (typically a quarter), in exchange for a specific sum of money.   Mr. Blue explained that this new system of "pre-funding" also required that "any calls not delivered in that quarter planned will be added into the expectation for the following quarter."

726.    Despite these marked changes in their written agreements, Anthem made clear in its communications with eHealth that "nothing about our underlying business agreement will change in terms of expected deliverables."   Specifically, the communications between and amongst Anthem and eHealth about these "Call Development Agreements" made clear that "the invoices will be for calls delivered, but [the] underlying business agreement is still for sales."

727.    This sentiment—that despite the content of their written contracts, the underlying business agreement between Anthem and eHealth was for sales of Anthem's Medicare Advantage plans—was repeated in numerous email communications throughout 2019, 2020, and 2021.

728.    Through these agreements, Anthem paid eHealth $11,200,000 in 2019, $4,950,000 in 2020, and $8,535,790 in 2021. While Anthem and eHealth represented that these payments were made for bona fide marketing services, they were in fact payments in exchange for agreed-upon sales of Anthem's Medicare Advantage plans.

729.    For example, a Call Development Agreement executed in August 2019 required Anthem to pay eHealth a total of $7.6 million for a minimum call volume of 417,500 over the third and fourth quarters of 2019.   However, in email communications regarding the payment of eHealth's invoices stemming from that agreement, Katie Merrick, Anthem's Project Administrator for National Medicare Sales, asked Mr. Blue to clarify "how many sales this represents and for

what time period." Mr. Blue explained in response that Anthem's $7.6 million payment to eHealth was for 19,000 submissions.

730.    Similarly, a Call Development Agreement covering the period from January 1 through March 31, 2020, and a subsequent amendment to that agreement, purported to require eHealth to deliver at least 117,857 calls in exchange for $2.75 million.

731.    According to the terms of the written contract, this money was "to cover actual, documented [eHealth] expenses incurred in an effort to [g]enerate calls." However, accompanying email communications between eHealth and Anthem discussing the agreement and amendment show that both parties understood that eHealth's true obligation was to produce 6,470 total applications for Anthem in exchange for Anthem's $2.75 million "investment."

732.    Notably, the invoices submitted by eHealth to Anthem for payment related to this Call Development Agreement did not actually document any of eHealth's expenses incurred; rather, they demanded lump sum payments for "services rendered."

733.    Consistent with the pre-funding provisions of the "Call Development Agreements," eHealth understood that, if it did not deliver on the agreed-upon sales commitment during a particular funding period, Anthem expected eHealth to make up the difference during a subsequent quarter.

734.    Anthem monitored eHealth's sales closely and pressured eHealth to ensure that it met the agreed-upon sales targets. In an email to eHealth on October 29, 2020, Mr. Bush stated, "Looking at production based on the commitments you all have with us we grow more concerned each day." He continued, "It sounds like several other carriers are winning over [Anthem] in your model, but I want to be very clear that we expect you all to hit your commitments to the dollars

we invested."  eHealth's Mr. Ratkovic responded that "we are pulling on every lever possible for our Anthem relationship."

735.    Both eHealth and Anthem understood that their various written agreements which purported to govern "marketing" reimbursements or payments for "calls" or "leads" were in fact a pretense constructed to disguise the fact that Anthem was paying eHealth for sales of its Medicare Advantage plans.  For example, in the fourth quarter of 2020, eHealth's Mr. Shasha expressed concern that "Anthem production will be in a hole coming out of AEP, coming into Q1 we are looking at a deficit of $4.7m."  There was no contractual basis for a sales "deficit" that eHealth had to "make up," but that was the parties' "underlying agreement," and Mr. Shasha knew it.

736.    Similarly, an eHealth spreadsheet from August 2021 stated that, for the fourth quarter of 2020, Anthem had paid eHealth "$400/App Prefund."  According to the spreadsheet, though, eHealth had not fulfilled its sales commitment to Anthem for 2020, and so "had to pay back apps not ach[ie]ved."

737.    In the second half of 2021, eHealth again missed an application "commitment" for Anthem and so "lost $400k" from the third quarter.  As Tom Loach, eHealth's Director of Carrier Development, explained internally at eHealth, "I was able to clawback $154k" despite the fact that "[w]e fell short of our commitments based on their investment."

738.    Starting in August 2021, Anthem increased the amount of administrative override payments made to eHealth for each Medicare Advantage enrollment to $340 per sale, just as it had done with GoHealth months before, thus allowing Anthem to "shift investments into override expenses" so that Anthem would have "levers to chargeback for rapid disenrollment."

739.    Though the increased administrative override fees were purportedly to pay the fair market value of administrative costs incurred by eHealth in selling Anthem's Medicare Advantage

plans, that was a fiction.  And indeed, eHealth had experience participating in similar such unlawful efforts to hide kickbacks in purported override payments.  For example, at an April 22, 2021 meeting, eHealth's Mr. Loach commented to his colleagues that Wellcare had "moved all their sponsorship into the override."  He explained that, while Wellcare had added additional administrative tasks "on paper at least," it was merely a ploy to "get[] around this FMV [fair market value]," meaning the commission cap.

740.    Anthem also provided kickbacks to eHealth's agents to reward and induce Anthem sales.  Anthem set a "promo budget" for eHealth, within which eHealth would have discretion to allocate the funds towards contests, prizes, and other remuneration for its employed agents. eHealth would then provide an invoice for payment to Anthem, along with receipts documenting expenditures on the various incentives provided to eHealth's agents.

741.    These giveaways were directly for sales of Anthem plans.  For example, in the fourth quarter of 2019, Anthem provided eHealth a $40,000 promotional budget to "ignite a fire for Q4 and reward [eHealth's] agents for outstanding performance."  eHealth used that money to provide thousands of dollars' worth of meals, gift cards, and expensive consumer items to its agents, including video game consoles, GoPro cameras, Apple Watches, and various other high dollar value incentives.

742.    In total, over the course of the period from 2017 through 2021, Anthem paid eHealth over $46 million in "marketing" money.  These payments had their intended effect, with Anthem's share of eHealth sales exceeding its national market share by a substantial margin during almost the entire period.

### D.    The Defendants' Kickback Schemes Harmed Medicare Beneficiaries

743.    As discussed, the kickbacks offered and paid by the Defendant Insurers motivated the Defendant Brokers to sell the Defendant Insurers' Medicare Advantage plans regardless of whether those plans were in the best interests of the brokers' clients.  And all Defendants were aware that the Medicare Advantage plans that the Defendant Brokers sold for the highest payout were frequently not the right plans for the Medicare beneficiaries who enrolled in them.

744.    The Defendant Insurers knew that the aggressive sales tactics from the Defendant Brokers resulted in high rates of complaints to Medicare by the beneficiaries, as well as rapid disenrollments from plans, reflecting the stark disconnect between the beneficiaries' needs and the plans into which the Defendant Brokers steered them.

745.    Even publicly, Humana's Chief Executive Officer, Mr. Broussard, recognized that telephonic brokers had led to unhelpful "churning" between plans as well as "higher compliance issues."  As he further explained at the "Goldman Sachs 14th Annual Healthcare CEOs Unscripted Conference" in January 2022, "[w]e've seen sales that have been sold that people didn't even know they were being sold.  So it's an aggressive channel."

746.    As discussed *supra*, Mr. Broussard had internally raised concerns with the volume of beneficiary complaints generated by GoHealth, but Humana's relationship with GoHealth continued despite his misgivings.

747.    In July 2021, Humana raised concerns directly to GoHealth, with compliance employees asking if GoHealth had "any thoughts on why the GoHealth agents had such a high CTM [complaints to Medicare] rate from the Joe Nammath [sic] commercial compared to" another broker.  Humana's data showed GoHealth generating nearly 10 complaints per 1,000 sales, which was more than sixteen times the rate of the other broker.

748.    Humana's Manager of Sales Compliance, Lee Ann Gaydosh, set up a call with GoHealth's Deputy General Counsel, Michael Boshardy, to discuss the high CTM rate. Ms. Gaydosh reported back to Humana leadership that "although [Mr. Boshardy] did not want to put it in email …..GoHealth is not as good at the sales process" (ellipsis in original), leading to the high complaint rate.   On information and belief, Humana did not take remedial action as to GoHealth.

749.    At the operational level, Humana generated regular "scorecards" for brokers that included the number of "compliance investigations" generated by the broker, including the number that were deemed as "Founded."  For example, a "Year in Review" scorecard for eHealth for 2020 showed both a rising rate of "Founded" complaints over the years and hundreds of "Founded" or "Inconclusive" complaints concerning enrollment applications to Humana.

750.    Aetna had similar knowledge of high rates of complaints generated by the brokers to which it paid kickbacks.  In 2021, for example, Mr. Luna discussed a "bonus program for brokers" but raised concern about "high CTM levels" and noted that "CMS has been reaching to us every month about the high level of CTMs."

751.    Aetna's Mr. Feret had "very candid conversations" with certain of Aetna's partner brokers, who acknowledged that "CTMs are higher across the board."  Mr. Luna asked, in response, how brokers could improve performance to mitigate the "high CTM cost" caused by brokers.

752.    Regularly in 2021, a large group of Aetna executives and managers met for a "CTM Reduction Meeting."  Slides for a November 2021 meeting acknowledged that Aetna's "Strategic Partners"—meaning telephonic brokers receiving payment from Aetna, including the Defendant Brokers—"led to 80% of these CTMs."

753.    The slides further noted various forms of complaints, including, just for the year to date, more than 1,300 complaints of enrollment without consent, 440 complaints of misrepresentation of a provider network, and nearly 700 complaints of other sales or benefit misrepresentations.  These represented multifold increases from prior years on multiple metrics, including a 514% increase in "MA Benefit Misrepresentation" complaints and a 365% increase in "MA Network Misrepresentation."

754.    The Defendant Brokers also understood potential harm to beneficiaries.  For example, a GoHealth agent asserted that GoHealth "wants you to consistently flip the same people into new policies even if the one they have is the best one for them."  As discussed previously, other GoHealth agents raised concern internally about financial pressure to sell certain carriers— particularly Anthem—over others, regardless of whether a different insurer had a better plan for a beneficiary.

755.    GoHealth also took actions, in direct response to kickbacks, which prevented beneficiaries from enrolling in the plan of their choice.  For example, in response to a $3.7 million payment from an MAO, Wellcare, GoHealth's Ms. Heider explained to a colleague in 2021 that, "even if [a lead] is non-branded from the $3.7M, we could only sell wellcare/centene MA plans on that, *even if the customer wanted a UHC plan or other carrier plan*" (emphasis added).  That is, even if a beneficiary contacted GoHealth as a result of a "non-branded" advertisement, and the beneficiary wanted to enroll in a different plan, GoHealth would not allow the beneficiary's preferred enrollment if it conflicted with GoHealth's kickback relationships and financial incentives.

756.    As a competitor's employee accurately surmised about GoHealth, using Humana as an example, "[i]f for whatever reason Humana either doesn't exist in that market or it's an

absolute wrong fit for that consumer – and I don't think they care if it's the wrong fit – they're just gonna push Humana until they hit that number."

757.    As with GoHealth, eHealth maintained a consistently high rate of complaints received from Medicare beneficiaries who interacted with eHealth agents.

758.    Complaints involved various harms to beneficiaries, including complaints of enrollment into Medicare Advantage plans without the beneficiaries' consent, complaints of beneficiaries whose primary care or other necessary medical providers were not in their new plans' networks, and complaints of aggressive or dishonest sales tactics.  In only the first half of 2021, for example, eHealth received more than 2,000 complaints of enrollment without consent, and more than 500 complaints of improper sales tactics.

759.    eHealth's compliance personnel substantiated numerous such complaints over years, including the following representative examples from 2019:

- In April 2019, a Medicare beneficiary complained that "she never completed an application or gave anyone permission to enroll her into the Aetna plan."

- In May 2019, an independent insurance broker complained that, after an eHealth agent convinced a Medicare beneficiary to switch from original Medicare and TRICARE (which covered the beneficiary's co-pays for ongoing cancer treatment) to a Humana Medicare Advantage plan, the beneficiary faced $17,000 in costs because the beneficiary's health care providers were out of network for the Humana plan.

- In June 2019, a Medicare beneficiary complained that she called eHealth for free information and later discovered that the agent enrolled her in a Humana Medicare Advantage plan without her permission.  The beneficiary stated that she had told the agent that she wanted to keep her UnitedHealthcare plan and that the agent promised her insurance would not change.

- In October 2019, a Medicare beneficiary complained that an eHealth agent had convinced him to switch from a Humana Medicare Advantage plan to a Wellcare Medicare Advantage plan, only to learn that the Wellcare plan's provider network did not include his health care providers.

760.    Further, eHealth directly "suppress[ed] carriers" on its online and telephonic platforms in order to increase sales for other insurers that paid kickbacks, regardless of the relative merits of the plans for beneficiaries.

761.    Like eHealth, SelectQuote understood that its kickback arrangements—and resulting preferences for paying insurers—caused problems for beneficiaries. For example, SelectQuote received millions of dollars in payments from an insurer (Wellcare) in exchange for a group of SelecQuote agents focused on selling that insurer's plans. But this program, called "Wellcare Direct," led to "higher CTMs and disenrollment rates" than SelectQuote's general sales model, including "33% higher" complaints in one period.

762.    A SelectQuote Senior Director of Sales Operations, Jack Sieger, candidly explained "the root cause of the issue from my perspective":

> Choice Agents only sell WellCare when it is the best plan for the client, while WCD [i.e., Wellcare Direct] sells *WC even if UHC or anyone else have a plan that better fits the clients [sic] needs*. While this doesn't explain 'founded' CTM complaints[] it can increase overall CTM's as clients will use CTM complaints to attempt to return to a prior or new plan. (Emphasis added.)

Mr. Kopmeyer forwarded Mr. Sieger's message to a colleague, stating simply that "We don't want to say this."

763.    As a SelectQuote Senior Sales Director explained, "From what I understand the economics make since [sic] for us to do this since it is an upfront cash grab."

764.    Like eHealth, SelectQuote acknowledged internally that it had "buil[t] out suppression tools," which could make certain MAOs or plans "not show in certain states or all together," without regard for the best interests of beneficiaries reaching out to SelectQuote.

## V.    THE DEFENDANTS MADE MATERIAL FALSE CLAIMS

### A.    The Defendants Made, or Caused to Be Made, Material False Claims Because They Violated the Anti-Kickback Statute

765.    Defendants knowingly made or presented, or caused to be made or presented, claims for payment to the United States that resulted from violations of the AKS.

766.    Defendants also knowingly made or presented, or caused to be made or presented, claims for payment to the United States that falsely represented compliance with material statutory, regulatory, and contractual requirements to comply with the AKS.

### 1.    The Defendant Insurers' Contracts with CMS Required Each Defendant Insurer to Agree to Comply with the AKS

767.    From 2016 through at least 2021, the Defendant Insurers entered into contracts with CMS to provide healthcare to Medicare-eligible beneficiaries under the Medicare Advantage program.

768.    In each of those contracts, the Defendant Insurers expressly certified that they would "comply with . . . Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law, the False Claims Act (31 [U.S.C.] §§3729 et. seq.), and the anti-kickback statute (§ 1128B(b) of the Act)."

769.    For each of those contracts, compliance with the contractual and regulatory provisions requiring compliance with the AKS was expressly "material to the performance of the MA contract." *Id.* § 422.504(a).

770.    When each Defendant Insurer renewed a contract for a subsequent year, it again expressly agreed to comply with the AKS.

771.    For example, on September 11, 2015, Humana, through its subsidiary Humana Wisconsin Health Organization Corporation, entered into Contract H6622 with CMS to provide

Medicare Advantage plans through December 31, 2016.  Humana's CFO Brian Kane signed the contract on Humana's behalf.

772.    Each year, through 2020, Humana renewed this contract.  On September 15, 2016, Contract H6622 was renewed through December 31, 2017.  Humana's CEO Mr. Broussard signed the contract on Humana's behalf.  On September 14, 2017, Contract H6622 was renewed through December 31, 2018, and Mr. Broussard again signed the contract for Humana.  On September 18, 2018, Contract H6622 was renewed through December 31, 2019, and Mr. Kane signed the contract on Humana's behalf.  On September 20, 2019, Contract H6622 was renewed through December 31, 2020, and Mr. Kane signed the contract on Humana's behalf.  On September 18, 2020, Contract H6622 was renewed through December 31, 2021, and Mr. Kane signed the contract on Human's behalf.

773.    Similarly, on September 11, 2015, Aetna, through its subsidiary Aetna Life Insurance Company, entered into Contract H5521 with CMS to provide Medicare Advantage plans through December 31, 2016.  Kimberly Covert, the Chief Financial Officer for Medicare Programs, signed the contract on Aetna's behalf.  On September 15, 2016, Contract H5521 was renewed through December 31, 2017; on September 14, 2017, Contract H5521 was renewed through December 31, 2018; and on September 18, 2018, Contract H5521 was renewed through December 31, 2019.  Ms. Covert signed each renewal through 2019 on Aetna's behalf.  On September 19, 2019, Contract H5521 was renewed through December 31, 2020.  Kevin Grozio, Aetna's Chief Financial Officer of Medicare, signed the contract on Aetna's behalf.  On September 16, 2020, Contract H5521 was renewed through December 31, 2021.  Mike Kavouras, Aetna's Vice President of Individual MA Strategy and Performance and Star Ratings, signed the contract on Aetna's behalf.

774.    Similarly, on September 11, 2015, Anthem, through its subsidiary Anthem Health Plans, Inc., entered into Contract H2836 with CMS to provide Medicare Advantage plans through December 31, 2015.  Marc Russo, Anthem's President of Medicare, signed the contract on Anthem's behalf.  On September 15, 2016, Contract H2836 was renewed through December 31, 2017; on September 14, 2017, it was renewed through December 31, 2018; on September 18, 2018, it was renewed through December 31, 2019; on September 19, 2019, Contract H2836 was renewed through December 31, 2020; and on September 16, 2020, it was renewed through December 31, 2021.  Mr. Russo signed each renewal on Anthem's behalf.

## 2.    The Defendant Insurers Certified in Their Claims for Payment That the Information They Provided Was Truthful

775.    To receive payment from CMS, each Defendant Insurer had to and did submit enrollment information for every beneficiary enrolled in one of its Medicare Advantage plans and, subsequently, monthly enrollment and payment data to CMS as well as a "Certification of Monthly [or Quarterly] Enrollment and Payment Data."  The Defendant Insurers each submitted enrollment and payment data, as well as the associated certification, to CMS monthly from 2016 through 2019.  Starting in 2020, the Defendant Insurers each submitted enrollment and payment data, as well as the associated certifications, to CMS on a quarterly basis.

776.    In submitting these data and associated certifications, the Defendant Insurers stated the following, as required by their contract and regulation: "The Organization hereby requests payment under the contract, and in doing so, makes the following certifications concerning CMS payments to the Organization.  The Organization acknowledges that the information described below directly affects the calculation of CMS payments to the Organization and that misrepresentations to CMS about the accuracy of such information may result in Federal civil

action and/or criminal prosecution . . . Based on best knowledge, information, and belief, all information submitted to CMS and/or its contractors is accurate, complete, and truthful."

777. For example, Ms. Covert submitted Certifications of Monthly [or Quarterly] Enrollment and Payment Data in each year of 2016-20. In 2016 through 2019, Ms. Covert signed on behalf of Aetna, Inc., and in 2020, Ms. Covert signed on behalf of CVS Health Corporation. In 2021, Kevin Grozio signed a Certification of Quarterly Enrollment data on behalf of CVS Health Corporation.

778. Mr. Kane submitted Certifications of Monthly [or Quarterly] Enrollment and Payment Data for Humana in each year of 2016-2021.

779. Mr. Russo signed Certifications of Monthly Enrollment and Payment Data for Anthem in each year of 2016-2018. Kristina Cournoyer, Anthem's Vice President of Finance for Medicare Programs, signed a Certification of Monthly Enrollment and Payment data in 2019. William Roth, Anthem's President of Medicare, signed a Certification of Quarterly Enrollment and Payment data in 2020. Elena McFann, Anthem's President of Medicare, signed a Certification of Quarterly Enrollment and Payment data in 2021.

780. Each Defendant Insurer's enrollment of a beneficiary was the initiation of a demand for the Government's monthly capitated payments to the Defendant Insurer for that beneficiary. Thus, each enrollment by the Defendant Insurers constituted presentment of a claim.

781. Each Defendant Insurers' transmittal to CMS of "accurate, complete, and truthful" data concerning "validly enrolled" beneficiaries also was a demand for, and a necessary precursor to, the Government's payment of the capitated rates for beneficiaries enrolled in the Defendant Insurer's plan. *See* 31 U.S.C. § 3729(b)(2) (defining "claim" under the FCA).

782.    Every time that the Defendant Insurers submitted beneficiary data and attestations concerning enrollments obtained from Defendant Brokers to which they had paid kickbacks in violation of the AKS, the Defendant Insurers falsely represented compliance with material statutory, regulatory, and contractual requirements to comply with the AKS. These false representations were material to the Government's payment decision.

### B. Aetna, Humana, and the Defendant Brokers Made, or Caused to Be Made, Material False Claims Because They Violated Anti-Discrimination Laws, Regulations, and Contractual Provisions

#### 1. Aetna and Humana Agreed in Contracts with CMS to Comply with Anti-Discrimination Laws and Regulations

783.    In each of their Medicare Advantage contracts with CMS, Aetna and Humana also expressly certified that they would "comply with the provisions of 42 [C.F.R.] § 422.110 concerning prohibitions against discrimination in beneficiary enrollment." Pursuant to 42 C.F.R. § 422.110, MAOs "may not deny, limit, or condition the coverage or furnishing of benefits to individuals eligible to enroll in a Medicare Advantage plan offered by the organization on the basis of any factor that is related to health status, including, but not limited to . . . disability." 42 C.F.R. § 422.110(a)(7).

784.    Beginning in September 2016, Aetna and Humana also agreed in their Medicare Advantage contracts to "comply with the requirements relating to Nondiscrimination in Health Programs and Activities in 45 [C.F.R.] Part 92, including submitting assurances that the MA Organization's health programs and activities would be operated in compliance with the nondiscrimination requirements, as required in 45 [C.F.R.] § 92.5." During the relevant time period, 45 C.F.R. § 92 prohibited, among other things, MAOs from implementing marketing practices that discriminate based on disability. 45 C.F.R. § 92.207 (2016).

785.     Beginning in September 2021, Aetna and Humana also agreed in their Medicare Advantage contracts that they would "comply with applicable anti-discrimination laws, including Title VI of the Civil Rights Act of 1964 (and pertinent regulations at 45 [C.F.R.] Part 80), §504 of the Rehabilitation Act of 1973 (and pertinent regulations at 45 [C.F.R.] Part 84), and the Age Discrimination Act of 1975 (and pertinent regulations at 45 [C.F.R.] Part 91)."

786.     Likewise, Aetna and Humana submitted "Assurance[s] of Compliance" with non-discrimination laws, in which they represented that they "agree[d] that compliance with this assurance constitutes a material condition of continued receipt of Federal financial assistance."

787.     For each Medicare Advantage contract Aetna and Humana entered into between 2016 and at least 2021, compliance with the contractual and regulatory provisions barring plans from limiting enrollment of beneficiaries with disabilities was expressly "material to the performance of the MA contract." *Id.* § 422.504(a).

## 2.     Aetna and Humana Conspired with the Defendant Brokers to Discriminate Against Medicare Beneficiaries with Disabilities in Violation of Contractual Requirements

788.     Despite expressly representing that they would comply with laws, regulations, and contractual provisions prohibiting discrimination against Medicare beneficiaries with disabilities, Aetna and Humana limited and otherwise discouraged enrollment of beneficiaries with disabilities in their Medicare Advantage plans.  From 2016 through at least 2021, Aetna and Humana conspired with the Defendant Brokers and others to enroll fewer disabled beneficiaries in their Medicare Advantage plans and reduce their overall proportions of disabled beneficiaries.

789.     From 2016 through at least 2021, Aetna and Humana submitted enrollment data to the Government requesting payment under their Medicare Advantage contracts, and they presented Certifications of Monthly [or Quarterly] Enrollment and Payment Data while they were knowingly

violating and while intending in the future to violate material statutory, regulatory, and contractual requirements concerning anti-discrimination.

790.    Every time that Aetna and Humana submitted beneficiary data and attestations while limiting and otherwise discouraging enrollment of beneficiaries with disabilities and while conspiring with the Defendant Brokers to do the same, the Aetna and Humana falsely represented compliance with material statutory, regulatory, and contractual requirements to comply with anti-discrimination laws.   These false representations were material to the Government's payment decision.

## VI.    EXAMPLES OF FALSE CLAIMS TO THE GOVERNMENT

### A.    Humana and GoHealth

791.    For each of the following beneficiaries who were enrolled pursuant to the above-described kickbacks, Humana submitted claims for payment to CMS in the form of enrollments and monthly beneficiary data and attested that the submitted information was "accurate, complete, and truthful" data concerning "validly enrolled" beneficiaries:

- In March 2016, under its contract H6609 and plan HumanaChoice, Humana submitted a claim with beneficiary data to CMS, including data related to Beneficiary 1.  Humana received payment pursuant to this claim.  In total, Medicare paid $6,278.22 to Humana for Beneficiary 1 in the year of Beneficiary 1's enrollment.

- In March 2017, under its contract H1951 and plan Humana Gold Plus, Humana submitted a claim with beneficiary data to CMS, including data related to Beneficiary 5.  Humana received payment pursuant to this claim.  In total, Medicare paid $10,365.57 to Humana for Beneficiary 5 in the year of Beneficiary 5's enrollment.

- In November 2018, under its contract H1036 and plan Humana Gold Plus, Humana submitted a claim with beneficiary data to CMS, including data related to Beneficiary 10.  Humana received payment pursuant to this claim.  In total, Medicare paid $22,721.88 to Humana for Beneficiary 10 in the year of Beneficiary 10's enrollment.

- In August 2019, under its contract H5525 and plan Humana Value Plus, Humana submitted a claim with beneficiary data to CMS, including data related to Beneficiary 11.  Humana received payment pursuant to this claim.  In total, Medicare paid $4,038.24 to Humana for Beneficiary 11 in the year of Beneficiary 11's enrollment.

- In February 2020, under its contract H0292 and plan Humana Gold Plus, Humana submitted a claim with beneficiary data to CMS, including data related to Beneficiary 14. Humana received payment pursuant to this claim. In total, Medicare paid $10,392.40 to Humana for Beneficiary 14 in the year of Beneficiary 14's enrollment.

The following table summarizes these and other examples of claims.

| Beneficiary | Defendant Broker | Defendant Insurer | Plan Name | Application Date; Effective Enrollment Date | CMS Payment to Insurer (Year of Enrollment) |
|---|---|---|---|---|---|
| 1 | GoHealth | Humana | HumanaChoice | Mar. 17, 2016; Apr. 1, 2016 | $6,278.22 |
| 2 | GoHealth | Humana | Humana Gold Plus | May 19, 2016; Jun. 1, 2016 | $6,367.76 |
| 3 | GoHealth | Humana | HumanaChoice | Nov. 9, 2016; Dec. 1, 2016 | $1,156.50 |
| 4 | GoHealth | Humana | Humana Gold Plus | Oct. 31, 2016; Jan. 1, 2017 | $32,620.92 |
| 5 | GoHealth | Humana | Humana Gold Plus | Mar. 21, 2017; Apr. 1, 2017 | $10,365.57 |
| 6 | GoHealth | Humana | HumanaChoice Florida | Oct. 24, 2017; Nov. 1, 2017 | $2,961.30 |
| 7 | GoHealth | Humana | Humana Gold Plus | Nov. 10, 2017; Jan. 1, 2018 | $10,351.32 |
| 8 | GoHealth | Humana | Humana Gold Plus | Apr. 12, 2018; May 1, 2018 | $20,526.40 |
| 9 | GoHealth | Humana | Humana Gold Plus | Aug. 20, 2018; Sep. 1, 2018 | $1,059.48 |
| 10 | GoHealth | Humana | Humana Gold Plus | Nov. 14, 2018; Jan. 1, 2019 | $22,721.88 |
| 11 | GoHealth | Humana | Humana Value Plus | Aug. 12, 2019; Sep. 1, 2019 | $4,038.24 |
| 12 | GoHealth | Humana | Humana Gold Plus | Oct. 15, 2019; Nov. 1, 2019 | $2,561.58 |
| 13 | GoHealth | Humana | Humana-Ochsner Network | Nov. 21, 2019; Jan. 1, 2020 | $20,256.72 |
| 14 | GoHealth | Humana | Humana Gold Plus | Feb. 10, 2020; Mar. 1, 2020 | $10,392.40 |
| 15 | GoHealth | Humana | Humana Community | Oct. 13, 2020; Nov. 1, 2020 | $964.34 |

| 16 | GoHealth | Humana | Humana Gold Plus | Nov. 24, 2020; Jan. 1, 2021 | $31,295.76 |
| 17 | GoHealth | Humana | Humana Gold Plus | Jun. 1, 2021; Jul. 1, 2021 | $16,378.86 |
| 18 | GoHealth | Humana | Humana Community | Aug. 24, 2021; Sep. 1, 2021 | $15,291.44 |

### B.    Humana and SelectQuote

792.    For each of the following beneficiaries who were enrolled pursuant to the above-described kickbacks, Humana submitted claims for payment to CMS in the form of enrollments and monthly beneficiary data and attested that the submitted information was "accurate, complete, and truthful" data concerning "validly enrolled" beneficiaries:

- In July 2016, under its contract H6622 and plan Humana Gold Plus, Humana submitted a claim with beneficiary data to CMS, including data related to Beneficiary 19. Humana received payment pursuant to this claim. In total, Medicare paid $13,307.30 to Humana for Beneficiary 19 in the year of Beneficiary 19's enrollment.

- In January 2017, under its contract H6622 and plan Humana Gold Plus, Humana submitted a claim with beneficiary data to CMS, including data related to Beneficiary 22. Humana received payment pursuant to this claim. In total, Medicare paid $4,137.54 to Humana for Beneficiary 22 in the year of Beneficiary 22's enrollment.

- In February 2018, under its contract H6622 and plan Humana Gold Plus, Humana submitted a claim with beneficiary data to CMS, including data related to Beneficiary 25. Humana received payment pursuant to this claim. In total, Medicare paid $8,180.10 to Humana for Beneficiary 25 in the year of Beneficiary 25's enrollment.

- In February 2019, under its contract H4141 and plan Humana Gold Plus, Humana submitted a claim with beneficiary data to CMS, including data related to Beneficiary 30. Humana received payment pursuant to this claim. In total, Medicare paid $18,200.90 to Humana for Beneficiary 30 in the year of Beneficiary 30's enrollment.

- In March 2020, under its contract H1951 and plan Humana Gold Plus, Humana submitted a claim with beneficiary data to CMS, including data related to Beneficiary 31. Humana received payment pursuant to this claim. In total, Medicare paid $18,341.91 to Humana for Beneficiary 31 in the year of Beneficiary 31's enrollment.

The following table summarizes these and other examples of claims.

| Beneficiary | Defendant Broker | Defendant Insurer | Plan Name | Application Date; Effective Enrollment Date | CMS Payment to Insurer (Year of Enrollment) |
|---|---|---|---|---|---|
| 19 | SelectQuote | Humana | Humana Gold Plus | Jul. 20, 2016; Aug. 1, 2016 | $13,307.30 |
| 20 | SelectQuote | Humana | HumanaChoice | Aug. 30, 2016; Sep. 1, 2016 | $8,800.48 |
| 21 | SelectQuote | Humana | HumanaChoice | Sep. 30, 2016; Oct. 1, 2016 | $8,537.34 |
| 22 | SelectQuote | Humana | Humana Gold Plus | Jan. 25, 2017; Feb. 1, 2017 | $4,137.54 |
| 23 | SelectQuote | Humana | HumanaChoice | Jun. 1, 2017; Jul. 1, 2017 | $4,768.14 |
| 24 | SelectQuote | Humana | Humana Gold Plus | Oct. 25, 2017; Nov. 1, 2017 | $2,185.64 |
| 25 | SelectQuote | Humana | Humana Gold Plus | Feb. 6, 2018; Mar. 1, 2018 | $8,180.10 |
| 26 | SelectQuote | Humana | HumanaChoice | Apr. 18, 2018; May 1, 2018 | $6,444.64 |
| 27 | SelectQuote | Humana | Humana Gold Plus | Oct. 10, 2018; Nov. 1, 2018 | $1,690.16 |
| 28 | SelectQuote | Humana | Humana Gold Plus | Dec. 6, 2018; Jan. 1, 2019 | $17,825.04 |
| 29 | SelectQuote | Humana | Humana Gold Plus | Dec. 6, 2018; Feb. 1, 2019 | $4,866.62 |
| 30 | SelectQuote | Humana | Humana Gold Plus | Feb. 11, 2019; Mar. 1, 2019 | $18,200.90 |
| 31 | SelectQuote | Humana | Humana Gold Plus | Mar. 18, 2020; Apr. 1, 2020 | $18,341.91 |
| 32 | SelectQuote | Humana | Humana Gold Plus | May 6, 2020; Jun. 1, 2020 | $1,480.22 |
| 33 | SelectQuote | Humana | Humana Gold Plus | Sep. 11, 2020; Oct. 1, 2020 | $2,344.92 |
| 34 | SelectQuote | Humana | Humana Gold Plus | Jan. 27, 2021; Feb. 1, 2021 | $7,515.97 |
| 35 | SelectQuote | Humana | HumanaChoice | Jul. 8, 2021; Aug. 1, 2021 | $2,629.20 |
| 36 | SelectQuote | Humana | HumanaChoice | Nov. 2, 2021; Dec. 1, 2021 | $746.78 |

C.      **Humana and eHealth**

793.    For each of the following beneficiaries who were enrolled pursuant to the above-described kickbacks, Humana submitted claims for payment to CMS in the form of enrollments and monthly beneficiary data and attested that the submitted information was "accurate, complete, and truthful" data concerning "validly enrolled" beneficiaries:

- In February 2016, under its contract H6622 and plan Humana Gold Plus, Humana submitted a claim with beneficiary data to CMS, including data related to Beneficiary 37. Humana received payment pursuant to this claim. In total, Medicare paid $12,477.00 to Humana for Beneficiary 37 in the year of Beneficiary 37's enrollment.

- In April 2017, under its contract H6622 and plan Humana Gold Plus, Humana submitted a claim with beneficiary data to CMS, including data related to Beneficiary 41. Humana received payment pursuant to this claim. In total, Medicare paid $16,561.60 to Humana for Beneficiary 41 in the year of Beneficiary 41's enrollment.

- In September 2018, under its contract H2649 and plan Humana Gold Plus, Humana submitted a claim with beneficiary data to CMS, including data related to Beneficiary 43. Humana received payment pursuant to this claim. In total, Medicare paid $6,189.30 to Humana for Beneficiary 43 in the year of Beneficiary 43's enrollment.

- In September 2019, under its contract H1036 and plan Humana Gold Plus, Humana submitted a claim with beneficiary data to CMS, including data related to Beneficiary 46. Humana received payment pursuant to this claim. In total, Medicare paid $2,648.76 to Humana for Beneficiary 46 in the year of Beneficiary 46's enrollment.

- In July 2020, under its contract H3533 and plan Humana Gold Plus, Humana submitted such a claim with beneficiary data to CMS, including data related to Beneficiary 50. Humana received payment pursuant to this claim. In total, Medicare paid $8,942.25 to Humana for Beneficiary 50 in the year of Beneficiary 50's enrollment.

- In March 2021, under its contract H5216 and plan HumanaChoice, Humana submitted such a claim with beneficiary data to CMS, including data related to Beneficiary 53. Humana received payment pursuant to this claim. In total, Medicare paid $11,983.23 to Humana for Beneficiary 53 in the year of Beneficiary 53's enrollment.

The following table summarizes these and other examples of claims.

| Beneficiary | Defendant Broker | Defendant Insurer | Plan Name | Application Date; Effective Enrollment Date | CMS Payment to Insurer (Year of Enrollment) |
|---|---|---|---|---|---|
| 37 | eHealth | Humana | Humana Gold Plus | Feb. 19, 2016; Mar. 1, 2016 | $12,477.00 |
| 38 | eHealth | Humana | Humana Gold Plus | Mar. 23, 2016; Apr. 1, 2016 | $14,780.97 |
| 39 | eHealth | Humana | HumanaChoice | Oct. 3, 2016; Nov. 1, 2016 | $4,525.00 |
| 40 | eHealth | Humana | HumanaChoice | Mar. 30, 2017; Apr. 1, 2017 | $26,756.64 |
| 41 | eHealth | Humana | Humana Gold Plus | Apr. 25, 2017; May 1, 2017 | $16,561.60 |
| 42 | eHealth | Humana | HumanaChoice | Aug. 14, 2017; Sep. 1, 2017 | $11,832.16 |
| 43 | eHealth | Humana | Humana Gold Plus | Sep. 20, 2018; Oct. 1, 2018 | $6,189.30 |
| 44 | eHealth | Humana | HumanaChoice | Oct.10, 2018; Nov. 1, 2018 | $5,827.54 |
| 45 | eHealth | Humana | Humana Value Plus | Nov. 6, 2018; Dec. 1, 2018 | $1,180.14 |
| 46 | eHealth | Humana | Humana Gold Plus | Sep. 23, 2019; Oct. 1, 2019 | $2,648.76 |
| 47 | eHealth | Humana | HumanaChoice | Sep. 17, 2019; Nov. 1, 2019 | $826.86 |
| 48 | eHealth | Humana | Humana Gold Plus | Oct. 3, 2019; Dec. 1, 2019 | $432.76 |
| 49 | eHealth | Humana | Humana Gold Plus | Jun. 25, 2020; Jul. 1, 2020 | $5,469.48 |
| 50 | eHealth | Humana | Humana Gold Plus | Jul. 6, 2020; Aug. 1, 2020 | $8,942.25 |
| 51 | eHealth | Humana | Humana Community | Aug. 18, 2020; Sep. 1, 2020 | $7,984.20 |
| 52 | eHealth | Humana | Humana Gold Plus | Jan. 19, 2021; Mar. 1, 2021 | $5,154.50 |
| 53 | eHealth | Humana | HumanaChoice | Mar. 9, 2021; Apr. 1, 2021 | $11,983.23 |
| 54 | eHealth | Humana | Humana Gold Plus | Jun. 10, 2021; Jul. 1, 2021 | $6,896.64 |

### D.    Aetna and eHealth

794.    For each of the following beneficiaries who were enrolled pursuant to the above-described kickbacks, Aetna submitted claims for payment to CMS in the form of enrollments and monthly beneficiary data and attested that the submitted information was "accurate, complete, and truthful" data concerning "validly enrolled" beneficiaries:

- In May 2016, under its contract H5521 and plan Aetna Medicare Essential Plan, Aetna submitted a claim with beneficiary data to CMS, including data related to Beneficiary 56. Aetna received payment pursuant to this claim. In total, Medicare paid $18,289.88 to Aetna for Beneficiary 56 in the year of Beneficiary 56's enrollment.

- In June 2017, under its contract H5521 and plan Aetna Medicare Premier Plan, Aetna submitted a claim with beneficiary data to CMS, including data related to Beneficiary 59. Aetna received payment pursuant to this claim. In total, Medicare paid $14,878.32 to Aetna for Beneficiary 59 in the year of Beneficiary 59's enrollment.

- In April 2018, under its contract H3928 and plan Aetna Medicare Advantra Plan, Aetna submitted a claim with beneficiary data to CMS, including data related to Beneficiary 62. Aetna received payment pursuant to this claim. In total, Medicare paid $5,306.08 to Aetna for Beneficiary 62 in the year of Beneficiary 62's enrollment.

- In January 2019, under its contract H1109 and plan Aetna Medicare Select Plan, Aetna submitted a claim with beneficiary data to CMS, including data related to Beneficiary 64. Aetna received payment pursuant to this claim. In total, Medicare paid $28,032.73 to Aetna for Beneficiary 64 in the year of Beneficiary 64's enrollment.

- In March 2020, under its contract H3192 and plan Aetna Medicare Premier, Aetna submitted a claim with beneficiary data to CMS, including data related to Beneficiary 68. Aetna received payment pursuant to this claim. In total, Medicare paid $37,248.66 to Aetna for Beneficiary 68 in the year of Beneficiary 68's enrollment.

- In June 2021, under its contract H5521 and plan Aetna Medicare Value Plan, Aetna submitted such beneficiary data to CMS, including data related to Beneficiary 71. Aetna received payment pursuant to this claim. In total, Medicare paid $15,431.58 to Aetna for Beneficiary 71 in the year of Beneficiary 71's enrollment.

The following table summarizes these and other examples of claims.

| Beneficiary | Defendant Broker | Defendant Insurer | Plan Name | Application Date; Effective Enrollment Date | CMS Payment to Insurer (Year of Enrollment) |
|---|---|---|---|---|---|
| 55 | eHealth | Aetna | Aetna Medicare TX Connect Plus 1 | Dec. 16, 2015; Jan. 1, 2016 | $54,657.00 |
| 56 | eHealth | Aetna | Aetna Medicare Essential Plan | May 16, 2016; Jun. 1, 2016 | $18,289.88 |
| 57 | eHealth | Aetna | Aetna Medicare Prime Plan | Oct. 5, 2016; Nov. 1, 2016 | $3,660.14 |
| 58 | eHealth | Aetna | Aetna Medicare Prime Plan | Mar. 20, 2017; Apr. 1, 2017 | $7,722.18 |
| 59 | eHealth | Aetna | Aetna Medicare Premier Plan | Jun. 9, 2017; Jul. 1, 2017 | $14,878.32 |
| 60 | eHealth | Aetna | Aetna Medicare Select Plan | Sep. 11, 2017; Oct. 1, 2017 | $2,982.87 |
| 61 | eHealth | Aetna | Aetna Medicare Prime Plan | Nov. 27, 2017; Jan. 1, 2018 | $22,935.60 |
| 62 | eHealth | Aetna | Aetna Medicare Advantra Plan | Apr. 18, 2018; May 1, 2018 | $5,306.08 |
| 63 | eHealth | Aetna | Aetna Medicare Select Plan | Jul. 2, 2018; Aug. 1, 2018 | $2,227.00 |
| 64 | eHealth | Aetna | Aetna Medicare Select Plan | Jan. 22, 2019; Feb. 1, 2019 | $28,032.73 |
| 65 | eHealth | Aetna | Aetna Medicare Explorer Elite | Aug. 28, 2019; Sep. 1, 2019 | $8,881.56 |
| 66 | eHealth | Aetna | Aetna Medicare Value Plan | Nov. 5, 2019; Dec. 1, 2019 | $1,127.68 |

| 67 | eHealth | Aetna | Aetna Medicare Value Plan | Dec. 6, 2019; Jan. 1, 2020 | $16,293.72 |
|---|---|---|---|---|---|
| 68 | eHealth | Aetna | Aetna Medicare Premier | Mar. 4, 2020; Apr. 1, 2020 | $37,248.66 |
| 69 | eHealth | Aetna | Aetna Medicare Explorer Elite | Oct. 26, 2020; Nov. 1, 2020 | $1,643.90 |
| 70 | eHealth | Aetna | Aetna Medicare Value Plan | Dec. 5, 2020; Jan. 1, 2021 | $29,951.40 |
| 71 | eHealth | Aetna | Aetna Medicare Value Plan | Jun. 1, 2021; Jul. 1, 2021 | $15,431.58 |
| 72 | eHealth | Aetna | Aetna Medicare Prime PCP Elite Plan | Sep. 18, 2021; Oct. 1, 2021 | $2,520.09 |

### E.    Aetna and SelectQuote

795.    For each of the following beneficiaries who were enrolled pursuant to the above-described kickbacks, Aetna submitted claims for payment to CMS in the form of enrollments and monthly beneficiary data and attested that the submitted information was "accurate, complete, and truthful" data concerning "validly enrolled" beneficiaries:

- In October 2017, under its contract H3931 and plan Aetna Medicare Elite, Aetna submitted a claim with beneficiary data to CMS, including data related to Beneficiary 73. Aetna received payment pursuant to this claim. In total, Medicare paid $2,682.12 to Aetna for Beneficiary 73 in the year of Beneficiary 73's enrollment.

- In April 2018, under its contract H4523 and plan Aetna Medicare Prime Plan, Aetna submitted a claim with beneficiary data to CMS, including data related to Beneficiary 77. Aetna received payment pursuant to this claim. In total, Medicare paid $12,198.43 to Aetna for Beneficiary 77 in the year of Beneficiary 77's enrollment.

- In May 2019, under its contract H1109 and plan Aetna Medicare Select Plan, Aetna submitted a claim with beneficiary data to CMS, including data related to Beneficiary 79. Aetna received payment pursuant to this claim. In total, Medicare paid $13,432.02 to Aetna for Beneficiary 79 in the year of Beneficiary 79's enrollment.

- In August 2020, under its contract H5521 and plan Aetna Medicare Value Plan, Aetna submitted a claim with beneficiary data to CMS, including data related to Beneficiary 84. Aetna received payment pursuant to this claim. In total, Medicare paid $11,041.40 to Aetna for Beneficiary 84 in the year of Beneficiary 84's enrollment.

- In May 2021, under its contract H1609 and plan Aetna Medicare Select Plan, Aetna submitted a claim with beneficiary data to CMS, including data related to Beneficiary 86. Aetna received payment pursuant to this claim. In total, Medicare paid $2,637.67 to Aetna for Beneficiary 86 in the year of Beneficiary 86's enrollment.

The following table summarizes these and other examples of claims.

| Beneficiary | Defendant Broker | Defendant Insurer | Plan Name | Application Date; Effective Enrollment Date | CMS Payment to Insurer (Year of Enrollment) |
|---|---|---|---|---|---|
| 73 | SelectQuote | Aetna | Aetna Medicare Elite | Oct. 16, 2017; Nov. 1, 2017 | $2,682.12 |
| 74 | SelectQuote | Aetna | Aetna Medicare Advantra Gold | Nov. 16, 2017; Dec. 1, 2017 | $1,008.03 |
| 75 | SelectQuote | Aetna | Aetna Premier Plan | Nov. 29, 2017; Dec. 1, 2017 | $2,214.57 |
| 76 | SelectQuote | Aetna | Aetna Medicare Essential Plan | Feb. 5, 2018; Mar. 1, 2018 | $7,345.50 |
| 77 | SelectQuote | Aetna | Aetna Medicare Prime Plan | Apr. 18, 2018; May 1, 2018 | $12,198.43 |
| 78 | SelectQuote | Aetna | Aetna Medicare Prime Plan | Sep. 27, 2018; Oct. 1, 2018 | $2,982.42 |
| 79 | SelectQuote | Aetna | Aetna Medicare Select Plan | May 20, 2019; Jun. 1, 2019 | $13,432.02 |
| 80 | SelectQuote | Aetna | Aetna Medicare Value 2 | Sep. 16, 2019; Oct. 1, 2019 | $7,996.59 |
| 81 | SelectQuote | Aetna | Aetna Medicare Value Plan | Oct. 11, 2019; Nov. 1, 2019 | $2,108.70 |

| 82 | SelectQuote | Aetna | Aetna Medicare Premier | Jan. 3, 2020; Feb. 1, 2020 | $13,931.50 |
| 83 | SelectQuote | Aetna | Aetna Medicare Value Plan | Mar. 14, 2020; Apr. 1, 2020 | $7,284.15 |
| 84 | SelectQuote | Aetna | Aetna Medicare Value Plan | Aug. 13, 2020; Sep. 1, 2020 | $11,041.40 |
| 85 | SelectQuote | Aetna | Aetna Medicare Premier | Dec. 6, 2020; Jan. 1, 2021 | $8,133.12 |
| 86 | SelectQuote | Aetna | Aetna Medicare Select Plan | May 3, 2021; Jun. 1, 2021 | $2,637.67 |
| 87 | SelectQuote | Aetna | Aetna Medicare Explorer Value | Jul. 19, 2021; Aug. 1, 2021 | $3,746.90 |

### F.    Aetna and GoHealth

796.    For each of the following beneficiaries who were enrolled pursuant to the above-described kickbacks, Aetna submitted claims for payment to CMS in the form of enrollments and monthly beneficiary data and attested that the submitted information was "accurate, complete, and truthful" data concerning "validly enrolled" beneficiaries:

- In November 2020, under its contract H4523 and plan Aetna Medicare Prime Plan, Aetna submitted a claim with beneficiary data to CMS, including data related to Beneficiary 88.  Aetna received payment pursuant to this claim.  In total, Medicare paid $79,047.24 to Aetna for Beneficiary 88 in the year of Beneficiary 88's enrollment.

- In September 2021, under its contract H3152 and plan Aetna Medicare Explorer Value, Aetna submitted a claim with beneficiary data to CMS, including data related to Beneficiary 90.  Aetna received payment pursuant to this claim.  In total, Medicare paid $18,218.04 to Aetna for Beneficiary 90 in the year of Beneficiary 90's enrollment.

The following table summarizes these and other examples of claims.

| Beneficiary | Defendant Broker | Defendant Insurer | Plan Name | Application Date; Effective Enrollment Date | CMS Payment to Insurer (Year of Enrollment) |
|---|---|---|---|---|---|
| 88 | GoHealth | Aetna | Aetna Medicare Prime Plan | Nov. 20, 2020; Jan. 1, 2021 | $79,047.24 |
| 89 | GoHealth | Aetna | Aetna Medicare Value Plan | Apr. 29, 2021; May 1, 2021 | $12,756.96 |
| 90 | GoHealth | Aetna | Aetna Medicare Explorer Value | Sep. 22, 2021; Oct. 1, 2021 | $18,218.04 |

### G.    Anthem and GoHealth

797.    For each of the following beneficiaries who were enrolled pursuant to the above-described kickbacks, Anthem submitted claims for payment to CMS in the form of enrollments and monthly beneficiary data and attested that the submitted information was "accurate, complete, and truthful" data concerning "validly enrolled" beneficiaries:

- In November 2019, under its contract H8432 and plan Empire MediBlue Dual Advantage Select, Anthem submitted a claim with beneficiary data to CMS, including data related to Beneficiary 91. Anthem received payment pursuant to this claim. In total, Medicare paid $42,298.68 to Anthem for Beneficiary 91 in the year of Beneficiary 91's enrollment.

- In November 2020, under its contract H3655 and plan Anthem MediBlue Preferred, Anthem submitted a claim with beneficiary data to CMS, including data related to Beneficiary 94. Anthem received payment pursuant to this claim. In total, Medicare paid $20,027.04 to Anthem for Beneficiary 94 in the year of Beneficiary 94's enrollment.

- In July 2021, under its contract H9525 and plan Anthem MediBlue Plus, Anthem submitted a claim with beneficiary data to CMS, including data related to Beneficiary 96. Anthem received payment pursuant to this claim. In total, Medicare paid $15,754.75 to Anthem for Beneficiary 96 in the year of Beneficiary 96's enrollment.

The following table summarizes these and other examples of claims.

| Beneficiary | Defendant Broker | Defendant Insurer | Plan Name | Application Date; Effective Enrollment Date | CMS Payment to Insurer (Year of Enrollment) |
|---|---|---|---|---|---|
| 91 | GoHealth | Anthem | Empire Mediblue Dual Advantage Select | Nov. 2, 2019; Jan. 1, 2020 | $42, 298.68 |
| 92 | GoHealth | Anthem | Anthem Mediblue Plus | Nov. 20, 2019; Jan. 1, 2020 | $7,635.24 |
| 93 | GoHealth | Anthem | Anthem Mediblue Preferred | Jan. 22, 2020; Feb. 1, 2020 | $24, 385.22 |
| 94 | GoHealth | Anthem | Anthem Mediblue Preferred | Nov. 6, 2020; Jan. 1, 2021 | $20,027.04 |
| 95 | GoHealth | Anthem | Anthem Mediblue Coordination Plus | Sept. 16, 2021; Oct. 1, 2021 | $7,981.20 |
| 96 | GoHealth | Anthem | Anthem Mediblue Plus | Jul. 30, 2021; Aug. 1, 2021 | $15,754.75 |

### H.    Anthem and eHealth

798.    For each of the following beneficiaries who were enrolled pursuant to the above-described kickbacks, Anthem submitted claims for payment to CMS in the form of enrollments and monthly beneficiary data and attested that the submitted information was "accurate, complete, and truthful" data concerning "validly enrolled" beneficiaries:

- In June 2017, under its contract H5530 and plan Anthem Medicare Preferred Standard, Anthem submitted a claim with beneficiary data to CMS, including data related to Beneficiary 97.  Anthem received payment pursuant to this claim.  In total, Medicare paid $21,444.18 to Anthem for Beneficiary 97 in the year of Beneficiary 97's enrollment.

- In September 2019, under its contract H0544 and plan Anthem Medicare Advantage, Anthem submitted a claim with beneficiary data to CMS, including data related to Beneficiary 103 as specified below.  Anthem received payment pursuant to this claim.  In total, Medicare paid $32,100.56 to Anthem for Beneficiary 103 in the year of Beneficiary 103's enrollment.

- In June 2020, under its contract H8552 and plan Anthem Medicare Advantage, Anthem submitted a claim with beneficiary data to CMS, including data related to Beneficiary 106. Anthem received payment pursuant to this claim. In total, Medicare paid $23,151.96 to Anthem for Beneficiary 106 in the year of Beneficiary 106's enrollment.

- In July 2021, under its contract H8552 and plan Anthem Medicare Advantage, Anthem submitted a claim with beneficiary data to CMS, including data related to Beneficiary 111. Anthem received payment pursuant to this claim. In total, Medicare paid $7,646.85 to Anthem for Beneficiary 111 in the year of Beneficiary 111's enrollment.

The following table summarizes these and other examples of claims.

| Beneficiary | Defendant Broker | Defendant Insurer | Plan Name | Application Date; Effective Enrollment Date | CMS Payment to Insurer (Year of Enrollment) |
|---|---|---|---|---|---|
| 97 | eHealth | Anthem | Anthem Medicare Preferred Standard | Jun. 22, 2017; Jul. 1, 2017 | $21,444.18 |
| 98 | eHealth | Anthem | Anthem Senior Advantage Value | Aug. 22, 2017; Sep. 1, 2017 | $13,890.48 |
| 99 | eHealth | Anthem | Anthem Medicare Preferred Standard | Apr. 6, 2017; May 1, 2017 | $19,322.40 |
| 100 | eHealth | Anthem | Anthem Medicare Advantage | May 29, 2018; Jun. 1, 2018 | $12,300.96 |
| 101 | eHealth | Anthem | Anthem Medicare Advantage | Apr. 24, 2018; May 1, 2018 | $19,010.32 |
| 102 | eHealth | Anthem | Anthem Medicare Advantage | Jan. 31, 2018; Mar. 1, 2018 | $17,459.18 |
| 103 | eHealth | Anthem | Anthem Medicare Advantage | Sep. 30, 2019; Oct. 1, 2019 | $32,100.56 |
| 104 | eHealth | Anthem | Anthem Mediblue Select | Jul. 20, 2019; Aug. 1, 2019 | $21,861.90 |

| 105 | eHealth | Anthem | Anthem Medicare Advantage | Jul. 22, 2019; Aug. 1, 2019 | $10,274.15 |
|---|---|---|---|---|---|
| 106 | eHealth | Anthem | Anthem Medicare Advantage | Jun. 29, 2020; Jul. 1, 2020 | $23,151.96 |
| 107 | eHealth | Anthem | Anthem Medicare Advantage | Mar. 5, 2020; Apr. 1, 2020 | $7,771.08 |
| 108 | eHealth | Anthem | Anthem Medicare Advantage | Jun. 5, 2020; Jul. 1, 2020 | $14,404.68 |
| 109 | eHealth | Anthem | Anthem Mediblue Select | Jul. 13, 2021; Aug. 1, 2021 | $7,117.45 |
| 110 | eHealth | Anthem | Anthem Medicare Advantage | Oct. 18, 2021; Nov. 1, 2021 | $15,135.57 |
| 111 | eHealth | Anthem | Anthem Medicare Advantage | Jul. 15, 2021; Aug. 1, 2021 | $7,646.85 |

## VII.    CAUSES OF ACTION

### COUNT I

**Violation of the False Claims Act:**
**Presentation, or Causing Presentation, of False or Fraudulent Claims for Payment**
**Resulting from a Violation of the Anti-Kickback Statute**

**(31 U.S.C. § 3729(a)(1)(A))**

**All Defendants**

799.    The Government realleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth in this paragraph.

800.    By virtue of the acts described above, the Defendants knowingly presented or caused to be presented materially false or fraudulent claims for payment or approval to the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).  That is, the Defendants knowingly made or

presented, or caused to be made or presented, to the United States claims for payment that resulted from violations of the Anti-Kickback Statute.

801.    The United States, unaware of the falsity of the claims made or caused to be made by the Defendants, paid claims that it would not have paid had it known of the Defendants' illegal conduct.

802.    Payment of the false and fraudulent claims was a reasonable and foreseeable consequence of the Defendants' conduct.

803.    By reason of the foregoing and because of the Defendants' wrongful conduct, the United States has suffered actual damages in an amount to be determined at trial, and therefore is entitled under the False Claims Act to recover treble damages plus a civil monetary penalty for each false or fraudulent claim.

## COUNT II

**Violation of the False Claims Act:**
**Presentation, or Causing Presentation, of False or Fraudulent Claims for Payment**

**(31 U.S.C. § 3729(a)(1)(A))**

**All Defendants**

804.    The Government realleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth in this paragraph.

805.    By virtue of the acts described above, the Defendants knowingly presented or caused to be presented materially false or fraudulent claims for payment or approval to the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).  That is, the Defendants knowingly made or presented, or caused to be made or presented, to the United States claims for payment that falsely represented compliance with material statutory, regulatory, or contractual requirements.

806.    Compliance with applicable statutes, regulations, and terms of the Defendant Insurers' contracts with the United States was a requirement of the Defendant Insurers' eligibility to receive payment from the United States.

807.    The Defendant Insurers' "agree[ment] to comply with . . . Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law, the False Claims Act (31 [U.S.C.] §§3729 et seq.), and the anti-kickback statute (§1128B(b) of the Act)" was a requirement of the Defendant Insurers' contracts with CMS and a condition of their eligibility to receive payment from the United States.

808.    The Defendant Insurers', including CVS Health's, representations of compliance with applicable statutory, regulatory, and contractual requirements were knowingly and materially false.

809.    The Defendant Insurers', including CVS Health's, promise or certification that the data they sent to the United States were "accurate, complete, and truthful" and concerned "validly enrolled" beneficiaries was a requirement of the Defendant Insurers' contracts with CMS and a condition of their eligibility to receive payment from the United States.

810.    The Defendant Insurers', including CVS Health's, promises and certifications were knowingly and materially false when the Defendants were violating applicable statutory, regulatory, and contractual requirements.

811.    The Defendant Brokers, by virtue of their conduct, knowingly caused the Defendant Insurers, including CVS Health, falsely to represent their compliance with applicable statutory, regulatory, and contractual requirements and falsely to promise or certify that the data they sent to

the United States were "accurate, complete, and truthful" and concerned "validly enrolled" beneficiaries.

812.    Because the Defendant Insurers', including CVS Health's, representations of compliance with applicable statutory, regulatory, and contractual requirements and their promises or certifications that the data they sent to the United States were "accurate, complete, and truthful" and concerned "validly enrolled" beneficiaries were knowingly false, the Defendant Insurers', including CVS Health's, claims to the United States were false.

813.    The United States, unaware of the falsity of the claims made or caused to be made by Defendants, paid claims that it would not have paid had it known of the Defendants' illegal conduct.

814.    Payment of the false and fraudulent claims was a reasonable and foreseeable consequence of the Defendants' conduct.

815.    By reason of the foregoing and because of the Defendants' wrongful conduct, the United States has suffered actual damages in an amount to be determined at trial, and therefore is entitled under the False Claims Act to recover treble damages plus a civil monetary penalty for each false or fraudulent claim.

## COUNT III

**Violation of the False Claims Act:**
**Presentation, or Causing Presentation, of False or Fraudulent Claims for Payment**

**(31 U.S.C. § 3729(a)(1)(A))**

**Humana, Aetna, CVS Health, and the Defendant Brokers**

816.    The Government realleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth in this paragraph.

817.    By virtue of the acts described above, Humana, Aetna, CVS Health, and the Defendant Brokers knowingly presented or caused to be presented materially false or fraudulent claims for payment or approval to the United States, in violation of 31 U.S.C. § 3729(a)(1)(A). That is, Humana, Aetna, CVS Health, and the Defendant Brokers knowingly made or presented, or caused to be made or presented, to the United States claims for payment that falsely represented compliance with material statutory, regulatory, or contractual requirements.

818.    Compliance with applicable statutes, regulations, and terms of Humana's and Aetna's contracts with the United States was a requirement of their eligibility to receive payment from the United States.

819.    Humana's and Aetna's promises to "comply with the provisions of 42 [C.F.R.] § 422.110 concerning prohibitions against discrimination in beneficiary enrollment" and to comply with 45 C.F.R. Part 92 were requirements of Humana's and Aetna's contracts with CMS and conditions of their eligibility to receive payment from the United States.

820.    Humana's, Aetna's, and CVS Health's representations of compliance with applicable statutory, regulatory, and contractual requirements were knowingly and materially false.

821.    Humana's, Aetna's and CVS Health's promises or certifications that the data they sent the United States were "accurate, complete, and truthful" and concerned "validly enrolled" beneficiaries and the promises or certifications found in their "Assurances of Compliance with Non-Discrimination Laws and Regulations" were requirements of Humana's and Aetna's contracts with CMS and conditions of their eligibility to receive payment from the United States.

822.    Humana's, Aetna's, and CVS Health's promises and certifications were knowingly and materially false when Humana and Aetna were violating applicable statutory, regulatory, and contractual requirements.

823.    The Defendant Brokers, by virtue of their discriminatory conduct, knowingly caused Humana, Aetna, and CVS Health falsely to represent their compliance with applicable statutory, regulatory, and contractual requirements and falsely to promise or certify that the data they sent to the United States were "accurate, complete, and truthful" and concerned "validly enrolled" beneficiaries.

824.    Because Humana's, Aetna's, and CVS Health's representations of compliance with applicable statutory, regulatory, and contractual requirements and their promises or certifications that the data they sent to the United States were "accurate, complete, and truthful" and concerned "validly enrolled" beneficiaries were knowingly false, Humana's, Aetna's, and CVS Health's claims to the United States were false.

825.    The United States, unaware of the falsity of the claims made or caused to be made by Humana, Aetna, CVS Health, and the Defendant Brokers, paid claims that it would not have paid had it known of Humana's, Aetna's, and the Defendant Brokers' illegal discrimination.

826.    Payment of the false and fraudulent claims was a reasonable and foreseeable consequence of Humana's, Aetna's, CVS Health's, and the Defendant Brokers' conduct.

827.    By reason of the foregoing and because of Humana's, Aetna's, CVS Health's, and the Defendant Brokers' wrongful conduct, the United States has suffered actual damages in an amount to be determined at trial, and therefore is entitled under the False Claims Act to recover treble damages plus a civil monetary penalty for each false or fraudulent claim.

## COUNT IV

**Violation of the False Claims Act:**
**False Records or Statements Material to False or Fraudulent Claims**

**(31 U.S.C. § 3729(a)(1)(B))**

**All Defendants**

828.    The Government realleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth in this paragraph.

829.    By virtue of the acts described above, the Defendants knowingly made, used, or caused to be made or used, false records or statements—for example, false claims, false statements in claims to federal health care programs, and false statements about compliance with the AKS. These false records or statements were material to false or fraudulent claims that were submitted to the United States, and which the United States paid and approved, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

830.    Compliance with applicable statutes, regulations, and terms of the Defendant Insurers' contracts with the United States was a requirement of the Defendant Insurers' eligibility to receive payment from the United States.

831.    The Defendant Insurers' "agree[ment] to comply with . . . Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law, the False Claims Act (31 [U.S.C.] §§3729 et seq.), and the anti-kickback statute (§1128B(b) of the Act)" was a requirement of the Defendant Insurers' contracts with CMS and a condition of their eligibility to receive payment from the United States.

832.    The Defendant Insurers', including CVS Health's, representations of compliance with applicable statutory, regulatory, and contractual requirements were knowingly and materially false.

833.    The Defendant Insurers', including CVS Health's, promise or certification that the data they sent to the United States were "accurate, complete, and truthful" and concerned "validly enrolled" beneficiaries was a requirement of the Defendant Insurers' contracts with CMS and a condition of their eligibility to receive payment from the United States.

834.    The Defendant Insurers', including CVS Health's, promises and certifications were knowingly and materially false when the Defendant Insurers were violating applicable statutory, regulatory, and contractual requirements.

835.    The Defendant Brokers, by virtue of their conduct, knowingly caused the Defendant Insurers, including CVS Health, falsely to represent their compliance with applicable statutory, regulatory, and contractual requirements and falsely to promise or certify that the data they sent to the United States were "accurate, complete, and truthful" and concerned "validly enrolled" beneficiaries.

836.    Because the Defendant Insurers', including CVS Health's, representations of compliance with applicable statutory, regulatory, and contractual requirements and their promises or certifications that the data they sent to the United States were "accurate, complete, and truthful" and concerned "validly enrolled" beneficiaries were knowingly false, the Defendant Insurers', including CVS Health's, claims to the United States were false.

837.    The United States, unaware of the falsity of the records, statements, representations, and claims made or caused to be made by the Defendants, paid claims that it would not have paid had it known of the Defendants' illegal conduct.

838. Payment of the false and fraudulent claims was a reasonable and foreseeable consequence of the Defendants' conduct.

839. By reason of the foregoing and because of the Defendants' wrongful conduct, the United States has suffered actual damages in an amount to be determined at trial, and therefore is entitled under the False Claims Act to recover treble damages plus a civil monetary penalty for each false or fraudulent claim.

## COUNT V

**Violation of the False Claims Act:**
**False Records or Statements Material to False or Fraudulent Claims**

**(31 U.S.C. § 3729(a)(1)(B))**

**Humana, Aetna, CVS Health, and the Defendant Brokers**

840. The Government realleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth in this paragraph.

841. By virtue of the acts described above, Humana, Aetna, CVS Health, and the Defendant Brokers knowingly made, used, or caused to be made or used, false records or statements—for example, false claims, false statements in claims to federal health care programs, and false statements about compliance with laws barring discrimination. These false records or statements were material to false or fraudulent claims that were submitted to the United States, and which the United States paid and approved, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

842. Compliance with applicable statutes, regulations, and terms of Humana's and Aetna's contracts with the United States was a requirement of their eligibility to receive payment from the United States.

843.    Humana's and Aetna's compliance with Medicare anti-discrimination statutory, regulatory, and contractual requirements was a requirement of their eligibility to receive payment from the United States.

844.    Humana's and Aetna's promises to "comply with the provisions of 42 [C.F.R.] § 422.110 concerning prohibitions against discrimination in beneficiary enrollment" and to comply with 45 C.F.R. Part 92 were requirements of their eligibility to receive payment from the United States.

845.    Humana's, Aetna's, and CVS Health's representations of compliance with applicable statutory, regulatory, and contractual requirements were knowingly and materially false.

846.    Humana's, Aetna's, and CVS Health's promises or certifications that the data they sent the United States was "accurate, complete, and truthful" and concerned "validly enrolled" beneficiaries and the promises or certifications found in their "Assurances of Compliance with Non-Discrimination Laws and Regulations" were requirements of Humana's and Aetna's contracts with CMS and conditions of their eligibility to receive payment from the United States.

847.    Humana's, Aetna's, and CVS Health's promises and certifications were knowingly and materially false when Humana and Aetna were violating applicable statutory, regulatory, and contractual requirements.

848.    The Defendant Brokers, by virtue of their conduct, knowingly caused Humana, Aetna, and CVS Health falsely to represent their compliance with applicable statutory, regulatory, and contractual requirements and falsely to promise or certify that the data they sent to the United States were "accurate, complete, and truthful" and concerned "validly enrolled" beneficiaries.

849.    Because Humana's, Aetna's, and CVS Health's representations of compliance with applicable statutory, regulatory, and contractual requirements regarding discriminatory practices and their promises or certifications that the data they sent to the United States were "accurate, complete, and truthful" and concerned "validly enrolled" beneficiaries were knowingly false, Humana's, Aetna's, and CVS Health's claims to the United States were false.

850.    The United States, unaware of the falsity of the claims made or caused to be made by Humana, Aetna, CVS Health, and the Defendant Brokers, paid claims that it would not have paid had it known of Humana's, Aetna's, CVS Health's, and the Defendant Brokers' illegal conduct.

851.    Payment of the false and fraudulent claims was a reasonable and foreseeable consequence of Humana's, Aetna's, and the Defendant Brokers' discriminatory conduct.

852.    By reason of the foregoing and because of Humana's, Aetna's, CVS Health's, and the Defendant Brokers' wrongful conduct, the United States has suffered actual damages in an amount to be determined at trial, and therefore is entitled under the False Claims Act to recover treble damages plus a civil monetary penalty for each false or fraudulent claim.

## COUNT VI

### Violation of the False Claims Act:
### Conspiracy to Violate 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B)

### (31 U.S.C. § 3729(a)(1)(C))

### All Defendants

853.    The Government realleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth in this paragraph.

854.    By virtue of the acts described above, the Defendant Insurers and the Defendant Brokers violated 31 U.S.C. § 3729(a)(1)(C) by conspiring together and with known and unknown

individuals to violate the Anti-Kickback Statute and the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A) & 3729(a)(1)(B).

855.    By virtue of the acts described above, the Defendants violated 31 U.S.C. § 3729(a)(1)(C) by conspiring together and with known and unknown individuals to violate applicable statutes, regulations, and Defendant Insurers' contracts with the United States concerning compliance with the Anti-Kickback Statute, and thus to violate the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B).

856.    Payment of the false and fraudulent claims was a reasonable and foreseeable consequence of Defendants' conspiracy.

857.    By reason of the foregoing, the United States has suffered actual damages because of the Defendants' wrongful conduct in an amount to be determined at trial, and therefore is entitled under the False Claims Act to recover treble damages plus a civil monetary penalty for each false or fraudulent claim.

## COUNT VII

**Violation of the False Claims Act:**
**Conspiracy to Violate 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B)**

**(31 U.S.C. § 3729(a)(1)(C))**

**Humana, Aetna, CVS Health, and the Defendant Brokers**

858.    The Government realleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth in this paragraph.

859.    By virtue of the acts described above, Humana, Aetna, CVS Health, and the Defendant Brokers violated 31 U.S.C. § 3729(a)(1)(C) by conspiring together and with known and unknown individuals to violate applicable statutes, regulations, and Humana's and Aetna's

contracts with the United States concerning discrimination against disabled beneficiaries, and thus to violate the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B).

860.    Payment of the false and fraudulent claims was a reasonable and foreseeable consequence of Humana's, Aetna's, CVS Health's, and the Defendant Brokers' conspiracy.

861.    By reason of the foregoing, the United States has suffered actual damages because of Humana's, Aetna's, CVS Health's, and the Defendant Brokers' wrongful conduct in an amount to be determined at trial, and therefore is entitled under the False Claims Act to recover treble damages plus a civil monetary penalty for each false or fraudulent claim.

## <u>COUNT VIII</u>

### Unjust Enrichment

### All Defendants

862.    The Government realleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth in this paragraph.

863.    The United States is entitled, under federal common law, to the recovery of monies by which Defendants have been unjustly enriched due to their actions as described in this complaint.

864.    Through the conduct and acts described above, the Defendants were unjustly enriched at the expense of the United States in an amount to be determined, which, under the circumstances, in equity and good conscience, and as dictated by the needs of justice and fairness, should be returned to the United States or would be unconscionable for the Defendants to retain.

865.    Through the conduct and acts described above, the Defendants have received payments from the Government to which they were not entitled, which unjustly enriched the Defendants, and for which they must make restitution.  The Defendants received such payments

based on the submission of false claims and based on causing the submission of false claims. In equity and good conscience, such money belongs to the Government and to the Medicare program and should not be retained by the Defendants.

866.    That is, by obtaining monies as a result of their violations of Federal law, the Defendants were unjustly enriched, and they are liable to account and pay such amounts, which are to be determined at trial, to the United States.

## VIII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, the United States respectfully requests that judgment be entered in its favor against the Defendants as follows:

(a)    On the First and Second Claims for relief (violations of the FCA, 31 U.S.C. § 3729(a)(1)(A)), judgment against all the Defendants for treble the Government's damages, in an amount to be determined at trial, plus a civil penalty in the maximum applicable amount for each violation of the FCA.

(b)    On the Third claim for relief (violations of the FCA, 31 U.S.C. § 3729(a)(1)(A)), judgment against Humana, Aetna, CVS Health, eHealth, GoHealth, and SelectQuote for treble the Government's damages, in an amount to be determined at trial, plus a civil penalty in the maximum applicable amount for each violation of the FCA.

(c)    On the Fourth Claim for relief (violations of the FCA, 31 U.S.C. § 3729(a)(1)(B)), judgment against all the Defendants for treble the Government's damages, in an amount to be determined at trial, plus a civil penalty in the maximum applicable amount for each violation of the FCA.

(d)     On the Fifth Claim for relief (violations of the FCA, 31 U.S.C. § 3729(a)(1)(B)), judgment against Humana, Aetna, CVS Health, eHealth, GoHealth, and SelectQuote for treble the Government's damages, in an amount to be determined at trial, plus a civil penalty in the maximum applicable amount for each violation of the FCA.

(e)     On the Sixth Claim for relief (violations of the FCA, 31 U.S.C. § 3729(a)(1)(C)), judgment against all Defendants for treble the Government's damages, in an amount to be determined at trial, plus a civil penalty in the maximum applicable amount for each violation of the FCA.

(f)     On the Seventh Claim for relief (violations of the FCA, 31 U.S.C. § 3729(a)(1)(C)), judgment against Humana, Aetna, CVS Health, eHealth, GoHealth, and SelectQuote for treble the Government's damages, in an amount to be determined at trial, plus a civil penalty in the maximum applicable amount for each violation of the FCA.

(g)     On the Eighth Claim for relief (Unjust Enrichment), judgment against all the Defendants for damages to the extent allowed by law.

(h)     Costs and such further relief as the Court may deem appropriate.

IX.    **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, the United States requests a trial by jury.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

LEAH B. FOLEY
United States Attorney


/s/ Charles B. Weinograd
Charles B. Weinograd
Julien M. Mundele
Assistant United States Attorneys
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100
Charles.Weinograd@usdoj.gov
Julien.Mundele@usdoj.gov


Jamie Ann Yavelberg
Edward C. Crooke
David G. Miller
Anna H. Jugo
Sara B. Hanson
Diana E. Curtis
Attorneys, Civil Division
U.S. Department of Justice
175 N Street N.E.
Washington, D.C. 20002
(202) 305-3231
David.G.Miller@usdoj.gov

Attorneys for the United States

Dated: May 1, 2025