# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

UNITED STATES OF AMERICA *ex rel.*
ANDREW SHEA,

                *Plaintiff,*

     v.

eHEALTH, INC., *et al.*,

                *Defendants.*

---

No. 21-cv-11777-DJC

 

## THE UNITED STATES' OPPOSITION TO DEFENDANTS' CONSOLIDATED MOTION TO DISMISS THE GOVERNMENT'S COMPLAINT IN PARTIAL INTERVENTION

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

LEGAL BACKGROUND ............................................................................................ 3

    A.   Motion to Dismiss and Pleading Standard ............................................... 3

    B.   The False Claims Act ............................................................................... 4

    C.   The Anti-Kickback Statute ....................................................................... 4

    D.   Medicare Advantage Regulations Related to Broker Payments ............... 6

    E.   Anti-Discrimination in Medicare Advantage ........................................... 7

ARGUMENT .............................................................................................................. 8

I.      The Complaint Sufficiently Pleaded Predicate Violations of the AKS ............... 9

    A.   Defendants Acted "Knowingly and Willfully" ....................................... 9

    B.   Defendants Solicited, Received, Offered, or Paid "Remuneration" ........ 10

    C.   Defendants' Remuneration Was "In Return For" or
        "To Induce" Enrollments in Medicare Advantage Plans ....................... 13

    D.   A Medicare Advantage Plan Is an "Item" or "Service" Under the AKS .......... 16

    E.   Defendants Had Fair Notice of the AKS ............................................... 22

II.     The Complaint Sufficiently Pleaded FCA Claims Based on AKS Violations ...... 26

    A.   Claims "Result[ed] From" AKS Violations (Count I) ............................ 26

    B.   False Representations of Compliance with the AKS (Counts II and IV) ......... 30

III.   The Complaint Sufficiently Pleaded FCA Claims Based
       On Discrimination .................................................................................. 40

    A.   Defendants Acted Knowingly ............................................................... 41

    B.   Defendants' Claims and Statements Were False .................................... 41

    C.   Defendants' Discrimination and Related Misrepresentations
        Were "Material" ................................................................................... 44

i

D.   Defendants' Discrimination Harmed and Fraudulently Induced
     the Government ................................................................................ 48

E.   The Government Sustained Damages ................................................ 50

IV.   The Complaint Sufficiently Pleaded FCA Conspiracy ......................................... 51

A.   The Complaint Alleged Agreements ................................................. 52

B.   The Complaint Alleged Acts in Furtherance .................................... 56

V.   The Complaint Sufficiently Pleaded Unjust Enrichment ...................................... 56

VI.   If Necessary, the Government Should Be Granted Leave
      to Amend Its Complaint ......................................................................... 58

CONCLUSION ................................................................................................ 58

# TABLE OF AUTHORITIES

**Cases**

*Allied Home Mortg. Cap. Corp. v. Belli*,
    No. 07-cv-11597, 2011 WL 13248374 (D. Mass. Mar. 3, 2011) ................................... 58

*Allison Engine Co. v. United States ex rel. Sanders*,
    553 U.S. 662 (2008)..................................................................................................... 54

*Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*,
    374 F.3d 23 (1st Cir. 2004)............................................................................................ 4

*Ams. for Beneficiary Choice v. U.S. Dep't of Health & Hum. Servs.*,
    No. 4:24-CV-00439-O, 2025 WL 2390849 (N.D. Tex. Aug. 18, 2025). ........................ 25

*Amyndas Pharm., S.A. v. Zealand Pharma A/S*,
    48 F.4th 18 (1st Cir. 2022)........................................................................................... 58

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)....................................................................................................... 2

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*,
    501 U.S. 104 (1991)..................................................................................................... 57

*Babb v. Wilkie*,
    589 U.S. 399 (2020)..................................................................................................... 19

*Baker v. Smith & Wesson, Inc.*,
    40 F.4th 43 (1st Cir. 2022)........................................................................................... 19

*Banco Nacional de Cuba v. Sabbatino*,
    376 U.S. 398 (1964)..................................................................................................... 56

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)....................................................................................................... 3

*Berezin v. FCA US, LLC*,
    No. 21-cv-10852-FDS, 2023 WL 8283870 (D. Mass. Nov. 30, 2023) ............................ 9

*Bingham v. HCA, Inc.*,
    783 F. App'x 868 (11th Cir. 2019) ............................................................................... 12

*Bond v. Clover Health Invs., Corp.*,
    587 F. Supp. 3d 641 (M.D. Tenn. 2022)...................................................................... 19

*Bostock v. Clayton Cnty.*,
    590 U.S. 644 (2020)........................................................................................ 17, 18, 27

*Burrage v. United States*,
    571 U.S. 204 (2014)..................................................................................... 27

*CFTC v. EOX Holdings, LLC.*,
    90 F.4th 439 (5th Cir. 2024) ....................................................................... 23

*Cook County v. United States ex rel. Chandler*,
    538 U.S. 119 (2003)..................................................................................... 50

*Cook v. Dept. of Mental Health*,
    10 F.3d 17 (1st Cir. 1993)............................................................................ 44

*Doukas v. Metropolitan Life Ins. Co*,
    950 F. Supp. 422 (D.N.H. 1996).................................................................. 43

*Fitzgerald v. Codex Corp.*,
    882 F.2d 586 (1st Cir. 1989).......................................................................... 3

*Foisie v. Worcester Polytechnic Inst.*,
    967 F.3d 27 (1st Cir. 2020)............................................................................ 8

*Grajales v. P.R. Ports Auth.*,
    682 F.3d 40 (1st Cir. 2012)............................................................................ 3

*Greene v. City of New York*,
    773 F. Supp. 3d 94 (S.D.N.Y 2025)........................................................... 44

*Guadalupe-Báez v. Pesquera*,
    819 F.3d 509 (1st Cir. 2016).......................................................................... 3

*Guckenberger v. Boston Univ.*,
    974 F. Supp. 106 (D. Mass. 1997)............................................................... 43

*Guilfoile v. Shields*,
    913 F.3d 178 (1st Cir. 2019)............................................................... *passim*

*Harris v. McRae*,
    448 U.S. 297 (1980)..................................................................................... 26

*HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*,
    594 U.S. 382 (2021)..................................................................................... 17

*In re Neurontin Mktg. and Sales Practices Litig.*,
    712 F.3d 21 (1st Cir. 2013).......................................................................... 27

*In re WellNx Mktg. & Sales Practices Litig.*,
    673 F. Supp. 2d 43 (D. Mass. 2009) ............................................................. 4

*Jones v. Hendrix*,
  599 U.S. 465 (2023) ............................................................................................................ 12

*Kaufman v. CVS Caremark Corp.*,
  836 F.3d 88 (1st Cir. 2016) ................................................................................................. 4

*Klaczak v. Consol. Med. Transp.*,
  458 F. Supp. 2d 622 (N.D. Ill. 2006) ............................................................................... 13

*Kowalski v. Gagne*,
  914 F.2d 299 (1st Cir. 1990) ............................................................................................... 9

*Lawton ex rel. United States v. Takeda Pharm. Co., Ltd.*,
  842 F.3d 125 (1st Cir. 2016) ............................................................................................. 36

*Maine Cmty. Health Options v. United States*,
  590 U.S. 296 (2020) ........................................................................................................... 21

*Ocasio-Hernandez v. Fortuno-Burset*,
  640 F.3d 1 (1st Cir. 2011) ................................................................................................. 52

*Quarles v. United States*,
  587 U.S. 645 (2019) ........................................................................................................... 21

*Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co.*,
  976 F.2d 58 (1st Cir. 1992) ................................................................................................. 9

*SNR Wireless LicenseCo, LLC v. Fed. Commc'ns Comm'n*,
  868 F.3d 1021 (D.C. Cir. 2017) ........................................................................................ 23

*Stop Illinois Health Care Fraud, LLC v. Sayeed*,
  957 F.3d 743 (7th Cir. 2020) ............................................................................................ 21

*Tanzin v. Tanvir*,
  592 U.S. 43 (2020) ............................................................................................................. 17

*Texas Indus., Inc. v. Radcliff Materials, Inc.*,
  451 U.S. 630 (1981) ........................................................................................................... 56

*United States ex rel. Angelo v. Allstate Insurance Company*,
  106 F.4th 441 (6th Cir. 2024) ........................................................................................... 55

*United States ex rel. Banigan v. PharMerica, Inc.*,
  950 F.3d 134 (1st Cir. 2020) ............................................................................................. 21

*United States ex rel. Behnke v. CVS Caremark Corp.*,
  No. 14-cv-824, 2025 WL 1758623 (E.D. Pa. June 25, 2025) .......................................... 25

*United States ex rel. Bidani v. Lewis*,
　264 F. Supp. 2d 612 (N.D. Ill. 2003) ............................................................ 32

*United States ex rel. Butler v. Shikara*,
　748 F. Supp. 3d 1277 (S.D. Fl. 2024) ................................................. 20, 46, 58

*United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*,
　579 F.3d 13 (1st Cir. 2009) .......................................................................... 37

*United States ex rel. Escobar v. Universal Health Servs., Inc.* ("*Escobar II*"),
　842 F.3d 103 (1st Cir. 2016) ........................................................... 31, 44, 47

*United States ex rel. Feldman v. van Gorp*,
　697 F.3d 78 (2d Cir. 2012) ........................................................................... 51

*United States ex rel. Flanagan v. Fresenius Med. Care Holdings*,
　142 F.4th 25 (1st Cir. 2025) ......................................................................... 38

*United States ex rel. Foreman v. AECOM*,
　19 F.4th 85 (2d Cir. 2021) ........................................................................... 47

*United States ex rel. Ge v. Takeda Pharm. Co.*,
　737 F.3d 116 (1st Cir. 2013) ........................................................................ 38

*United States ex rel. Gonite v. UnitedHealthcare of Georgia, Inc.*,
　No. 5:19-cv-246, 2025 WL 1184109 (M.D. Ga. Apr. 23, 2025) ..................... 19

*United States ex rel. Health Choice Alliance, LLC, v. Eli Lilly & Co., Inc.*,
　5:17-CV-123-RWS-CMC, 2018 WL 4026986 (E.D. Tex. July 25, 2018) ...... 39

*United States ex rel. Hutcheson v. Blackstone Med., Inc.*,
　647 F.3d 377 (1st Cir. 2011) .............................................................. 5, 33, 34

*United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*,
　874 F.3d 905 (6th Cir. 2017) ........................................................................ 55

*United States ex rel. Int'l Bhd. of Elec. Workers Loc. Union No. 98 v. Farfield Co.*,
　5 F.4th 315 (3d Cir. 2021) ............................................................................ 54

*United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*,
　360 F.3d 220 (1st Cir. 2004) ................................................... 36, 38, 49, 51

*United States ex rel. Marcus v. Hess*,
　317 U.S. 537 (1943) ..................................................................................... 49

*United States ex rel. McKoy v. Atlanta Primary Care Peachtree, PC*,
　No. 23-cv-13845, 2025 WL 1823269 (11th Cir., July 2, 2025) ..................... 39

*United States ex rel. Michigan v. State Farm Mut. Auto. Ins. Co.*,
No. 24-1379, 2025 WL 101639 (6th Cir. Jan. 15, 2025) .................................................. 53

*United States ex rel. Morsell v. Symantec Corp.*,
471 F. Supp. 3d 257 (D.D.C. 2020) ...................................................................... 48

*United States ex rel. Nargol v. DePuy Orthopaedics, Inc.*,
865 F.3d 29 (1st Cir. 2017).............................................................................. 37

*United States ex rel. Nicholson v. MedCom Carolinas, Inc.*,
42 F.4th 185 (4th Cir. 2022) ............................................................................ 54

*United States ex rel. Onnen v. Sioux Falls Indep. Sch. Dist.*,
688 F.3d 410 (8th Cir. 2012) ............................................................................ 46

*United States ex rel. Petratos v. Genentech Inc.*,
855 F.3d 481 (3d Cir. 2017)............................................................................. 49

*United States ex rel. Radhakrishnan v. Gampel*,
No. CV-20-00176, 2024 WL 894671 (D. Ariz. Mar. 1, 2024) .................................. 27, 58

*United States ex rel. Rost v. Pfizer, Inc.*,
507 F.3d 720 (1st Cir. 2007)............................................................................. 37

*United States ex rel. Sedona Partners LLC v. Able Moving & Storage Inc.*,
146 F.4th 1032 (11th Cir. 2025) ........................................................................ 12

*United States ex rel. Senters v. Quest Diagnostics Inc.*,
No. 24-cv-12998, 2025 WL 1951196 (11th Cir., July 16, 2025) ................................ 39

*United States ex rel. Spay v. CVS Caremark Corp.*,
875 F.3d 746 (3d Cir. 2017)............................................................................. 24

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
125 F.3d 899 (5th Cir. 1997) ............................................................................ 49

*United States ex rel. Tyson v. Amerigroup Illinois, Inc.*,
488 F. Supp. 2d 719 (N.D. Ill. 2007) ............................................................. 50, 51

*United States ex rel. Westmoreland v. Amgen*,
738 F. Supp. 2d 267 (D. Mass. 2010) .................................................................. 54

*United States ex rel. Westmoreland v. Amgen, Inc.*,
812 F. Supp. 2d 39 (D. Mass. 2011) .............................................................. 12, 32

*United States ex rel. Wilkins v. United Health Grp., Inc.*,
659 F.3d 295 (3d Cir. 2011).............................................................................. 19

*United States ex rel. Wollman v. Gen. Hosp. Corp.*,
   394 F. Supp. 3d 174 (D. Mass. 2019) ............................................................ 38

*United States ex rel. Yu v. Grifols USA, LLC*,
   No. 22-107, 2022 WL 7785044 (2d Cir. Oct. 14, 2022) .................................... 45

*United States ex. rel. Streck v. Eli Lilly & Co.*,
   152 F.4th 816 (7th Cir. 2025) ............................................................... 22, 24

*United States ex rel. Zotos v. Hingham*,
   98 F.4th 339 (1st Cir. 2024) ...................................................................... 48

*United States v. Am. Heart Research Found., Inc.*,
   996 F.2d 7 (1st Cir. 1993) ......................................................................... 57

*United States v. Applied Pharmacy Consultants, Inc.*,
   182 F.3d 603 (8th Cir. 1999) .................................................................... 58

*United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*,
   874 F.2d 20 (1st Cir. 1989) ..................................................... 11, 12, 14, 15

*United States v. Berkeley Heartlab, Inc.*,
   225 F. Supp. 3d 487 (D.S.C. 2016) ........................................................... 56

*United States v. Bollinger Shipyards, Inc.*,
   775 F.3d 255 (5th Cir. 2014) .................................................................... 24

*United States v. Coloplast Corp.*,
   No. 11-12131-RWZ, 2016 WL 4483868 (D. Mass. July 29, 2016) ................. 52

*United States v. Coloplast Corp.*,
   No. CV 11-12131-RWZ, 2016 WL 4483869 (D. Mass. Aug. 24, 2016) ................. 54, 56

*United States v. Eirby*,
   515 F.3d 31 (1st Cir. 2008) ......................................................................... 9

*United States v. Gelin*,
   712 F.3d 612 (1st Cir. 2013) ..................................................................... 19

*United States v. George*,
   900 F.3d 405 (7th Cir. 2018) .................................................................... 14

*United States v. Greber*,
   760 F.2d 68 (3d Cir. 1985) ....................................................................... 11

*United States v. Houston*,
   No. 2:09–0091, 2011 WL 4899983 (M.D. Tenn. Oct. 14, 2011) ................... 57

*United States v. Kilmartin,*
    944 F.3d 315 (1st Cir. 2019) .................................................................................. 27

*United States v. Kindred Healthcare, Inc.,*
    469 F. Supp. 3d 431 (E.D. Pa. 2020) ..................................................................... 46

*United States v. Lachman,*
    387 F.3d 42 (1st Cir. 2004) ..................................................................................... 24

*United States v. Lahey Clinic Hosp., Inc.,*
    399 F.3d 1 (1st Cir. 2005) ....................................................................................... 57

*United States v. Luna-Diaz,*
    222 F.3d 1 (1st Cir. 2000) ....................................................................................... 22

*United States v. Mead,*
    426 F.2d 118 (9th Cir. 1970) .................................................................................. 57

*United States v. Millenium Laboratories,*
    923 F.3d 240 (1st Cir. 2019) ........................................................................... 12, 20

*United States v. Neifert-White Co.,*
    390 U.S. 228 (1968) ................................................................................................ 50

*United States v. Patel,*
    778 F.3d 607 (7th Cir. 2015) .................................................................................. 21

*United States v. President & Fellows of Harvard Coll.,*
    323 F. Supp. 2d 151 (D. Mass. 2004) ............................................................... 52, 56

*United States v. Regeneron Pharm., Inc.,*
    No. 20-1121, 2020 WL 7130004 (D. Mass. Dec. 4, 2020) .................................... 12

*United States v. Regeneron Pharm., Inc.,*
    No. 20-cv-11217, 2023 WL 6296393 (D. Mass. Sept. 27, 2023) ..................... 26, 27

*United States v. Regeneron Pharms., Inc.,*
    128 F.4th 324 (1st Cir. 2025) .......................................................................... *passim*

*United States v. Regeneron Pharms., Inc.,*
    No. 20-cv-11217, 2025 WL 2207299 (D. Mass. Aug. 4, 2025) ....................... 16, 37

*United States v. Rivera,*
    55 F.3d 703 (1st Cir. 1995) ..................................................................................... 51

*United States v. Science Applications Intern. Corp.,*
    626 F.3d 1257 (D.C. Cir. 2010) .............................................................................. 33

*United States v. Shoemaker*,
    746 F.3d 614 (5th Cir. 2014) ............................................................. 14, 19

*United States v. Sorensen*,
    134 F.4th 493 (7th Cir. 2025) ........................................................... 14, 15

*United States v. Teva Pharms. USA, Inc.*,
    560 F. Supp. 3d 412 (D. Mass. 2021) ...................................................... 52

*United States v. Texas*,
    507 U.S. 529 (1993) ............................................................................. 57

*United States ex rel. Badr v. Triple Canopy, Inc.*,
    857 F.3d 174 (4th Cir. 2017) .................................................................. 33

*United States v. Zhen Zhou Wu*,
    711 F.3d 1 (1st Cir. 2013) ................................................................ 24, 26

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
    579 U.S. 176 (2016) ....................................................................... *passim*

*Universitas Educ., LLC v. Granderson*,
    No. 15-cv-11848-DJC, 2025 WL 889377 (D. Mass. Mar. 21, 2025) ..................... 8–9

*Vargas v. Lincare, Inc.*,
    134 F.4th 1150 (11th Cir. 2025) ............................................................. 39

*Whitaker v. Milwaukee County*,
    772 F.3d 802 (7th Cir. 2014) ................................................................. 16

**Statutes**

29 U.S.C. § 794 ................................................................................. 50, 51

31 U.S.C. § 3729(a)(1) ..................................................................... 5, 49, 61

31 U.S.C. § 3729(a)(1)(A) ...................................................................... 49

31 U.S.C. § 3729(a)(1)(A), (B) ................................................................. 1

31 U.S.C. § 3729(a)(1)(B) ...................................................................... 53

31 U.S.C. § 3729(a)(1)(C) .................................................................. 62, 64

31 U.S.C. § 3729(a)(3) (2008) ................................................................. 65

31 U.S.C. § 3730 ................................................................................ 39

31 U.S.C. § 3730(b)(5) .......................................................................... 14

42 U.S.C. § 12102(1)(c) ............................................................................. 52

42 U.S.C. § 1320a-7b .................................................................................. 1

42 U.S.C. § 1320a-7b(b) ......................................................................... 6, 11

42 U.S.C. § 1320a-7b(b)(1) ......................................................................... 11

42 U.S.C. § 1320a-7b(b)(1)–(2) ............................................................ 19, 22

42 U.S.C. § 1320a-7b(b)(2) ............................................................ 16, 17, 22

42 U.S.C. § 1320a-7b(g) ..................................................................... 1, 9, 32

42 U.S.C. § 1320a-7b(h) ............................................................................. 30

42 U.S.C. § 1395w–21(a)(1)(B) ................................................................. 56

42 U.S.C. § 1395w-21(j)(2)(D) .................................................................... 7

42 U.S.C. § 18116 ........................................................................................ 8

42 U.S.C. 1320a–7d(b) ............................................................................... 31

Social Security Amendments of 1972, Pub. L. 92-603 ............................... 17

**Rules of Civil Procedure**

Fed. R. Civ. P. 15(a)(2) .............................................................................. 58

Fed. R. Civ. P. 8(a)(2) .................................................................................. 4

Fed. R. Civ. P. 9(b) .......................................................................... 4, 8, 52

**Regulations**

42 C.F.R. § 1001.952(t)(2) ......................................................................... 22

42 C.F.R. § 422.110 .................................................................................... 43

42 C.F.R. § 422.110(a) ................................................................................ 42

42 C.F.R. § 422.110(a)(7) ...................................................................... 7, 41

42 C.F.R. § 422.2 .......................................................................................... 7

42 C.F.R. § 422.2274(a) ............................................................................... 6

42 C.F.R. § 422.504 (a)(2) ....................................................................... 5, 6

42 C.F.R. § 422.504(a) ............................................................................................ 45

42 C.F.R. § 422.504(a)(2) ........................................................................................ 7

42 C.F.R. § 422.504(a)(3) ........................................................................................ 45

42 C.F.R. §§ 1008.1 ................................................................................................ 25

45 C.F.R. § 84.68(b)(1) ..................................................................................... 42, 43

45 C.F.R. § 92.207 ................................................................................................... 7

45 C.F.R. § 92.4 ...................................................................................................... 7

**Other Authorities**

155 Cong. Rec. S10852, S10853 (daily ed. Oct. 28, 2009)
    Statements on Introduced Bills and Joint Resolutions ...................................... 20

64 Fed. Reg. 63504 (Nov. 19, 1999)
    Federal Health Care Programs: Fraud and Abuse; Statutory Exception to the
    Anti-Kickback Statute for Shared Risk Arrangements. .................................... 22

70 Fed. Reg. 4858 (Jan. 31, 2005)
    OIG Supplemental Compliance Program Guidance for Hospitals ................... 14

73 Fed. Reg. 28556 (May 16, 2008)
    Revisions to the Medicare Advantage and Prescription Drug Benefit Programs ............. 15

73 Fed. Reg. 54226 (Sept. 18, 2008)
    Revisions to the Medicare Advantage and
    Prescription Drug Benefit Programs ................................................... 7, 22, 25

86 Fed. Reg. 5864 (Jan. 19, 2021)
    Contract Year 2022 Policy and Technical Changes to the Medicare
    Advantage Program, Medicare Prescription Drug Benefit Program,
    Medicaid Program, Medicare Cost Plan Program, and Programs of
    All-Inclusive Care for the Elderly .................................................................. 13

AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (1976) ...................................... 18

BLACK'S LAW DICTIONARY (4th Ed. Rev., 1968) ........................................................ 12

BLACK'S LAW DICTIONARY (5th Ed. 1979) ................................................................ 18

HHS-OIG, *Special Fraud Alert: Suspect Payments in Marketing Arrangements Related to
    Medicare Advantage and Providers* (Dec. 11, 2024),
    http://perma.cc/QUH8-WDUT ....................................................................... 22

Medicare-Medicaid Anti-Fraud Abuse Amendments of 1977, Report of the Senate
    Committee on Finance on S. 143 (No. 95-453, Sept. 26, 1977),
    https://perma.cc/6CNH-WVLZ ........................................................................ 20

RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT (A.L.I. 2011) .................... 56

26 R. Lord, WILLISTON ON CONTRACTS § 69:12 (4th ed. 2003)............................................ 31, 58

WEBSTER'S NEW COLLEGE DICTIONARY (1977)........................................................... 18

WEBSTER'S NEW WORLD DICTIONARY, SECOND COLLEGE EDITION (1972) ............................... 18

# INTRODUCTION

The United States' Complaint in Partial Intervention, Dkt. No. 41 ("Complaint" or "Compl."), set out in methodical detail the fraud schemes that the Defendants perpetrated to the detriment of the Medicare Advantage program and the beneficiaries it serves.  The Complaint explained with particularity how Aetna and its parent corporations ("Aetna"), Anthem, and Humana (together, the "Defendant Insurers") offered and paid hundreds of millions of dollars in illegal kickbacks to eHealth, GoHealth, and SelectQuote (together, the "Defendant Brokers") to induce them to enroll beneficiaries into the Defendant Insurers' Medicare Advantage plans. Compl. ¶¶ 98–100, 162, 255, 425.  It described how the Defendant Brokers, in turn, steered thousands of Medicare beneficiaries to the Defendant Insurers' plans by incentivizing their agents to sell those plans, by establishing teams of agents who could sell only those plans, and by sometimes refusing to sell plans of insurers who did not pay (or did not pay enough) in kickbacks.

The Complaint further alleged that Defendants hid these kickback schemes under the guise of "administrative" or "marketing" payments to evade and exceed regulatory limits on sales commissions.  *E.g.*, *id.* ¶¶ 297, 582, 621, 739. All of the Defendants knew that the use of "administrative payments" to induce Medicare Advantage enrollments would implicate the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b.  So, each Defendant tried to conceal its misconduct, including by creating pretextual contracts and falsified invoices.  *E.g.*, ¶¶ 235–39, 300–01, 385, 597.  False claims to the Government "result[ed] from" Defendants' AKS violations. 42 U.S.C. § 1320a-7b(g).  The Defendant Insurers also falsely represented their compliance with the AKS, which the Defendant Brokers also caused.  31 U.S.C. § 3729(a)(1)(A), (B).

The Complaint further explained how Aetna and Humana used kickbacks not only to illegally induce enrollments, but also to pressure the Defendant Brokers to enroll fewer Medicare

beneficiaries with disabilities. *E.g.*, Compl. ¶¶ 307, 329, 336, 498, 500–01. Aetna and Humana signed numerous plan contracts with the Government stating that non-discrimination was "material to the performance of the [Medicare Advantage] contract." *Id.* ¶¶ 769, 771–74. Despite these agreements, Aetna and Humana conspired with the Defendant Brokers to discriminate against beneficiaries with disabilities by denying or limiting their ability to access Aetna's and Humana's Medicare Advantage plans. Facing pressure from Aetna and Humana, the Defendant Brokers took various steps to steer disabled beneficiaries away from Aetna and Humana plans, even as the Defendant Brokers responded to the Defendant Insurers' kickbacks by recommending those same plans to non-disabled Medicare beneficiaries. *E.g.*, *id.* ¶¶ 320, 539. These steps included, for example, diverting calls received from disabled beneficiaries, disabling an "enroll" button to reduce disabled beneficiaries' ability to enroll, and demanding that other downstream vendors stop providing contact information for disabled beneficiaries. *E.g.*, *id.* ¶¶ 341, 345, 508, 526. Aetna and Humana discriminated to extract greater profits from their Medicare Advantage plan contracts with the Government. *Id.* ¶¶ 101, 310, 313, 488.

In an early footnote in their brief, Defendants claim that they "treat the Complaint's factual allegations as true for purposes of this motion to dismiss," Dkt. No. 115, Joint Memorandum in Support of Defendants' Motion to Dismiss ("Memo.") at 4 n.1, as they must at this stage. *E.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Defendants then spend much of their brief assailing a case that the Government did not bring. Contrary to the factual allegations and evidence marshaled in the Complaint, Defendants now suggest, for example, that the alleged kickbacks were "***long allowed and regulated***" by the agency and that their discriminatory actions were merely the "design[] of marketing campaigns." Memo. at 1, 3. As such, Defendants ask the Court to accept a version of the facts that is unmoored from the Government's Complaint and to overlook

reasonable inferences that can be drawn from the Complaint's well-pleaded allegations. That approach is inappropriate in a motion to dismiss. Although Defendants criticize the Complaint as "flooding the Court with hundreds of hand-picked, selectively excerpted, and acontextual emails and communications," Memo. at 2, Defendants do not attempt to contextualize any of these hundreds of inculpatory communications. And Defendants assert that their discrimination did not cause any false claims, even as the Complaint alleged that the Defendant Insurers' eligibility to receive any reimbursement from the Medicare Advantage program (including payment of the specific claims referenced in Section VI of the Complaint) depended on their compliance with the non-discrimination provisions of applicable laws and regulations.

Because the Complaint laid out the United States' allegations in careful factual detail, well surpassing the requirements of Rules 8(a) and 9(b), and because those allegations more than adequately stated claims upon which relief can be granted, Defendants' motion should be denied.

## **LEGAL BACKGROUND**

### A.     Motion to Dismiss and Pleading Standard

At the motion to dismiss stage under Rule 12(b)(6), a court must "accept the truth of all well-pleaded facts and draw all reasonable inferences therefrom in the pleader's favor." *Guadalupe-Báez v. Pesquera*, 819 F.3d 509, 514 (1st Cir. 2016) (quoting *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 44 (1st Cir. 2012)). A complaint suffices so long as "the well-pleaded facts, taken in their entirety, permit the reasonable inference that the defendant is liable for the misconduct alleged." *Guadalupe-Báez*, 819 F.3d at 514. That is, a complaint must plead factual allegations, not specific legal theories. *E.g.*, *Fitzgerald v. Codex Corp.*, 882 F.2d 586, 589 (1st Cir. 1989). Where a plaintiff has shown "a plausible entitlement to relief," the court must deny a motion to dismiss. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Claims based on fraud must be stated with particularity, although "intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "[T]he circumstances to be stated with particularity under Rule 9(b) generally consist of 'the who, what, where, and when of the allegedly [misleading] representation.'" *Kaufman v. CVS Caremark Corp.*, 836 F.3d 88, 91 (1st Cir. 2016) (quoting *Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 29 (1st Cir. 2004) (second alteration in original)). "The purpose of Rule 9(b) is to provide notice, not to test the factual allegations of the claim." *In re WellNx Mktg. & Sales Practices Litig.*, 673 F. Supp. 2d 43, 51 (D. Mass. 2009) (quotation omitted).

B.    The False Claims Act

The FCA imposes liability on any person (A) who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," (B) who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," or (C) who "conspires to commit a violation of subparagraph (A), (B)" or other substantive sections. 31 U.S.C. § 3729(a)(1). "Knowingly" includes "actual knowledge," "deliberate ignorance," or "reckless disregard" and "require[s] no proof of specific intent to defraud. *Id.* § 3729(b)(1). The FCA defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4).

C.    The Anti-Kickback Statute

The AKS prohibits the solicitation, receipt, offer, or payment of illegal remuneration:

(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) . . .

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program . . . .

(2)  Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) . . .

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B)  to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program . . . .

42 U.S.C. § 1320a-7b(b).  In 2010, Congress amended the AKS to provide that any claim "that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]."  *Id.* § 1320a-7b(g).  Separate from section 1320a-7b(g), a distinct "pathway to FCA liability for an AKS violation [exists] when someone falsely represents compliance with a material requirement that there be no AKS violation in connection with the claim."  *United States v. Regeneron Pharm., Inc.*, 128 F.4th 324, 333 (1st Cir. 2025) (citing *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 392–94 (1st Cir. 2011)).

In annual contracts between Medicare Advantage Organizations ("MAOs") and the Centers for Medicare & Medicaid Services ("CMS"), MAOs agree to comply with "Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including . . . the False Claims Act (31 U.S.C. §§ 3729 et seq.), and the anti-kickback statute."  42 C.F.R. § 422.504 (a)(2); *see* Compl. ¶¶ 94, 768.  And in monthly or quarterly submissions of beneficiary data to CMS, MAOs "must certify that each enrollee for whom the organization is requesting payment is validly

- 5 -

enrolled in an MA plan offered by the organization" and that the information the MAO provides is "accurate, complete, and truthful." *Id.* § 422.504(*l*)(1); *see* Compl. ¶¶ 96, 781.

      D.    <u>Medicare Advantage Regulations Related to Broker Payments</u>

      Subject to regulatory limits, MAOs may provide compensation to insurance brokers for the brokers' services. Following a Congressional mandate to promulgate rules that "ensure that the use of compensation creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs," 42 U.S.C. § 1395w-21(j)(2)(D), CMS imposed a cap on the amount that an MAO could pay a broker as "compensation" for a beneficiary's enrollment in a Medicare Advantage plan. 42 C.F.R. § 422.2274(a) (2021). This cap on "compensation" covers all "monetary or non-monetary remuneration of any kind," such as commissions, bonuses, gifts, prizes, or awards. *Id.*

      In addition to capped "compensation" for enrollments, MAOs also could pay brokers for bona fide administrative services "other than selling insurance products." Prior to 2021, the CMS regulation provided that:

> [i]f the MA organization contracts with a third party entity . . . to sell its insurance products, or perform services (for example, training, customer service, or agent recruitment) . . . [t]he amount paid to the third party for services other than selling insurance products, if any, must be fair-market value and must not exceed an amount that is commensurate with the amounts paid by the MA organization to a third party for similar services during each of the previous 2 years.

*Id.* § 422.2274(b)(1)(iv) (2020). The updated 2021 version of the regulation similarly required that "[p]ayments made for services other than enrollment of beneficiaries (for example, training, customer service, agent recruitment, operational overhead, or assistance with completion of health risk assessments) must not exceed the value of those services in the marketplace." *Id.* § 422.2274(e)(1) (Mar. 2021). Neither version allowed MAOs to make administrative payments in return for enrollments. Compl. ¶¶ 81–82. When CMS first promulgated the broker

compensation regulation, it specifically warned that "agent and broker relationships can be problematic under the Anti-Kickback Statute if they involve, by way of example only, compensation in excess of fair market value, compensation structures tied to the health status of the beneficiary (for example, cherry-picking), or compensation that varies based on the attainment of certain enrollment targets." 73 Fed. Reg. 54226, 54239 (Sept. 18, 2008).

     E.    <u>Anti-Discrimination in Medicare Advantage</u>

Medicare Advantage plans must accept anyone who meets the Medicare eligibility requirements and lives within a plan's service area, regardless of the person's health status. *E.g.*, 42 C.F.R. § 422.2. MAOs and brokers cannot discriminate against beneficiaries with disabilities in connection with enrollment in Medicare Advantage plans. 42 U.S.C. § 18116; 45 C.F.R. § 92.207. That is, MAOs and their contractors "may not deny, limit, or condition the coverage or furnishing of benefits to individuals eligible to enroll in a Medicare Advantage plan offered by the organization on the basis of any factor that is related to health status, including, but not limited to . . . disability." 42 C.F.R. § 422.110(a)(7). "Disability" means "a physical or mental impairment that substantially limits one or more major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment[.]" 45 C.F.R. § 92.4.

In every Medicare Advantage contract with the Government, MAOs agree to "comply with the prohibition in § 422.110 on discrimination in beneficiary enrollment," which is "material to the performance of the MA contract." 42 C.F.R. § 422.504(a)(2). Starting in September 2016, MAOs also agreed in their Medicare Advantage contracts to comply with nondiscrimination rules "in 45 [C.F.R.] Part 92, including submitting assurances that the MA Organization's health programs and activities would be operated in compliance with the nondiscrimination requirements[.]" *See* Compl. ¶ 784. Aetna and Humana perceived beneficiaries with disabilities

as more expensive to cover, and therefore less profitable, than beneficiaries without disabilities. *Cf.* Compl. at 2.

## **ARGUMENT**

The Complaint adequately pleaded facts supporting each element of its FCA claims predicated on AKS violations, under either available "pathway": (1) claims "resulting from" a violation of the AKS, 42 U.S.C. § 1320a-7b(g)) or (2) claims "falsely represent[ing] compliance with a material requirement." *Regeneron*, 128 F.4th at 333. The Complaint also pleaded facts supporting each element of its FCA claims relating to discrimination by Aetna, Humana, and the Defendant Brokers. It sufficiently pleaded an FCA conspiracy claim based on Defendants' schemes to violate the FCA. It also appropriately pleaded unjust enrichment, in the alternative and under federal common law. Throughout, the Complaint satisfied the particularity requirements of Rule 9(b), "plac[ing] the defendants on notice and enabl[ing] them to prepare meaningful responses." *Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 51 (1st Cir. 2020) (quotation omitted). Therefore, the Court should deny Defendants' motion to dismiss.

Rather than tackle the Complaint's allegations head-on, Defendants frequently quote the Government's briefing in a separate case in the Northern District of Texas challenging an April 2024 rule under the Administrative Procedure Act ("APA"). *See Ams. for Beneficiary Choice v. U.S. Dep't of Health & Hum. Servs.*, No. 4:24-cv-439 (N.D. Tex.). Defendants suggest it is somehow "telling[]" that the Government's Complaint is "[s]ilent" on the 2024 rule and the legal challenges to it. Memo. at 2 &10. The Complaint here alleged conduct that occurred years before the April 2024 Rule and the APA litigation and under different factual and regulatory contexts.[1]

---

[1] In addition to having no relevance to these proceedings, the Government's 2024 APA briefing is also not properly before the Court. A court may take judicial notice of "the rulings and factual findings by other courts"—not extrinsic briefing. *Universitas Educ., LLC v. Granderson*, No.

# I.    The Complaint Sufficiently Pleaded Predicate Violations of the AKS

The Complaint pleaded sufficient factual allegations for each element of the AKS violations that underlie the FCA violations: (A) Defendants acted "knowingly and willfully"; (B) they (Defendant Brokers) solicited and received or they (Defendant Insurers) offered and paid "any remuneration"; (C) "remuneration" was "in return for" or "to induce" enrollments in the Defendant Insurers' Medicare Advantage plans; and (D) Medicare Advantage plans constitute "any item or service for which payment may be made . . . under a Federal health care program." 42 U.S.C. § 1320a-7b(b).  Finally, construing Defendants' regulatory arguments as coming under notice, *see* Memo. at 2, 13–16, 23, the Complaint did not implicate fair notice concerns.

## A.    Defendants Acted "Knowingly and Willfully"

The Complaint sufficiently pleaded facts showing that Defendants acted "knowingly and willfully" in soliciting, offering, receiving, or paying kickbacks.  *Id.* § 1320a-7b(b)(1)–(2).  No Defendant challenges the sufficiency of scienter allegations.  That is unsurprising based on the Complaint's extensive well-pleaded allegations demonstrating consciousness of wrongdoing, such as self-described "small handshake deals in dark back rooms," Defendants' repeated use of written contracts that did not reflect their underlying agreements, and the admissions in communications about the illegality of their conduct (e.g., the stated belief that "if Aetna got audited by [CMS], they'd be fuc[**]ed.").  Compl. ¶¶ 385, 424, 622, 642.  Defendants have waived their right to challenge scienter on reply.  *See United States v. Eirby*, 515 F.3d 31, 36 n.4 (1st Cir. 2008); *Berezin v. FCA US, LLC*, No. 21-cv-10852-FDS, 2023 WL 8283870, at *5 (D. Mass. Nov. 30, 2023).

---

15-cv-11848-DJC, 2025 WL 889377, at *1 n.2 (D. Mass. Mar. 21, 2025) (citing *Kowalski v. Gagne*, 914 F.2d 299, 305 (1st Cir. 1990)).  And if Defendants are suggesting that the APA briefing constitutes a judicial admission, they must identify specific "factual assertions" made "clearly and unambiguously" in that briefing, which they have not.  *Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co.*, 976 F.2d 58, 61 (1st Cir. 1992); *see* Memo. at 6 n.3.

B.    Defendants Solicited, Received, Offered, or Paid "Remuneration"

Using extensive documentary evidence, the Complaint described "remuneration" solicited, received, offered, or paid by every Defendant in return for or to induce Medicare Advantage enrollments. 42 U.S.C. § 1320a-7b(b)(1), (2); *see, e.g.*, Compl. ¶¶ 223, 269, 299, 595.    The Defendants largely ignore these factual allegations, instead claiming that the Government must "allege that the payments at issue exceeded the value of those services in the marketplace (*i.e.*, fair market value)" to constitute "remuneration" under the AKS.    Memo. at 21.    That is wrong for several reasons: it assumes, contrary to the well-pleaded allegations of the Complaint, that the challenged payments were only for permissible marketing services; and it conflicts with the law of the circuit and the text of the AKS.

First, the payments at issue were not otherwise-compliant payments of debatable market value.    Instead, they were payments at least in part for commitments to sell specific quantities of the MAOs' Medicare Advantage plans.    *E.g.*, Compl. ¶¶ 136, 414.    eHealth, for example, took remuneration from the Defendant Insurers in exchange for enrollments, but the parties often disingenuously asserted in their contracts that the remuneration reflected administrative payments for the establishment and maintenance of carrier "Mini-Sites" within eHealth's website.    *E.g., id.* ¶¶ 258 (Humana), 394 (Aetna), 714 (Anthem).    In fact, eHealth elsewhere acknowledged that the purported administrative payments were "budgeted as 100% profit" rather than paying for a bona fide service, *id.* ¶ 270, and it significantly varied the price for the same alleged service to different insurers.    *Id.* ¶¶ 259 (no charge to UnitedHealthcare for eHealth mini-site), 274 (no Humana payment for eHealth mini-site for first three quarters of 2018 versus $5 million payment for the final quarter), 393–94 (Aetna paid $2.5 million for eHealth mini-site in 2018).    Defendants also intended some of the payments to limit sales of competitors' plans (such as through "exclusive"

agents or "pods," turning off competitors' plans, or refusing to contract with MAO competitors). *E.g.*, *id.* ¶¶ 144 (describing Humana's "Current 'Handshake' agreement where [GoHealth] will not Contract with certain Large Competitors"), 199–206 (Humana paid SelectQuote to "maintain[] a 'pod' of agents that sold only Humana policies," but their contracts did not mention the "pod").

There is no fair market value for kickbacks that are falsely described as payments for other services, or for payments with one purpose to induce or reward referrals, *Guilfoile v. Shields*, 913 F.3d 178, 189 (1st Cir. 2019), and so the Complaint did not "convert compliant payments into kickbacks." Memo. at 23. Worse still, Aetna and Humana conditioned some payments on the Defendant Brokers' reducing the proportion of disabled Medicare beneficiaries enrolling in their Medicare Advantage plans. *E.g.*, *id.* ¶ 320 ("funds" paid to a broker "will dry up quickly" without reduction in proportion of disabled beneficiaries). In no circumstance could a legitimate administrative payment, purportedly to pay a broker for non-enrollment expenses, be conditioned on the broker enrolling a lower proportion of disabled beneficiaries eligible for Medicare based on disability.

Second, an atextual imposition of a fair market value minimum to "remuneration" is foreclosed by circuit precedent, which Defendants relegate to a footnote. Memo. at 22 n.6 (citing *United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d 20, 33 (1st Cir. 1989)). In *Bay State*, the First Circuit clarified that the term "any remuneration" in the AKS "includes not only sums for which no actual service was performed but also those amounts for which some professional time was expended." 874 F.2d at 30 (quoting *United States v. Greber*, 760 F.2d 68, 71 (3d Cir. 1985)). That is because "Congress did not explicitly change the statute to exclude reasonable payments for actual work done." *Id.* at 31. Therefore, the First Circuit squarely rejected a fair market value precondition by recognizing that "reasonable payments for actual work done"

can constitute "remuneration" under the AKS. *Id.*; *see also Guilfoile*, 913 F.3d at 189 ("[T]he AKS targets any remunerative scheme. . . ."); *United States v. Regeneron Pharm., Inc.*, No. 20-11217, 2020 WL 7130004, at *10 (D. Mass. Dec. 4, 2020) (stating that "remuneration" in the AKS is "anything of value"); *United States ex rel. Westmoreland v. Amgen, Inc.*, 812 F. Supp. 2d 39, 68 (D. Mass. 2011) (noting that remuneration is "anything of value as an inducement to generate business payable by Medicare or Medicaid").[2]  *United States v. Millenium Laboratories* does not stand for the contrary proposition cited by Defendants; instead, that case compared two complaints under the FCA's first-to-file rule, 31 U.S.C. § 3730(b)(5), and described additional price-related details in the first complaint.  923 F.3d 240, 254 (1st Cir. 2019).

Third, the text of the AKS is clear.  It refers to "any remuneration," without limitation on the term.  When Congress placed this term in the statute in 1977 to expand liability beyond specified "bribes," "kickbacks," and "rebates," *see* Medicare-Medicaid Anti-Fraud and Abuse Amendments of 1977, "remuneration" meant "[r]eward; recompense; salary."  BLACK'S LAW DICTIONARY 1460 (4th Ed. Rev., 1968).  Limiting "any remuneration" only to payments above fair market value cannot be squared with the ordinary meaning of the term.  *See Jones v. Hendrix*, 599 U.S. 465, 480 (2023) ("Here, as often is the case, the best interpretation is the straightforward one.").  A case Defendants cited recognizes this clear textual point: "[r]emuneration, for purposes of the AKS, is defined broadly, meaning 'anything of value'" and so "[i]n many cases

---

[2]  An unpublished Eleventh Circuit opinion to the contrary is unpersuasive, as it erred in textual analysis by choosing ever-tighter dictionary definitions and then assuming without explanation that a "benefit[]" can "only be quantified by reference to its fair market value."  *Bingham v. HCA, Inc.*, 783 F. App'x 868, 873 (11th Cir. 2019) (unpublished); *see* 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent.").  The Eleventh Circuit itself recently stated, in a different context, that "*Bingham* is not binding on us, and we do not find it persuasive." *United States ex rel. Sedona Partners LLC v. Able Moving & Storage Inc.*, 146 F.4th 1032, 1041 (11th Cir. 2025).  If the Eleventh Circuit itself finds *Bingham* unpersuasive, this Court should give this unpublished,  out-of-circuit opinion no consideration.

remuneration is not at issue because the defendant has accepted cash or a cash equivalent such as a bribe." *Klaczak v. Consol. Med. Transp.*, 458 F. Supp. 2d 622, 678 (N.D. Ill. 2006). So it is here: "remuneration" is not at issue because Defendants paid or received "cash or a cash equivalent." *Id.*; *see, e.g.*, Compl. ¶¶ 156, 235.

Finally, if Defendants indirectly challenge "remuneration" by mischaracterizing the "Government's theory" as being that "all non-compensation payments by MAOs to TPMOs [i.e., third-party marketing organizations] are unlawful kickbacks," that is wrong. Memo. at 14. In fact, the Complaint stated that "[i]n addition to this 'compensation' for enrollments, MAOs could pay brokers for certain bona fide administrative services other than enrollment of beneficiaries." Compl. ¶ 79. As CMS has explained, however, MAOs must "not use these administrative payments as a means to circumvent the limits on compensation to agents and brokers" and payments must fairly relate to the "administrative services being performed." *Id.* ¶ 82 (quoting 86 Fed. Reg. 5864, 5994 (Jan. 19, 2021)).

C.    Defendants' Remuneration Was "In Return For" or "To Induce" Enrollments in Medicare Advantage Plans

The Complaint described how the Defendant Insurers paid kickbacks to "induce" the Defendant Brokers "to refer an individual" to the Defendant Insurers' plans or to "arrange for or recommend purchasing . . . or ordering" the Insurers' Medicare Advantage plans. 42 U.S.C. § 1320a-7b(b)(2); *e.g.*, Compl. ¶¶ 156, 399. Defendants contest only inducement, which is an element of subsection (b)(2) but not (b)(1) ("in return for"). "[I]n the heartland of what the AKS is intended to prevent [is] the use of payments to improperly influence decisions on the provision of health care[.]" *Guilfoile*, 913 F.3d at 192–93. Defendants on both sides of the kickback relationships sought to "improperly influence" Medicare beneficiaries' health care decisions, without due regard for beneficiaries' interests. *E.g.*, Compl. ¶¶ 743–44.

Though "any person" may violate the AKS, the First Circuit has explained that "[r]elevant considerations for identifying an unlawful kickback include . . . whether the person being paid the alleged kickback is 'in a position to generate [f]ederal health care program business[.]'" *Guilfoile*, 913 F.3d. at 189 (quoting 70 Fed. Reg. 4858, 4864 (Jan. 31, 2005)). The Defendant Brokers were in a paradigmatic position to generate Medicare Advantage business for MAOs. *E.g.*, Compl. ¶ 288. Rather than address the First Circuit's "consideration[]" of whether a payee is "in a position to generate [f]ederal health care program business," as all the Defendant Brokers were, Defendants rely almost entirely on *United States v. Sorensen,* 134 F.4th 493 (7th Cir. 2025). Memo. at 24–25. There, the Seventh Circuit reversed a defendant's AKS conviction for insufficient evidence, in part because the recipients of the kickbacks were "neither physicians . . . nor other decisionmakers in positions to 'leverage fluid, informal power and influence' over healthcare decisions." *Sorensen,* 134 F.4th at 496 (quoting *United States v. George*, 900 F.3d 405, 411 (7th Cir. 2018)).

The Government respectfully submits that the *Sorensen* court misread both the text of the AKS and the prior caselaw on which it relied. Subsection (b)(2) refers to "any remuneration" paid to "any person." 42 U.S.C. § 1320a-7b(b)(2). If Congress wanted to limit the AKS to a "decisionmaker" group, it would have done so. To "limit drastically" the concept of "any person" is at odds with the plain meaning of the statutory text. *United States v. Shoemaker*, 746 F.3d 614, 627 (5th Cir. 2014); *see Bay State*, 874 F.2d at 35 (explaining that the AKS "makes no distinction on the basis of control or extent of participation" and so can "reach minor actors"). *Sorensen*'s reference to "fluid, informal power and influence" comes from *Shoemaker*, where the Fifth Circuit explained that "Congress's concerns in enacting the statute [were] to broaden liability to reach operatives who leverage fluid, informal power and influence." 746 F.3d at 629–30. *Shoemaker*

provided this concept as an example of the "broaden[ed] liability" intended by Congress, not as a limitation on the statute's reach.

Regardless, even if *Sorensen*'s analysis were not mistaken and inconsistent with the First Circuit's rulings in *Guilfoile* and *Bay State*, the Complaint's allegations nonetheless comfortably meet the *Sorensen* "decisionmakers" test for subsection (b)(2) of the AKS.  The Defendant Brokers "leverage[d] fluid, informal power and influence' over healthcare decisions" by Medicare beneficiaries, taking actions that the Defendant Insurers induced.  *Sorensen,* 134 F.4th at 496 (quotation omitted).  The Complaint alleged that the Defendant Brokers directly steered beneficiaries to favored insurance plans, often "prepar[ing] and submit[ting]" the beneficiaries' enrollment applications.  Compl. ¶ 58; *cf. id.* ¶ 392 (turning off certain carriers to boost other carriers that paid kickbacks).  To achieve this steering, the Defendant Brokers used their positions of trust and made false claims of unbiased, carrier-agnostic support for beneficiaries.  *See id.* ¶¶ 65 (GoHealth "determine[d] which carriers to slow down or stop and how we can maximize cash"), 262 (eHealth: "I need to get Humana more sales so please give me about 5-7 states that I can shut off another carrier to drive them"), 760 (eHealth "suppress[ed] carriers" so as "to increase sales for other insures that paid kickbacks, regardless of the relative merits of the plans for beneficiaries"), 74 & 110 (SelectQuote purported to be "unbiased" but referred unsuspecting beneficiaries to "a 'pod' of agents who sold only Humana plans").

As CMS has explained, "[a]gents selling MA and PDP [i.e., prescription drug plans] products play a significant role in providing guidance and advice to beneficiaries when selecting health plan options.  This unique position allows them to influence beneficiary choices."  *Id.* ¶ 67 (quoting 73 Fed. Reg. 28556, 28583 (May 16, 2008)).  The Defendant Insurers paid the Defendant Brokers partly due to that influence over beneficiaries and the false "perception of shopping

everything within a market and picking the best plan." *Id.* ¶ 590. Finally, because these payments were made with "at least one purpose" to induce or reward beneficiary enrollments, *see Guilfoile*, 913 F.3d. at 189, it is beside the point that the Defendant Insurers may have also "paid marketers [i.e., the Defendant Brokers] . . . to market," Memo. at 25.

      D.    <u>A Medicare Advantage Plan Is an "Item" or "Service" Under the AKS</u>

The AKS prohibits the offer, solicitation, payment, or receipt of remuneration in return for, or to induce, referrals, recommendations, or arrangements for the "purchasing, leasing, or ordering any good, facility, service, or item" that may be paid for "under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(1)–(2). The AKS does not limit the broad terms of "good," service," or "item." That is not surprising because the AKS was designed to address sweeping and varied health care expenditures by the Government. A Medicare Advantage plan is plainly an "item" or "service" under the AKS. Indeed, Medicare (a "Federal health care program" under the AKS) paid an average of approximately $12,000 per beneficiary's Medicare Advantage plan in 2019.

Ignoring the slew of well-pleaded facts detailing their kickbacks, Defendants first contend that the Complaint "does not articulate whether or how an MA Plan or an enrollment falls into any of the other statutory categories' 'broad ordinary meanings'" (that is, item, good, or service) and that this perceived "silence alone merits dismissal." Memo. at 17. Defendants cite no authority for such a pleading requirement because there is not one. A plaintiff must plead only "factual allegations, not legal theories*." United States v. Regeneron Pharm., Inc.*, No. 20-cv-11217, 2025 WL 2207299, at *3 (D. Mass. Aug. 4, 2025) (quoting *Whitaker v. Milwaukee County*, 772 F.3d 802, 808 (7th Cir. 2014)). The Government has pleaded in detail the who, what, where, when, and how of Defendants' kickback schemes. Compl. ¶¶ 98–742. The Complaint pleaded that, at the time of their misconduct, Defendants understood that the AKS applied to Medicare Advantage

plans and enrollments.  For example, Humana's and Aetna's broker contracts warned that the brokers must comply with the AKS because, for example, Humana "will pay Producer [i.e., broker] using federal funds it receives in connection with the performance of its obligations under CMS's contract with the Company."  *Id.* ¶¶ 104, 383; *see id.* ¶¶ 170 (Humana employee acknowledging that broker payment "limitations may be better defined by the Anti-Kickback Statute"), 635 (Anthem employee noting possible "anti-kickback risk" for broker contracts).

Defendants next argue that the AKS does not apply to the alleged conduct as a matter of law because Medicare Advantage plans do not constitute "item[s]" or "service[s]" under the AKS.  Memo. at 17.  This novel argument fares no better.  Defendants' constricted interpretation of "item" and "service" is unsupported by the AKS's text and, assuming textual ambiguity, runs counter to the AKS's purpose and its statutory context.  Defendants cite no case adopting their blinkered textual argument.

When interpreting a statute, courts first consider the plain, ordinary meaning of the text in the absence of statutory definitions.  *E.g.*, *HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*, 594 U.S. 382, 388 (2021).  If the text is clear, the inquiry ends there.  *Bostock v. Clayton Cnty.,* 590 U.S. 644, 674 (2020).  The AKS does not define "item" or "service," and so a court must first examine the ordinary meaning of these terms, starting with definitions around the time of enactment (here, the 1970s).  *E.g.*, *Tanzin v. Tanvir*, 592 U.S. 43, 48 (2020); *see* Social Security Amendments of 1972, Pub. L. 92-603 (including "items or services").

Both "item" and "service" have plain meanings that encompass Medicare plans, which Defendants implicitly concede by never grappling with the ordinary meanings of these common

words.[3]  An "item," for example, is "a single article or unit included in a collection, enumeration, or series" or, more colloquially, "a separate thing."  "Item," AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (1976); "Item," WEBSTER'S NEW WORLD DICTIONARY, SECOND COLLEGE EDITION (1972).  A "service" is generally understood as a "help, use, or benefit." "Service," WEBSTER'S NEW COLLEGE DICTIONARY (1977); *see also* BLACK'S LAW DICTIONARY 5th Ed. (1979) ("The term [service] has a variety of meanings, depending on the context[.]").  A Medicare Advantage plan naturally falls within the plain meaning of each term.  It is an item because it is one "article or unit" of the many insurance options from which a Medicare-eligible beneficiary may select.  A Medicare Advantage plan is also a service because the plan contracts with a network of providers available to the beneficiary, adjudicates and reimburses claims on behalf of the beneficiary, and provides benefits directly to the beneficiary, such as medication reviews and treatment management (all of these are a "help, use, or benefit" to the Medicare beneficiary).  *Cf.* Compl. ¶¶ 31–48.  A broker can "recommend . . . ordering" a particular Medicare Advantage plan, for example.  42 U.S.C. § 1320a-7b(b)(2).

Ignoring the first step of statutory interpretation, Defendants claim that only "health care products or services that a health care provider might supply to patients" constitute "item[s]" or "service[s]" under the AKS.  Memo. at 17.  But Congress did not limit "item" or "service" to the subset of those supplied by a health care provider.  If Congress meant to restrict these terms, it would have done so clearly.  *See Bostock*, 590 U.S. at 654–55 ("[O]nly the words on the page constitute the law adopted by Congress and approved by the President.").  A close reading of the statute suggests the opposite: the AKS prohibits remuneration relating to (a) "any item or service"

---

[3]  A Medicare Advantage plan may also constitute a "good" under subsection (b)(1), as a "good" is "something that has economic utility or satisfies an economic want."  "Good," WEBSTER'S NEW COLLEGE DICTIONARY (1977).

or (b) "any good, facility, service, or item" where payment may be made by federal health care programs.  42 U.S.C. § 1320a-7b(b)(1)–(2).  The modifier "any" serves only to broaden, not limit, these terms.  *See United States v. Gelin*, 712 F.3d 612, 618 (1st Cir. 2013) ("The common meaning of the adjective 'any' . . . is 'regardless of sort, quantity, or number'" (citations omitted)).  Courts have understood the use of "any" elsewhere in the AKS as demonstrating the statute's appropriate breadth.  *E.g.*, *Shoemaker*, 746 F.3d at 629 (finding that limiting the term "any person" "would be tantamount to re-writing the statutory text").

Because the statutory text is clear, the Court need not look at legislative intent or other external material such as statutory context.  *E.g.*, *Babb v. Wilkie*, 589 U.S. 399, 404 (2020); *Baker v. Smith & Wesson, Inc.*, 40 F.4th 43, 48 (1st Cir. 2022).  At least one court has expressly determined that a Medicare Advantage plan is an "item or service" under the AKS, finding that the AKS's reach "is not limited to referrals for care itself, but rather for 'any item or service' paid under Medicare . . . such as a Part C plan."  *Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 657–58 (M.D. Tenn. 2022); *see id.* at 673 (denying motion to dismiss because plaintiffs "alleged that [the defendant MAO's] personnel gave out valuable gift cards as an inducement for referrals to its AKS-covered Part C business").  And three other courts have considered similar allegations that MAOs paid kickbacks to induce enrollments in their Medicare Advantage plans, with each court understanding that the AKS applied to Medicare Advantage plans and not seeing a need to venture into extratextual review.  *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 298 (3d Cir. 2011) (reversing dismissal for allegations that an MAO "violated the FCA by illegally providing kickbacks in violation of the [AKS] . . . to induce the clinic to switch its patients to" the MAO's plans); *United States ex rel. Gonite v. UnitedHealthcare of Georgia, Inc.*, No. 5:19-cv-246, 2025 WL 1184109, at *1 (M.D. Ga. Apr. 23, 2025) (holding that

relator sufficiently pleaded AKS violations regarding an MAO's alleged kickbacks for enrollments in "a type of Medicare Advantage plan"); *United States ex rel. Butler v. Shikara*, 748 F. Supp. 3d 1277, 1290 (S.D. Fl. 2024) (holding that FCA relator sufficiently pleaded AKS violations regarding MAO's alleged kickbacks for "steering Medicare patients to their organizations"). Straining to distinguish these cases, Defendants assert that each "involved alleged payments to ***healthcare providers***." Memo. at 18 n.5. But the identity of a kickback recipient has no bearing on whether a Medicare Advantage plan is an "item" or "service" under the AKS. Also, *Shikara* involved payments both to a doctor and to his owned-and-operated brokerage "that enter[ed] contracts with insurance agents who sell Medicare Advantage Plans." 748 F. Supp. 3d at 1289.

Even if there were textual ambiguity, legislative intent would support the application of the AKS to Medicare Advantage plans. *See Millenium Labs*., 923 F.3d at 250 (reviewing legislative history "as a check to confirm the accuracy of our textual analysis"). For example, the Senate Committee Report for the 1977 amendment to the AKS discussed a penalty for "[M]edicare providers, physicians, and other suppliers of services." Medicare-Medicaid Anti-Fraud Abuse Amendments of 1977, Report of the Senate Committee on Finance on S. 143 (No. 95-453, Sept. 26, 1977) at 10, https://perma.cc/6CNH-WVLZ. The term "other suppliers" indicates that "services" must be understood as broader than only those from health care "providers [or] physicians." *Id.* Similarly, a sponsor of the 2010 amendments to the AKS explained the goal of "making all payments that stem from an illegal kickback subject to the False Claims Act." 155 Cong. Rec. S10852, S10853 (daily ed. Oct. 28, 2009) (statement of Sen. Kaufman). Applying ordinary meanings of "item" and "service" is consistent with the Congressional purpose of covering "all payments that stem from an illegal kickback" and combating the many ways financial incentives may improperly affect health care decisions and patient choice. *Id.* As several courts

have recognized, the AKS follows "Congress's broad objectives in the [AKS] of preventing Medicare and Medicaid fraud and protecting patient choice." *Stop Illinois Health Care Fraud, LLC v. Sayeed*, 957 F.3d 743, 749–50 (7th Cir. 2020); *Guilfoile*, 913 F.3d at 192–93.

In contrast, if the AKS were construed to exclude Medicare Advantage plans, the statute's power to safeguard Medicare from improper kickbacks would be significantly weakened. Such a result would defy Congressional intent by placing more than half of all Medicare spending (totaling hundreds of billions of dollars per year) outside the AKS's ambit. Compl. ¶ 38; *see Quarles v. United States*, 587 U.S. 645, 654 (2019) ("We should not lightly conclude that Congress enacted a self-defeating statute."). Certainly, the AKS seeks to "prevent medical providers from making decisions based on improper financial incentives rather than medical necessity," but that is not the statute's only purpose. *United States ex rel. Banigan v. PharMerica, Inc.*, 950 F.3d 134, 137 (1st Cir. 2020); *see, e.g.*, *United States v. Patel*, 778 F.3d 607, 615 (7th Cir. 2015).

Statutory context also supports a plain-text understanding. Defendants suggest that, because defined terms in the Social Security Act like "medical and other health services," "inpatient hospital services," and "extended care services" refer to specified medical items and services supplied to patients, the undefined AKS terms "item" and "service" should be similarly limited. Memo. at 19. To the contrary, the existence of such definitions in neighboring provisions strongly suggests that Congress knew how to narrow meaning of those terms when it wanted them to reflect something more limited than their ordinary meanings. But in the AKS, Congress did not impose such a limiting definition on those terms. *See Maine Cmty. Health Options v. United States*, 590 U.S. 296, 314 (2020) ("When Congress includes particular language in one section of a statute but omits it in another, Congress intended a difference in meaning" (citation modified)).

- 21 -

Defendants' grasps at other regulatory or sub-regulatory definitions cannot contravene statutory text and are largely irrelevant, such as a definition only "[f]or purposes of this [regulatory] paragraph."  42 C.F.R. § 1001.952(t)(2).  In fact, this safe harbor that Defendants reference expressly "does not cover marketing services or any services provided prior to a beneficiary's enrollment in a health plan."  64 Fed. Reg. 63504, 63507 (Nov. 19, 1999).  Or Defendants misconstrue agency guidance, such as where the Office of Inspector General of the Department of Health and Human Services ("HHS-OIG") described examples, not an exhaustive list, of "any item or service."  Memo. at 18.  In fact, HHS-OIG has explained in guidance that payments by MAOs to third parties in return for referrals in Medicare Advantage plans "implicate certain fraud and abuse laws, including the Federal anti-kickback statute," just as CMS did in 2008.  HHS-OIG, *Special Fraud Alert: Suspect Payments in Marketing Arrangements Related to Medicare Advantage and Providers* (Dec. 11, 2024), http://perma.cc/QUH8-WDUT; 73 Fed. Reg. at 54239.

The Government's plain reading of the statute accords with the ordinary meanings of "item" and "service" and, if needed as a check, with legislative intent and statutory context.  The Court should reject Defendants' attempt to impose unfounded limitations on the AKS, not least because "overcomplicated and hyper technical interpretations cannot defeat common-sense plain readings of text."  *United States ex. rel. Streck v. Eli Lilly & Co.*, 152 F.4th 816, 826 (7th Cir. 2025).  The rule of lenity does not apply where text is clear because there is no ambiguity to resolve in favor of a defendant.  *See United States v. Luna-Diaz*, 222 F.3d 1, 3 n.2 (1st Cir. 2000).

E.    Defendants Had Fair Notice of the AKS

Each Defendant had fair notice that the AKS could apply to remuneration paid or received for Medicare Advantage enrollments.  *E.g.*, Compl. ¶¶ 82–83, 106, 123, 204.  Defendants appear to bring a two-pronged notice argument under both administrative law and due process.  In doing

so, they disregard the Complaint's well-pleaded allegations to claim falsely that the Complaint "dress[ed] up compliant payments as kickbacks." Memo. at 15. Beyond straying outside the Complaint, these arguments are unavailing. At the outset, it is important to note that each of the Defendant Insurers' annual contracts with CMS included a representation that they would comply with the AKS. Compl. ¶ 94. This requirement of compliance made clear that the AKS could apply to MAOs' conduct and, in context, that certain payments (such as capped commissions) were permissible whereas other payments were not.

Administrative law. The Government has not brought an action where "a violation of a regulation subjects private parties to criminal or civil sanctions." *CFTC v. EOX Holdings, LLC.*, 90 F.4th 439, 444 (5th Cir. 2024) (quotation omitted). As Defendants rightly concede, the Government instead brought an FCA case premised in relevant part on alleged "violations of the AKS." Memo. at 15. Defendants' citation to *EOX Holdings* therefore misses the mark, as the Fifth Circuit addressed the "fair notice doctrine" specific to sanctions premised on violations of agency rules. *EOX Holdings*, 90 F.4th at 444; *see also SNR Wireless LicenseCo, LLC v. Fed. Commc'ns Comm'n*, 868 F.3d 1021, 1043 (D.C. Cir. 2017). In this case, the Complaint repeatedly described unlawful kickback payments "disguised" as "administrative payments" governed by agency regulations. *E.g.*, Compl. ¶¶ 98, 106, 421.

Even taking Defendants' regulatory arguments on their face, CMS never "***expressly authorized***" purported administrative payments made for, or to induce, enrollments in the insurers' Medicare Advantage plans. Memo. at 13 (emphasis in original); *e.g.*, Compl. ¶¶ 106, 204. Indeed, Defendants agree with the Complaint that "CMS's regulations ***allow*** marketing and other administrative payments to be made 'based on' enrollments . . . just not 'for' enrollments[.]" Memo. at 15. CMS never "issued contradictory or misleading public interpretations" of the

administrative payment regulation or of its bar on administrative payments "for" enrollments. *United States v. Lachman*, 387 F.3d 42, 57 (1st Cir. 2004). Defendants cannot point to any misleading statement in CMS guidance about "marketing," particularly because no version of the administrative payment regulation even uses the term "marketing."

Again, Defendants flee from well-pleaded allegations relating to conduct between 2016 and 2021. Instead, they look to the Government's November 2024 briefing in *Americans for Beneficiary Choice* for the unremarkable point that CMS had "concerns about third-party marketing organizations—especially bidding wars." Memo. at 23. That years-later statement does not mean that CMS condoned Defendants' illegal payments alleged in the Complaint. Even assuming this argument had a factual basis, a "government knowledge" defense is "not appropriate at the motion to dismiss stage." *United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 264 (5th Cir. 2014); *cf. Eli Lilly*, 152 F.4th at 845 (noting that "'merely showing *some* government knowledge' of the falsity is not enough; there must be evidence of the government's 'cooperation and collaborative problem-solving' or 'explicit approval' to undercut" an FCA claim (quoting *United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 755–57, 759 (3d Cir. 2017)).

Due process. Construing Defendants' notice challenge as coming under due process rather than administrative law, it also fails. When analyzing the fair notice aspect of a due process challenge, a court must consider the specific facts as alleged and applied to the specific defendant. *United States v. Zhen Zhou Wu*, 711 F.3d 1, 14 (1st Cir. 2013). Defendants' behavior, as alleged in the Complaint, demonstrates that they had fair notice. These sophisticated companies had actual knowledge of the AKS. *E.g.*, Compl. ¶¶ 104, 248, 383–84, 580, 671. That is more than is required under the AKS, where "a person need not have actual knowledge of this section or specific intent to commit a violation of this section." 42 U.S.C. § 1320a-7b(h).

Defendants knew that permissible administrative payments should "seek to reimburse agents and brokers for the costs incurred in rendering a *service other than enrollment*, such as their 'operational overhead'" and that "administrative payments are distinct from the enrollment process that agents and brokers facilitate." *Ams. for Beneficiary Choice v. United States Dep't of Health & Hum. Servs.*, No. 4:24-CV-00439-O, 2025 WL 2390849, at *6 (N.D. Tex. Aug. 18, 2025). Defendants understood this distinction between commissions (which are capped and expressly for enrollments) and administrative payments (which are uncapped but cannot be for enrollments). That is why, as the Complaint described, every Defendant repeatedly made deals involving cash payments in exchange for certain numbers of enrollments but carefully drafted written contracts that made no mention of the underlying trades. *E.g.*, Compl. ¶¶ 120–23, 137–40, 190–91, 235–40, 296–98, 394–95, 402–03, 644–45, 687–90.

If Defendants truly believed their conduct to be legal, they would have had no reason to engage in repeated and sometimes confusing cover-up efforts, from pretextual contracts to falsified invoices. *E.g.*, *id.* ¶¶ 239 (modifying an invoice to remove "sales"), 301 ("The commitments on production are verbal over the phone and on spreadsheets - but nowhere on contract[.]"). Further, as noted above, CMS has warned at least since 2008 that enrollments to Medicare Advantage plans could violate the AKS. *Id.* ¶ 83 (quoting 73 Fed. Reg. at 54239). If an insurer or broker disagreed with CMS's warnings, it could have sought clarification from the agency or an advisory opinion from HHS-OIG. *Cf. United States ex rel. Behnke v. CVS Caremark Corp.*, No. 14-cv-824, 2025 WL 1758623, at *40 (E.D. Pa. June 25, 2025) (stating that, where the company was aware that it could seek agency guidance on the "propriety of a particular business practice," its "failure to seek clarification or guidance from CMS is further evidence of scienter"); *see also* 42 U.S.C. 1320a–7d(b); 42 C.F.R. §§ 1008.1 *et seq.* (procedures and topics for advisory opinions from HHS-OIG).

Ultimately, the AKS scienter requirement covers only "willful[]" violations of the law, so any notice or vagueness challenge "is especially inapposite." *Zhen Zhou Wu*, 711 F.3d at 15. That scienter requirement, which Defendants do not challenge here, means that "good-faith errors are not penalized." *Harris v. McRae*, 448 U.S. 297, 311 n.17 (1980).

## II.    The Complaint Sufficiently Pleaded FCA Claims Based on AKS Violations

The Complaint pleaded AKS-predicated violations of the FCA under both available "pathway[s]" described by the First Circuit: (A) claims "resulting from" AKS violations and (B) claims that "falsely represent[ed] compliance with a material requirement that there be no AKS violation in connection with the claim." *Regeneron*, 128 F.4th at 333.

### A.    Claims "Result[ed] From" AKS Violations (Count I)

The Complaint sufficiently pleaded that claims for items or services "result[ed] from" Defendants' violations of the AKS. 42 U.S.C. § 1320a-7b(g). When Congress added Section 1320a-7b(g) in 2010, it "establish[ed] a new pathway to liability for AKS violations." *Regeneron*, 128 F.4th at 331. That "new pathway" removed some obstacles to proving liability. When the Government relies on Section 1320a-7b(g), it proves falsity where it establishes the kickback violation, and it does not have to prove materiality. *Id.* at 334 (citing *Guilfoile*, 913 F.3d at 190). According to the First Circuit, subsection (g) requires proof of but-for causation. *See id.* at 336.

The but-for causation standard does not "render[] it so difficult to establish liability that the 2010 amendment would have no practical effect," *Regeneron*, 128 F.4th at 335, and indeed it is not an "insuperably difficult" burden to meet, *United States v. Regeneron Pharm., Inc.*, No. 20-cv-11217, 2023 WL 6296393, at *12 (D. Mass. Sept. 27, 2023). One can look to tort common law where but-for causation does not require that an actor be "the sole factual cause of a harm." *Id.* For example, "a negligent act will satisfy the but-for causation requirement if it was a 'substantial

factor in bringing about' the harm." *Id.* (citation omitted); *see United States ex rel. Radhakrishnan v. Gampel*, No. CV-20-00176, 2024 WL 894671, at *4 (D. Ariz. Mar. 1, 2024) (finding that a court could "infer that referrals made under [certain] financial arrangements would not have been made but for them"). Evidence of but-for causation "may . . . include, in the right circumstances," temporal proximity between a kickback and a claim. *Regeneron*, 2023 WL 6296393, at *12.

The Supreme Court and the First Circuit, evaluating other areas of the law, have held that proving but-for causation allows for various forms of evidence, in part because events may have "multiple but-for causes." *Bostock*, 590 U.S. at 656 (holding in a Title VII case that but-for causation can be a "sweeping standard"); *see United States v. Kilmartin*, 944 F.3d 315, 327 (1st Cir. 2019) (holding that a criminal defendant's conduct could be a but-for cause "even when it combines with other independent causes") (citing *Burrage v. United States*, 571 U.S. 204, 211 (2014)). For example, the First Circuit approved of RICO plaintiffs proving but-for causation through expert testimony and inferences from data, which together "clearly demonstrated but-for causation." *In re Neurontin Mktg. and Sales Practices Litig.*, 712 F.3d 21, 40 (1st Cir. 2013).

Defendants propose a standard divorced from caselaw and from the Complaint's facts, asking the Court to require the Government to show, for each individual enrollment, that a "marketing payment" caused a broker "to take a marketing action," that a specific individual saw the "marketing action," and that the individual would not have enrolled absent the "marketing action." Memo. at 37. Defendants cite no authority for this convoluted standard; to the Government's knowledge, no court has held that an FCA plaintiff can prove but-for causation only with evidence of the decision-making processes of individual agents and beneficiaries in this way.

Here, the Complaint alleged that: (1) the Defendant Insurers paid illegal remuneration to the Defendant Brokers to induce them to sell their plans or to reward the Brokers for doing so;

(2) in direct response to that remuneration, the Defendant Brokers took various steps (far beyond "marketing action," Memo. at 37) to steer beneficiaries to the favored insurers, including by paying their agents extra compensation to sell those Insurers' plans and by limiting the agents' ability to recommend plans of other MAOs (*e.g.*, Compl. ¶¶ 65, 109, 124, 131, 144, 160, 209, 211, 218, 224, 242, 248, 262–63, 277, 284–85, 392, 423, 445–47, 589, 626–29, 637–39, 658–59, 663, 666–69, 694–95, and 723); and (3) the Defendant Brokers consequently enrolled more beneficiaries in the Defendant Insurers' plans than they otherwise would have but for the kickbacks.

The Complaint contained extensive factual allegations supporting the existence of enrollments that would not have occurred but for Defendants' conduct. For example, one eHealth employee explained to another that Aetna's "kicker" payments "worked out in our favor" and provided a chart showing a significant increase in sales for Aetna after the "Kicker Campaign Launch." *Id.* ¶ 477. He wrote that "you can see where sales were trending in those markets prior to the campaign...and you can see how sales trended afterwards." *Id.* ¶ 478 (ellipsis in original). Likewise, the Complaint compared the relative share of Aetna's sales at GoHealth versus Aetna's national share, showing a change from nearly zero sales at GoHealth to more than double the national average after Aetna started paying kickbacks to GoHealth. *Id.* ¶ 464 (chart of Aetna's share at GoHealth and nationally before and after Aetna paid kickbacks); *see also id.* ¶¶ 225, 436 (relative share of Aetna and Humana at SelectQuote, compared to non-kickback paying MAO, showing increased Aetna sales that would not have occurred but for kickbacks).

Humana employees similarly described enrollments that would not have occurred but for its payments to brokers. For example, a Humana employee acknowledged that, without payments to induce SelectQuote to create a "pod" of agents who sold only Humana plans, Humana's market share from SelectQuote "would look more like 30% total. The pod allows us to be at 47% total [of

SelectQuote's sales]," because "the pod allows them to shift and increase our market share." *Id.* ¶¶ 110 & 228; *see also id.* ¶ 209 (if SelectQuote had shifted agents from an exclusive Humana "pod" to sell more insurers' plans, "Humana would have received only about twenty-six percent of those agents' sales"). Humana employees repeatedly described and sought "incremental" sales, "additive sales," or "additive production" from the Defendant Brokers, based specifically on additional payments to the Defendant Brokers. *Id.* ¶¶ 164 ("3,037 incremental sales"), 189 (comparing additional submissions and cost-per-sale for different payments), 255 (SelectQuote to Humana: "for an investment of $500K we could commit an incremental ~2,500+ enrollments"), 296 (eHealth and Humana: "500 incremental sales . . . would be paid at $250CPS [cost per sale]"); *see also id.* ¶ 210 (Humana employee: "Our agreement for this arrangement was that the Core would continue to produce the same amount of Humana MA sales, and the marketing dollars we invested would drive incremental sales from the Humana POD."). A Humana manager even instructed subordinates to ask brokers "if we gave them more money could they drive more Humana sales? . . . How many more could they get?" *Id.* ¶ 296. Further, when Humana described using payments to brokers to "successfully box[] out competitors," it is at minimum a reasonable inference that Humana received certain enrollments that would have gone to the "boxed out" MAOs but for Humana's illegal payments. *Id.* ¶ 220; *see also id.* ¶¶ 156, 160, 169 (Humana's "Current Approach" to broker payments included "[b]oxing-out competing carriers through exclusive / semi[-]exclusivity"), 279 ("Ehealth CPS [cost per sale] going up but we are also boxing out United. Intense Humana commitment means less focus on others.")

Anthem used similar terminology to refer to sales caused by kickbacks. For example, an Anthem employee told GoHealth of "an additional $1M in investment for incremental applications/sales from you all" (though GoHealth sent Anthem a sham invoice the next day for

"20,000 live transfers"). *Id.* ¶ 610. "Incremental" or "additive" enrollments provided in exchange for illegal payments would not happen but for those payments. Indeed, after Anthem started paying kickbacks to GoHealth, its share of GoHealth's Medicare Advantage sales was consistently much higher than its share of sales nationally. *Id.* ¶ 709. Together, these well-pleaded facts more than sufficed to allege but-for causation at the pleading stage.

### B.    False Representations of Compliance with the AKS (Counts II and IV)

Counts II and IV alleged AKS-predicated violations of the FCA under a false certification theory. "Under this theory, a defendant violates the FCA when presenting (or causing to be presented) a claim that misrepresents compliance with a 'statutory, regulatory, or contractual requirement' that 'the defendant knows is material to the [g]overnment's payment decision.'" *Regeneron*, 128 F.4th at 332 (quoting *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 181 (2016)) (alteration in original). So, the Government must plead facts to support materiality and falsity, as the Complaint amply did here, but is "not require[d]" to plead "causation to demonstrate falsity." *Regeneron*, 128 F.4th at 333.

Defendants argue that the Complaint "fails to plead the materiality and particular-false-claim elements of a false certification theory." Memo. at 25–26. First, regarding materiality, Defendants gloss over the Complaint's well-pleaded allegations and ignore contrary law on the centrality of the AKS to CMS's payment decisions. Second, Defendants' argument concerning the "particular-false-claim element[]" is largely an attempt to annul years of First Circuit precedent that "false-certification claims require no proof of causation." *Regeneron*, 128 F.4th at 334.

### i.    Compliance with the AKS Is a Material Condition of Payment

Claims to the Government may be rendered false by a false certification of compliance with a material condition of payment. *See Escobar*, 579 U.S. at 192. The Supreme Court did "not

decide whether § 3729(a)(1)(A)'s materiality requirement is governed by § 3729(b)(4) or derived directly from the common law," because "[u]nder any understanding of the concept, materiality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.'" *Escobar*, 579 U.S. at 193 (quoting 26 R. Lord, WILLISTON ON CONTRACTS § 69:12 (4th ed. 2003)) ("WILLISTON"). The Government did not receive the benefit of its bargain, which included that decisions affecting items or services paid for by Medicare were free from financial inducements and were made based on the interests of program beneficiaries.

As the First Circuit has explained, AKS violations are material as a matter of law because the 2010 amendment to the AKS "essentially codifie[d] the long-standing view that AKS violations are 'material' in the FCA context." *Guilfoile*, 913 F.3d at 190–91. To the Government's knowledge, no court has held that a violation of the AKS was immaterial to the Government's payment decision.

Further, the alleged AKS violations and related misrepresentations squarely fit within *Escobar*'s factors. When evaluating whether "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement" is "material," courts generally consider "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar*, 579 U.S. at 192, 193. The Supreme Court identified several non-dispositive factors to consider: (1) whether compliance with a particular requirement was "a condition of payment"; (2) whether the Government paid claims "despite its actual knowledge" of the violation; and (3) whether a violation was "minor or insubstantial." *Id.* at 193–95. On remand, the First Circuit explained that "the fundamental inquiry is whether a piece of information is sufficiently important to influence the behavior of the recipient." *United States ex rel. Escobar v. Universal Health Servs., Inc.* ("*Escobar II*"), 842 F.3d 103, 109 (1st Cir. 2016) (quotation omitted).

Compliance with the AKS was a condition of payment.  Compl. ¶¶ 31, 769.  The Defendant Insurers promised in annual contracts with CMS to comply with the AKS.  *Id.* ¶¶ 767–70.  Further, CMS considers compliance with the AKS (and related broker compensation rules) important to protect beneficiaries. As CMS explained when it first published regulations on broker compensation in 2008, "[t]he compensation structure is designed to help prevent inappropriate moves of beneficiaries from plan-to-plan," and payments such as "compensation that varies based on the attainment of certain enrollment targets" can be "problematic under the Anti-Kickback Statute."  Compl. ¶ 83 (quoting 73 Fed. Reg. 54226, 54239 (Sept. 18, 2008)).

The Complaint explained that the Government did not have actual knowledge of kickback violations when making payment decisions in 2016 through 2021.  *Id.* ¶¶ 813, 837.  Far from it: after the underlying *qui tam* was filed in November 2021, *id.* ¶ 5, the Government invested significant prosecutorial and agency resources to determine whether there may have been such violations.  *See* 31 U.S.C. § 3730 ("The Attorney General diligently shall investigate a violation under section 3729.").  The Complaint made clear that CMS's regulations allowed certain administrative payments, but not kickbacks disguised as administrative payments.  *E.g.*, Compl. ¶¶ 79–83, 98, 106.   In addition, an AKS violation, and a corresponding false certification, is not "minor or insubstantial."  When the Government learns of such violations, it "regularly enforces the AKS and pursues FCA liability based on underlying violations of the AKS."  Compl. ¶ 33; *see Westmoreland*, 812 F.Supp.2d at 50 (noting "absurdity" of argument that "compliance with the Anti–Kickback Statute is not a precondition of Medicare payment"); *United States ex rel. Bidani v. Lewis*, 264 F. Supp. 2d 612, 616 (N.D. Ill. 2003) (noting that a contrary finding on materiality "would put the government in the position of funding illegal kickbacks after the fact").

ii.    The Complaint Sufficiently Pleaded Falsity

The Complaint met the pleading requirements for falsity.  When FCA claims, like Counts II and IV, are predicated on AKS violations "[u]nder a false certification theory, FCA liability lies when a defendant falsely represents AKS compliance on a federal agency form." *Regeneron*, 128 F.4th at 334 (citing *Blackstone*, 647 F.3d at 392).  Thus, all that the Government must plead for its false certification claims is that Defendants' "claims represented compliance with a material condition of payment that was not in fact met." *Blackstone*, 647 F.3d at 379.[4]  There are two types of claims at issue: enrollments of beneficiaries to Medicare Advantage plans and monthly or quarterly submissions of beneficiary data to CMS.  *E.g.*, Compl. ¶ 791.

The Complaint described in detail how the Defendant Insurers expressly promised AKS compliance in their annual Medicare Advantage contracts, even as they were actively violating the AKS with the Defendant Brokers.  *See* Compl. ¶¶ 75, 767–87.  It provided examples of these contracts, identified them by contract number, and detailed the names, titles, and employers of the individuals who signed the contracts for each Defendant Insurer.  *Id.* ¶¶ 771–74.  The Complaint also included the contractual language that the Defendant Insurers signed, in which they "expressly certified that they would 'comply with . . . Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including . . . the anti-kickback statute.'" *See id.* ¶¶ 768, 807, 831.  Due to the ongoing kickback schemes described in the Complaint, *id.* ¶¶ 98–764, the Defendant Insurers' annual contract renewals stating compliance with the AKS were false.

---

[4]  The Supreme Court explained in *Escobar* that it "need not resolve whether all claims for payment implicitly represent that the billing party is legally entitled to payment." *Escobar*, 579 U.S. at 188. A claim may be "false" under a certification theory even if it contains no specific representations about the goods or services provided.  *See, e.g.*, *United States ex rel. Badr v. Triple Canopy, Inc.*, 857 F.3d 174, 179 (4th Cir. 2017); *United States v. Science Applications Intern. Corp.*, 626 F.3d 1257, 1269 (D.C. Cir. 2010).

The Complaint contained equally detailed descriptions of the falsity in Defendant Insurers' quarterly or monthly data submission claims, which each consisted of a demand for payment for enrolled beneficiaries and a certification. The Complaint explained how, in the certifications made with these claims (i.e., the data submissions), the Defendant Insurers "request[ed] payment *under the contract*" for all their beneficiaries—the same contracts in which they promised to comply with the AKS. *Id.* ¶¶ 776 (emphasis added). Those submissions stated "that misrepresentations to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution." *Id.* ¶¶ 775–76. With each claim, the Defendant Insurers represented that "all information submitted to CMS and/or its contractors is accurate, complete, and truthful" and that the data provided "concern[ed] 'validly enrolled' beneficiaries." *E.g.*, *id.* ¶¶ 776, 81, 791, 793–98, 809, 833. The Complaint provided examples of such data submissions and accompanying certifications, including the names and titles of the individuals who signed them for each Defendant Insurer. *Id.* ¶¶ 777–79. And the Complaint explained that, because the parties were not complying with the AKS, these certifications were false and the data submissions (and enrollments) from the Defendant Insurers to CMS were therefore false claims under the FCA. *E.g.*, *id.* ¶¶ 782, 812, 836.

Defendants argue that the Complaint must "connect an AKS violation to a specific claim" and "connect a certification of compliance to a non-compliant claim." Memo. at 31. To the extent Defendants are arguing that, to prove falsity under a certification theory, the Government must show some element of causation, that argument was squarely rejected by the First Circuit. *Regeneron*, 128 F.4th at 334 ("[F]alse-certification claims require no proof of causation."). To the extent Defendants are instead making the unremarkable point there should be some factual nexus between the underlying AKS violations and the false claims, the Complaint supplied that nexus.

*See id.* at 333.  The Complaint alleged that the Defendant Insurers paid kickbacks to induce the Defendant Brokers to enroll beneficiaries in their Medicare Advantage plans, despite promising in their annual contracts with CMS to comply with the AKS.  More specifically, the Complaint alleged that Defendant Insurers paid kickbacks to specific Defendant Brokers at specific times, and that, after those kickbacks were paid, each of the Defendant Brokers targeted and enrolled beneficiaries specifically for the insurers that had paid the kickbacks.  Indeed, the Complaint alleged not merely that the kickbacks occurred, but that the kickbacks had their intended and foreseeable effect: increased enrollments for the insurers that had paid them.  *E.g.*, *id.* ¶¶ 110, 209, 436, 478.

Take Beneficiary 37, whom Defendants highlight, as an example.  Memo. at 32.  eHealth referred Beneficiary 37 to Humana.  *See* Compl. ¶ 793.  "In February 2016 . . . Humana submitted a claim with beneficiary data to CMS, including data related to Beneficiary 37."  *Id.*  Just four days before Beneficiary 37's enrollment application, Humana agreed to pay eHealth $250,000 in purported "marketing" funding.  *Id.* ¶ 262.  In return, eHealth steered beneficiaries to Humana's Medicare Advantage plans.  *Id.*  In addition to the close temporal proximity of the enrollment to the kickbacks, Defendants themselves acknowledged at the time that the scheme worked.  *Cf. id.* ¶¶ 264 (Humana to eHealth: "we are about half way through March and right about 1,500 MA sales").  When it entered its Medicare Advantage contract with CMS, Humana promised not to violate the AKS, *e.g.*, *id.* ¶¶ 75, 767–87; when Humana submitted claims for capitated payments for Beneficiary 37, it represented that Beneficiary 37 was validly enrolled and that it had not violated the AKS.  *Id.* ¶ 793.  This nexus between the AKS violations (i.e., kickbacks) and the false claims (i.e., enrollments and data submitted to CMS) is hardly "raw speculation," as the Defendants claim.  Memo. at 33.

As the Complaint made clear, the Government did not allege AKS-predicated violations of the FCA for beneficiaries whom the Defendant Insurers enrolled on their own, nor for beneficiaries whom non-Defendant brokers enrolled.  The Complaint alleged AKS-predicated violations of the FCA only for beneficiaries whom the Defendant Brokers referred while the Defendant Insurers were paying illicit bribes to induce these exact referrals, all while Defendant Insurers represented to the federal government that they were not engaged in this exact illegal conduct.  *E.g.*, *id.* ¶¶ 791–98.

Representative claims.  Defendants contend that the Complaint failed "to identify 'an actual false claim.'"  Memo. at 31 (internal citation omitted).  On the contrary, the Complaint identified more than 100 specific claims submitted by the Defendant Insurers for Medicare beneficiaries referred by each Defendant Broker.  Defendants also incorrectly argue that the Complaint is "vague as to what the 'claims' at issue here are."  Memo. at 31.  But the Complaint is clear: as explained above, the Defendant Insurers "submitted claims for payment to CMS in the form of enrollments and monthly beneficiary data."  Compl. ¶¶ 791–98; *see* Memo. at 32 (acknowledging that the Complaint alleged that "claims are both the MAOs' periodic submissions of enrollment data to CMS ***and*** the enrollments themselves").

A complaint should generally "provide details that identify particular false claims for payment that were submitted to the government."  *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 232 (1st Cir. 2004) (abrogation on other grounds recognized by *Lawton ex rel. United States v. Takeda Pharm. Co., Ltd.*, 842 F.3d 125, 130 (1st Cir. 2016)).  Though there is no "checklist of mandatory requirements," the First Circuit has explained that identifying details could include: dates, contents, identification numbers, money the Government paid, goods or services billed, and individuals involved.  *Karvelas*, 360 F.3d at 233.  A key purpose

- 36 -

of this claim-identification requirement is to ensure that false claims were submitted to the Government for payment (making them actionable under the FCA) and not, for example, to a private payor. *See United States ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 732 (1st Cir. 2007). For this reason, the First Circuit has also explained that, when the "entire purpose" of an illegal kickback scheme is to get the Government to pay for claims, even fewer details are required. *United States ex rel. Nargol v. DePuy Orthopaedics, Inc.*, 865 F.3d 29, 40 (1st Cir. 2017) (citing *United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 579 F.3d 13, 31 (1st Cir. 2009)).[5]

The Complaint's representative claims are more than sufficient to satisfy Rule 9(b). The Complaint described **the what**, carefully detailing the schemes whereby the Defendant Insurers paid kickbacks to the Defendant Brokers to induce them to steer beneficiaries to the Defendant Insurers' Medicare Advantage plans. Compl. ¶¶ 103–764. And for each of the 111 sample claims, the Complaint identified **the who**, including the specific beneficiary for whom the claim was submitted, the Defendant Broker that received illegal kickbacks and referred the beneficiary, and the Defendant Insurer that paid the kickbacks and submitted the false claim for payment. *Id.* ¶¶ 791–96. Each sample claim also contained **the when** (effective enrollment dates) and described **how much** (quantifying the government payments for the year of the enrollment). *See Duxbury*, 579 F.3d at 29–30 (requiring significantly less detail). FCA cases with appropriate sample claims regularly proceed. *E.g.*, *Regeneron*, 2025 WL 2207299, at *4 (finding that the Government had satisfied "the heightened pleading standard applicable to FCA claims" under a false certification

---

[5] Defendants' argument that the Complaint fails to allege a "particular false claim," Memo. at 25, 31–35, is also inapplicable to non-submitting defendants (here, the Defendant Brokers). As the First Circuit has said, a complaint against non-submitting defendants "satisf[ies] Rule 9(b) by providing 'factual or statistical evidence to strengthen the inference of fraud beyond possibility' without necessarily providing details as to each false claim." *Duxbury*, 579 F.3d at 29 (quoting *Rost*, 507 F.3d at 733)).

theory by alleging eleven sample claims and the "exact language of [a] certification" that required AKS compliance); *see also United States ex rel. Wollman v. Gen. Hosp. Corp.*, 394 F. Supp. 3d 174, 188 (D. Mass. 2019).

None of the cases cited by Defendants supports an argument of deficiency in the Complaint's allegations of sample claims.  The First Circuit cases on which Defendants rely involved *qui tam* relators' complaints that either did not offer any sample claims or did not provide sufficient details about the related illegal schemes.  *See Karvelas*, 360 F.3d at 233 ("[T]he complaint never specifies the dates or content of any particular false or fraudulent claim allegedly submitted for reimbursement by Medicare or Medicaid."); *United States ex rel. Ge v. Takeda Pharm. Co.*, 737 F.3d 116, 124 (1st Cir. 2013) (finding the complaint provided "next to no facts in support of the proposition that [defendant's] alleged misconduct resulted in the submission of false claims or false statements").  Defendants' characterization of *United States ex rel. Flanagan v. Fresenius Med. Care Holdings*, 142 F.4th 25 (1st Cir. 2025), is misleading.  Contrary to Defendants' suggestion that the *Flanagan* complaint's "approach" included "identify[ing] exemplar enrollments and certifications," Memo. at 34, that complaint addressed "annual Medicare costs reports" rather than enrollments and had "not identified a single specific false claim or provided any representative or sample claims, as required." *Flanagan*, 142 F.4th at 29, 33.  The First Circuit emphasized that the relator had "not pointed us to any allegations in the complaint that address what [defendant] actually submitted . . . as to certifications." *Id.* at 37.  The First Circuit thus did not affirm dismissal because of some missing causal "tie," Memo. at 34, but rather because "the complaint is not as specific as Flanagan asserts" and "[b]roadly stating that [the defendant] intended to have all claims paid, whether or not tainted by the kickback scheme, is not sufficient to satisfy our heightened standard under Rule 9(b)." *Flanagan*, 142 F.4th at 33, 37.  That

"approach" is far from this Complaint's detailed sample claims, amply related to the alleged kickback schemes. In any event, none of these First Circuit cases stands for the proposition that a chart of submitted sample claims is insufficient, where a complaint has sufficiently pleaded factual allegations about the underlying illegal schemes.

Defendants' citations to an unpublished, non-precedential Eleventh Circuit decision and to a magistrate judge's Report are similarly unavailing. In *United States ex rel. Senters v. Quest Diagnostics Inc.*, the relator's complaint was predicated on the defendant's false representation of medical necessity. No. 24-cv-12998, 2025 WL 1951196, at *1 (11th Cir., July 16, 2025). The pleading deficiency there was the relator's "blanket allegation with no particular facts to show why the [service] for Patient Y was not medically necessary." *Id.* at *3.[6] As for *United States ex rel. Health Choice Alliance, LLC, v. Eli Lilly & Co., Inc.*, Defendants misconstrue that Magistrate Judge's Report when they suggest it involved insufficient "'charts' of assembled claims." Memo. at 33 (citing 5:17-CV-123-RWS-CMC, 2018 WL 4026986, at *55 (E.D. Tex. July 25, 2018). The charts at issue in *Health Choice Alliance* contained no information about any claim submitted and instead included only "publicly available . . . collective government reimbursement figures" for certain drugs and urged statistical extrapolation to demonstrate that the defendant must have submitted at least one false claim. 2018 WL 4026986, at *55.

---

[6] Defendants' other Eleventh Circuit citations fare no better, as those cases involved partial dismissals affirmed because relators' complaints lacked sufficient details for claims. *See Vargas v. Lincare, Inc.*, 134 F.4th 1150, 1161 & n.5 (11th Cir. 2025) (holding that, where the "relators identify specific claims, with dates, amounts, and billing codes" they satisfied Rule 9(b), and comparing it to a situation where "relators provide[d] no claim numbers, no billing codes, no dates, and no reimbursement amounts"); *United States ex rel. McKoy v. Atlanta Primary Care Peachtree, PC*, No. 23-cv-13845, 2025 WL 1823269, at *2, *7 (11th Cir., July 2, 2025) (affirming denial of motion to dismiss where the relator "gave specifics about a [single] representative claim submitted to Medicare" and affirming grant where the relator "didn't provide any specifics about the appointment or billing—no date of appointment, service received, amount allegedly billed, or claim number").

**III.    The Complaint Sufficiently Pleaded FCA Claims Based On Discrimination**

The Complaint alleged sufficient facts to support that Aetna, Humana, and the Defendant Brokers violated the FCA due to their discriminatory conduct.  Between 2016 and 2021, CMS paid Aetna and Humana billions of dollars to provide insurance options for qualified Medicare beneficiaries regardless of their medical history or health status.  *See* Compl. ¶¶ 38, 84–90.  (The amounts that CMS paid depended on each plan member's expected health risk.  *Id.* ¶ 44.)  In return, Aetna and Humana promised not to discriminate based on disability.  *Id.* ¶¶ 92–95.  Nonetheless, seeking higher profits, Aetna and Humana directed the Defendant Brokers to enroll lower proportions of disabled beneficiaries and conditioned unlawful kickbacks (disguised as "administrative payments") on the Defendant Brokers' success in effectuating that discrimination.  *E.g.*, *id.* ¶¶ 320, 331, 336–38, 504, 517–19.  The Defendant Brokers, eager to receive the illegal kickbacks, took various actions to deny or limit the ability of disabled beneficiaries to access Aetna's and Humana's plans.  *E.g., id.* ¶¶ 340 (in response to pressure from Humana, GoHealth "began 'kicking . . . out' leads for Medicare beneficiaries with disabilities), 355 ("SelectQuote . . . changed its marketing strategies to favor Medicare beneficiaries over sixty-five"); 514 (at Aetna's behest, eHealth did not offer Aetna plans to Medicare beneficiaries in Texas or New Jersey because Aetna complained that those states generated too many sales to disabled Medicare beneficiaries), 528 (eHealth asked referral sources to "route the U65 [under 65] calls away from us").

As to the elements of the FCA, first, these Defendants "knowingly present[ed], or caused to be present[ed]," claims for payment that falsely represented compliance with material anti-discrimination requirements (Count III).  31 U.S.C. § 3729(a)(1)(A).  Second, these Defendants knowingly made, or caused to be made, false representations of compliance with anti-discrimination laws in connection with claims to the Government (Count V).  *Id.* § 3729(a)(1)(B);

*see* Compl. ¶¶ 788–90.  The Complaint sufficiently alleged that the discrimination and related misrepresentations were "material" to the Government.  Through their discrimination, Defendants' presented (or caused to be presented) false claims to the Government and fraudulently induced the Government to enter Medicare Advantage contracts.  Finally, although it is not an element for FCA liability, the Complaint alleged that the Government suffered damages.

A.    Defendants Acted Knowingly

Aetna, Humana, and the Broker Defendants acted "knowingly" in submitting false claims, causing claims to be submitted, or making false representations relating to discrimination.  31 U.S.C. § 3729(a)(1).  Again, no Defendant challenges the sufficiency of the Complaint's scienter allegations with respect to discrimination.  *See, e.g.*, Compl. ¶¶ 326 (Humana employee: "I am assuming you want us to have this dialogue over the phone as I recall that we don't really want to put this in writing?" Response: "That is right."), 495 (Aetna managers viewing differential treatment of beneficiaries with disabilities, including "curtail[ing] sales" to such beneficiaries, as "a compliance risk," something "[w]e should NOT be talking about," and a "[v]ery big no-no").

B.    Defendants' Claims and Statements Were False

Far beyond "sections with nefarious titles," Memo. at 54, the Complaint contained numerous examples of the violations of anti-discrimination law that made claims and representations of compliance "false."  The Complaint explained how Aetna, Humana, and the Defendant Brokers took or suborned actions to "deny, limit, or condition the coverage or furnishing of benefits to individuals eligible to enroll in an MA plan" on the basis of disability, 42 C.F.R. § 422.110(a)(7), and caused individuals with disabilities to "be subjected to discrimination" in this federally funded program, 29 U.S.C. § 794 ("Section 504").  HHS's regulations provide helpful examples of prohibited discriminatory conduct.  For instance, MAOs and other federally

funded entities may not "[p]rovide different or separate . . . services to individuals with disabilities . . . than is provided to others unless such action is necessary to provide qualified individuals with disabilities with . . . services that are as effective as those provided to others."  45 C.F.R. § 84.68(b)(1)(i), (iv).  Moreover, MAOs may not "apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any program or activity, unless such criteria can be shown to be necessary for the provision of the program or activity being offered."  *Id.* § 84.68(b)(8).

The Complaint alleged various discriminatory actions, including:

- "kicking . . . out" calls from beneficiaries perceived to have disabilities, Compl. ¶ 341;

- diverting calls of disabled beneficiaries, or those perceived to have disabilities, to the "open marketplace," *id.* ¶ 345;

- terminating relationships with brokers who, in Humana's view, enrolled too many disabled beneficiaries, *id.* ¶ 347;

- adding date of birth on lead forms to limit enrollment of disabled beneficiaries, *id.* ¶ 352;

- only purchasing or using leads of beneficiaries over the age of sixty-five to avoid younger, likely disabled beneficiaries, *id.* ¶ 353;

- "direct[ing] certain traffic"—disabled beneficiaries—away from Aetna and "to other folks who have the appetite for it," *id.* ¶ 503;

- disabling the "enroll button" for certain plans to reduce disabled beneficiaries' ability to enroll in those plans, *id.* ¶ 508;

- "filter[ing] out Aetna plans" to push disabled beneficiaries away from Aetna, *id.* ¶ 510;

- "reach[ing] out to [certain lead suppliers] and let them know to stop sending <65 leads to us," *id.* ¶ 526, *see also id.* ¶ 528 ("stop sending us U65 leads immediately"); and

- a broker promising to Aetna that it would "reject all calls/leads for consumers under 65, so this should eliminate this type of business completely," *id.* ¶ 567.

These actions squarely "den[ied], limit[ed], or condition[ed] the coverage or furnishing of benefits" for Medicare beneficiaries with disabilities.  42 C.F.R. § 422.110(a).

As caselaw and analogous regulations make clear, unlawful denial of services includes situations where entities applied "eligibility criteria that screened out or tend to screen out . . . any class of individuals with disabilities" or referred such individuals unnecessarily to "different or separate services" than those offered to non-disabled customers. 45 C.F.R. §§ 84.68(b)(1)(iv), (b)(8). The Complaint alleged precisely this conduct, where Defendants screened out beneficiaries whom they suspected to be disabled and then either rejected those beneficiaries or rerouted them to other MAOs. *E.g.*, Compl. ¶ 503. This conduct violated Section 504 and 42 C.F.R. § 422.110. *See Guckenberger v. Boston Univ.*, 974 F. Supp. 106, 134–35 (D. Mass. 1997) (holding that Section 504's prohibition on eligibility criteria that "tend to screen out" individuals with disabilities "makes it discriminatory to impose policies or criteria that, while not creating a direct bar to individuals with disabilities, diminish an individual's chances of such participation" (quotations omitted)); *Doukas v. Metropolitan Life Ins. Co*, 950 F. Supp. 422, 426 (D.N.H. 1996) (discussing similar "tend to screen out" provision from the Americans with Disabilities Act ("ADA") and applying it to an individual who was "denied the opportunity to benefit" from an insurance product). Rejecting calls from disabled beneficiaries or refusing to allow those beneficiaries to enroll, whether based on profit motive or discriminatory animus, is not "marketing." *Cf.* Memo. at 3, 47. It is unlawful discrimination.

Defendants seek to exploit the success of their discriminatory conduct by stressing that the Government has not identified any of the individual victims of their discrimination or pleaded details about their disabilities. Memo. at 1, 40. These arguments fail for several reasons. First, Defendants' assertions ignore the Complaint's well-pleaded allegations that Defendants' discrimination substantially reduced the proportion of disabled Medicare beneficiaries who were able to enroll in Aetna's and Humana's Medicare Advantage plans. Compl. ¶¶ 358–77 (Humana),

573–77 (Aetna).  A clear reasonable inference from a substantial statistical decrease and from the specific alleged actions taken to cause that decrease is the existence of victims.

Second, the Complaint alleged that Defendants discriminated against individuals who had disabilities or whom Defendants "regarded as" being disabled.  42 U.S.C. § 12102(1)(c); *cf. Cook v. Dept. of Mental Health*, 10 F.3d 17, 22 (1st Cir. 1993) (plaintiff prevailing on "perceived disability" theory).  Under anti-discrimination law, it is sufficient that Defendants themselves regarded the avoided beneficiaries as disabled.  *E.g.*, *Greene v. City of New York*, 773 F. Supp. 3d 94, 108 (S.D.N.Y 2025) (plaintiffs, individuals with actual or perceived disabilities, sufficiently alleged that they were "qualified individuals" under the ADA and Section 504 because the call-in employees "perceived Plaintiffs as having such [disabilities]").  That is, the Government need not plead that these beneficiaries had any specific disability.

C.    Defendants' Discrimination and Related Misrepresentations Were "Material"

An actionable "false record or statement" must be "material to a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(B), with "material" defined in the FCA as having "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4).  As discussed above, *Escobar* identified several non-dispositive factors to consider in assessing materiality: (1) whether compliance with a particular requirement was "a condition of payment"; (2) whether the Government paid claims "despite its actual knowledge" of the violation; and (3) whether a violation was "minor or insubstantial."  579 U.S. at 193–195.  The First Circuit has held that "courts are to conduct a holistic approach to determining materiality in connection with a payment decision, with no one factor being necessarily dispositive." *Escobar II*, 842 F.3d at 109.  Here, the Complaint sufficiently pleaded that Aetna's, Humana's, and the Defendant

Brokers' violations of anti-discrimination laws and corresponding misrepresentations were "material" to the Government under a holistic inquiry.

<u>Condition of payment</u>.  Each of CMS's annual contracts with Aetna and Humana expressly identified compliance with Section 422.110's non-discrimination provision as "material to the performance of the MA contract."  Compl. ¶ 97 (quoting 42 C.F.R. § 422.504(a)), *see id.* ¶ 783.  The contractual terms relating to discrimination were not "catchall" references such as to "the entire U.S. Code and Code of Federal Regulations" or mere incorporation-by-reference.  *Escobar*, 579 U.S. at 196.  Instead, in Section 422.504(a), the agency identified specific conditions of payment that must be included in each MAO contract.  *See United States ex rel. Yu v. Grifols USA, LLC*, No. 22-107, 2022 WL 7785044, at *3 (2d Cir. Oct. 14, 2022) (summary order) (contrasting "a contract that merely incorporates by reference" with a contract containing "a provision that specifically identifies any of the contractual or regulatory requirements" (quotation omitted)).  Starting in September 2016, the Defendant Insurers also promised to "comply with the requirements relating to Nondiscrimination in Health Programs and Activities in 45 [C.F.R.] Part 92, including submitting assurances that the MA Organization's health programs and activities would be operated in compliance with the nondiscrimination requirements."  Compl. ¶ 784.  It should be unsurprising that large Government contracts would have multiple conditions of payment, ranging from non-discrimination to "provid[ing] the basic benefits" required by Medicare.  42 C.F.R. § 422.504(a)(3).  Compliance with the non-discrimination provisions was a condition of payment, which weighs in favor of materiality.  *Escobar*, 579 U.S. at 194.

<u>No actual knowledge</u>. The Government did not have "actual knowledge that certain requirements"—here, non-discrimination provisions—"were violated" when entering Medicare Advantage contracts with Aetna and Humana from 2016 through 2021 or when paying claims

under these contracts. *Escobar*, 579 U.S. at 195; *see* Compl. ¶¶ 825, 837. The existence of other regulatory tools, such as possible "intermediate sanctions" by an agency, neither demonstrates actual knowledge nor undermines FCA materiality. The FCA contains no stepwise requirement that an agency try every regulatory tool before the United States files suit based on significant alleged violations. *E.g.*, *United States ex rel. Onnen v. Sioux Falls Indep. Sch. Dist.*, 688 F.3d 410, 415 (8th Cir. 2012) ("Congress intended to allow the government to choose among a variety of remedies, both statutory and administrative, to combat fraud," and so cases have not held that "a complex regime of regulatory sanctions precludes the [United States] from suing under the FCA").

Not "minor" or "insubstantial." The Complaint pleaded facts showing that Defendants' discrimination and corresponding misrepresentations were neither "minor [n]or insubstantial." *Escobar*, 579 U.S. at 194. As Defendants point out, an MAO may violate the FCA by "false statements that fraudulently inflate fixed payments from Government programs." *United States v. Kindred Healthcare, Inc.*, 469 F. Supp. 3d 431, 445 (E.D. Pa. 2020); *see* Memo. at 43–44. That is hardly the only possible FCA violation within the Medicare Advantage program. *E.g.*, *Shikara*, 748 F. Supp. 3d at 1289. Here, Aetna, Humana, and the Defendant Brokers took repeated, intentional actions to deny or limit the enrollment of disabled beneficiaries into Medicare Advantage plans, all while Aetna and Humana signed contracts that laid out the anti-discrimination provisions with which every MAO agreed to comply. *See* Compl. ¶¶ 783–85. Defendants understood the importance of non-discrimination to CMS, underscoring why their employees tried to cover up their unlawful discrimination. *E.g., id.* ¶¶ 326, 495.

Defendants' discrimination and related misrepresentations undermined a "core purpose" of Medicare Advantage and of Defendants' contracts with CMS: health care coverage being equally available to all eligible Medicare beneficiaries. 42 U.S.C. § 1395w–21(a)(1)(B); *cf. United*

*States ex rel. Foreman v. AECOM*, 19 F.4th 85, 117 (2d Cir. 2021); *see also Escobar II*, 842 F.3d at 111 (finding that an agency's "decision to have a series of regulations in place . . . strongly counsels in favor of a finding that compliance with these regulations is central" to the Government program). That is, compliance with the anti-discrimination requirements went to the "essence of the bargain" between the Government and the MAOs. *Escobar*, 579 U.S. at 193 n.5. Beyond the Government's robust interest in combating discrimination, cherry-picking of beneficiaries based on health status could destabilize the intricate Medicare Advantage payment system. *See* Compl. ¶¶ 42–45.

Although intentional discrimination against a small number of people would not necessarily be "minor or insubstantial" under a Government contract, the Complaint pleaded that Defendants' discrimination affected more than a "small slice" of Medicare beneficiaries. *See* Memo. at 44. Aetna refused to allow eHealth to sell its Medicare Advantage plans in two of its biggest markets—the states of Texas and New Jersey—because Aetna perceived the beneficiaries with disabilities in those states not to be profitable enough and that this lack of profitability was "killing" those markets. *See, e.g.*, Compl. ¶¶ 512, 514–15. As for Humana, the Complaint explained, through a contemporaneous chart created by Humana, that "[b]eneficiaries with disabilities made up 52% and 47% of eHealth's Medicare Advantage enrollments for Humana in 2016 and 2017, respectively, but"—after discriminatory conduct that Humana demanded—"only 23% in 2020 and 13–18% at the beginning of 2021." Compl. ¶ 377. As a result of calculated actions that Aetna and Humana demanded, other brokers, too, made significant reductions to the proportion of disabled beneficiaries enrolled with Aetna and Humana following the MAOs' pressure. *Id.* ¶¶ 359–61 (GoHealth reducing proportion from 38.6% to 21.8%), 367 (other broker reducing proportion from 52.5% to 30%). This is hardly the kind of situation where the First

Circuit has found materiality lacking, such as where a relator attempts to use the FCA to "tr[y] once again to vindicate a purported grievance with municipal authorities" over speeding tickets. *Cf. United States ex rel. Zotos v. Hingham*, 98 F.4th 339, 342 & n.1 (1st Cir. 2024). Under any approach to evaluating materiality holistically, the Complaint survives.

      D.    <u>Defendants' Discrimination Harmed and Fraudulently Induced the Government</u>

      Defendants argue that "[t]here can be no FCA liability if allegedly wrongful conduct does not cause the submission of a claim for payment." Memo. at 45. Defendants similarly argue that their alleged discrimination could not have violated the FCA if the misconduct "resulted in claims ***not*** being presented." *Id.* at 1, 38. To the contrary, the Complaint squarely pleaded that Aetna and Humana submitted claims that had been made false by unlawful discrimination and that Defendant Brokers caused such claims to be submitted. Compl. ¶¶ 788–90; *see also id.* ¶ 813. (As noted above, "a defendant violates the FCA when presenting (or causing to be presented) a claim that misrepresents compliance with a 'statutory, regulatory, or contractual requirement' that 'the defendant knows is material to the [g]overnment's payment decision.'" *Regeneron*, 128 F.4th at 332 (quoting *Escobar*, 579 U.S. at 181)). In addition, when Aetna and Humana signed contracts or renewals promising not to violate anti-discrimination provisions while knowingly doing so, they fraudulently induced CMS to enter such contracts. *See id.* ¶¶ 783–87; *cf. United States ex rel. Morsell v. Symantec Corp.*, 471 F. Supp. 3d 257, 300 (D.D.C. 2020) ("The fraudulent inducement theory requires that a claim be submitted under a contract procured by fraud, regardless of the details of the claim itself.").

      Under the FCA, then, Defendants harmed the Government in two independently sufficient ways. *First*, the Defendant Insurers submitted, and the Defendant Brokers caused to be submitted, claims that falsely represented compliance with non-discrimination provisions. Compl. ¶¶ 789–90. These non-discrimination provisions also were expressly stated in the Insurers' annual

contracts. *Id.* ¶¶ 783–84. Indeed, the Complaint explained clearly that the "Defendant Insurers received money from Medicare based on the presentation of false claims . . . *rendered false by illegal discrimination* against persons with disabilities," with "[e]xamples of such false claims . . . provided below in Section VI [of the Complaint]." *Id.* ¶ 102 (emphasis added). The Complaint then included more than ninety example claims under relevant Humana and Aetna contracts.[7] *Id.* ¶¶ 791–96. Further, the Complaint repeatedly alleged that discrimination related to kickbacks: "From 2016 through at least 2021, Aetna and Humana further conditioned some of their kickbacks on the Defendant Brokers reducing or limiting the proportion of persons with disabilities that the brokers enrolled in their plans." *Id.* ¶ 101; *see also id.* ¶ 489 (Aetna "told [brokers] that it would not pay 'marketing' money if the ratio of disabled to non-disabled beneficiaries was higher than what Aetna deemed acceptable.").

To the extent Defendants seek to import a but-for and proximate cause causation standard to claims directly submitted, there is no such requirement in the FCA. *Cf. Regeneron*, 128 F.4th at 333 (a plaintiff is "not require[d]" to plead "causation to demonstrate falsity" under a false certification theory). Defendants improperly intermingle cases which address the separate "causes to be presented" prong of the FCA. *See United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481 (3d Cir. 2017) (noting that relator "claimed the company caused physicians to submit Medicare claims"). The Government's Opposition to the Defendant Brokers' Motion to Dismiss

---

[7] Even absent the pleaded examples of false claims, the First Circuit has recognized that a "false certification for the purpose of receiving a payment or benefit becomes the practical equivalent of a statutory false claim." *Karvelas*, 360 F.3d at 232 n.15; *accord United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997) ("[W]here the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation.").

discusses the appropriate proximate cause standard for claims non-submitting entities "caused to be presented," which is not relevant to submitting entities like the Defendant Insurers.

*Second*, Defendant Insurers fraudulently induced CMS to enter annual contracts after the Defendants' discrimination. Compl. ¶¶ 783–87; *cf. United States ex rel. Marcus v. Hess*, 317 U.S. 537, 543 (1943) ("The initial fraudulent action and every step thereafter taken, pressed ever to the ultimate goal—payment of government money to persons who had caused it to be defrauded."). The logical extension of Defendants' "claims ***not*** being presented" argument is that illegal discrimination in a federal health care program could never violate the FCA if a company effectively avoided members of its disfavored group. That runs counter to caselaw (including fraudulent inducement) and common sense. *E.g.*, *United States ex rel. Tyson v. Amerigroup Illinois, Inc.*, 488 F. Supp. 2d 719, 730 (N.D. Ill. 2007) (determining that liability, damages, and penalties were all appropriate under the FCA where a managed care plan "purposely avoided 'unhealthies' and pregnant women and was motivated by profit in doing so"). As the Supreme Court has explained for decades, the FCA reaches "all fraudulent attempts to cause the Government to pay out sums of money," *United States v. Neifert-White Co.*, 390 U.S. 228, 233 (1968), because "Congress wrote [the FCA] expansively," *Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (internal quotation omitted).

E.    The Government Sustained Damages

Defendants argue that the FCA should not apply because the Government sustained no loss. Memo. at 45. Although damages are not an element for liability under section 3729, the Complaint pleaded that the Government sustained damages "because of" Defendants'

discrimination-related misconduct.  31 U.S.C. § 3729(a)(1); *e.g.*, Compl. ¶¶ 791–96.[8]  At a later stage, the Government could evaluate damages in various appropriate ways, whether "the full amount the government paid based on materially false statements" or under a different legal theory, including one based on the increased payouts that Aetna and Humana obtained from the government as a result of their discrimination or one based on the diminution of value to the Government as a result of Defendants' failure to offer insurance to eligible Medicare beneficiaries in a non-discriminatory manner.  *United States ex rel. Feldman v. van Gorp*, 697 F.3d 78, 90 (2d Cir. 2012); *cf. Tyson*, 488 F. Supp. 2d at 732 (allowing flexible damage calculation because "[i]t would have been nearly impossible for Plaintiffs to provide an accurate calculation of damages" based on the avoidance of certain beneficiaries).  To be clear, in all events, the Government did not "receive[] exactly what it paid for."  Memo. at 48.  In Medicare Advantage, CMS did not merely pay for insurance coverage; it paid for such coverage under various material, contractual conditions, including that MAOs not discriminate against beneficiaries with disabilities; Defendants' failure to meet those conditions harmed the Government.

## IV.    The Complaint Sufficiently Pleaded FCA Conspiracy

The FCA bars "conspir[ing] to commit a violation of" a substantive provision of the FCA, 31 U.S.C. § 3729(a)(1)(C), with liability attaching where (1) a defendant conspired with one or more versions to commit such a substantive violation and (2) one or more conspirators performed

---

[8]  Defendants appear to conflate the existence of a claim seeking payment (usually "the *sine qua non* of a False Claims Act violation," *Karvelas*, 360 F.3d at 225 (quotation omitted), and pleaded here) with actual Government payment (not required for an FCA violation, *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995)).  *See* Memo. at 45.  Defendants flatly ignore the law of the circuit in suggesting that there must be a "requisite causal link between Defendants' alleged false certifications and any loss to the Government."  *Id.* at 45.  In fact, the First Circuit has stated that a defendant who "submits a false claim for payment may still be liable under the FCA for statutory penalties, even if it did not actually induce the government to pay out funds or to suffer any loss." *Rivera*, 55 F.3d at 709.

any act in furtherance of the conspiracy. *Cf. United States v. Teva Pharm. USA, Inc.*, 560 F. Supp. 3d 412, 423 (D. Mass. 2021). The first element requires an agreement, explicit or implicit, between parties to commit fraud within the meaning of the FCA. *Id.*; *see United States v. President & Fellows of Harvard Coll.*, 323 F. Supp. 2d 151, 198 (D. Mass. 2004). Rule 9(b) applies to FCA conspiracy claims, though "[a] plaintiff may plead [FCA] conspiracy with particularity by alleging conduct from which the court can naturally infer an agreement among multiple parties." *United States v. Coloplast Corp.*, No. 11-12131-RWZ, 2016 WL 4483868, at *2 (D. Mass. July 29, 2016).

Defendants focus only on language in the Complaint's Causes of Action to argue that the Complaint "makes only a conclusory allegation" in support of its conspiracy claims. *See* Memo. at 50. That is incorrect. Defendants disregard the dozens of paragraphs that described in detail Defendants' agreements and acts taken in furtherance of those agreements. Of course, a court should consider the "cumulative effect of the factual allegations" in a complaint, so the precise location of pleaded facts is irrelevant. *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 14 (1st Cir. 2011).

A.    The Complaint Alleged Agreements

The Complaint alleged that from 2016 through at least 2021, each of the Defendant Insurers entered into agreements with each of the Defendant Brokers to pay hundreds of millions of dollars in kickbacks in exchange for commitments to sell specific quantities of their Medicare Advantage policies.[9] Such agreements involved claims to the Government that resulted from violations of the AKS and falsely represented compliance with the AKS. *E.g.*, Compl. ¶¶ 765–66.

_____

[9] As just a small portion of the well-pleaded examples of agreements between conspirators: Compl. ¶¶ 129 (Humana and GoHealth's 2016 agreement for "$750k to drive 3,000 Humana enrollments"), 203–04 (Humana and SelectQuote's 2016 agreement for $316,525 for 1,151 enrollments), 269 (Humana's and eHealth's 2017 agreement of "[$]250,000 per quarter, $ is really for 3,000 additional sales"), 389 (describing eHealth's and Aetna's 2016 agreement for "$175 per

The Complaint also alleged that Aetna and Humana entered into agreements with each of the Defendant Brokers to enroll fewer Medicare beneficiaries with disabilities into Aetna and Humana's Medicare Advantage plans.  For example, SelectQuote agreed to keep "a close eye on" its proportion of sales to disabled beneficiaries for Humana.  Compl. ¶ 333; *see also id.* ¶ 336 (describing conversation where a Humana employee told an eHealth employee that enrolling a high percentage of disabled beneficiaries affected eHealth's receipt of "marketing $").  Similarly, Humana and GoHealth agreed to try to stay under twenty percent of disabled Medicare beneficiary enrollments.  *Id.* ¶ 344.  Aetna had similar agreements with each of the Defendant Brokers.  For example, when asked by a subordinate about a "report on eHealth disabled mix," an Aetna manager responded that eHealth "should do the report for you but you should be the one keeping eHealth to their commitment."  *Id.* ¶ 500; *see also id.* ¶ 503 (text message reflecting SelectQuote's agreement with Aetna to re-direct "traffic" of disabled Medicare beneficiaries at Aetna's behest), ¶ 563 (describing GoHealth email reflecting Aetna's expectation for percentage of enrolled disabled Medicare beneficiaries).  The Complaint also pleaded agreements between the Aetna entities, as representatives signed data submissions (requesting payment from the Government) for various Aetna Life Insurance plans on behalf of CVS Health and Aetna Inc.  *Id.* ¶ 777.

The Complaint thus satisfied the conspiracy requirement of pleading agreements to violate the FCA, but Defendants argue that the Complaint's allegations failed to plead an agreement made "*in order to*" violate the FCA, as opposed to an agreement that made it "*likely*" there would be a violation of the FCA, s*ee* Memo. at 49 (quoting *United States ex rel. Michigan v. State Farm Mut.*

---

sale for 646" enrollments, on top of the 2153 enrollments eHealth was "already on the hook for"), 423 (describing Aetna's and SelectQuote's 2017 agreement for $120,000 for 3,000 enrollments), 462 (Aetna's and GoHealth's 2020 agreement for $200 per enrollment that remained in effect for at least 90 days), 595 (Anthem's and GoHealth's 2017 agreement to pay for enrollments), 719 (Anthem's and eHealth's 2017 agreement for $250,000 for 1,250 enrollments).

*Auto. Ins. Co.*, No. 24-1379, 2025 WL 101639, at *4 (6th Cir. Jan. 15, 2025)), and that the government failed to allege sufficient facts to support the inference that the agreements were "to defraud the government," *id.* at 50.  The First Circuit has not accepted an "in order to" test for FCA conspiracy.  This test from the Sixth Circuit is in tension with the post-2009 text of the FCA, as a defendant must now only "conspire[] to commit a violation" of a substantive section, 31 U.S.C. § 3729(a)(1)(C), rather than "conspire[] to defraud the Government by getting a false or fraudulent claim allowed or paid," 31 U.S.C. § 3729(a)(3) (2008).[10]  Leaving aside the merits of the Sixth Circuit's extratextual requirement, the Complaint would comfortably meet this test.

The Defendant Insurers' Medicare Advantage business necessarily involved receiving capitated payments from the Government based on enrollments of Medicare beneficiaries.  Compl. ¶¶ 42–44.  As such, the Complaint alleged a clear factual connection between the agreements for kickbacks in exchange for enrollments (or in exchange for a lower proportion of enrollments of disabled beneficiaries) and claims for payment to the United States.  (Indeed, the enrollments themselves were claims to the Government.  Compl. ¶¶ 791–98.)  *See United States ex rel. Westmoreland v. Amgen*, 738 F. Supp. 2d 267, 278 (D. Mass. 2010) (finding conspiracy adequately alleged when the "very essence of the . . . kickback scheme" was that providers would be able to profit by claiming Medicare reimbursement for free overfill provided by the defendant manufacturer); *United States v. Coloplast Corp.*, No. CV 11-12131-RWZ, 2016 WL 4483869, at *3 (D. Mass. Aug. 24, 2016) (finding that emails between manufacturer and supplier negotiating

---

[10]  In support of this test, Defendants also cite *United States ex rel. Nicholson v. MedCom Carolinas, Inc.*, 42 F.4th 185, 193 (4th Cir. 2022), which perhaps mistakenly quoted an abrogated portion of *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 673 (2008), that examined the former conspiracy provision of the FCA (i.e., "by getting").  Memo. at 49; *see, e.g.*, *United States ex rel. Int'l Bhd. of Elec. Workers Loc. Union No. 98 v. Farfield Co.*, 5 F.4th 315, 335 (3d Cir. 2021) (recognizing "Congress's overruling of *Allison Engine*").

discounts to promote manufacturer's products at the expense of competitors, which on its face ran afoul the AKS, coupled with the allegation that the supplier had enrolled in Medicare as a supplier, were sufficient to plead FCA conspiracy claim).

The Complaint's allegations are far from situations, such as in several Sixth Circuit cases cited by Defendants, in which courts have dismissed conspiracy claims due to a lack of connection between the alleged schemes and any false claims to the Government.  For example, in *United States ex rel. Angelo v. Allstate Insurance Company*, the relators' conspiracy "theory boils down to a basic assumption that whoever contracted with [defendant] . . . must have been in cahoots with [defendant]," but of course "a contractual relationship alone does not suggest collusion any more than it suggests a legitimate business relationship." 106 F.4th 441, 453 (6th Cir. 2024).  Similarly, the Sixth Circuit has affirmed dismissal of relators' FCA conspiracy claims where "[t]he chain that connects defendants' alleged misconduct to the eventual submission of false claims to the government is an unusually attenuated one." *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 917 (6th Cir. 2017).  *Bristol-Myers* is instructive here.  Those relators alleged that defendants participated in a scheme to promote a certain drug. *Id*. at 914.  The only scheme alleged was "to increase [drug] prescriptions through improper promotion."  *Id*. at 917.  That is, the agreement in *Bristol-Myers* had a goal both distinct from and broader than possibly submitting claims to the Government.  In marked contrast, the Complaint here alleged that the purpose of the agreements between the Defendant Insurers and the Defendant Brokers was to submit claims to Medicare: enrollments into Medicare Advantage plans and related data submissions. *E.g.*, Compl. ¶¶ 100–103, 578, 791–98.

B.    The Complaint Alleged Acts in Furtherance

The Government need allege only one act in furtherance of a conspiracy, and the alleged act may be committed by any member of the conspiracy.  *E.g.*, *Harvard Coll.*, 323 F. Supp. 2d at 196.  The Complaint well exceeded this standard for Defendants' conspiracies to violate the FCA, including by describing each Defendant Insurer's (including CVS Health's) false certifications of compliance with the AKS and anti-discrimination laws and ultimate submission of claims to the Government.  Compl. ¶¶ 777, 791–98.  Defendants took each of these actions in furtherance of a conspiracy to violate the FCA, which suffices to plead acts in furtherance of a conspiracy.  *See Coloplast*, 2016 WL 4483869, at *3 (document identifying claims actually submitted to Medicare while alleged kickback agreement was in effect sufficient to plead act in furtherance of conspiracy); *United States v. Berkeley Heartlab, Inc.*, 225 F. Supp. 3d 487, 502 (D.S.C. 2016) (noting that "[a]ll of the acts undertaken" as part of the alleged kickback scheme qualified as acts in furtherance of the agreement, including selling medically unnecessary tests, paying fees to physicians, and paying commissions for test sales).

## V.    The Complaint Sufficiently Pleaded Unjust Enrichment

The Government has pleaded, in the alternative, unjust enrichment against all Defendants under federal common law.  Long after *Erie,* the Supreme Court has "recognized the need and authority in some limited areas to formulate what has come to be known as 'federal common law,'" including situations "in which a federal rule of decision is 'necessary to protect uniquely federal interests.'"  *Texas Indus., Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 640 (1981) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 426 (1964)).  The FCA supplements rather than supplants federal common law remedies that the United States has available to recoup monies wrongfully paid by the Government and retained by a third party.  *See* RESTATEMENT (THIRD) OF

RESTITUTION AND UNJUST ENRICHMENT § 4(2) & cmt. c (A.L.I. 2011) (assertion that an unjust enrichment claim "may be dismissed because the plaintiff has an adequate remedy at law . . . is simply wrong").

As the Supreme Court has said, "courts may take it as a given that Congress has legislated with an expectation that the [common law] principle will apply except 'when a statutory purpose to the contrary is evident.'" *United States v. Texas*, 507 U.S. 529, 534 (1993) (quoting *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) (alteration in original)). Thus, the First Circuit has held that the Medicare Act did not prevent the government from bringing an unjust enrichment claim to recover overpayments. *United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 17–18 (1st Cir. 2005) ("It is hard for us to fathom why Congress would intend to give the government access to a judicial forum by statute when the overpayment was procured by fraud but to preclude the government from a routine common law damages action for overpayment."). Like the Medicare Act, the FCA displays no statutory purpose to exclude common law remedies. *See United States v. Mead*, 426 F.2d 118, 123 (9th Cir. 1970) ("[N]o statute is to be construed as altering the common law further than its words import.").

The availability of common law remedies is particularly appropriate when, as here, the United States might be left without a remedy if a jury were to find, for example, that a Defendant did not act with the requisite scienter under the FCA. *See United States v. Houston*, No. 2:09–0091, 2011 WL 4899983, at *5–7 (M.D. Tenn. Oct. 14, 2011) (denying Government's motion for summary judgment on FCA allegations but ordering recovery of $125,000 improperly collected by defendant under common law theories, including unjust enrichment). For this reason, courts often permit the United States to seek unjust enrichment damages as a "back-up" in FCA cases. *E.g.*, *United States v. Am. Heart Research Found., Inc.*, 996 F.2d 7, 12 (1st Cir. 1993) (affirming

dismissal of FCA claim but remanding for reconsideration of "back-up" unjust enrichment claim brought in the alternative); *United States v. Applied Pharmacy Consultants, Inc.*, 182 F.3d 603, 609 (8th Cir. 1999) (allowing unjust enrichment claim and stating that "it would be a gross injustice to the United States to apply woodenly the technical rule" of a bar based on the existence of a contract); *Radhakrishnan*, 2024 WL 894671, at *4 ("[A]n unjust enrichment claim [is] available to the United States and [is] not necessarily derivative of False Claims Act claims.").

The Complaint alleged facts showing that, first, Defendants each received payment, directly or indirectly, from the Government (for MAOs, capitated Medicare Advantage payments, *e.g.*, Compl. ¶¶ 42, 313, 485; and for brokers, at least the "contractual commission payment[s] pursuant to federal funds the MAO receives from CMS," *Shikara*, 748 F. Supp. 3d at 1300, *e.g.*, Compl. ¶¶ 100, 117, 122, 463). Second, each Defendant knew of these payments. Third, based on the misconduct alleged, it would be inequitable or "unconscionable" for each Defendant to retain Government payments. *Id*. ¶ 864; *see* WILLISTON § 68:5 (laying out the standard elements); *Allied Home Mortg. Cap. Corp. v. Belli*, No. 07-cv-11597, 2011 WL 13248374, at *6 (D. Mass. Mar. 3, 2011) (applying elements from WILLISTON).

## VI.    If Necessary, the Government Should Be Granted Leave to Amend Its Complaint

If the Court concludes that any part of the Complaint does not satisfy Rule 8(a) or Rule 9(b), the Government respectfully requests leave to amend its Complaint. *See* Fed. R. Civ. P. 15(a)(2) (a court "should freely give leave when justice so requires"); *Amyndas Pharm., S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 39 (1st Cir. 2022) ("Amendments may be permitted pre-judgment, even after a dismissal for failure to state a claim." (citation modified)).

## <u>CONCLUSION</u>

For all the foregoing reasons, Defendants' motion to dismiss should be denied.

Respectfully submitted,

| | |
|---|---|
| BRETT A. SHUMATE | LEAH B. FOLEY |
| Assistant Attorney General | United States Attorney |
| Civil Division | |

*/s/ David G. Miller*
Jamie Ann Yavelberg
Edward C. Crooke
David G. Miller
Anna H. Jugo
Diana E. Curtis
Sara B. Hanson
Attorneys, Civil Division
U.S. Department of Justice
175 N Street N.E.
Washington, D.C. 20002
(202) 305-2335
David.G.Miller@usdoj.gov
Anna.H.Jugo@usdoj.gov
Sara.B.Hanson@usdoj.gov
Diana.E.Curtis@usdoj.gov

Dated: October 20, 2025

*/s/ Charles B. Weinograd*
Charles B. Weinograd
Julien M. Mundele
Hillary Harnett
Assistant United States Attorneys
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100
Charles.Weinograd@usdoj.gov
Julien.Mundele@usdoj.gov
Hillary.Harnett@usdoj.gov

Attorneys for the United States

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served upon all counsel of record via ECF on October 20, 2025.

*/s/ Charles B. Weinograd*
Charles B. Weinograd
Dated: October 20, 2025
