**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** ) <br> **ex rel. ANDREW SHEA,** ) <br> ) <br> **Plaintiff,** ) <br> ) <br> **v.** ) <br> ) <br> **eHEALTH, INC., eHEALTH** ) <br> **INSURANCE SERVICES, INC.,** ) <br> **CVS HEALTH CORPORATION,** ) <br> **AETNA LIFE INSURANCE** ) <br> **COMPANY, AETNA, INC.,** ) <br> **HUMANA INC., ELEVANCE HEALTH,** ) <br> **INC., GOHEALTH, INC., and** ) <br> **SELECTQUOTE, INC.,** ) <br> ) <br> **Defendants.** ) | **Case No. 21-cv-11777-DJC** |

<u>**MEMORANDUM AND ORDER**</u>

**CASPER, C.J.**                                        **March 25, 2026**

## I.      Introduction

Andrew Shea ("Relator") filed his initial *qui tam* complaint in this matter on November 2,

2021.  D. 1.  The government partially intervened, D. 34, filing its complaint against CVS Health,

Inc., Aetna Inc. and Aetna Life Insurance Company (collectively, "Aetna"); Elevance Health, Inc.

("Anthem"); Humana, Inc. ("Humana"); GoHealth, Inc. ("GoHealth"); SelectQuote, Inc.

("SelectQuote"); and eHealth Inc. and eHealth Insurance Services, Inc. (collectively, "eHealth")

(collectively, "Defendants"), alleging violations of the False Claims Act (the "FCA"), 31 U.S.C.

§§ 3729-33, premised on violations of the Anti-Kickback Statute (the "AKS") (Counts I-II alleging

violations of 31 U.S.C. § 3729(a)(1)(A) as to all Defendants; Count IV alleging violations of 31 U.S.C. § 3729(a)(1)(B) as to same; Count VI alleging conspiracy under 31 U.S.C. § 3729(a)(1)(C) as to same; Count VIII alleging unjust enrichment as to same) and federal anti-discrimination regulations (Count III alleging violations of 31 U.S.C. § 3729(a)(1)(A) as to all Defendants but Anthem; Count V alleging violations of 31 U.S.C. § 3729(a)(1)(B) as to same; Count VII alleging conspiracy under 31 U.S.C. § 3729(a)(1)(C) as to same), D. 41.  Defendants have now moved to dismiss the complaint pursuant to Fed. R. Civ. P. 8(a), Fed. R. Civ. P. 9(b) and Fed. R. Civ. P. 12(b)(6).  D. 114.  eHealth has also moved for early discovery.  D. 126.  For the reasons stated below, the Court DENIES Defendant's motion to dismiss, D. 114, as to Counts I-VII, and ALLOWS same, id., as to Count VIII, and DENIES eHealth's discovery motion, D. 126.

## II.    Standard of Review

### A.    Federal Rule of Civil Procedure 8(a)

Pursuant to Fed. R. Civ. P. 8(a), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and "'give [each] defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). To be sure, "the requirements of Rule 8(a)(2) are minimal—but 'minimal requirements are not tantamount to nonexistent requirements.'" Educadores Puertorriqueños en Acción v. Hernandez, 367 F.3d 61, 68 (1st Cir. 2004) (quoting Gooley v. Mobil Oil Corp., 851 F.2d 513, 514 (1st Cir. 1988)). Accordingly, a "complaint should at least set forth minimal facts as to who did what to whom, when, where, and why—although why, when why means the actor's state of mind, can be averred generally." Id.  Where, as here, "a plaintiff brings a claim against multiple defendants, the plaintiff must . . . draft his complaint in such a manner that it is clear what the alleged factual

allegations and legal claims are against each individual defendant" and "cannot simply refer to the defendants collectively where it cannot be reasonable inferred that all the defendants engaged in the alleged misconduct." Burnham v. Dudley Dist. Ct., No. 15-cv-40031-DHH, 2015 WL 5698418, at *5 (D. Mass. Sept. 28, 2015).

### B. Federal Rule of Civil Procedure 9(b)

Federal Rule of Civil Procedure 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud or mistake." The purpose of Rule 9(b) is "to give notice to defendants of the plaintiffs' [fraud] claim, to protect defendants whose reputation may be harmed by meritless claims of fraud, to discourage 'strike suits,' and to prevent the filing of suits that simply hope to uncover the relevant information during discovery." Doyle v. Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996) (internal citation omitted). These heightened pleading requirements apply to claims brought under the FCA. See, e.g., United States ex rel. Gagne v. City of Worcester, 565 F.3d 40, 45 (1st Cir. 2009) (noting that "the heightened pleading requirements of Fed. R. Civ. P. 9(b) apply to [FCA] claims"). Accordingly, a plaintiff must satisfy the requirements of Rule 9(b) by setting forth the "the time, place, and content of an alleged false representation." Gagne, 565 F.3d at 45 (citation omitted) (internal quotation mark omitted); Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004) (noting that Rule 9(b) requires the pleader "to specify the who, what, where, and when of the allegedly false or fraudulent representation").

### C. Federal Rule of Civil Procedure 12(b)(6)

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim for relief." Schatz v. Republican State Leadership Comm., 669 F.3d 50,

55 (1st Cir. 2012).  Reading the complaint "as a whole," the Court conducts a two-step, context-specific inquiry.  García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013).  First, the Court must perform a close reading of the complaint to distinguish the factual allegations from the conclusory legal allegations contained therein.  Id.  Factual allegations must be accepted as true, while legal conclusions are not entitled credit.  Id.  Second, the Court must determine whether the factual allegations support a "reasonable inference that the defendant is liable for the misconduct alleged."  Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (citation omitted).  In sum, the complaint must provide sufficient factual allegations for the Court to find the claim "plausible on its face."  García-Catalán, 734 F.3d at 103 (citation omitted).  "In determining whether a [pleading] crosses the plausibility threshold, 'the reviewing court [must] draw on its judicial experience and common sense.'"  Id. (second alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)).

### III.    Background

#### A.    Statutory Background

Established in 1965, Medicare, which consists of Parts A and B, is administered by the Centers for Medicare & Medicaid Service ("CMS").  See 42 U.S.C. §§ 1395c–1395w-6.  In 1997, Congress created Part C, which is the Medicare Advantage ("MA") program, under which Medicare-eligible beneficiaries may elect to receive their Medicare benefits through private insurers known as Medicare Advantage Organizations ("MAOs"), rather than the CMS.  42 U.S.C. §§ 1395w-21–1395w-29; see MSP Recovery Claims, Series LLC & Series 17-04-631 v. Plymouth Rock Assurance Corp., Inc., 404 F. Supp. 3d 470, 476 (D. Mass. 2019).  Under Part C, Medicare pays MAOs an advanced, fixed amount per month for each beneficiary covered under the MAO's plan to provide the same original Medicare benefits.  42 C.F.R. § 422.304(a).  "Congress's goal in

4

creating the Medicare Advantage program was to harness the power of private sector competition to stimulate experimentation and innovation that would ultimately create a more efficient and less expensive Medicare system." In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig., 685 F.3d 353, 363 (3d Cir. 2012).

### B.    Factual Background

The following facts are alleged in the complaint, D. 41, and the Court takes these allegations as true for purposes of considering Defendants' motion to dismiss, D. 114.

Defendants are participants in the MA program. D. 41 ¶¶ 40, 54. Aetna, Humana, and Anthem (collectively, "Defendant Insurers") are MAOs. Id. ¶ 40. To participate in the MA program, MAOs execute annual agreements with CMS, certifying their compliance with various rules and regulations, in relevant part, "the [FCA] . . . and the [AKS]," and the "prohibition in § 422.110 on discrimination in beneficiary enrollment." Id. ¶ 94 (quoting 42 C.F.R. § 422.504(h); 42 C.F.R. § 422.504(a)(2)). To compensate the MAOs for providing coverage to Medicare beneficiaries, CMS issues monthly payments to them in a fixed amount per beneficiary enrolled in each MA plan. Id. ¶ 42. To receive these monthly payments, MAOs must certify the accuracy, completeness, and truthfulness of all data submitted to CMS, including "'specified enrollment information, encounter data, and other information that CMS may specify.'" Id. ¶ 95 (quoting 42 C.F.R. § 422.504(l)).

Defendant Brokers are private, independent insurance brokers that connect eligible Medicare beneficiaries seeking MA coverage with available plans. Id. ¶¶ 52-54. CMS, under 42 C.F.R. § 422.2274(a) (2020), imposes a cap on "compensation" that may be paid to brokers by MAOs for their services in enrolling beneficiaries to their MA plans. Id. ¶ 77. Prior to 2021 (the relevant period here), CMS also allowed MAOs to pay such brokers for "services other than selling

insurance products," with the requirement that such payments "must be fair-market value" and "must not exceed an amount that is commensurate with the amounts paid by the [MAO] to a third party for similar services during each of the previous 2 years."  Id. ¶ 80 (quotations omitted) (quoting 42 C.F.R. § 422.2274(b)(1)(iv) (2020)).

Between 2016 and 2021, as alleged, Defendant Insurers entered into marketing agreements with Defendant Brokers to "induce them to steer" Medicare beneficiaries to Defendant Insurers' MA plans.  Id. ¶ 98.  The language of the marketing agreements did not include reference to payment-per-enrollee arrangements, allegedly "[t]o disguise the true nature of the agreements."  Id. ¶ 106.  As to Defendant Insurers, the government alleges that Humana paid Defendant Brokers "hundreds of millions of dollars," referred to as "co-op money" or "market development funds" (or "MDF"), to "box out" competitors, id. ¶ 103; that Aetna paid Defendant Brokers "more than eighty million dollars . . . purportedly for 'marketing' services," id. ¶ 378; and that Anthem paid GoHealth and eHealth "hundreds of millions of dollars in exchange for their commitments to sell specific quantities of Anthem's [MA] plans," id. ¶ 578.  Defendant Brokers allegedly understood that these marketing payments (which were in addition to, and separate from, permissible per-enrollment compensation that was capped, i.e., commissions) were given in exchange for steering new beneficiaries to Defendant Insurers' plans, and, acting on this understanding, prioritized sales of Defendant Insurers' MA plans, id. ¶¶ 99-100, by, for example, modifying the compensation, bonus and commissions structures for their agents, see, e.g., id. ¶¶ 446-47, 463, 624, 629, 638-39, 646, 655, 678, 681, 698, creating "pods" of agents dedicated to selling Defendant Insurers' plans, see, e.g., id. ¶¶ 109-10, 199, 202, 205-06, 208-10, 228, 443-45, 451-52, and agreeing not to contract with Defendant Insurers' competitors, see, e.g., id. ¶¶ 144-45, 647-48.

From 2016 through at least 2021, Aetna and Humana also allegedly conditioned marketing payments to Defendant Brokers on limiting the number of Medicare beneficiaries with disabilities (referred to as "U65" beneficiaries, or individuals under sixty-five who qualify for Medicare coverage) enrolled in Defendant Insurers' plans, and Defendant Brokers complied.  See id. ¶¶ 101-02, 305-77, 484-577.  To achieve Defendant Insurers' preferred customer mix, as alleged, Defendant Brokers, for example, evaded calls from disabled beneficiaries, see, e.g., id. ¶¶ 345-46, disabled online enrollment buttons, halted telephonic sales to U65 beneficiaries in certain states and removed the option to enroll in these plans altogether, see, e.g.,  id. ¶¶ 505-10.

## IV.    Procedural History

Relator filed his original *qui tam* complaint on November 2, 2021.  D. 1.  On January 13, 2025, the government notified the Court of its decision to intervene in part in the matter and did so only as to the Defendants now named in the complaint.  D. 34.  The government then filed the now operative complaint on May 1, 2025.  D. 41.  Defendants have moved to dismiss the complaint.  D. 114.  eHealth also has moved for early discovery.  D. 126.  The Court heard the parties on the pending motions and took these matters under advisement.  D. 143.

## V.    Discussion

### A.    Motion to Dismiss

Having reviewed Defendants' motion, D. 114-17, the government's opposition to same, D. 120-22, and Defendants' reply, D. 128-30, the Court DENIES the motion, except as to Count VIII, for the reasons stated below.

> 1.    *FCA Liability Under 31 U.S.C. § 3729(a)(1)(A) and § 3729(a)(1)(B) for Violations of the AKS (Counts I, II and IV)*

The government alleges two theories of liability under the FCA:  (1) the submission of false claims stemming from violations of the AKS, D. 41 ¶¶ 765-82, and (2) the submission of

false claims stemming from violations of federal anti-discrimination regulations, id. ¶¶ 783-90. Counts I, II and IV hinge on the former theory and the Court turns first to these claims.

a)      Establishing Defendants' Liability Under the AKS

To establish a violation of the AKS, a plaintiff must demonstrate that (1) remuneration was offered with (2) the intent to induce referrals to a health care program (3) paid for, at least in part, by a federal health care program.  See 42 U.S.C. § 1320a-7b(b)(2);[1] see also Guilfoile v. Shields, 913 F.3d 178, 188-89 (1st Cir. 2019).  "Essentially, the AKS targets any remunerative scheme through which a person is 'paid in return for referrals' to a program under which payments may be made from federal funds."  Omni Healthcare, Inc. v. MD Spine Sols. LLC, 761 F. Supp. 3d 356, 363 (D. Mass. 2025) (quoting Guilfoile, 913 F.3d at 189), aff'd sub nom. United States ex rel. Omni Healthcare Inc. v. MD Spine Sols. LLC, 160 F.4th 248 (1st Cir. 2025); see United States ex rel. Bawduniak v. Biogen Idec, Inc., No. 12-cv-10601-IT, 2018 WL 1996829, at *2 (D. Mass. Apr. 27, 2018).

Defendants argue that the government has failed to plead a violation of the AKS because (1) the alleged marketing payments were expressly authorized by Congress and CMS, D. 115 at 26-29, (2) neither MA plans nor enrollments qualify as "remuneration" under the statutory language of the AKS, id. at 29-33, (3) the government has failed to plead that the alleged marketing payments were above fair market value, id. at 34-36, and (4) there was no inducement because,

---

[1] The AKS prohibits the "knowing[] and willful[] offer[] or pay[ment] of any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program."  42 U.S.C. § 1320(a)-7b(b)(2)(A), (B).

8

again, the payments were authorized by CMS, id. at 37-38.  The Court analyzes each argument in turn.

(1)    The Alleged Marketing Payments Were Not Authorized

In support of its argument that the alleged payments were authorized by CMS, Defendants initially cite 42 C.F.R. § 422.2274 (effective Mar. 22, 2021), which provides that "payments made for services other than enrollment (i.e., administrative payments for, e.g., "training, customer service, agent recruitment, operational overhead, or assistance with completion of health risk assessments") "must not exceed the value of those services in the marketplace."   42 C.F.R. § 422.2274(e)(2); D. 115 at 15, 20-21, 28, 35 (citing same).  Given the relevant time frame of 2016 to 2021 as alleged, D. 41 ¶ 98, the more relevant version of the regulation, 42 C.F.R. § 422.2274 is the one in effect before 2021 that, by contrast, does not provide the language to which Defendants point.  D. 115 at 28.  Instead, it provides that the "amount paid to the third party for services other than selling insurance products, if any, must be fair-market value and must not exceed an amount that is commensurate with the amounts paid by the MA organization to a third party for similar services during each of the previous 2 years."  42 C.F.R. § 422.2274(b)(1)(iv)(B); D. 41 ¶ 80.

Under either version of the regulation, Defendants argue that the alleged payments were authorized for "marketing."  D. 115 at 27.  Specifically, Defendants argue that their conduct was authorized marketing because the 2009 CMS Medicare Marketing Guidelines define marketing as "[s]teering, or attempting to steer, a potential enrollee towards a plan."  Id. (quotation marks omitted) (quoting 2009 CMS Medicare Marketing Guidelines § 10 (Aug. 7, 2009), https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/dwnlds/R91MCMpdf.pdf (last visited Mar. 24,

2026)).[2] But this definition addresses marketing, not the pay-to-play scheme for enrollment to a specific insurer's plan, as alleged by the government, that violates the regulations capping remuneration.    See, e.g., D. 41 ¶ 107 (alleging that Humana "knew such 'marketing reimbursements' were pretenses, as the parties instead 'back[ed] in to' a dollar figure for enrollments" (alterations in original)); id. ¶ 410 (providing that complaining that since "Aetna was only paying 'marketing' funding of $200 per enrollment, Aetna had 'lost market share' on the eHealth sales platform"); id. ¶ 614 (alleging that Anthem contemplated "increasing the payment per enrollment . . . from $250 to $400" to GoHealth and that the broker's employees were discussing how to "steer more beneficiaries to Anthem plans in order to capitalize the much higher payouts").    Even the 2009 CMS Medicare Marketing Guidelines for marketing activities (e.g., "circulation [of] brochures," the creation of "slides and charts" and, at most, "[t]he activities of a plan sponsor's . . . brokers, . . . contributing to the steering of a potential enrollee towards a specific plan or limited number of plans, [who] may receive compensation directly or indirectly from a plan sponsor for marketing activities"), see 2009 CMS Medicare Marketing Guidelines § 10, do not make permissible the allegations that the label of "marketing" was used to mask remuneration for enrollment above the permissible cap and involving, for example, establishing "pods" of sales agents dedicated to selling particular plans, D. 41 ¶¶ 110, 208, "shut[ing] off" other carriers to drive more sales in particular states, id. ¶¶ 262, 432, and inserting Defendant Insurer-specific "override[s]" into their call scoring systems to artificially inflate that call's overall value, id. ¶ 65.

---

[2] The Court notes that CMS explicitly provided, in defining 'marketing,' that "[a]ssisting in enrollment" did not constitute marketing. Id. § 20.

Here and now, where plausibility is the touchstone, the government has adequately alleged that Defendants exchanged payments for enrollments, see, e.g., D. 41 ¶ 218 (providing that "[SelectQuote] sent [Humana] a proposal stating that, in exchange for $742,500 from Humana, SelectQuote would generate 4,210 Humana sales," which was then formally agreed); id. ¶ 469 (describing Aetna "$150 'kicker' [program, which involved] paying brokers an extra $150 for each sale" of Aetna plans); id. ¶ 592 (providing that "Anthem and GoHealth discussed the number of enrollments or cost per enrollment that a specific amount of 'marketing' funding would generate"), such that Defendants allegedly did not comply with either version of 42 C.F.R. § 422.2274 where the government's allegations are that these payments were not, in fact, for marketing (i.e., not made for "payments made for services other than enrollment" or "services other than selling insurance products") but were for enrollment.

The fact that Defendants' agreements purported to focus on marketing, rather than per-enrollee fee arrangements, does not alter this analysis, because the substance of the agreements and payments control, not their form. See United States ex rel. Westmoreland v. Amgen, Inc., 812 F. Supp. 2d 39, 47 (D. Mass. 2011) (noting that the "gravamen of a violation of the [AKS] is 'inducement' and not necessarily the structure of the arrangement,' such that 'case by case inquiries must necessarily focus on the intent of the parties'" (quoting Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti–Kickback Provisions, 56 Fed. Reg. 35952, 35955 (July 29, 1991))); see also United States v. Pfizer, Inc., 188 F. Supp. 3d 122, 134 (D. Mass. 2016) (stating that "the very nature of a sham is that it pretends to be compliant when it is not"), aff'd sub nom. United States ex rel. Booker v. Pfizer, Inc., 847 F.3d 52 (1st Cir. 2017); compare D. 41 ¶ 103 (describing Humana "'co-op' money or 'market development funds'") and id. ¶ 378 (describing Aetna payments "purportedly for 'marketing' services") and id. ¶¶ 579-580

(describing Anthem payments for "'production' targets or 'commitments'" and the alleged attempt to "disguise these payments" as reimbursement for "'marketing' activities") with id. ¶¶ 118-20 (citing correspondence in which GoHealth stated that the model for marketing funding "is built off of a 'marketing bonus' that is tied to production," and Humana responded, "'you have the right idea, it just all depends how we describe it [because] CMS has very strict rules on how we compensate partners'") and id. ¶ 389 (providing correspondence from Aetna, '[w]e may need more [sales] and will pay per sale . . . [eHealth is] already on the hook for 2153 [enrollments] in these markets and we would pay $175 per sale for the additional 646'") and id. ¶¶ 593-594 (providing that "Anthem and GoHealth expressly negotiated for 1,250 policy submissions").  The government has adequately alleged that the payments among Defendants did not qualify as administrative payments under the CMS regime.  Contrary to Defendants' assertions, D. 115 at 34-35, the Court, therefore, need not reach whether such payments were either fair market value or "commensurate" with other prior payments under CMS regulations.

To the extent that Defendants further argue that establishing remuneration under the AKS requires a showing that any such remuneration was above fair market value, D. 115 at 34-35, the Court turns to this issue. Defendants seek to distinguish First Circuit precedent foreclosing such requirement on the basis that "the [CMS] rules here are prescribed by regulation, and those regulations authorize payments tied to fair market value." Id. at 35 n.6 (seeking to distinguish United States v. Bay State Ambulance & Hosp. Rental Serv., Inc., 874 F.2d 20, 33 (1st Cir. 1989)). Because the First Circuit has provided that remuneration "includes not only sums for which no actual service was performed but also those amounts for which some professional time was expended, . . . expand[ing] 'remuneration' to cover situations where no service is performed," Bay State Ambulance & Hosp. Rental Serv., Inc., 874 F.2d at 30, and because the Court has already

12

determined that CMS regulations do not authorize the alleged payments here, such that no fair market value requirement applies, this argument also fails.  See Guilfoile, 913 F.3d at 189 (providing "considerations for identifying an unlawful kickback," which do not include fair market value).

Accordingly, Defendants' conduct was not expressly authorized by CMS.

(2)    The Government Has Adequately Alleged Renumeration

The Court also disagrees with Defendants that the government has not adequately alleged remuneration.  Under the AKS, "illegal remuneration" is defined as the "knowing[] and willful[] solicit[ation] or [receipt of] any [payment] (including any kickback, bribe or rebate) directly, indirectly, overtly or covertly, in cash or in in kind in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or in return for . . . arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program."  42 U.S.C. § 1320a-7b(b)(1)-(2).  Remuneration under this statute has been understood as "*anything of value*" given as "an inducement to generate business payable by Medicare or Medicaid."  United States v. Regeneron Pharms., Inc., No. 20-cv-11217-FDS, 2020 WL 7130004, at *10 n.7 (D. Mass. Dec. 4, 2020) (emphasis in original) (internal citation and quotation marks omitted).

Defendants argue that the alleged conduct does not constitute remuneration under the AKS, because the definition of remuneration hinges on, *inter alia*, the recommendation of a "good . . . service, or item,"  D. 115 at 26 (quoting 42 U.S.C. § 1320a-7b(b)(1)–(2)), and this language refers to "health care products or services that a healthcare provider might supply to patients," not insurance plans or beneficiaries, id. at 30-31.  The government disagrees and argues

13

that MA plans fall within the ambit of both "item" and "service." D. 120 at 30-36. Neither "item" nor "service" is defined in the AKS.

"Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." Dolan v. United States Postal Serv., 546 U.S. 481, 486 (2006). When interpreting a statute, the Court first "begins with the language of the statute." In re Hill, 562 F.3d 29, 32 (1st Cir. 2009). "[The Court] assume[s] that the words Congress chose, if not specially defined, carry their plain and ordinary meaning," id., "focus[ing] on the plain meaning of the whole statute, not of isolated sentences." Colón-Marrero v. Vélez, 813 F.3d 1, 11 (1st Cir. 2016) (quotations omitted) (quoting Arnold v. United Parcel Serv., Inc., 136 F.3d 854, 858 (1st Cir. 1998)). "Absent ambiguity, the inquiry ends with the text of the statute." Campbell v. Washington Cnty. Technical Coll., 219 F.3d 3, 6 (1st Cir. 2000). If there is ambiguity, courts look to congressional intent, "employ[ing] the traditional tools of statutory construction, including a consideration of the language, structure, purpose, and history of the statute." In re Hill, 562 F.3d at 32 (internal citation and quotation marks omitted).

(a)    Interpreting "Item or Service" Under the AKS

The Court considers each of Defendants' arguments in turn. Defendants first point to the Office of Inspector General's (the "OIG") definitions of these terms, which discuss, *inter alia*, "drugs, supplies, or health care services," D. 115 at 31-32 (quotations omitted) (quoting HHS-OIG, Fraud & Abuse Laws: Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), https://perma.cc/J9FX-CMX6 (last visited Mar. 24, 2026)). The cited language merely provides examples of "item[s] or service[s]," not an exhaustive list. D. 120 at 36. Defendants further point to 42 C.F.R. § 1001.952(t)(2)(iv), which provides that "[m]arketing and other pre-enrollment

activities are not 'items or services' for purposes of this section." D. 115 at 31. The relevance of this language is unclear, however, where its applicability is explicitly limited to its context. See 64 Fed. Reg. 63504, 63507 (Nov. 19, 1999) (noting that it is another "limitation on the regulatory safe harbor protection" that it only applies to remuneration for health care items and services and those items or services reasonably related to the provision [of same]" and that "Section 1001.952(t) does not cover marketing services or any services provided prior to a beneficiary's enrollment in a health plan").

Next, Defendants cite the "Definitions" in the Social Security Act, which incorporates the phrase "item or service" repeatedly and, in one section, defines "medical and other health services" to include "physician services" and other services provided by hospitals. D. 115 at 32 (quoting 42 U.S.C. § 1395x(s)). As argued by the government, D. 120 at 35, however, "'when Congress includes particular language in one section of a statute but omits it in another,' Congress 'intended a difference in meaning.'" Maine Cmty. Health Options v. United States, 590 U.S. 296, 314 (2020) (quoting Digital Realty Tr., Inc. v. Somers, 583 U.S. 149, 161 (2018)).

Defendants then argue that their proposed meaning of these terms is consistent with the 2010 amendment to the AKS, which was intended to address "medical care kickbacks." D. 115 at 33 (quoting 155 Cong. Rec. S10852, S10853 (daily ed. Oct. 28, 2009) (statement of Sen. Kaufman)). But, even in the cited testimony, the senator noted that the 2010 amendment made "all payments that stem from an illegal payment subject to the [FCA]," emphasizing the broad reach of the AKS. D. 120 at 34 (quoting 155 Cong. Rec. at S10853).

Lastly, Defendants rely on language from another session in this Court, providing that the AKS is designed to deter kickback payments, which are, in turn, designed to influence "providers' independent medical judgment," D. 115 at 33 (quotations omitted) (quoting Westmoreland, 812

F. Supp. 2d at 53). The Court notes, however, that the Westmoreland court also stated that the broader purpose of the AKS is to "strengthen the capability of the [g]overnment to detect, prosecute, and punish fraudulent activities under the [M]edicare and [M]edicaid programs," Westmoreland, 812 F. Supp. 2d at 53 (quoting H.R. Rep. No. 95–393, pt. 2, at 44, as reprinted in 1977 U.S.C.C.A.N. 3039, 3040, 3047, 3050)—a purpose not specific to the fraudulent conduct of medical providers alone.

In light of the foregoing, the Court disagrees with Defendants' argument that the reach of the AKS is limited to items or services that might be supplied by a healthcare provider to a patient. D. 115 at 30-31; see Omni Healthcare, 761 F. Supp. 3d at 367 (concluding that the "[p]lain language" of the AKS imposes liability for "payments to independent contractors who were hired to influence those who make healthcare decisions on behalf of providers by promoting a company's product or service"); see also Guilfoile, 913 F.3d at 191-92 (determining that "complaint's allegations that the [pharmacy services company]," which "regularly bill[ed] federal insurance programs," "paid [the consultant] to induce him to use his position with the hospitals to influence them to select [that company] for the contracts at issue . . . plausibly alleged . . . a violation of the AKS"). As the government has noted, D. 120 at 33-34, other courts have concluded that the AKS's prohibition on fraudulent behavior "is not limited to referrals for care itself, but rather for 'any item or service' paid under Medicare, such as a Part C plan." Bond v. Clover Health Invs., Corp., 587 F. Supp. 3d 641, 656-57 (M.D. Tenn. 2022) (quoting 42 U.S.C. § 1320a-7b(b)(2)). Other courts facing similar facts have determined that steering beneficiaries to particular MAOs in exchange for kickbacks falls within the ambit of the AKS. See, e.g., United States ex rel. Butler v. Shikara, 748 F. Supp. 3d 1277, 1290, 1303 (S.D. Fla. 2024) (denying motion to dismiss FCA claim premised on AKS violation where "MAOs allegedly paid kickbacks and

16

commissions to [healthcare provider and a field marketing organization] in exchange for steering Medicare patients to their organizations"); United States ex rel. Wilkins v. United Health Grp., Inc., 659 F.3d 295, 298-99 (3d Cir. 2011) (reversing dismissal as to AKS-based FCA claim where defendant MAO "illegally provid[ed] kickbacks . . . to a New Jersey medical clinic to induce the clinic to switch its patients to [defendant]"). For these reasons, as argued by the government, MA plans can be considered as "item[s] or service[s]" for purposes of establishing remuneration under the AKS. Accordingly, the hundreds of millions of dollars of marketing payments alleged to have been dispensed by Defendant Insurers over a span of years to Defendant Brokers sufficiently constitute *anything of value*. Regeneron Pharms., Inc., 2020 WL 7130004, at *10 n.7; see, e.g., D. 41 ¶ 103; id. ¶ 378; id. ¶ 578. The government has provided sufficient facts to allege remuneration for purposes of the AKS.

(3)    The Government Has Adequately Alleged Inducement

In analyzing inducement, the "intent of the entity providing remuneration is critical." Regeneron Pharms., Inc., 2020 WL 7130004, at *8. "[S]o long as *one purpose* of the offer or payment is to induce . . . referrals," an AKS violation can be found. Id. (emphasis in original) (quoting United States v. McClatchey, 217 F.3d 823, 835 (10th Cir. 2000)). While the "AKS is not violated where a company hopes or expects that 'referrals may ensue from remuneration that was designed wholly for other purposes,' . . . [r]ather, liability attaches only when the statements and actions . . . reveal an intent beyond a 'collateral hope or expectation,' such that it is clear that the remunerations were designed specifically to encourage claims to Medicare." United States v. Teva Pharms. USA, Inc., 560 F. Supp. 3d 412, 420 (D. Mass. 2021) (quoting McClatchey, 217 F.3d at 834-35 n.7).

17

Here, as alleged, Defendant Brokers enrolling beneficiaries in Defendant Insurers' plans was not simply an incidental or hoped-for result of the marketing payments—it was their explicit and intended purpose. See, e.g., D. 41 ¶ 590 (providing that, "[i]nternally, an Anthem executive recognized the 'significant [sales] growth' that came with paying brokers, such as GoHealth, who 'highlight[ed] the perception of shopping everything within a market and picking the best plan,' while in fact they steered beneficiaries towards Anthem plans in exchange for '[m]arketing investments'") By virtue of the specific, enrollee-based targets and conditions imposed by Defendant Insurers on marketing payments, such agreements were "designed specifically to encourage" enrollment, or to induce referrals. See, e.g., D. 41 ¶ 129 (alleging that "GoHealth was given $750K in [Special Enrollment Period for MA] to drive 3,000 Humana Enrollments"); id. ¶ 281 (providing correspondence that "eHealth and Humana 'are in agreement for $5m for 25k apps'"), id. ¶¶ 200, 389, 433 (alleging that "[Aetna] and [SelectQuote] exchanged emails about how to structure a $1.5 million marketing payment in return for 7,000 sales of Aetna plans"); see Regeneron Pharms., Inc., 2020 WL 7130004, at *8.

Further, as argued by the government, D. 120 at 29, Defendant Brokers were positioned to induce beneficiaries by virtue of their role in the MA program as the connective tissue between beneficiaries and available plans, see Guilfoile, 913 F.3d at 191 (noting that defendant "paid [individual] to induce him to use his position" on their behalf); cf. United States v. Sorensen, 134 F.4th 493, 496 (7th Cir. 2025) (reversing AKS conviction where recipients of would-be kickbacks "were neither physicians in a position to refer their patients nor other decisionmakers in positions

18

to 'leverage fluid, informal power and influence' over healthcare decisions" (quoting <u>United States v. George</u>, 900 F.3d 405, 411 (7th Cir. 2018))).[3]

Accordingly, the government has adequately alleged inducement.

> (4)   Participation in the MA Program Is Payable By Federal Health Care Program

Defendant Insurers' participation in the MA program is "payable in whole or in part by a [f]ederal health care program" by virtue of the monthly capitation payments paid to Defendant Insurers by CMS.  <u>Guilfoile</u>, 913 F.3d at 189 (quoting <u>OIG Supplemental Compliance Program Guidance for Hospitals</u>, 70 Fed. Reg. 4858, 4864 (Jan. 31, 2005)); D. 41 ¶ 42.

Accordingly, the government has plausibly alleged the elements of an AKS violation.  <u>See</u> 42 U.S.C. § 1320a-7b(b)(2); <u>see also</u> <u>Guilfoile</u>, 913 F.3d at 188-89.  The Court next considers whether they have adequately alleged FCA liability for same under Counts I, II and IV.

> b)   <u>Defendants' FCA Liability for the Alleged AKS Violations</u>

Establishing a violation of the FCA "hinges on four elements: whether (1) claims or statements were made; (2) these claims or statements were false; (3) these falsehoods were

---

[3] In <u>Sorensen</u>, the alleged kickback scheme involved the defendant employing salesmen to push a particular medical product by faxing unsigned prescriptions for the product to physicians for signature (with patient consent).  <u>Sorensen</u>, 134 F.4th at 501-02.  The Seventh Circuit determined that the defendant "did not violate the [AKS]" where "no evidence suggest[ed] that [he] or his associates exerted any sort of special informal influence on the physicians making healthcare decisions" through their "aggressive advertising efforts," particularly where the physicians retained ultimate authority on whether or not to sign the prescriptions and "declined 80 percent of the orders."  <u>Id.</u> at 497, 501, 503.  Here, in contrast as alleged, Defendant Brokers, independent brokers, were in a unique position of influence to direct MA beneficiaries to one MA plan or another.  <u>See, e.g.</u>, D. 41 ¶¶ 53-55; <u>see, e.g.</u>, <u>id.</u> ¶ 70 (providing that eHealth claimed to provide "'unbiased, personalized recommendations'" for affordable, individualized healthcare plans); <u>id.</u> ¶ 71 (providing that GoHealth "promised to 'simplify the difficult and confusing process by offering . . . unbiased advice'"); <u>id.</u> ¶ 73 (providing that SelectQuote promised to provide "unbiased comparison shopping for" MA plans).

material; and (4) these statements were made with scienter of the falsehood." United States ex rel. Mackillop v. Grand Canyon Educ., Inc., 626 F. Supp. 3d 418, 444-45 (D. Mass. 2022).  To the fourth element, the "FCA defines 'knowingly' to mean that the defendant 'has actual knowledge of the information,' 'acts in deliberate ignorance of the truth or falsity of the information,' or 'acts in reckless disregard of the truth or falsity of the information.'" Omni Healthcare, 761 F. Supp. 3d at 363 (quoting 31 U.S.C. § 3729(b)(1)(A)).  Proof of specific intent to defraud is not required. Id. (quoting 31 U.S.C. § 3729(b)(1)(B)).

Relevant here, an AKS violation offers two theories of liability under the FCA:  (1) liability under the 2010 amendment to the AKS, under which "an AKS violation that results in a federal health care payment is a per se false claim under the FCA," Regeneron Pharms., Inc., 2020 WL 7130004, at *7 (quoting Guilfoile, 913 F.3d at 190), and (2) "false certification" liability, which attaches when a defendant falsely represents AKS compliance on a federal agency form, United States v. Regeneron Pharms., Inc., 793 F. Supp. 3d 261, 266 (D. Mass. 2025).  "Put simply, claims under the 2010 amendment run on a separate track than do claims under a false-certification theory." United States v. Regeneron Pharms., Inc., 128 F.4th 324, 334 (1st Cir. 2025).

(1)     2010 Amendment Liability (Count I)

Under the 2010 amendment, no representation of AKS compliance, either "implied or express," is required.  Id. at 334.  Under this theory, "the government must prove that the AKS violation was a but-for cause of the false claim." Id. at 336.

In moving to dismiss, Defendants argue that the government "has not alleged that any specific AKS violation was the but-for cause of any specific claim." D. 115 at 49.  The  Court disagrees.  The complaint does not rely on mere "speculation or conjecture" in connecting false claims to Defendants' conduct, United States v. Regeneron Pharms., Inc., No. 20-cv-11217-FDS,

2023 WL 6296393, at *12 (D. Mass. Sept. 27, 2023), aff'd, 128 F.4th at 324; rather, it alleges pages of claims submitted to the government by Defendant Insurers resulting from their business with Defendant Brokers over the relevant period, sufficiently "link[ing] those payments to the purported scheme." Teva, 560 F. Supp. 3d at 422-23 (determining that complaint stated a "plausible violation of FCA" where it "identifie[d] 30 examples of payments" potentially violating the AKS and "link[ed] those payments to the purported scheme," thereby "raising a reasonable inference" that those payments resulted in a federal health care payment); Regeneron, 2023 WL 6296393, at *12 (determining use of "'matching' analysis identifying Medicare claims for which [government] paid some or all of beneficiary's copay [to be] . . . sufficient to withstand summary judgment"); see, e.g., D. 41 ¶ 791 (alleging that "[i]n March 2016, under its contract H6609 and plan HumanaChoice, Humana submitted a claim with beneficiary data to CMS, including data related to Beneficiary 1[, provided by GoHealth, and] Humana received [at least $6,279.22 in] payment pursuant to this claim"); id. ¶ 792 (alleging similarly as to Humana and SelectQuote); id. ¶ 793 (alleging similarly as to Humana and eHealth); id. ¶ 794 (alleging that [i]n June 2017, under its contract H5521 and plan Aetna Medicare Premier Plan, Aetna submitted a claim with beneficiary data to CMS, including data related to Beneficiary 50[, provided by eHealth, and] Aetna received [at least $14,878.32 in] payment pursuant to this claim"); id. ¶ 795 (alleging similarly as to Aetna and SelectQuote); id. ¶ 796 (alleging similarly as to Aetna and GoHealth); id. ¶ 797 (alleging that "[i]n July 2021, under its contract HP525 and plan Anthem MediBlue Plus, Anthem submitted a claim with beneficiary data to CMS, including data related to Beneficiary 96[, provided by GoHealth, and] Anthem received [at least $15,754.75 in] payment pursuant to this claim"); id. ¶ 798 (alleging similarly as to Anthem and eHealth). While Defendants' conduct may not have been the sole reason a beneficiary enrolled in one of Defendant Insurer's plans and

contributed to future capitation payments, see Regeneron Pharms., Inc., WL 6296393, at *12, the complaint sufficiently connects their conduct to claims for payment for purposes of establishing FCA liability.

Defendants contend that this case is analogous to United States ex rel. Flanagan v. Fresenius Med. Care Holdings, Inc., 142 F.4th 25, 36 (1st Cir. 2025). There, the First Circuit considered a kickback scheme wherein, *inter alia*, a doctor was allegedly given "two [compensated] medical director positions" by the defendant dialysis services provider with the expectation that he would refer patients to the defendant for treatment. Id. Ultimately, the court determined that the relator's but-for theory of causation failed because the complaint included "no allegations" that the doctor "would not have made [the challenged] referrals had he not been given the medical director position," and "d[id] nothing to tell" the court whether referrals actually resulted from the alleged scheme. Id. Here, in contrast, the government alleges that Defendant Brokers acted on behalf of Defendant Insurers in ways they would not have absent the alleged payments, thereby causing enrollments (and claims submitted by Defendant Insurers to the government) that otherwise would not have occurred. See, e.g., D. 41 ¶ 202 (alleging that "SelectQuote projected that these exclusive agents would sell 7,049 Humana policies in 2016 that SelectQuote otherwise would not have sold"); id. ¶ 478 (alleging that "but for the kickers and incentive payments, eHealth would not have enrolled nearly as many beneficiaries in Aetna Medicare Advantage plans"); id. ¶ 710 (alleging that "Anthem and GoHealth knew that the marketing funding from Anthem caused Anthem plans to obtain a grossly disproportionate share of GoHealth sales compared to Anthem sales nationally").

22

In light of the foregoing, the Court determines that "the who, what, when, where, and how of the alleged fraud" has been sufficiently established for purposes of Rule 9(b) as to Count I. Hagerty, 844 F.3d at 31 (quotations omitted) (quoting Ge, 737 F.3d at 123–24).

(2)     False Certification Liability (Counts II and IV)

Counts II and IV allege FCA liability under a false certification theory of liability.  To state a claim under the false certification theory of the FCA under Rule 9(b), the government must allege "(1) that claims were indeed submitted to the government containing either express or implied representations of compliance, (2) that those representations were false, and (3) that those representations were material to Medicare's payment decision."  Regeneron Pharms., Inc., 793 F. Supp. 3d at 268.  In this context, "it is not the AKS violation itself that renders the claim false. Rather, it is the false representation that there is no AKS violation."  Regeneron Pharms., Inc., 128 F.4th at 333.  The materiality standard in this context is "demanding" and requires looking to "whether a piece of information is sufficiently important to influence the behavior of the recipient." Bawduniak, 2018 WL 1996829, at *4 (quotation marks omitted) (quoting United States ex rel. Escobar v. Universal Health Servs., 842 F.3d 103, 110 (1st Cir. 2016)).  Proof that the government has paid a particular claim with actual knowledge that certain requirements were violated constitutes "very strong evidence that those requirements are not material."  See United States ex rel. Stonebrook v. Merck KGaA, Darmstadt, Germany, No. 21-cv-10866-DJC, 2024 WL 1142702, at *10 (D. Mass. Mar. 15, 2024) (quoting Universal Health Servs., Inc. v. United States, 579 U.S. 176, 194-95 (2016)).

Defendants again argue that the government failed to identify any particular false claim resulting from Defendants' conduct, D. 115 at 44-48, and that the government failed to establish materiality, id. at 39-44.  The Court addresses each argument in turn.

23

*(a)      Absence of Any Particular False Claim*

"Evidence of an actual false claim is the *sine qua non* of a False Claims Act violation." Guilfoile, 913 F.3d at 188 (quotations omitted) (quoting United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 225 (1st Cir. 2004)).  Here, as discussed above, the government has provided tables of claims submitted by Defendant Insurers which, based on the framework outlined in 42 C.F.R § 422.504(l), required certifications of compliance on submission.  See D. 41 ¶¶ 775-82, 791-98 (alleging that "Defendant Insurers submitted beneficiary data and attestations concerning enrollments obtained from Defendant Brokers to which they had paid kickbacks in violation of the AKS").  The government also alleges that Defendant Insurers' contracts with CMS to participate in the MA program required that Defendant Insurers "comply with . . . the [AKS]." See id. ¶¶ 765-74.  The government then explicitly ties the claims to "beneficiaries who were enrolled pursuant to the [alleged] kickbacks."  Id. ¶¶ 791-98.  Accordingly, the government has adequately alleged false claims resulting from Defendants' false certifications of compliance.

As part of their challenge to these claims, Defendants cite Flanagan, where the First Circuit considered and rejected a relator's false representation claims.  Flanagan, 142 F.4d at 36-37. Unlike in Flanagan, 142 F.4th at 36-37 (dismissing false representation claim where relator "has not pointed [] to any allegations in the complaint that address what [defendant] actually submitted in [the] reports, . . . as to certifications"), the complaint provides factual allegations about contractual language and specific allegations as to the false certifications made by Defendant Insurers.  See, e.g., D. 41 ¶¶ 767-69 (alleging that "[f]rom 2016 through at least 2021, [] Defendant Insurers entered into contracts with CMS . . . [and] expressly certified that they would" comply with the FCA and AKS, and that such compliance was expressly material to the contract); id. ¶¶ 772-74 (alleging specific CMS contract and renewal dates as to each of the Defendant Insurers);

24

id. ¶¶ 775-82 (providing examples of when "each Defendant Insurer had to and did submit enrollment information for every beneficiary enrolled . . . as well as the associated certification"); ¶¶ 807-08 (providing compliance requirements as to Count II), 831-32 (providing compliance requirements as to Count IV).  The detailed allegations here contrast with the dearth of same in the cases referenced by Defendants.  D. 115 at 47-48 (citing Flanagan, Senters, Health Choice All., LLC); cf. United States ex rel. Senters v. Quest Diagnostics, Inc., 2025 WL 1951196, at *3 (11th Cir. July 16, 2025) (determining relator "failed to plead with particularity that a *false* claim was submitted to the government" where false certification claims rested on whether services were medically necessary and relator only provided "blanket allegation with no particular facts" that services were not medically necessary (emphasis in original)); Health Choice All., LLC, on behalf of United States v. Eli Lilly & Co., Inc., No. 17-cv-123-RWS-CMC, 2018 WL 4026986, at *55 (E.D. Tex. July 25, 2018) (dismissing for failure to plead submission of false claims where relator "relie[d] on summaries of aggregate annual reimbursement amounts by Medicare and Medicaid" that contained "publicly available information" and "collective government reimbursement figures without any indication" of their connection to the alleged kickbacks, thereby "lack[ing] the level of detail required"), report and recommendation adopted, No. 17-cv-123-RWS-CMC, 2018 WL 3802072 (E.D. Tex. Aug. 10, 2018).

Accordingly, the Court concludes that the government has adequately alleged the existence of false claims under this theory of FCA liability.

### (i)     Materiality

As to this element, Defendants argue that the fact that CMS paid Defendants' claims "forecloses any suggestion of materiality," particularly where the government has failed to point to an instance where CMS refused to pay claims for payment resulting from the alleged conduct.

D. 115 at 40-41.  Defendants further argue that the contractual breaches alleged by the government are not themselves material.  D. 115 at 43-44.

Under the FCA,  "material" "means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."   31 U.S.C. § 3729(b)(4).  "[M]ateriality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." Universal Health Servs., Inc., 579 U.S. at 193 (internal quotation marks and citation omitted).  "The materiality standard is demanding." Id. at 194.  "The [FCA] is not 'an all-purpose antifraud statute,' or a vehicle for punishing garden-variety breaches of contract or regulatory violations." Id. (quoting Allison Engine Co. v. United States ex rel. Sanders, 553 U.S. 662, 672 (2008)).  "A misrepresentation cannot be deemed material merely because the [g]overnment designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." Id.  "Nor is it sufficient for a finding of materiality that the [g]overnment would have the option to decline to pay if it knew of the defendant's noncompliance." Id.  "Materiality, in addition, cannot be found where noncompliance is minor or insubstantial." Id.

Here, however, the complaint alleges that the government had no knowledge of AKS violations from 2016 through 2021 and that, if it had, it would not have paid Defendants' claims.  D. 41 ¶ 813 (alleging that the government, "unaware of the falsity of the claims made or caused to be made by Defendants, paid claims that it would not have paid had it known of Defendants' illegal conduct"); id. ¶ 837 (same).  That is, the complaint has "allege[d] that the United States cannot pay a claim induced through the payment of a kickback and that, if the program administrators knew the claims at issue were the result of the payment of kickbacks, the claims would have been denied." Bawduniak, 2018 WL 1996829, at *5 (assessing materiality under an implied false

26

certification theory).  The complaint further alleges that compliance with the AKS is material to CMS payment decisions, outlining the specific language in Defendant Insurers' contracts with CMS to that effect.  See e.g., D. 41 ¶ 769 (providing that compliance with the AKS was "expressly 'material to the performance of the MA contract'" (quoting 42 C.F.R. § 422.504(a)); see id. ¶¶ 765-82;  Regeneron Pharms., Inc., 793 F. Supp. 3d at 268 (reasoning that "complaint allege[d] sufficient facts to state a plausible claim for violation of the FCA under a false-certification theory" where "the complaint contain[ed] [*inter alia*] a five-paragraph section alleging that compliance with the AKS is material to Medicare's payment decisions").  Accordingly, "[e]ven applying this demanding standard" as to materiality, Bawduniak, 2018 WL 1996829, at *5, the complaint survives.

For the foregoing reasons, Counts II and IV allege sufficient facts to state a plausible FCA claim.

> ## 2.    *The Government Adequately Alleged FCA Liability Based on Violation(s) of Non-Discrimination Regulations (Counts III and V)*

Counts III and V hinge on the theory that Aetna, Humana and Defendant Brokers discriminated against disabled beneficiaries and then falsely represented their compliance with anti-discrimination laws.  D. 41 ¶¶ 816-27, 840-52.  "To state a claim under either clause [of the FCA], a relator plausibly must allege that the defendant (1) made claims or statements; (2) that these claims or statements were false; and (3) made with the requisite scienter." Stonebrook, 2024 WL 1142702, at *7.  The misrepresentation must also be material to the government's decision to pay to fall within the remit of the FCA.  Id.

Aetna, Humana and Defendant Brokers move to dismiss both Counts, D. 115 at 50-61, arguing that the government (1) failed to plausibly allege the submission of any particular false

claim and (2) failed to prove any element of a false claim under the FCA, i.e., falsity, materiality, causation or damages, id. at 51.

(a)        Absence of Any Particular False Claim

Aetna, Humana and Defendant Brokers dispute that any false claim was submitted to the government in connection with the alleged discrimination. Id. at 51-52. Aetna, Humana and Defendant Brokers' theory is as follows:  because the government's discrimination claims are premised on Aetna, Humana and Defendant Brokers intentionally steering U65 beneficiaries away from Aetna and Humana's plans, it is not possible that Aetna and Humana could then submit false claims related to those U65 beneficiaries, as they were never enrolled. Id. Here, the government alleges that kickbacks were conditioned not only on Defendant Brokers steering MA beneficiaries toward Aetna and Humana, but also on steering U65 beneficiaries away from same. See D. 41 at 6 (alleging that "Aetna and Humana used their kickbacks to [] Defendant Brokers not only to buy enrollments in their plans, but also to pressure brokers to enroll fewer Medicare beneficiaries with disabilities, whom the insurers perceived as more expensive to cover"). The government further alleges that Aetna and Humana falsely certified compliance as to both aspects to submit their claims for payment to CMS. See, e.g., id. ¶¶ 767-69, 791-98. The complaint therefore adequately alleges specific false claims stemming from Aetna, Humana and Defendant Brokers' alleged discriminatory conduct.[4]

---

[4] Aetna, Humana and Defendant Brokers also argue that the government has failed to plead causation, i.e. that their alleged false certifications caused any loss to the government, because the "[g]overnment's theory is that [Aetna, Humana and Defendant Brokers'] conduct resulted in the [g]overnment *not* paying money it otherwise would have paid because that conduct allegedly resulted in MAO Defendants *not* enrolling certain beneficiaries . . . and therefore *not* resulting [in] claims for capitated payments for such beneficiaries" from CMS. D. 115 at 58-60. Again, this argument fails, as the government has alleged that Aetna and Humana's payments were conditioned on Defendant Brokers lowering the amount of U65 beneficiaries enrolled in Aetna

28

(b)    *Falsity*

Aetna, Humana and Defendant Brokers argue that the government failed to plead falsity because the complaint neither addresses the specific elements of either 45 C.F.R. Part 92[5] or 42 C.F.R. § 422.110 nor alleges the existence of any specific disabled persons who were impacted by the alleged discrimination.  D. 115 at 53-55; D. 128 at 28.  In opposition, the government contends that the complaint sufficiently alleges that Aetna, Humana and Defendant Brokers took actions to "'deny, limit, or condition the coverage or furnishing of benefits to individuals eligible to enroll in an MA plan' on the basis of disability,'" as well as to cause "individuals with disabilities to 'be subjected to discrimination' in this federally funded program."  D. 120 at 55 (quoting 42 C.F.R. § 422.110(a)(7); 29 U.S.C. § 794).[6]

On this point, the complaint is replete with allegations surrounding Aetna, Humana and Defendant Brokers' efforts to minimize U65 enrollment.  As to the two insurers, the complaint alleges that Humana determined that U65 beneficiaries "ha[d] a negative impact" on "medical expense ratios," and were not worth the higher capitated rates that Defendant Insurers received for disabled beneficiaries from CMS.  D. 41 ¶¶ 309, 311-14.  In the face of "extraordinarily high U65%" rates of enrollment from "a few partners," Humana's Sales Vice President wrote that "big offenders that are getting marketing dollars . . . need to fix [U65] enrollment immediately or funds will dry up quickly."  Id. ¶ 319-20.  Humana made clear to unsatisfactory brokers that "[i]t will be impossible to secure marketing dollars with the U65 % that high."  Id. ¶ 331.  Aetna similarly

and Humana's plans, see, e.g., D. 41 at 6, and that Aetna and Humana falsely certified compliance as to same, resulting in payment, see, e.g., id. ¶¶ 767-69, 791-98.

[5] The parties do not dispute that Part 92 incorporates the same legal analysis applicable to claims under Section 504 of the Rehabilitation Act.  D. 115 at 53; D. 120 at 55; D. 128 at 27.

[6] The parties both apply the legal framework utilized in 29 U.S.C. § 794 to 45 C.F.R. Part 92.  D. 115 at 53; D. 120 at 55; see 45 C.F.R. Part 92.3(a)-(b).

determined that disabled beneficiaries lowered their "medical benefit ratio," and, in reaction, "condition[ed] 'marketing' funding on the proportion of disabled beneficiaries enrolled in Aetna's [MA] plans." Id. ¶ 486, 488. Aetna "set goals for brokers to ensure that the number of disabled Medicare beneficiaries did not exceed a certain percentage" of their MA plans, providing that "[i]f [a broker's] mix [of U65 enrollment] is higher than our other partners, they do not get paid." Id. ¶¶ 489, 518. As to Defendant Brokers, eHealth explored "turn[ing] carriers off or on by market by product depending on DOB," and actually "disable[d] the enroll button" for particular plans on the eHealth website and "turn[ed] off" telephonic sales in particular states in an effort to minimize U65 enrollment. Id. ¶¶ 506, 508-09. Similarly, GoHealth "kick[ed] . . . out" leads for disabled beneficiaries, id. ¶ 340, and SelectQuote wrote to Aetna that they "[c]an direct certain [U65] traffic to other folks who have the appetite for it" in response to pressure to keep "U65 biz" at around "20%" of enrollments, id. ¶ 503.

In sum, the complaint provides plausible allegations of discriminatory practices by Aetna, Humana and Defendant Brokers that would support the inference that any certification as to their compliance with anti-discrimination regulations was false. D. 41 ¶¶ 305-77, 484-577. The complaint further alleges that Aetna and Humana agreed to comply with anti-discrimination laws in their annual CMS contracts from 2016 through 2021 and affirmed that compliance in submitting claims for payment. D. 41 ¶¶ 783-87.

Aetna, Humana and Defendant Brokers' argument that the government's allegations are conclusory and fail under Rule 9(b), as the complaint identifies no "affected individual, much less any facts about their disability" under either 45 C.F.R. Part 92 or 42 C.F.R. § 422.110, does not alter this outcome. D. 115 at 54. The complaint plausibly alleges that Aetna and Humana conditioned payments on minimizing U65 enrollment, and that Defendant Brokers did so. The

complaint further alleges that such conduct reduced the proportion of U65 beneficiaries enrolled in Aetna and Humana's MA plans. D. 41 at 6; id. ¶ 113 (alleging that "Humana knew that this discriminatory conduct violated the law and its contracts with CMS, but it persisted in the discrimination until brokers had reduced the proportion of Medicare beneficiaries with disabilities that the brokers referred to Humana"); id. ¶ 496 (alleging that Aetna personnel "became responsible for ensuring that the Defendant Brokers and other brokers reduced the proportion of disabled beneficiaries they enrolled in Aetna [MA] plans"). Aetna, Humana and Defendant Brokers pointing to cases addressing Section 504 liability in the context of suits brought by individual plaintiffs, D. 115 at 54; cf. J.S.H. v. Newton, 654 F. Supp. 3d 7, 13-15, 21 (D. Mass. 2023) (providing standard for Section 504 claims in context of suit against hospital for violations of the Americans with Disabilities Act in treatment of minor patient); Williams v. Massachusetts Coll. of Pharmacy & Allied Health Scis., No. 12-cv-10313-DJC, 2013 WL 1308621, at *1, *9 (D. Mass. Mar. 31, 2013) (discussing Section 504 claim where student with learning disability was dismissed from college for low grades), does not warrant a different outcome as to the government's FCA claim regarding U65 discrimination in light of the factual allegations in the complaint.

Accordingly, the Court concludes that falsity has been adequately alleged.

### (c)    Materiality

Aetna, Humana and Defendant Brokers argue (1) that the government has not offered a "single allegation" of a prior government decision that refused payment in the face of similar violations, particularly where CMS has other tools to enforce non-discrimination compliance, D. 115 at 55-56, (2) that the government has not alleged that non-discrimination is essential to the purpose of the MA program, id. at 56-57, and (3) that compliance with non-discrimination is not

31

a condition of payment, id. at 57-58.  The government counters that such compliance is material to CMS, D. 120 at 58-59, that the government lacked actual knowledge of the noncompliance and would not have paid the claims had it known, id. at 59-60, and that the discrimination alleged undermined the core purpose of the MA program, id. at 60-61.

As noted above, "misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act."  See Universal Health Servs., Inc., 579 U.S. at 192.  As in the Court's discussion of the government's AKS claims, the government has alleged that compliance with nondiscrimination regulations was a material condition of payment, D. 41 ¶¶ 94-97, 790, and that the government's lack of actual knowledge of noncompliance cannot now be understood as approval of Defendants' conduct, id. ¶ 825 (alleging that government, "unaware of the falsity of the claims made or caused to be made by Humana, Aetna, CVS Health, and the Defendant Brokers, paid claims that it would not have paid had it known"); id. ¶ 850 (alleging same).

As to whether such compliance went to "the very essence of the bargain," Universal Health Servs., Inc., 579 U.S. at 193 n.5 (internal citation and quotation marks omitted), noncompliance with non-discrimination requirements can be "material to the Government's decision to pay" in the context of the FCA.  United States ex rel. Williams v. City of Brockton, No. 12-cv-12193-IT, 2016 WL 7429176, at *7 (D. Mass. Dec. 23, 2016).  In Williams, the court considered whether a plausible claim under the FCA had been alleged against defendants for their false certifications of compliance with federal civil rights laws.  Id. at *6.  In concluding that defendants' failure to disclose "non-compliance of federal civil rights laws was material," the court reasoned that non-discrimination was a core tenet of the underlying program, such that defendants' violations went

32

"to the very essence of the bargain." Id. at *7 (quotation omitted).[7]  Similar here, intentionally minimizing the enrollment of U65 beneficiaries seeking coverage through the MA program is neither "minor nor insubstantial." Id.; see Escobar, 842 F.3d at 111 (explaining that "regulatory compliance is not merely a condition of payment; rather, [an agency's] decision to have a series of regulations in place . . . strongly counsels in favor of a finding that compliance with these regulations is central to the [underlying] program and thus material to the government's payment decision").  It directly undercuts the purpose of the MA program, which is explicitly to connect eligible beneficiaries, who may be disabled, to health insurance plans.  D. 41 ¶¶ 34-51; see 42 U.S.C. § 1395c et seq.

Taking the factual allegations in the complaint as true and making all reasonable inferences in favor of the government, as the Court must do at this point, the complaint has plausibly alleged FCA liability premised on discrimination (Counts III and V).

### (d)    Damages

Aetna, Humana and Defendant Brokers argue that the government did not sustain damages but, rather, received "exactly what it paid for," as MA beneficiaries were provided with coverage. D. 115 at 60-61.  The government responds by pointing to the allegations of damages made in the complaint, D. 41 ¶¶ 791-96, and disputes that CMS received what it paid for, insofar as MA participants engaged in discrimination against U65 beneficiaries, D. 120 at 65.  Here, the government has alleged damages in connection with the alleged discrimination in the form of, *inter*

---

[7] Contrary to Defendants' assertions, see D. 115 at 50, the existence of other avenues of redress for discrimination claims does not foreclose the use of the FCA as an enforcement mechanism here.  See United States v. Inc. Vill. of Island Park, 888 F. Supp. 419, 442 (E.D.N.Y. 1995) (rejecting that FCA claim was preempted by the Fair Housing Act where "alleged false claims involve racial discrimination in housing and a failure to implement the requirements of the [related] regulations").

*alia*, claims for payment submitted by Aetna and Humana falsely certifying compliance with antidiscrimination regulations. D. 41 ¶¶ 791-96. That is, as alleged, CMS funded Defendants' discriminatory practices. Accordingly, Defendants' argument on this point fails.

> 3. *The Government Plausibly Alleged Defendant Brokers' Liability Under the FCA*

Defendant Brokers separately argue that the government has failed to adequately allege that they caused either the submission of false claims (Counts I-III) or false records (IV-V), or that they conspired with Defendant Insurers to do so (Counts VI and VII). See D. 116 at 8-14.

The parties mainly dispute what standard governs liability for non-submitting entities under the FCA. Defendants argue that "there must be allegations about *how* the non-submitting defendant was the *cause* of the false claim's submission," id. at 9, and that no such allegations can be found as to Defendant Brokers because Defendant Insurers submitted the allegedly false claims to CMS, id. at 10. In so doing, Defendants cite President & Fellows of Harvard College, which provides that presentation of a false claim requires "some degree of participation in the claims process," United States v. President & Fellows of Harvard Coll., 323 F. Supp. 2d 151, 186 (D. Mass. 2004), D. 116 at 8-9, and distinguish United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 389 (1st Cir. 2011) because it "was about *falsity*, not *causation*," D. 129 at 5 (emphasis in original). The government disagrees with Defendants' interpretation of Hutcheson, D. 121 at 9, as well as their reliance on President & Fellows of Harvard College which predates Hutcheson, id. at 11, and instead argues that Defendant Brokers can be liable as the proximate cause of a false claim, id. at 10-11, including through their "knowing[] participat[ion] in a scheme that, if successful, would ultimately result in the submission of a false claim to the government." Commonwealth ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc., 334 F. Supp. 3d 394, 406 (D. Mass. 2018).

The Court agrees with the government's view of the standard.  Beginning with Hutcheson, the First Circuit provided that, "[w]hen the defendant in an FCA action is a non-submitting entity, the question is whether that entity knowingly caused the submission of either a false or fraudulent claim or false records or statements to get such a claim paid."  Hutcheson, 647 F.3d at 389. Although it is correct, as Defendants point out, that "[g]enerally mere knowledge of the submission of claims and knowledge of the falsity of those claims is insufficient to establish 'causation' under the FCA," President & Fellows of Harvard Coll., 323 F. Supp. 2d at 186 (internal citation omitted); see D. 128 at 5-6 (arguing same), it is also correct that a defendant's "ongoing business relationship with a repeated false claimant, [where] the defendant knows of the false claims, yet does not cease doing business with the claimant or disclose the false claims to the United States, [constitutes] ostrich-like behavior [which] itself becomes 'a course of conduct that allow[s] fraudulent claims to be presented to the federal government,'" President & Fellows of Harvard Coll., 323 F. Supp. 2d at 187 (internal citation omitted).  This view of causation accords with Martino-Fleming, 334 F. Supp. 3d at 406, which followed Hutcheson, id. (citing Hutcheson, 647 F.3d at 389-90) and concluded that "[i]f a person knowingly participated in a scheme, if successful, would ultimately result in the submission of a false claim to the government, he has caused those claims to be submitted."  Id.

Here, the government has adequately alleged that Defendant Brokers were aware that their agreements with Defendant Insurers were, in essence, fee-per-enrollment agreements, violating government regulations and that claims for payment resulted from this arrangement, such that FCA liability attaches to Defendant Brokers' conduct.  See, e.g., D. 41 ¶ 302 (providing eHealth correspondence about Humana ostensibly paying "$15M/year" in 'marketing payments' for eHealth's provision of a Humana-focused "minisite" that only drove "15 enrollments a year[,]

CMS will surely never figure that one out" and, continuing, that Humana was not "paying for enrollments" but "for the technology . . . [w]ink wink"); id. ¶ 442 (providing SelectQuote email, "the key to making this work while staying within CMS guidelines is to have Aetna reimburse us for a portion of our lead cost associated with the cost of the policies sold, i.e.[,] rather than invoicing marketing dollars for 100 policies @ $250 per, we would send an invoice for 1000 leads @ $25 per[,] [m]ath would play out the same"); id. ¶ 597 (providing GoHealth correspondence, "we typically try to avoid putting [Targeted Cost per Acquisition data] in writing that blatantly, given CMS precautions").

The government has also adequately alleged that Defendant Brokers were aware that Defendant Insurers wanted them to exclude disabled beneficiaries, violating federal anti-discrimination statutes, that Defendant Brokers did so, and that Aetna's and Humana's claims for payment resulted from this arrangement, such that FCA liability attaches to Defendant Brokers' conduct. See, e.g., id. ¶ 548 (providing eHealth correspondence that "Aetna wants us to turn off TV [advertising] in NJ . . . [t]hey are freakout [sic] about <65 business,"); id. ¶ 343 (providing GoHealth correspondence that "we'll need to be able to address effectively" questions about carriers "not wanting a significant portion of u64 Medicare eligible customers on their books"); id. ¶ 354 (providing SelectQuote correspondence "regarding our U65 mix . . . we can improve our mix through a change in marketing efforts . . . should skew to an older demographic and we can look to drive leads with a higher age range to Humana competitive states").

Even accepting Defendant Brokers' proposed standard, D. 116 at 11, the government has adequately alleged that Defendant Brokers' conduct strayed into active participation. As to the AKS claims, the government alleges that Defendant Brokers altered their sales tactics and corporate strategies to advantage Defendant Insurers' plans, maximize enrollments, and thereby

increase the amount of claims submitted to the government for payment. See, e.g., D. 41 ¶¶ 109, 208, 262, 289, 432 (describing insurer-specific "pods" of salesmen within Defendant Brokers and "shut[ing] off" other MA insurers to favor Defendant Insurers). As to the discrimination claims, the government alleges that Defendant Brokers took active steps to minimize the enrollment of U65 beneficiaries to Defendant Insurers' plans in order to continue receiving the alleged kickback payments. See, e.g., id. ¶¶ 332, 340, 354, 503, 506, 508-09. Further, as alleged, Defendant Brokers provided beneficiary data to Defendant Insurers and, it can plausibly be inferred, were aware, by virtue of their participation in the MA program, that Defendant Insurers made claims for payment to the government on the basis of that data, D. 41 ¶ 782, moving their conduct beyond "mere knowledge" of falsehood and into action, D. 116 at 10; cf. President & Fellows of Harvard Coll., 323 F. Supp. 2d at 188 (holding that one defendant was not liable for FCA claim because he "did not take any actions to have claims submitted to the government"). Because "[i]t was foreseeable" that the enrollment data Defendant Brokers submitted would be used in claims "submitted to the government" by Defendant Insurers, id. at 187-88 (denying summary judgment as to other co-defendant on FCA claim where he had approved expenses and was aware that project was funded by federal government), and because Defendant Brokers alleged knew that such claims were not in compliance with CMS requirements, there is a plausible AKS claim against them.

Accordingly, Defendant Brokers do not provide a separate basis for dismissal on this ground.

### 4.     *Aetna Inc. and CVS Health were Properly Named as Defendants*

Writing separately, Aetna Inc. and CVS Health argue that the government engaged in improper group pleading by lumping them into the collective "Aetna," D. 117 at 7-8, and that the

government failed to state a claim against either specific party outside of paragraph 777 of the complaint, id. at 8-11.

"In the context of a fraud suit involving multiple defendants," the heightened pleading standard under Rule 9(b) requires that a plaintiff "at a minimum identify the role of each defendant in the alleged fraudulent scheme." United States ex rel. Chao v. Medtronic PLC, No. 17-cv-01903-MCS-SS, 2021 WL 4816647, at *13 (C.D. Cal. Apr. 12, 2021) (quoting United States v. Corinthian Colleges, 655 F.3d 984, 997-98 (9th Cir. 2011)); see United States v. Exec. Health Res., Inc., 196 F. Supp. 3d 477, 517 n.38 (E.D. Pa. 2016) (providing that "allegations against [parent] and its subsidiaries must be particularized in order to state a claim against each defendant"). The parties do not dispute that "[i]t is a general principle of corporate law . . . that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." United States v. Bestfoods, 524 U.S. 51, 61 (1998). As between a parent and a subsidiary, however, "[a] parent may be liable for the submission of false claims by a subsidiary where the parent had direct involvement in the claims process." United States ex rel. Martino-Fleming v. South Bay Mental Health Ctrs., 540 F. Supp. 3d 103, 117 (D. Mass. 2021) (alteration in original) (internal citation and quotation marks omitted).

Under this standard, the Court concludes that the complaint did not engage in improper group pleading as to Aetna Inc. and CVS Health. First, the complaint distinguishes between the various entities that comprise its definition of "Aetna," cf. United States v. Lakeway Reg'l Med. Ctr., LLC, No. 19-cv-00945-JRN, 2020 WL 6146571, at *2 (W.D. Tex. Feb. 13, 2020) (determining complaint contained improper group pleading where counts "d[id] not distinguish between the Defendants even once"), defining "Aetna" as "Aetna Inc., Aetna Life Insurance Company, and their affiliates or subsidiaries," D. 41 ¶ 7, and providing a breakdown of the

38

corporate structure, i.e. that Aetna Inc. "is a subsidiary of CVS Pharmacy, Inc., which is in turn a subsidiary of [CVS Health]," id. ¶ 6; cf. United States ex rel. Ahumada v. NISH, 756 F.3d 268, 281 n.9 (4th Cir. 2014).  The complaint then proceeds to levy a variety of allegations against these defendants as so defined, see generally D. 41, thereby putting Defendants on notice of the factual basis for the claims asserted against them.  See Gray v. BMW of N. Am., LLC, No. 13-cv-3417-WJM-MF, 2014 WL 4723161, at *2 (D.N.J. Sept. 23, 2014).

Second, the complaint alleges that Aetna Inc. and CVS Health had "direct involvement" in the claims process.  Martino-Fleming, 540 F. Supp. 3d at 117 (internal citation and quotation marks omitted).  Indeed, the government specifically alleges that the Chief Financial Officer for Medicare Programs at Aetna, id. ¶ 773, submitted enrollment and data certifications on behalf of Aetna Inc. from 2016 through 2019 and on behalf of CVS Health in 2020 and 2021, id. ¶ 777; see United States ex rel. Bassan v. Omnicare, Inc., No. 15-cv-4179-CM, 2025 WL 1591609, at *12 (S.D.N.Y. June 5, 2025) (determining that parent "'caused' the filing of false and fraudulent claims by certifying (falsely) that [subsidiary]'s dispensing systems complied with the law").  Aetna Inc. and CVS Health dispute that they had any knowledge of the falsity of these certifications, D. 117 at 10-11, but "knowledge . . . may be alleged generally" under Rule 9(b).  Fed. R. Civ. P. 9(b); D. 41 ¶ 383 (alleging knowledge as to Aetna).  Aetna Inc. and CVS Health further argue that, because these allegedly false certifications were not signed by an either entity, they are not liable for such representations.  D. 117 at 9; D. 130 at 6.  At this stage, however, these allegations have been plausibly pled against Aetna Inc. and CVS Health.  The existence of "an intermediary entity," here, Aetna Life Insurance Company, does not "insulate[]" Aetna Inc. and CVS Health from liability.  Bassan, 2025 WL 1591609, at *12.

Accordingly, Defendants Aetna Inc. and CVS Health do not provide a separate basis for dismissal on this ground.[8]

### 5.    *The Government Plausibly Alleged an FCA Violation Under 31 U.S.C. § 3729(a)(1)(C) (Conspiracy) (Counts VI, VII)*

The government alleges that Defendants conspired to submit false claims under both theories of liability, that is, for AKS violations and for discrimination against disabled beneficiaries. D. 41 ¶¶ 854, 859. Defendants argue that the conspiracy claims are conclusory and devoid of factual support. D. 115 at 61-64.

"Conspiracy liability under the FCA requires [] that '(1) the defendant conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States; and (2) one or more conspirators performed any act to effect the object of the conspiracy.'" Teva, 560 F. Supp. 3d at 423 (quoting Westmoreland, 738 F. Supp. 2d at 280). Under this standard, a conspiracy to violate the FCA "requires an agreement between the relevant parties to commit fraud within the meaning of the FCA," whether explicit or implicit. Id.

Defendants argue that the government has failed to allege any agreement among Defendants to conspire, so much as it has alleged the existence of distinct marketing agreements among distinct Defendant pairings. D. 115 at 62-63. Defendants further argue that the existence of marketing agreements does not prove the existence of any agreement or agreements to defraud the government. Id. at 63. The Court disagrees; the marketing agreements, as alleged and taken together, constitute a pretextual workaround to the compensation cap imposed by CMS, as well as a mechanism to reduce U65 enrollment by Aetna and Humana. As claims for payment resulting

---

[8] Aetna Inc. and CVS Health raise a further argument that claims against the former should be limited to 2016 through 2019, and that claims against the latter should be limited from 2020 through 2021. D. 117 at 11. The Court declines to limit the government's plausible allegations against either entity at this stage.

from these agreements would be submitted for payment to the government, it is reasonable to infer that the agreements were made with the understanding that the government would be defrauded, and that steps were taken to accomplish same.

Here, the government has adequately alleged (1) the existence of marketing payments and agreements between Defendants, the alleged co-conspirators, D. 41 at 6; (2) that the payments exchanged among Defendants under these agreements were not permitted under CMS and qualified as kickbacks under the AKS, see, e.g., id. ¶ 385 (providing eHealth correspondence, "Aetna's 'marketing' payment model was 'not even a little compliant . . . if Aetna got audited by cms, they'd be fu[\*\*]ed"), and were conditioned on discriminatory behavior, see, e.g., id. ¶ 790 (alleging that Aetna and Humana "conspir[ed] with the Defendant Brokers" to "submit[] beneficiary data and attestations while limiting and otherwise discouraging enrollment of beneficiaries with disabilities"); and (3) that these marketing arrangements led to claims being submitted to the government for payment, falsely representing compliance with CMS regulations, id. ¶¶ 791-98. In sum, "the facts alleged allow one reasonably to infer that the [defendants] agreed, at least implicitly, to assist in the scheme." Teva, 560 F. Supp. 3d at 423. Accordingly, dismissal of the conspiracy claims, Counts VI and VII, is not warranted.

### 6.    The Government's Unjust Enrichment (Count VIII) Claim

The government argues that its unjust enrichment claim should be allowed as an alternative to its FCA claims. D. 120 at 70-72. This Court, however, agrees that "courts in this district have routinely dismissed unjust-enrichment claims under similar facts," Regeneron, 2023 WL 6296393, at \*14. It is the "availability of a remedy at law [i.e., the FCA claims], not the viability of that remedy, that prohibits a claim for unjust enrichment." Id. (quoting Shaulis v. Nordstorm, Inc., 865 F.3d 1, 16 (1st Cir. 2017)); see Teva, 560 F. Supp. 3d at 423. Because "an adequate remedy at law

exists in the government's FCA claims, id. at 423-24, the Court dismisses the unjust enrichment claim, Count VIII.

### B.      Motion for Discovery

In light of the Court's ruling on the motion to dismiss and the fact that the Court will soon set a discovery schedule in connection with the initial scheduling conference, the Court denies eHealth's motion for early discovery, D. 126, without prejudice.[9]

## VI.      Conclusion

For the foregoing reasons, the Court DENIES Defendants' motion, D. 114, as to Counts I-VII, and ALLOWS same, id., as to Count VIII.  Further, the Court DENIES eHealth's motion for discovery, D. 126.

**So Ordered.**

/s Denise J. Casper
Chief United States District Judge

---

[9] Given this ruling, the Court DENIES the government's motion for leave to file a surreply regarding the discovery motion, D. 140, as moot.